**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| TOWN OF DAVIE POLICE PENSION PLAN, individually and on behalf of all others similarly situated,<br><br>                Plaintiff,<br>    v.<br><br>PIER 1 IMPORTS, INC., ALEXANDER W. SMITH, and CHARLES H. TURNER,<br><br>              Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Town of Davie Police Pension Plan ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: (a) regulatory filings made by Pier 1 Imports, Inc. ("Pier 1" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases and media reports issued by and disseminated by the Company; (c) analyst reports concerning Pier 1; and (d) other public information regarding the Company.

## INTRODUCTION

1.       This class action is brought on behalf of purchasers of Pier 1's publicly traded common stock between December 19, 2013 and September 24, 2015, inclusive (the "Class Period"). The claims asserted herein are alleged against Pier 1, Pier 1's President and Chief Executive Officer, Alexander W. Smith, and Pier 1's former Chief Financial Officer, Charles H. Turner (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities

Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

2.      Pier 1 is a retailer of decorative home furnishings and gifts imported from countries around the world.  Pier 1 maintains over 1,000 stores in the United States and Canada and operates as one segment consisting of the retail sales of decorative home furnishing, furniture, gifts, and related items.

3.      In mid-2012, Pier 1 began implementing its "1 Pier 1" initiative, through which the Company would launch an e-commerce business to complement its traditional brick-and-mortar stores.  From the start of the Class Period, the Company touted the success of "1 Pier 1" and issued earnings guidance that reflected approximately 10-20% growth year over year, which it attributed, in large part, to its burgeoning e-commerce business.  As months passed and costs associated with the implementation of "1 Pier 1" began to mount, the Company continued to tout the success of its e-commerce initiative and assured investors that the Company was well-positioned to handle the higher levels of inventory needed to support the growth strategy, and that increased inventories would not result in discounting of merchandise or lower margins.  As a result of these misrepresentations, Pier 1 stock traded at artificially inflated prices during the Class Period.

4.      The truth began to be revealed on February 10, 2015, when the Company sharply reduced its financial guidance for the fiscal year ending February 28, 2015.  The Company attributed the sudden change in its outlook to softer than expected sales in January and February 2015 and "unplanned" expenses, primarily related to incremental supply chain costs associated with the "1 Pier 1" initiative.  Pier 1 also announced that the Company's Chief Financial Officer Charles H. Turner had suddenly "retired."  As a result of these disclosures, shares of Pier 1 plummeted from $16.97 per share to $12.84, or approximately 25%.

5.      Then, on September 24, 2015, the Company significantly reduced its earnings guidance for fiscal 2016, which Pier 1 attributed to margin pressures from increased promotional and clearance activity, as well as inventory related issues within its distribution center network. These disclosures caused the price of Pier 1 shares to fall from $8.67 per share to $7.61, or approximately 12%.

6.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.P.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

8.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Pier 1 maintains its executive offices in this District and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District.  In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

9.      Plaintiff Town of Davie Police Pension Plan is a pension fund based in Davie, Florida that provides retirement benefits for retired police officers of the Town of Davie.  As of June 2015, Plaintiff managed assets in excess of $127 million on behalf of hundreds of active

members, retirees, and beneficiaries.  Plaintiff purchased shares of Pier 1 stock on the New York Stock Exchange ("NYSE") during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

10.     Defendant Pier 1 is a Delaware corporation with its principal executive offices located at 100 Pier 1 Place, Fort Worth, Texas.  The Company's common stock trades on the NYSE, which is an efficient market, under ticker symbol "PIR."  Pier 1 currently has over 86 million shares of stock outstanding.

11.     Defendant Alexander W. Smith ("Smith") was, at all relevant times during the Class Period, Pier 1's President and Chief Executive Officer.

12.     Defendant Charles H. Turner ("Turner") was, at all relevant times during the Class Period, Pier 1's Chief Financial Officer until he suddenly "retired" on February 10, 2015.

13.     Defendants Smith and Turner are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with Pier 1, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## SUBSTANTIVE ALLEGATIONS

## BACKGROUND

14.     Based in Fort Worth, Texas, Pier 1 is a retailer of decorative home furnishings and gifts imported from countries around the world.  Pier 1 maintains over 1,000 stores in the United States and Canada and operates as one segment consisting of the retail sales of decorative home furnishing, furniture, gifts, and related items.  Although Pier 1 has traditionally been a "brick and mortar" retailer, during fiscal year 2013, the Company began to aggressively grow and develop online sales of its products.  Specifically, on August 23, 2012, the Company announced the official launch of its new e-commerce website, Pier1.com.  The Company launched Pier1.com as part of its "1 Pier 1" omni-channel initiative that sought to turn Pier 1 from an in-store retailer to a combined in-store and online retailer.

15.     Through its new e-commerce website, the Company would allow customers to purchase products online and have them shipped directly to the Pier 1 store of their choice without incurring shipping charges.  The new e-commerce website would also allow for easier navigation to locate the Company's products while maintaining Pier 1's renowned "treasure hunt" feel.  With regards to the new e-commerce website, Chief Executive Officer Alex Smith expressed "extreme[] delight[] with the successful launch of our new e-Commerce enabled website, Pier1.com, which allows customers to shop our unique array of merchandise while selecting the shipping destination of their choice."

16.     Following these announcements, Defendants repeatedly assured investors that the Company would work diligently towards completing the implementation of its new e-commerce business.  In addition, Defendants touted that they would fully integrate the e-commerce site, further strengthening the foundation on which to build the Company's multi-channel capabilities and promised a "fully integrated and seamless organization."

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING
## STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

17.     On December 19, 2013, the first day of the Class Period, the Company issued a press release announcing its financial results for its fiscal third quarter ended November 30, 2013.[1] Despite disappointing results that were announced just three months earlier, in the press release, which was also filed with the SEC on Form 8-K, the Company reported that it had delivered "solid third quarter financial results," which the Company attributed, in part, to its "promotional marketing stance" that "drove strong traffic" and touted the progress made with the "1 Pier 1" omni-channel initiative.

18.     That same day, Pier 1 held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, Defendant Smith touted the Company's financial results and specifically noted the "strong levels of operating performance," "robust sales growth," and "broad-based strength across virtually all of our product categories."

19.     During the conference call, Defendant Smith also stated that the "1 Pier 1" omni-channel initiative "continues to gain momentum" and that "[w]e couldn't be more thrilled about the opportunity that a strong and growing e-commerce presence affords us."  Smith further stated that "[o]ur customer base is expanding both in size and quality" and "[o]ur plans for fiscal 2015 are well underway and we expect a strong year as we have huge confidence in our ability to execute our "1 Pier 1" omni-channel strategy and continue to build market share."

20.     Also during the conference call, Defendant Turner stated that "[Pier 1] continue[s] to be pleased with the level of improvement we're seeing throughout the portfolio, in both comp store sales growth and overall productivity."  Smith further stated the Company's financial guidance for the fourth quarter, "[t]otal sales growth in the high- single-digit range, comp store

---

[1] Pier 1's fiscal year begins March 1 and concludes February 28.

sales growth in the mid- single-digit range and earnings per share in the range of $0.60 to $0.66, representing year-over- year growth of 9% to 20%."

21.     On January 8, 2014, Pier 1 filed with the SEC its Form 10-Q for the third quarter of fiscal 2014, confirming the financial results announced by the Company in its December 19 press release.   The Form 10-Q was signed by Defendants Smith and Turner and contained certifications by Defendants Smith and Turner that attested to the purported accuracy and completeness of the 10-Q.   In the quarterly report, Pier 1 reiterated its continued success in executing its "1 Pier 1" initiative.   Specifically, the Company stated that it was "making advancements in expanding its omni-channel strategy and executing its '1 Pier 1' vision."   The Company also stated that it "expected seamless integration of the Company's increasingly interconnected businesses" and that "sales will continue to improve as a result of its unique and special merchandise assortments, superior in-store experience and enhanced e-Commerce experience."

22.     Analysts were enthused by Defendants' statements.   For example, on January 14, 2014, analysts with Wedbush, after meeting with Company executives, including Defendant Turner, reiterated their outperform rating on Company stock, specifically citing the "1 Pier 1" program.   Specifically, the Wedbush analysts stated that they "remain optimistic that Pier 1 should continue to execute its 1 Pier 1 strategy. . . . inventories are in good shape entering 2014, new spring merchandise looks good, compares are easy, and we continue [to] like the long- term 1-Pier-1 strategy."

23.     The statements and omissions set forth in ¶¶17-21 were materially false and misleading because Defendants knew or should have known that: (i) the Company's infrastructure and distribution network could not support the sharp increase in inventory associated with the "1

Pier 1" initiative; (ii) the Company's inventory levels – which were based on the Company's earnings projections – were escalating, which caused a sharp increase in the logistical costs associated with carrying excess inventory; and as a result (iii) Defendants resorted to discounting and sales promotions to sell excess inventory, which caused margins to contract.

24.     Defendants continued to tout their strong sales growth, driven, in part, by their "1 Pier 1" initiative.  Specifically, on April 10, 2014, the Company issued a press release announcing its financial results for its fiscal fourth quarter ended March 1, 2014.  In the press release, which was also filed with the SEC on Form 8-K, the Company stated that "[a]s a testament to the early success of '1 Pier 1', e-Commerce delivered 4% of total sales in its sophomore year – well on its way to achieving our targeted sales contribution of 10% by the end of fiscal 2016."  The Company also issued earnings guidance for fiscal 2015 in the range of $1.16 to $1.24 per share, representing year-over-year growth of 15% to 23%.

25.     On April 10, 2014, Pier 1 held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, Defendant Smith claimed that he was "highly confident that Pier 1 Imports is positioned for substantial growth in the coming years."  Smith also touted that Pier 1 was "at the beginning of a new chapter as we tap into the enormous potential that our omni-channel strategy gives us" and that "[s]ales growth in fiscal 2015 will be substantial."  Finally, Smith stated that Pier 1 was "in the best shape we've ever been and look forward to a year of strong growth in fiscal 2015."

26.     During the conference call, the Company also assured investors that its distribution chain was operating efficiently and that inventory growth was manageable.  Specifically, Defendant Smith stated that "because we run our business with a single inventory and our planning and allocation capabilities are so sophisticated, we expect our inventory growth to be well-

controlled as it was in fiscal 2014" and that the Company's "merchandise and field teams are well prepared for this level of expansion."

27.     On April 29, 2014, the Company filed its annual report on Form 10-K for the fiscal year ended March 1, 2014, confirming the financial results announced by the Company in its April 10 press release.  The Form 10-K was signed by Defendants Smith and Turner and contained certifications by Defendants Smith and Turner that attested to the purported accuracy and completeness of the 10-K.

28.     In the annual report, Company stated that although it "encountered some challenges during the year and concluded with a tough fourth quarter, pressured by significant weather disruption, it made excellent progress in the execution of its '1 Pier 1' strategy."  The annual report also stated that the Company's "sales will continue to improve as a result of its unique and special merchandise assortments, superior in-store service and enhanced e-Commerce experience."

29.     The statements and omissions set forth in ¶¶24-28 were materially false and misleading because Defendants knew or should have known that: (i) the Company's infrastructure and distribution network could not support the sharp increase in inventory associated with the "1 Pier 1" initiative; (ii) the Company's earnings guidance for fiscal 2015 and 2016 was misstated and lacked a reasonable basis when made; (iii) the Company's inventory levels – which were based on the Company's earnings projections – were escalating, which caused a sharp increase in the logistical costs associated with carrying excess inventory; and as a result (iv) Defendants resorted to discounting and sales promotions to sell excess inventory, which caused margins to contract.

30.     On June 19, 2014, the Company issued a press release announcing its financial results for its fiscal first quarter ended May 31, 2014.  In the press release, which was also filed with the SEC on Form 8-K, the Company adjusted downward its fiscal year 2014 earnings

guidance from $1.16 to $1.24 per share to $1.14 to $1.22 per share.  In the press release, Defendant

Smith also noted that Pier 1's growth in its web sales supported the Company's strategy to use its

to support its e-commerce site.  Specifically, Smith stated that the Company's "stores continue to

serve as an important and productive gateway to Pier1.com, with approximately one-quarter of our

online transactions originating at the store and one-third of orders placed at home being picked up

in-store."

31.     That same day, Pier 1 held a conference call with analysts and investors to discuss

the Company's earnings and operations.  During the conference call, Defendants continued touting

the "1 Pier 1" initiative and the omni-channel capabilities.  In particular, Defendant Smith stated

that he was "delighted with the dramatic increase in e-commerce and how the advantages of the

"1 Pier 1" strategy have been embraced by our customers."  Smith also touted the success of the

"1 Pier 1" initiative and stated that "[b]ased on the momentum we are experiencing, we are revising

our e-commerce growth expectations for fiscal 2015 and 2016."  Smith further stated that the

Company's "1 Pier 1 strategy [has] been embraced by our customers both new and returning" and

"[w]hen we planned fiscal 2015, we did not expect our customers to engage our brand through

Pier1.com with quite this much enthusiasm."  During the conference call, Defendant Turner stated

that inventory growth was "in line with our expectations" and that "[h]aving one inventory is

allowing us to be more efficient."

32.     On July 9, 2014, Pier 1 filed with the SEC its Form 10-Q for the first quarter of

fiscal 2015, confirming the financial results announced by the Company in its June 19 press

release.  The Form 10-Q was signed by Defendants Smith and Turner and contained certifications

by Defendants Smith and Turner that attested to the purported accuracy and completeness of the

10-Q.  In the quarterly report, Pier 1 reiterated its continued success in executing its "1 Pier 1"

initiative.  Specifically, the Company stated that in "response to the early success of its '1 Pier 1' omni-channel strategy, the Company now expects to achieve e-Commerce sales of at least $200 million in fiscal 2015, and e-Commerce sales of at least $400 million in fiscal 2016."

33.     The statements and omissions set forth in ¶¶30-32 were materially false and misleading because Defendants knew or should have known that: (i) the Company's infrastructure and distribution network could not support the sharp increase in inventory associated with the "1 Pier 1" initiative; (ii) the Company's earnings guidance for fiscal 2015 and 2016 was misstated and lacked a reasonable basis when made; (iii) the Company's inventory levels – which were based on the Company's earnings projections – were escalating, which caused a sharp increase in the logistical costs associated with carrying excess inventory; and as a result (iv) Defendants resorted to discounting and sales promotions to sell excess inventory, which caused margins to contract.

34.     On September 17, 2014, the Company issued a press release announcing its financial results for its fiscal second quarter ended August 30, 2014.  In the press release, which was also filed with the SEC on Form 8-K, the Company stated that the Company "accomplished a great deal during the first half of the year, moving to fast-track our omni-channel strategy as e-Commerce continues to deliver exceptional growth."  Pier 1 also stated that the pace of growth of e-commerce sales remains high and that "customers love [the Company's] expanded assortments and the ability to shop however they choose."

35.     Pier 1 also announced that the acceleration of investments in the "1 Pier 1" omni-channel strategy would allow this momentum to continue.  Although the Company revised its earnings guidance for fiscal 2015 to $0.95 to $1.05 per share, down from previous guidance of $1.14 to $1.22 per share, Pier 1 attributed the downward guidance revision to the "acceleration of investments in our '1 Pier 1' omni-channel strategy."

36.     That same day, Pier 1 held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, the Company continued to tout the success of its e-commerce business.  Specifically, Defendant Smith stated that although the Company "anticipated that the transformation from our highly profitable retail store format to an equally compelling omni-channel business, which we call 1 Pier 1, would be gradual . . . things are playing out better and differently than we expected with e-commerce accelerating rapidly." Defendant Turner touted that the "initiatives we put into place earlier in the year will help drive sales, particularly during our peak holiday season."  Finally, Defendant Smith assured investors that the Company's earnings guidance was based on "very prudent and cautious assumptions."

37.     On October 8, 2014, Pier 1 filed with the SEC its Form 10-Q for the second quarter of fiscal 2015, confirming the financial results announced by the Company in its September 17 press release.  The Form 10-Q was signed by Defendants Smith and Turner and contained certifications by Defendants Smith and Turner that attested to the purported accuracy and completeness of the 10-Q.  In the quarterly report, Pier 1 reiterated that "[i]n response to the early success of its '1 Pier 1' omni-channel strategy, the Company expects to achieve e-Commerce sales of at least $200 million in fiscal 2015, and e-Commerce sales of at least $400 million in fiscal 2016."

38.     The statements and omissions set forth in ¶¶34-37 were materially false and misleading because Defendants knew or should have known that: (i) the Company's infrastructure and distribution network could not support the sharp increase in inventory associated with the "1 Pier 1" initiative; (ii) the Company's earnings guidance for fiscal 2015 and 2016 was misstated and lacked a reasonable basis when made; (iii) the Company's inventory levels – which were based on the Company's earnings projections – were escalating, which caused a sharp increase in the

logistical costs associated with carrying excess inventory; and as a result (iv) Defendants resorted to discounting and sales promotions to sell excess inventory, which caused margins to contract.

39.     On December 18, 2014, the Company issued a press release announcing its financial results for its fiscal third quarter ended November 29, 2014.  In the press release, which was also filed with the SEC on Form 8-K, the Company stated that it is "confident that the value proposition created by our exclusive and unique product remains strong" and that its "ambitious omni-channel transformation continues to progress well."   The Company also reiterated fiscal 2015 earnings guidance of $0.95 to $1.05 per share.

40.     The Company also announced that inventories had ballooned to $535.5 million, an increase of 25% compared to $429.1 million in the year ago period.  Defendants attributed the increased inventory to expected growth at the distribution and fulfillment centers to support the "1 Pier 1" initiative.  Defendants also assured investors that the inventory growth did not present "any significant mark down risk."

41.     That same day, Pier 1 held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, Defendant Smith continued to tout the "[t]he transformation of Pier 1 Imports from one of the most profitable bricks-and-mortar home specialty stores into what we fully expect to be one of the most sophisticated and profitable omni-channel retailers continues."

42.     On this news, the price of the Company's stock rose, from $13.90 on December 18, 2014 to $15.18 on December 19, 2014.

43.     The statements and omissions set forth in ¶¶39-41 were materially false and misleading because Defendants knew or should have known that: (i) the Company's infrastructure and distribution network could not support the sharp increase in inventory associated with the "1

Pier 1" initiative; (ii) the Company's earnings guidance for fiscal 2015 and 2016 was misstated and lacked a reasonable basis when made; (iii) the Company's inventory levels – which were based on the Company's earnings projections – were escalating, which caused a sharp increase in the logistical costs associated with carrying excess inventory; and as a result (iv) Defendants resorted to discounting and sales promotions to sell excess inventory, which caused margins to contract.

44.     Analysts reacted favorably to Defendants' assurances.  For example, On December 19, 2014, analysts from Deutsche Bank stated that the Company "keeps plugging along on its 1-Pier-1 strategy[.]  We applaud the company for managing through some near-term choppiness and moving forward on the crucial exercise of becoming a truly omni-channel company."  Also, on December 19, 2014, analysts from BB&T stated that "Pier 1 continues to make strides on '1 Pier 1' omni-channel strategy."

45.     On January 7, 2015, Pier 1 filed with the SEC its Form 10-Q for the third quarter of fiscal 2015, confirming the financial results announced by the Company in its December 18 press release.  The Form 10-Q was signed by Defendants Smith and Turner and contained certifications by Defendants Smith and Turner that attested to the purported accuracy and completeness of the 10-Q.  In the quarterly report, Pier 1 reiterated that "[i]n response to the early success of its '1 Pier 1' strategy, the Company expects to achieve e-Commerce sales of at least $200 million in fiscal 2015, and e-Commerce sales of at least $400 million in fiscal 2016."

46.     The statements and omissions set forth in ¶45 were materially false and misleading because Defendants knew or should have known that: (i) the Company's infrastructure and distribution network could not support the sharp increase in inventory associated with the "1 Pier 1" initiative; (ii) the Company's earnings guidance for fiscal 2015 and 2016 was misstated and lacked a reasonable basis when made; (iii) the Company's inventory levels – which were based on

the Company's earnings projections – were escalating, which caused a sharp increase in the logistical costs associated with carrying excess inventory; and as a result (iv) Defendants resorted to discounting and sales promotions to sell excess inventory, which caused margins to contract.

## THE TRUTH ABOUT PIER 1'S GUIDANCE AND INVENTORY PROBLEMS IS REVEALED

47.     On February 10, 2015, Pier 1 stunned investors when it announced that it was lowering its earnings guidance for fiscal 2015, which the Company had just reiterated on December 18.  Defendants now expected Pier 1 to earn between $0.80 to $0.83 per share for fiscal 2015, more than 20% less than the Company had told investors to expect just months earlier.  The Company also revealed that it expected its inventory to remain elevated through the fiscal year. Separately, the Company announced that Defendant Turner was suddenly retiring (at the age of 58) effective immediately, which caused analysts and investors to immediately question Defendants' credibility.  Indeed, after noting the "material shortfall" in fourth quarter earnings, analysts from Barclays questioned whether "there were gross miscalculations on the part of prior management when previous guidance was given at the end of the third quarter and implicitly reaffirmed after December."

48.     As a result of these disclosures, Pier 1 stock dropped from $16.97 per share to $12.84, or approximately 25%, wiping out over $365 million in market value.

49.     Analysts noted their shock and disappointment in the true state of Pier 1's e-commerce strategy, which had been so consistently touted throughout the Class Period.  For example, on February 11, 2015, analysts from Credit Suisse questioned whether "the company has moved almost too quickly, and has not been equipped to deal with the transformation" in its e-commerce business.  The Credit Suisse analysts also expressed concern that the Company built "infrastructure that may not be scalable over time."  Similarly, analysts from BB&T stated that

"the company's plunge into omnichannel retailing has made its business much more difficult to manage and accurately forecast."

50.     Despite reporting disappointing financial results, the Company downplayed its poor quarterly performance, and assured investors that the implementation of the "1 Pier 1" strategy remained strong.  Specifically, on April 8, 2015, the Company issued a press release announcing its financial results for its fiscal fourth quarter ended February 28, 2015.  In the press release, which was also filed with the SEC on Form 8-K, the Company stated that its "omni-channel transformation is largely complete and from a brand strength and customer facing perspective we could not be more pleased with the results."  Although "fiscal 2015 clearly did not turn out as we had originally budgeted" Pier 1 assured investors that it would utilize "the strength of the Pier 1 Imports brand and our investments in it to improve our profitability."  Finally, the Company announced earnings guidance of $0.83 to $0.87 per share for fiscal 2016 and assured investors that inventory levels would "begin to moderate as we move through the second half of fiscal 2016."

51.     That same day, Pier 1 held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, Defendant Smith stated that the Company's "1 Pier 1" strategy was intact, creating "an operating and growth platform with seamless integration across stores, desktop, and mobile."  Defendants also assured investors that higher inventory levels would abate and would not result in discounting and margin pressures.  For instance, Defendant Smith stated that "[a]lthough fiscal 2015 ending inventories are higher than originally planned, their complexion is healthy and not believed to pose a substantial markdown risk."

52.     On April 28, 2015, the Company filed its annual report on Form 10-K for the fiscal year ended February 28, 2015, confirming the financial results announced by the Company in its

April 8 press release.  The Form 10-K was signed by Defendants Smith and Turner and contained certifications by Defendants Smith and Turner that attested to the purported accuracy and completeness of the 10-K.  In its annual report, the Company assured investors that "sales will continue to improve as a result of its unique and special merchandise assortments, superior omni-channel experience and improvements to its marketing strategy."

53.     The statements and omissions set forth in ¶¶50-52 were materially false and misleading because Defendants knew or should have known that: (i) the Company's infrastructure and distribution network could not support the sharp increase in inventory associated with the "1 Pier 1" initiative; (ii) the Company's earnings guidance for fiscal 2015 and 2016 was misstated and lacked a reasonable basis when made; (iii) the Company's inventory levels – which were based on the Company's earnings projections – were escalating, which caused a sharp increase in the logistical costs associated with carrying excess inventory; and as a result (iv) Defendants resorted to discounting and sales promotions to sell excess inventory, which caused margins to contract.

54.     On June 17, 2015, the Company issued a press release announcing its financial results for its fiscal first quarter ended May 30, 2015.  In the press release, which was also filed with the SEC on Form 8-K, the Company stated that "E-Commerce continues to perform exceptionally well, generating strong improvement across all performance metrics."  Pier 1 also stated that it was "resolutely focused on continuing to execute on the top line and demonstrating greater expense control" and "[w]ith our omni-channel transformation now complete, we are confident that we can begin to rebuild our profitability levels through measured sales and margin growth."  The Company also reiterated earnings guidance of $0.83 to $0.87 per share for fiscal 2016.

55.     The statements and omissions set forth in ¶54 were materially false and misleading

because Defendants knew or should have known that: (i) the Company's infrastructure and distribution network could not support the sharp increase in inventory associated with the "1 Pier 1" initiative; (ii) the Company's earnings guidance for fiscal 2015 and 2016 was misstated and lacked a reasonable basis when made; (iii) the Company's inventory levels – which were based on the Company's earnings projections – were escalating, which caused a sharp increase in the logistical costs associated with carrying excess inventory; and as a result (iv) Defendants resorted to discounting and sales promotions to sell excess inventory, which caused margins to contract.

56.     Then, on September 24, 2015, the Company cut its guidance for fiscal 2016 and announced results for the fiscal second quarter ended August 30, 2015 that were lower than investors had been led to expect.  Defendants attributed the guidance revision to margin pressures from increased promotional and clearance activity, as well as inventory related issues within its distribution center network.  Despite Defendants' assurance that inventory levels would normalize, Pier 1's inventories spiked to $533 million, up 11% since the Company's February 2015 disclosures.  As a result and contrary to Defendants' prior statements, Pier 1 was forced to offer steeper discounts and sales promotions, which caused the Company's margins to contract.  In addition, Pier 1 lowered its earnings guidance for fiscal 2016 to $0.56 to $0.64 per share, down 26% from previously issued guidance.

57.     These disclosures caused the price of Pier 1 shares to fall from $8.67 per share to $7.61, or 12.2%.

## LOSS CAUSATION

58.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of Pier 1 common stock and operated as a fraud or deceit on the Class.  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the

market on February 10, 2015 and September 24, 2015, the price of Pier 1 common stock fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Pier 1 common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

59.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the common stock of Pier 1 during the Class Period. Excluded from the Class are Defendants and their families, directors, and officers of Pier 1 and their families and affiliates.

60.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Pier 1 has over 86 million shares of common stock outstanding, owned by hundreds or thousands of investors.

61.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether Defendants violated the Exchange Act;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e)     Whether the price of Pier 1 common stock was artificially inflated;

(f)    Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g)    The extent of damage sustained by Class members and the appropriate measure of damages.

62.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

63.    Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

64.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**INAPPLICABILITY OF STATUTORY SAFE HARBOR**

65.    Pier 1's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

66.    Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Pier 1 who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

**PRESUMPTION OF RELIANCE**

67.     At all relevant times, the market for Pier 1's common stock was an efficient market for the following reasons, among others:

(a)     Pier 1 stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Pier 1 filed periodic public reports with the SEC and NYSE;

(c)     Pier 1 regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Pier 1 was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

68.     As a result of the foregoing, the market for Pier 1 common stock promptly digested current information regarding Pier 1 from all publicly available sources and reflected such information in the price of Pier 1 stock.  Under these circumstances, all purchasers of Pier 1 common stock during the Class Period suffered similar injury through their purchase of Pier 1 common stock at artificially inflated prices and the presumption of reliance applies.

69.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's

Case 3:15-cv-03415-D   Document 1   Filed 10/21/15   Page 22 of 27   PageID 22

decelerating revenue growth—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Pier 1's compliance with federal regulations and the quality of its private student loan portfolio, as set forth above, that requirement is satisfied here.

<u>COUNT I</u>

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

70.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

71.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Pier 1 common stock at artificially inflated prices.

72.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Pier 1 common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

73.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

74.     During the Class Period, Defendants made the false statements specified above,

22

which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

75.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Pier 1's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

76.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Pier 1 common stock.  Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Pier 1 common stock had been artificially inflated by Defendants' fraudulent course of conduct.

77.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

78.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

79.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

80.     The Individual Defendants acted as controlling persons of Pier 1 within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-

day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Pier 1, the Individual Defendants had the power and ability to control the actions of Pier 1 and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.     Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: October 21, 2015

Respectfully Submitted,

/s/ *Jim McCown*_____
James M. McCown
Texas State Bar No. 00788002
**NESBITT VASSAR & MCCOWN, L.L.P**
15851 Dallas Parkway, Suite 800
Addison, TX 75001
Telephone: (972) 371-2420
Facsimile: (972) 371-2410
jmccown@nvmlaw.com

*Local Counsel for Plaintiff Town Of Davie Police
Pension Plan*


(*Pro Hac Vice* Forthcoming)
Gerald H. Silk
New York State Bar No. 2764140
Avi Josefson
New York State Bar No. 4149407
**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 554-1400
Facsimile:  (212) 554-1444
jerry@blbglaw.com
avi@blbglaw.com

*Counsel for Plaintiff Town Of Davie Police Pension
Plan*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Greg Brillant, on behalf of Town of Davie Police Officers' Pension Plan ("Davie Police"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Chairman of Davie Police. I have reviewed the complaint and authorize its filing.

2. Davie Police did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Davie Police is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Davie Police's transactions in the Pier 1 Imports, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. Davie Police is currently seeking to serve as a lead plaintiff and representative party on behalf of a class in the following action filed under the federal securities laws during the three years preceding the date of this Certification:

   *Niksich v. Iconix Brand Group, Inc.*, No. 15-cv-4860 (S.D.N.Y.)

6. Davie Police has served as a representative party on behalf of a class in the following action filed under the federal securities laws during the three years preceding the date of this Certification:

   *Town of Davie Police Pension Plan v. CommVault Systems, Inc.*,
   No. 14-cv-5628 (D.N.J.)

7. Davie Police will not accept any payment for serving as a representative party on behalf of the Class beyond Davie Police's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___ day of October, 2015.

_____
Greg Brillant

**Town of Davie Police Officers' Pension Plan**
**Transaction in Pier 1 Imports, Inc.**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 4/7/2015 | 3,071 | 12.7396 |
| Purchase | 4/8/2015 | 4,875 | 12.5981 |
| Purchase | 4/9/2015 | 337 | 13.6472 |
| Purchase | 4/10/2015 | 235 | 13.7755 |
| Purchase | 4/13/2015 | 704 | 13.8648 |
| Purchase | 4/14/2015 | 1,267 | 13.5022 |
| Purchase | 4/15/2015 | 141 | 13.3399 |
| Purchase | 4/16/2015 | 201 | 13.3246 |
| Purchase | 4/29/2015 | 472 | 12.7124 |
| Purchase | 6/5/2015 | 2,445 | 12.0388 |
| Purchase | 6/8/2015 | 797 | 12.1306 |
| Purchase | 6/18/2015 | 654 | 11.9968 |
| Purchase | 6/19/2015 | 155 | 11.9931 |
| Purchase | 7/8/2015 | 1,982 | 12.3482 |
| Purchase | 7/27/2015 | 2,268 | 11.7276 |