**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

TOWN OF DAVIE POLICE PENSION PLAN, individually and on behalf of all others similarly situated,

Plaintiff,

v.

PIER 1 IMPORTS, INC., ALEXANDER W. SMITH, and CHARLES H. TURNER.

Defendants.

Case No. 15-cv-3415

**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

JURY TRIAL DEMANDED

# TABLE OF CONTENTS


I. PRELIMINARY STATEMENT .......... 2

II. JURISDICTION AND VENUE .......... 7

III. PARTIES .......... 8

A. Lead Plaintiff .......... 8

B. Defendants .......... 8

IV. BACKGROUND AND NATURE OF THE FRAUD .......... 10

A. Pier 1's Business and the Critical Importance of Clean Inventory .......... 10

B. The 1 Pier 1 Initiative .......... 14

C. Pier 1 and the Executive Defendants Repeatedly Told Investors that Pier 1 Had Clean Inventory Levels, High Demand for Pier 1 Products, Sophisticated Infrastructure, and No Markdown Risk .......... 17

D. In Reality, and Unbeknownst to Shareholders, Pier 1 Carried Excess Inventory That Far Exceeded Demand, and Strained Pier 1's Poor Infrastructure and Resulted in Significant Markdown Risk .......... 22

1. Defendants Ordered Massive Amounts of Inventory, While Ignoring that Actual Sales Were Insufficient to Clear the Inventory .......... 23

2. The Inventory Excess Across Pier 1's Stores and Distribution Network, Unequipped to Handle Such An Influx, Was Extreme .......... 31

a. On the Basis of Unrealistic Sales Goals, the Company Purchased Excess Inventory .......... 31

b. The Company Lacked the Infrastructure Necessary to Handle the Excess Inventory .......... 37

c. The Company's Inventory Problems Caused It to Incur Significant Costs .......... 39

d. Despite Defendants' Repeated Representations to the Contrary, the Company's Excess Inventory Presented Serious Markdown Risk .......... 43

V. PARTIAL DISCLOSURES AND THE GRADUAL EMERGENCE OF THE FULL IMPACT OF THE FRAUD .......... 45

A. February 10, 2015: Pier 1 Announces Higher Supply Chain Expenses and the Resignation of Its CFO, and the Stock Price Falls -25% ... 45

B. Pier 1 Falsely Reassures Investors that Its Inventory Would Normalize and that the Prior Increase in Inventory Did Not Present a Markdown Risk and that It Was "Transitory" ... 47

C. September 24, 2015: Pier 1 Discloses Markdowns and "Challenges" from Operating with Excess Inventory, and the Stock Price Falls -12.2% ... 48

D. Pier 1 Falsely Attempts to Minimize the Scale of Its Excess Inventory ... 50

E. December 16, 2015: Pier 1 Discloses Negative Financial Results from Its Excess Inventory, and that Inventory Will Not Track Sales Again Until the End of Fiscal Year 2017, and the Stock Price Falls -20% ... 50

VI. ADDITIONAL ALLEGATIONS OF SCIENTER ... 53

VII. FALSE AND MISLEADING STATEMENTS ... 73

A. Defendants' Materially False and Misleading Statements Concerning the Company's Infrastructure, and Its Ability to Control Inventory ... 74

B. Defendants' Materially False and Misleading Statements Concerning Pier 1's Purported "Clean" Inventory Levels and Lack of Markdown Risk ... 77

C. Defendants' Materially False and Misleading Statements and Certifications as to the Company's Inventory and Internal Controls ... 81

D. Defendants' Material Omissions that Rendered their Statements Materially False and Misleading ... 83

VIII. LOSS CAUSATION ... 87

IX. PRESUMPTION OF RELIANCE ... 90

X. CLASS ACTION ALLEGATIONS ... 91

XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ... 92

XII. CLAIMS FOR RELIEF ... 93

XIII. PRAYER FOR RELIEF ... 100

XIV. JURY DEMAND ... 101

Lead Plaintiff the Municipal Employees' Retirement System of Michigan ("Lead Plaintiff") brings this action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, on behalf of itself and all other persons or entities who purchased or otherwise acquired the publicly-traded common stock of Pier 1 Imports, Inc. ("Pier 1" or the "Company") during the period from December 19, 2013 through December 17, 2015, inclusive (the "Class Period") and were damaged thereby (the "Class"). Lead Plaintiff brings this action against Defendants Pier 1, Pier 1's chief executive officer ("CEO") Alexander W. Smith, and Pier 1's former chief financial officer ("CFO"), Charles H. Turner (the "Executive Defendants"; and, collectively with Pier 1, the "Defendants").

Lead Plaintiff alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters. Lead Plaintiff's information and belief are based on the ongoing independent investigation of its undersigned counsel. This investigation includes a review and analysis of: (i) Pier 1's public filings with the U.S. Securities and Exchange Commission (the "SEC"); (ii) research reports by securities and financial analysts; (iii) transcripts of Pier 1's conference calls with analysts and investors; (iv) Pier 1 presentations, press releases, and reports; (v) news and media reports concerning the Company; (vi) data reflecting the pricing of Pier 1 securities; (vii) information provided by former Pier 1 employees; and (viii) other material and data concerning the Company, as identified herein. Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by the Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial additional evidentiary support for the allegations set forth herein will be uncovered after a reasonable opportunity for further investigation or discovery.

## I. PRELIMINARY STATEMENT

1. This class action arises from a securities fraud perpetrated by Pier 1 and two of its most-senior executives. Pier 1 is a home furnishings retailer that sells its products through more than 1,000 stores in the United States and Canada, as well as via its e-commerce website, Pier1.com. During the Class Period, Defendants misrepresented and concealed from the market that Pier 1 acquired excess inventory that far exceeded consumer demand and posed a substantial risk that the Company needed to engage in costly price markdowns to clear it. As Pier 1 only belatedly admitted, the Company operated for at least 18 months during the Class Period with a level of inventory that was "out of whack with demand." During the Class Period, Pier 1's distribution centers and logistics network operated inefficiently and incurred significant, previously undisclosed costs, such that, as of the end of the Class Period in December 2015, it would take at least another 18 months for inventory to return to normal levels and to track demand. As discussed below, these revelations were directly contrary to the representations Pier 1, its CEO (Smith) and its former CFO (Turner) made to investors during the Class Period.

2. In mid-2012, Pier 1 began implementing its "1 Pier 1" initiative, through which the Company launched its e-commerce business to complement its traditional retail stores. From the start of the Class Period, the Company touted the success of "1 Pier 1." As months passed and undisclosed costs associated with the implementation of "1 Pier 1" began to mount, the Company continued to tout the success of its initiative and assured investors that the Company was well-positioned to handle higher levels of inventory needed to support the growth strategy, and that any increased inventories were according to its sales plan and would not result in discounting or lower margins.

3. Indeed, it was critical for Pier 1 to ensure that its level of inventory was in line with actual sales and consumer demand. Excess inventory is expensive to store, track, and

transport from the Company's warehouses (which Pier 1 termed "distribution centers") to retail stores. Pier 1's business is also highly seasonal and holiday-based, such that its inventory can quickly become obsolete or excessive if not closely aligned with demand, and Pier 1 would be required to "clear" its excess merchandise by sharply reducing prices through markdowns. Markdowns, once instituted, would cut into the Company's profits and cause Pier 1's margins to contract. As a result, inventory levels, and whether they track actual consumer demand, were critical metrics used by analysts and investors to determine whether to invest in Pier 1 stock during the Class Period.

4. In light of these considerations, on May 7, 2013, shortly before the Class Period, the Company claimed during a presentation to analysts and investors that Pier 1 had a new, "advanced" system for controlling its margins and inventory. According to Pier 1, the system improved the Company's "forecast accuracy" and "inventory control" and allowed the Company to "keep all distribution centers in optimal stock," which "improved in-stock accuracy." During the Class Period, the Executive Defendants further claimed that Pier 1 had invested "a lot in systems" that ensured Pier 1's inventories were "always well controlled," and that Pier 1 was able to "grow sales and not go crazy with inventory." In one typical example of the type of assurance Pier 1 made to investors, the Company's Form 10-K annual report filed with the SEC on April 29, 2014 claimed that it was "strategically managing" its inventory and monitoring inventory levels to "correspond with consumer demand."

5. Throughout the Class Period, Defendants also repeatedly told investors that Pier 1 was operating with a "clean" inventory. "Clean" inventory is a standard industry term meaning that Pier 1's inventory level was not excessive, that it corresponded with actual demand, and that it did not require costly markdowns to clear. Analysts directly relied on those representations, and specifically commented that the Company's claimed "clean" inventory boded well for the

success of the Company's 1 Pier 1 initiative. On December 19, 2013, the first day of the Class Period, Defendant Smith even claimed that Pier 1 was operating with inventory that was at "historical lows" – a claim that is demonstrably false. Defendants also categorically denied to investors that Pier 1's inventory levels posed any risk of costly markdowns. For example, on December 18, 2014, Defendant Smith claimed that Pier 1 did "not see any significant markdown risk," and on April 8, 2015, Smith again stated that the "complexion" of the Company's inventory was "healthy" and therefore was not believed to pose a "substantial markdown risk." As a result of these misrepresentations, Pier 1 stock traded at artificially inflated prices throughout the Class Period.

6. By the beginning of the Class Period in December 2013, however, Pier 1's inventories had already grown to excessive levels. Indeed, the Company already admitted at the end of the Class Period in late 2015, that the excess inventory could not be "cleared" without a lengthy period of costly markdowns lasting at least a year and half, and stretching into 2017.

7. Accounts of former Pier 1 employees corroborate that admission and reflect that, during the Class Period, the Company repeatedly failed to meet the unrealistic internal sales targets that Pier 1 used as the basis to purchase excess inventory to support its 1 Pier 1 initiative. As a result of those undisclosed failures, Pier 1 did not pay bonuses to non-executive employees for the two fiscal years at the heart of the Class Period (fiscal years 2014 and 2015). At the same time, the Company's distribution centers were overflowing with excess inventory, its stores were "busting at the seams" with merchandise, and the Company incurred undisclosed costs in order to store containers full of inventory at ports and rail yards and in temporary storage facilities. Indeed, despite Defendant Smith's claim on June 17, 2015 that Pier 1 retail stores' inventories were "extraordinarily well-controlled," as late as February 2016, two months after the Class Period and after Defendants had undertaken massive markdowns to clear inventories, over 40%

of the Company's retail stores were still keeping excess inventory in expensive external storage containers.

8. Smith, Turner, and Pier 1 knew or recklessly disregarded the serious risk that the Company's excess inventory posed. Indeed, former employees described an internal Pier 1 town hall meeting in March 2014 where Smith issued a *mea culpa* to a large gathering of Pier 1 employees, including by acknowledging, among other things, that "[w]e became victims of our own ambition."

9. Defendants have admitted to these material, undisclosed facts. As discussed below, through a series of partial corrective disclosures throughout 2015, the Company admitted that (i) Pier 1 was carrying excess inventory in such large amounts that it would take Pier 1 at least 18 months to successfully markdown the excess merchandise and sell it off before truly achieving a "clean" inventory position; and (ii) the excess inventory had posed "challenges" to Pier 1's distribution centers, which were not operating efficiently and which resulted in "incremental distribution center costs that affect[ed Pier1's] gross profit." As Pier 1 sold off the excess inventory through aggressive markdown efforts, the Company's margins contracted and Pier 1's earnings per share declined sharply.

10. Specifically, Defendants began to reveal the existence of Pier 1's excess inventory on February 10, 2015, with the announcement that the Company had been unable to adequately forecast revenues and expenses, that it had higher costs resulting from "unplanned supply chain expenses," and that its CFO, Defendant Turner was departing the Company. Analysts, who had been told until as late as January 2015 that inventories were "in line" with expectations, were shocked, and responded by describing the increased supply chain expenses as "inexplicable," calling the announcement as a "major setback," and concluding that "markdown risk" was "high." This news also surprised investors and sent the Company's stock plummeting nearly

25%, from $16.97 per share on February 10, 2015 to close at $12.84 on February 11, 2015.

11. Even after this first revelation, Defendants continued to misrepresent the true state of the Company's business to the market. As late as April 8, 2015, a mere eight months before the end of the Class Period and while inventories were in fact at historic highs, Pier 1 told investors that its inventory complexion was "healthy," and that any inventory-related issues were only "transitory." Defendants repeated this assurance in June 2015 by telling investors that Pier 1's "re-forecasting" and "adjusting" its plans was leading to stabilization. However, within months of these representations, Defendants revealed that inventories had risen far beyond manageable levels, such that extensive promotional efforts were necessary to sell down the excess.

12. Specifically, on September 24, 2015, contrary to Smith's recent assurance that the issues the Company feared were only "transitory," Pier 1 announced that its excess inventory had caused unspecified "issues" within its supply chain, that there were "inventory related inefficiencies within the Company's distribution center network," and that it needed to resort to increased clearance activity to sell off the excess. On a conference call that day with analysts, Smith disclosed that Pier 1 would "continue to feel the effects of our elevated inventory levels the remainder of the year," and even recounted to listeners that he reminds himself in the mirror "every day" that "nothing good happens when you have too much inventory," and that "we are in the throes of working this down."

13. Analysts expressed further shock at the Company's disclosures, writing that they were "particularly surprised" by the "extent of markdowns," given "management's earlier assertions this would not be a significant issue." In response to the Company's disclosures, which were sharply divergent from Defendants' prior representations, the price of Pier 1 stock fell by 12.2%, from $8.67 per share on September 24, 2015 to $7.61 on September 25, 2015.

Moreover, at least one analyst concluded in the wake of the announcement, and following a call with Pier 1 management, that inventories would not be "clean until . . . Feb. 2017," more than 19 months into the future.

14. Finally, on December 16, 2015, the Company confirmed for the first time that it would take Pier 1 at least 18 months before inventory levels were in line with actual demand, with Smith describing the Company's inventory levels as "extremely high." The Company's interim CEO also disclosed that only four of the Company's six distribution centers were operating with "acceptable levels of efficiencies," meaning two of the six centers were not. Analysts described these disclosures as being part of a "stunning fall from grace," with Pier 1's top line and gross margin "well worse than we expected." One analyst concluded in the wake of the disclosures that the Company would have had to miss its previously publicized internal sales goals by a staggering $100 million in order to produce the announced shortfall. The market responded by dumping Pier 1's shares, which again plummeted by 20% in one day, from $5.95 per share on December 16, 2015 to $4.75 on December 17, 2015.

15. In all, as the Company revealed piecemeal to the public the true magnitude and severity of its exposure to markdown risk, caused by excess inventory, Pier 1's stock dropped from a Class Period high of $23.11 on December 27, 2013 to $4.75 on December 17, 2015, a staggering reduction of over 80%.

## II. <u>JURISDICTION AND VENUE</u>

16. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

17. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28

U.S.C. § 1391(b). Pier 1 maintains its executive offices in this District and many of the acts and conduct that constitute the violations of law complained of herein, including the dissemination to the public of materially false and misleading information, occurred in and/or was issued from this District.

18. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Lead Plaintiff

19. Lead Plaintiff the Municipal Employees' Retirement System of Michigan ("Lead Plaintiff" or "MERS") is tax-exempt governmental pension plan trust and a Michigan statutory public corporation and instrumentality of its participating municipalities and courts. MERS administers over 2,000 plans on behalf of 850 Michigan municipal employers and represents over 115,000 participants. As of March 31, 2016, MERS had approximately $9.3 billion in total assets. As reflected in the certification filed with the Court (ECF No. 14), MERS purchased Pier 1 common stock during the Class Period and was damaged thereby. On April 25, 2016, this Court appointed MERS as Lead Plaintiff for this litigation.

### B. Defendants

20. Defendant Pier 1 is a Delaware corporation with its principal executive offices located at 100 Pier 1 Place, Fort Worth, Texas, 76102. During the Class Period, the Company's common stock traded on the New York Stock Exchange ("NYSE"), which is an efficient market, under the ticker symbol "PIR." As of December 2015, the end of the Class Period, Pier 1 had over 83 million shares of common stock outstanding.

21. Defendant Alexander W. Smith ("Smith") has served as Pier 1's President and

CEO since February 2007. During the Class Period, Defendant Smith reviewed, approved, and signed Pier 1's materially false and misleading SEC filings and certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX Certifications"). Specifically, Defendant Smith signed: (i) the Forms 10-Q that the Company filed with the SEC on January 8, 2014, July 9, 2014, October 8, 2014, January 7, 2015, July 8, 2015, and October 7, 2015; and (ii) the Forms 10-K that the Company filed with the SEC on April 29, 2014 and April 28, 2015. Defendant Smith also made statements in press releases and participated in conference calls with securities analysts, where Pier 1's financial condition was presented and discussed. Specifically, Defendant Smith made materially false and misleading statements on the Company's earnings conference calls held on December 19, 2013, April 10, 2014, June 19, 2014, December 18, 2014, April 8, 2015, and June 17, 2015, and in materially false and misleading Pier 1 press releases disseminated on February 28, 2014, January 8, 2015, and April 8, 2015.

22. Defendant Charles H. Turner ("Turner") served as Pier 1's CFO from August 1999 until February 2015. Prior to his "early retirement" from the Company on February 11, 2015 at the age of 58, Turner had been a Pier 1 employee for 22 years and previously served as Pier 1 Executive Vice President ("EVP"), Senior Vice President of Stores and Controller and Principal Accounting Officer. During the Class Period, Defendant Turner reviewed, approved, and signed Pier 1's materially false and misleading SEC filings and SOX Certifications. Specifically, Defendant Turner signed: (i) the Forms 10-Q that the Company filed with the SEC on January 8, 2014, July 9, 2014, October 8, 2014, and January 7, 2015; and (ii) the Form 10-K that the Company filed with the SEC on April 29, 2014. Defendant Turner also participated in conference calls with securities analysts, during which Pier 1's financial condition was presented and discussed. Specifically, Defendant Turner made materially false and misleading statements on the Company's earnings conference calls held on December 19, 2013 and April 10, 2014.

23. Defendants Smith and Turner are together referred to hereinafter as the "Executive Defendants." The Executive Defendants, because of their positions with Pier 1 during the Class Period, had the power and authority to control, and did control, the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Executive Defendants was provided with copies of the Company's reports and press releases alleged herein to be materially false and misleading prior to, or shortly after, their issuance and had the ability and opportunity to issue them, prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Executive Defendants knew or were severely reckless in disregarding that the adverse facts detailed herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## IV. BACKGROUND AND NATURE OF THE FRAUD

### A. Pier 1's Business and the Critical Importance of Clean Inventory

24. Pier 1 is a specialty retailer of decorative home furnishings with over 1,000 retail stores that also sells merchandise through its website, Pier1.com. In the early 2000s, having reached sales of over $1 billion, the Company embarked on a series of expansion campaigns. By 2007, however, it became clear that Pier 1 had grown too quickly. Sales plummeted, and the Company reported a staggering $227 million loss for fiscal year 2007. As a result, Pier 1 terminated its CEO and hired as a new CEO Defendant Alex Smith, a retail veteran with over two decades of experience in operations and merchandising at major retailers.

25. Smith became Pier 1's CEO effective February 19, 2007, following seven consecutive quarterly losses at the Company. As CEO, Smith adopted a cost-cutting strategy centered around aggressive inventory management, which included obtaining and maintaining a

level of inventory that was in line with actual consumer demand for Pier 1's products, and which did not have excess inventory that would require significant markdowns to clear. Smith repeatedly referred to this level of inventory as "clean inventory."[1]

26. The Company's actual inventory level was one of the most critical metrics to investors in analyzing Pier 1's value as a company because it was a key measure of demand for the Company's products and the growth of its revenue stream. Indeed, if inventory levels were to rise significantly (and outstrip actual sales and demand for Pier 1's products), this would create a backlog of merchandise, which would be costly for Pier 1 to maintain, and result in inefficiencies at the Company's distribution centers. Those conditions would in turn require Pier 1 to "clear" excess inventory by marking down its merchandise, which would reduce the Company's margins.

27. For these reasons, Pier 1 listed "Inventories" as one of its seven "Critical Accounting Policies" in every one of its Forms 10-K filed with the SEC since at least 2005 and throughout the Class Period. Moreover, every single Pier 1 Form 10-K from 2012 onwards claimed explicitly that the Company was "focusing on strategically managing inventory levels and closely monitoring merchandise purchases to keep inventory in line with consumer demand."

[1] Defendants have used the term "clean" inventory on numerous occasions throughout the past decade to describe inventory that was not excessive, tracked actual demand and carried no markdown risk. For example, on a September 20, 2007 conference call with analysts, Defendant Turner stated: "The clearance event was very successful and we ended July with very clean inventory." On an April 10, 2008 conference call with analysts, Defendant Smith stated: "we will continue to stress our everyday fair values and use markdown dollars to clean up and manage our inventory." On a December 18, 2008 conference call with analysts, Defendant Smith informed listeners that if the Company's customers tighten spending, then "we'll end up discounting more to clean our inventories." Elsewhere in the industry, retailers like Gap Inc. and T.J. Maxx (Defendant Smith's former company) both use the term "clean" in the same manner. For example, on a February 26, 2014 conference call with analysts, T.J. Maxx's CEO stated, "[w]e stuck to our off-price discipline and took aggressive markdowns in January, particularly in apparel, to clear the product. Although this impacted merchandise margins, it allowed us to begin the new year with extremely clean inventories."

28. Analysts were also focused on the Company's inventory levels, and repeatedly discussed that topic with Defendants Smith and Turner on conference calls and in numerous analyst reports issued before and during the Class Period. Indeed, analysts or Company executives raised the status of Pier 1's inventory on every single quarterly earnings call for as long as these calls have been transcribed and published, including throughout the Class Period.

29. Accordingly, on his very first conference call with analysts and investors as Pier 1's CEO on April 12, 2007, Defendant Smith outlined his strategy to improve Pier 1's business and stressed the need to ensure that inventory levels were commensurate with actual consumer demand. On the call, Smith presented his six-point action plan that focused heavily on cost-cutting through managing inventory and tracking sales. Indeed, Smith announced the creation of a new department at Pier 1 specifically tasked with overseeing "inventory levels, markdowns and purchase-order managements." Smith stated that this group would synchronize Pier 1's inventory with sales by managing purchases and initiating markdowns for excess merchandise, "so that everything from assortment planning through to store allocation and everything in between will be carefully and thoughtfully planned and executed." Smith also announced that a member of the Company's executive team would run the department and report directly to him, and emphasized the importance of the Company's inventory levels, stating that, "We know that a carefully balanced inventory by department, category and SKU[2] at an individual store level is ***essential***."

30. In order to have an efficient inventory management system with better distribution, Defendant Smith also announced on April 12, 2007 that Pier 1 would "tighten up our supply chain," in order to "drive down costs, reduce lead times, and increase inventory turn."

---

[2] A Stock Keeping Unit, or "SKU," is a standard retail industry term indicating a distinct type of item for sale. For example, each of Pier 1's individual lines of merchandise, such as a certain type of chair or dish, has a distinct SKU, and all items within that merchandise line would carry the same SKU number.

The person chosen to lead this effort was Pier 1's CFO at the time, Defendant Turner. Turner was tasked with taking over Pier 1's entire supply chain distribution system, and conducting a review of "every part of the supply chain," from "freight costs" to "transportation and delivery contracts," to "the use of outside storage facilities."

31. Over time, as Pier 1 faced other obstacles, the factor that the Company pointed to as being critical to overcoming problems it faced was its ability to achieve and maintain proper levels of inventory. In December 2008, Pier 1's stock price fell below the New York Stock Exchange's de-listing threshold for the first time, and on December 15, 2008, the Company received notice that its stock was no longer in compliance with listing requirements. On December 18, 2008, Turner stressed on a conference call with investors that, as the Company tried to weather this development and a serious downturn in its business, "***the number one thing, we as a Management team, is focused on is our inventory levels***."

32. Smith and Turner's stated focus on inventory levels is unsurprising, given that inventory is a critical metric for retailers. As the authors of the seminal work on inventory management in the digital age (two Professors who teach at the Wharton and Harvard Schools of Business) have written: "[e]ven a casual glance at a typical retailer's financial statements shows the importance of inventory management to earnings. Too much of it imposes hefty costs. But too little can do damage too, reducing a firm's sales and gross margin." The same authors, after an exhaustive study of the retail industry, concluded that, "[i]n addition to the impact on earnings . . . retailers also face higher risk of bankruptcy when carrying excessive inventory. The problem arises because they try to build up assets (stores and inventory) in anticipation of sales. If their sales fail to meet their goals, earnings and cash flow can quickly turn negative."

33. Thus, Defendants, other retailers, and those who study them, are fully aware of the importance of synchronizing inventories with sales. From 2008 through 2011, Pier 1's

management apparently adhered to its plan to do so. After peaking in 2007, reported inventory declined each year from 2008 to 2011, and in one year alone, from 2008 to 2009, Pier 1 slashed reported inventory by $100 million. Pier 1's financial position strengthened as the Company maintained levels of inventory that matched consumer demand, with cash growing as inventory declined, and Defendants touted how the Company was aggressively "focus[ing] on managing inventory levels." During the Company's April 7, 2009 earnings call, Turner thus attributed the Company's improving financial metrics to a "continued focus" on inventory, and Smith stated that "accurate buying, lower supply chain costs, [and] clean inventory" had reduced pressure on the Company's margins.

**B. The 1 Pier 1 Initiative**

34. Despite its turnaround, Pier 1 faced growing pressure to enter the online retail space from internet-based retail competitors like Wayfair and Amazon. In response, the Executive Defendants planned for Pier 1 to develop an "omni-channel" approach that would integrate online and in-store retail sales. Referred to as "1 Pier 1," the initiative allowed customers to shop in the Company's online store and either have their purchases shipped to their homes, or pick them up at Pier 1's U.S. stores without incurring shipping charges. On August 23, 2012, the Company announced the official launch of its brand new e-commerce platform.

35. As an integral component of 1 Pier 1, the Company claimed that it upgraded its planning and allocation systems to accurately monitor and maintain inventory in line with sales. During a May 7, 2013 conference call with analysts and investors, Defendant Smith introduced the members of his executive team, including Michael Benkel (EVP of Planning and Allocations), who discussed the purported capabilities of Pier 1's system. During his presentation, Benkel claimed that "over the past few years, we've made tremendous improvements to our system to support the merchandising team, specifically focusing on four

planning and allocation systems." In that regard, Benkel detailed the Company's purportedly upgraded ability to monitor and control inventory, stating:

> First, we have a relatively new planning system to manage our SKU level plans and forecast. We built this system internally rather than buying one so that we could customize it to the unique complexity of our business and, at the same time, building capabilities to accommodate future growth.
>
> Some of the key factors we considered when developing the system include our six distribution centers and the different transit times needed to ***keep each one in optimal inventory***. We also took into account the very lead times from our vendors and distinct ocean transit times from the many countries we buy from.
>
> We quickly felt the benefits of our investment in this new system and forecast accuracy at the SKU level. This has resulted in more accurate projection, improved assortment planning ***and optimal DC [Distribution Center] inventories*** to drive sales. Additionally, in keeping with our 1 Pier 1 vision, the systems enable us to forecast at the SKU level across both our stores and e-commerce businesses.

36. Emphasizing the fact that the system provided the executive team with visibility into these key metrics, Benkel added:

> Reporting was also a key factor when we built the new planning system. Previously, we lacked a flexible reporting tool to measure our performance at the individual SKU level in comparison to how it was planned . . . Now, ***we have the ability to quickly and accurately measure how a SKU performs to its plan and, by measuring its performance, we know where and how we can improve***.

37. Analysts responded positively to these developments. For example, on May 7, 2013, Barclays reported that "Benkel, EVP of Planning and Allocation highlighted the upgraded tech systems Pier 1 teams are using to manage SKU forecasts. The teams are now able to accurately measure how individual SKUs are performing and maximize the productivity of all assortments. Overall, Pier 1 is using better data analytics across the business to drive sell-through of products." Barclays concluded: "[w]e believe that the company's initiatives will continue to

drive robust same-store sales and merchandise margins." The next day, Jefferies also reported that "Benkel, EVP Planning and Allocations, gave a strong presentation about how recent investments in analytics will drive improvements in inventory management going forward, including the optimization of the assortment by store, speedier replenishment, and channel integration."

38. On May 10, 2013, analysts at Telsey Advisory Group similarly reported, under the heading "Planning and Allocations," that "In recent years, Pier 1 has made significant investments and enhancements to the IT systems used to forecast, plan and allocate inventory to distribution centers and stores. This has resulted in more accurate SKU plans by week, better in stocks, easier reporting of best and worst performing items, compressed replenishment times, and more optimal inventory levels at the company's six DCs [distribution centers]." On May 17, 2013, Deutsche Bank called Pier 1 a "21st Century Growth Story" in its report on the Company's May 7, 2013 presentation, and stated that, "[r]ecent investments in infrastructure" will help support growth in market share, including "a new allocating system [that] . . . resulted in better inventory accuracy at the DC level, a SKU planning system, a new SKU / store assortment system, and an open-to-buy system." Deutsche Bank concluded, "[w]e maintain our Buy rating as we continue to believe the Street is under-estimating the true longer-term sales and earnings potential and that upward revisions to estimates should drive share price appreciation going forward."

39. Thus, by the start of the Class Period at the latest, Pier 1 claimed to possess a state-of-the-art inventory management system, built in-house, that provided the data and real-time awareness that the Company needed to measure inventory, compare inventory to the Company's sales plan, and thereby purchase inventory in line with actual sales and consumer demand. These claims were well-received by analysts, who widely reported their confidence in

the Company and attributed this confidence to the infrastructural improvements the Company touted.

### C. Pier 1 and the Executive Defendants Repeatedly Told Investors that Pier 1 Had Clean Inventory Levels, High Demand for Pier 1 Products, Sophisticated Infrastructure, and No Markdown Risk

40. The items sold in Pier 1's retail locations and on its website are housed as inventory in six distribution and fulfillment centers located in Maryland, Ohio, Texas, California, Georgia, and Washington. Pier 1's merchandise is primarily imported from China and other foreign countries and shipped to the United States by boat, then delivered to the Company's distribution centers. At the distribution centers, Pier 1 stores the merchandise until it is further shipped to Pier 1 retail stores in each distribution center's region, or delivered directly to the consumer.

41. The Company's development of its 1 Pier 1 initiative required substantial investments in Pier 1's inventory management and distribution network. However, during the Class Period, Company executives assured investors that Pier 1 had already invested in the required infrastructure, staffing, and systems to ensure that Pier 1 kept clean inventory levels as it executed on its omni-channel strategy. For example, on December 19, 2013, the first day of the Class Period, Smith participated in an earnings call where an analyst asked him about Pier 1's ability to control its inventory. In response, Smith stated: "I want to pick you up on that question about [whether] inventory is well controlled. ***Ours are always well controlled***." Smith then re-emphasized the point in response to the analyst's follow-up questions, stating:

> I think the point about our inventory . . . is obviously we think about it a lot. We've been investing over the last few years a lot in systems, of course, in terms of our allocation replenishment systems, but also in investing in people and our planning and allocation functions. I think we are really getting the results of all of that investment now, which allows us to ***grow sales and not go crazy with inventory***.

42. Markets welcomed this news, and on the same day, Pier 1's stock price increased by more than 5%, from a close of $20.73 per share on December 18, 2013 to close at $21.79 on December 19, 2013.

43. Throughout the Class Period, Defendant Smith repeatedly assured the market that Pier 1's inventory was "clean," and on each of these occasions, analysts relied upon and responded positively to Smith's claims. For example, on September 19, 2013, Smith reported that Pier 1 had a "clean" inventory. In response, Barclays emphasized to investors that "management entered into 3Q with a very clean inventory position." Credit Suisse also wrote that the Company had "exited Q2 with a clean inventory position . . . which should mitigate merchandise margin pressure," and, on the same day, BB&T wrote that it was "encouraged to hear inventories are clean," and that Pier 1's stock presented "an attractive buying opportunity—particularly given the company's clean inventory position."

44. On January 9, 2014, Pier 1 announced its December 2013 sales results in a Form 8-K, reporting comparable store sales that were below expectations, which it attributed to bad weather. Meanwhile, the Company also claimed in a press release that it was "making advancements in expanding its omni-channel strategy," and "expected seamless integration of the Company's increasingly interconnected businesses." In the press release, Defendant Smith noted that the "e-commerce business remained strong and continues to outperform our expectations," and "inventory levels are on plan." On January 9, 2014, Credit Suisse reported it was "encouraged by the online and non-weather impacted stores and by the commentary from Alex Smith that their inventory is clean out of the holiday." On January 14, 2014, analysts with Wedbush, after meeting with Company executives, including Defendant Turner, reiterated their outperform rating on Company stock, specifically citing the "1 Pier 1" program. In particular, the Wedbush analysts stated that they "remain optimistic that Pier 1 should continue to execute it

1 Pier 1 strategy . . . inventories are in good shape entering 2014, new spring merchandise looks good, compares are easy, and we continue [to] like the long-term 1 Pier 1 strategy."

45. Throughout calendar year 2014, Defendants continued to assure the market that Pier 1 had its inventory well under control. For instance, the Company preannounced fiscal fourth quarter 2014 results on February 28, 2014, in a Form 8-K filed with the SEC.[3] In a simultaneous press release, Defendant Smith reported that while Pier 1 "continued to experience significant disruption from adverse weather," he reiterated that the Company was "entering fiscal 2015 in a clean inventory position."

46. Analysts were further encouraged by this news. For example, BB&T Capital reported on February 28, 2014 that "Pier 1's long-term growth prospects remain intact" and "we are happy to hear Pier 1 enters FY'1[5] in a clean inventory position." The same day, Telsey Advisory Group approved of the Company's "efforts to clear through winter inventory" and reported that Pier 1 was "entering 2014 in a clean position." Wedbush and Wells Fargo Securities also both noted that inventories "are clean heading into FY2015."

47. Next, on April 10, 2014, when reporting the Company's financial results for the fiscal fourth quarter of 2014 and full fiscal year 2014, Defendant Smith described the pressure on sales and earnings that Pier 1 had experienced during the holiday quarter as "navigable" "bumps

---

[3] Pier 1's fiscal year starts the prior March and ends the current March. For example, fiscal year 2014 began in March 2013 and ended in March 2014. A chart setting forth the start and end of each relevant fiscal quarter is set forth below:

| Fiscal Year | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| 2014 | Mar. 3, 2013 to June 1, 2013 | June 2, 2013 to Aug. 31, 2013 | Sept. 1, 2013 to Nov. 30, 2013 | Dec. 1, 2013 to March 1, 2014 |
| 2015 | Mar. 2, 2014 to May 31, 2014 | June 1, 2014 to Aug. 30, 2014 | Aug. 31, 2014 to Nov. 29, 2014 | Nov. 30, 2014 to February 28, 2015 |
| 2016 | Mar. 1, 2015 to May 30, 2015 | May 31, 2015 to Aug. 29, 2015 | Aug. 30, 2015 to Nov. 29, 2015 | Nov. 30, 2015 to Feb. 27, 2016 |

in the road" that are "now behind us." The Company also assured investors that its distribution chain was operating efficiently and that any inventory growth was manageable. For example, on a call with analysts held the same day, Defendant Smith stated that, "we have the resources and infrastructure in place to scale the business." Smith further claimed that, because Pier 1's "planning and allocation capabilities are so sophisticated, we expect our inventory growth to be well-controlled as it was in fiscal 2014," and that the Company's "merchandise and field teams are well prepared for this level of expansion." Finally, Smith concluded that Pier 1 was "in the best shape we have ever been and [we] look forward to a year of strong growth in fiscal 2015."

48. Analysts again responded positively to the Company's claims about its inventory, with Barclays reporting the same day that the "inventory position is in line with managements' expectations," and "Pier 1 plans to end 1Q with inventories up in-line with sales growth." Barclays further praised "Pier 1's investments outside of e-commerce," noting that it "now has the ability to manage its SKU level plans and forecasts, effectively allowing the company to better target customer demand patterns together with efficient inventory management at the company's existing store-focused distribution centers."

49. Defendants' assurances that Pier 1 managed its inventory levels to track actual sales and consumer demand continued through fiscal year 2015. For example, Smith reassured the market during an earnings conference call on June 19, 2014 that any margin pressures were due to a promotional environment and "not so much [to] markdown pressure," and "we continue to run a very clean inventory as I know you know." On the same day, Barclays reported that it was "confident in the company's ability to manage pricing and promotions longer term." The next day, analysts at Argus Institutional Partners also wrote in response to the Company's statements that, "management said that the gross margin was pressured by a highly promotional retail environment and a shift to e-commerce sales" and "[w]e believe that gross margin is being

pressured by promotions to drive traffic rather than by markdowns resulting from bad inventory management." Similarly, Barrington Research Associates wrote that, "[i]nventory is in good shape," and Jeffries concluded that "we continue to have a lot of conviction in our long-term outlook on PIR . . . Pier 1 runs a very tight ship on inventory these days."

50. Then, on September 17, 2014, the Company issued a press release announcing its financial results for the fiscal second quarter of 2015. While the Company also reported that inventory had increased 15.5% from the prior year, it repeated that the increase was "in line with management's expectations." Additionally, in response to questions from analysts, Defendant Turner attributed the increases in inventory not to excess product or poor sales, but instead to the need to take on more inventory in advance of Chinese New Year.

51. Analysts credited Turner's explanation for the Company's inventory increases. KeyBanc Capital Markets reported on September 17, 2014 that Pier 1's inventory was "in line with its expectations" and that the reported increase was due to Pier 1's new distribution center, growth in the Company's e-commerce business, and early receipt of inventory due to Chinese New Year.

52. Through the end of calendar year 2014, Pier 1 continued to emphasize that its inventory growth was the result of increasing sales and did not necessitate further markdowns or create margin pressures. On December 18, 2014, the Company issued a press release announcing its financial results for fiscal third quarter 2015, and reaffirmed its previously-issued guidance for fiscal year 2015. With respect to Pier 1's inventory levels, Defendant Turner announced that while inventories had increased 25% year-on-year, this additional inventory was necessary "to support higher sales," and Defendant Smith stated that while total inventory was up, "we do not see any significant mark down risk."

53. Analysts continued to credit these claims by Defendants. For example,

Oppenheimer reported on December 19, 2014 that "[c]omments from management suggest that higher inventories are consistent with the company's plans and should position PIR well for the balance of the holiday selling season and early seasonal sales in 2015."

54. Pier 1 followed up on these assurances with a January 8, 2015 announcement that over the holiday season, the Company enjoyed an 8.2% increase in comparable store sales. In the press release, Defendant Smith projected success and optimism, stating that "[t]raffic to the brand was up nicely and sell-through on our holiday assortments was on plan," and "the business is well-positioned as we head into the early spring selling season." Analysts viewed this announcement as further evidence that the Company was "once again finding its footing and positioned to deliver in coming quarters," and the price of Pier 1's common stock jumped another 6.5% that day.

### D. In Reality, and Unbeknownst to Shareholders, Pier 1 Carried Excess Inventory That Far Exceeded Demand, and Strained Pier 1's Poor Infrastructure and Resulted in Significant Markdown Risk

55. As discussed above, Defendants Smith, Turner, and Pier 1 repeatedly claimed during the Class Period that Pier 1 was operating with "clean" inventory and no markdown risk. Indeed, Defendants had stated that Pier 1's inventory position was "clean" on no less than five occasions during the Class Period, including three times in fiscal 2015. During the Class Period, the Executive Defendants also attributed any increases in the Company's reported inventories to increased demand for its products, as well as seasonal events such as Chinese New Year, which purportedly caused the Company to take on more inventory than usual. Moreover, each of the Company's Forms 10-K filed with the SEC during the Class Period, and signed by both Defendants Smith and Turner, stated that "[t]he Company's focus remains on making conservative inventory purchases" and "managing those inventories."

56. However, the Executive Defendants' repeated assurances that the Company's

growing inventories were in line with expectations, that they did not necessitate markdowns to sell off any excess, and did not present margin pressure, were materially false and misleading. In contrast to the success story that Smith and Turner repeatedly portrayed to the market after unveiling the 1 Pier 1 initiative, and as the Company has now admitted, Pier 1 did not maintain an inventory level that tracked sales and consumer demand during the Class Period. Thus, each time the Executive Defendants claimed their inventory levels were according to "plan," they misleadingly failed to disclose that the sales plan was in fact failing in real-time. As a result, as Pier 1 has also now ***admitted***, inventories at the Company's distribution centers and stores were at unprecedented levels during the time that Defendants repeatedly claimed inventories were "clean," or "in line" with demand. In fact, as the Company only disclosed in December 2015, inventory was so excessive that it would take Pier 1 at least ***18 months*** to return to a point where its inventory was "clean," or tracked to actual sales. As investors only learned at the end of the Class Period, in order to reduce the excess inventory, the Company had to engage in massive product markdowns over several quarters that seriously eroded Pier 1's profit margins and cut its earnings per share, sending its stock price down sharply. Contrary to Defendants' claims, such an excessive inventory backlog does not accumulate overnight or in just a single quarter.

### 1. Defendants Ordered Massive Amounts of Inventory, While Ignoring that Actual Sales Were Insufficient to Clear the Inventory

57. In connection with the launch of 1 Pier 1, the Executive Defendants prepared sales goals and parallel inventory increases that were dramatically out of line with actual consumer demand and sales. It became clear to the Executive Defendants by the beginning of the Class Period that the unrealistic sales they had predicted were not materializing and would not any time soon. However, even as they realized the gravity of the situation, they continued to direct Pier 1's buyers to purchase merchandise and inventory at unsustainably high levels. Rather than changing course and informing the Company's investors of what had happened, they

hid the truth by inventing excuses for mounting inventory levels, while forcing ever-more ambitious targets onto sales and planning and allocation staff.

58. As confirmed by numerous former Pier 1 employees, who worked in Company locations across the country, Pier 1's distribution centers were filled with so much excess inventory that large numbers of full shipping containers were left in ports, railyards and parking lots, unable to be unloaded because warehouses and stores had run out of room. Even as Defendant Smith was telling the market that Pier 1 was running a "very clean inventory," stores were resorting to renting outdoor storage space to accommodate the excess merchandise, and distribution centers were forced to pay fines to keep loaded containers in railway yards and ports. As discussed below, the Executive Defendants knew or were severely reckless in disregarding that inventory was not in line with sales as they had claimed, but were at excessive levels, which gave rise to the need for significant and costly markdowns.

59. Pier 1 inventories are managed by small teams based out of merchandise departments divided by the types of merchandise. The teams, known as "pods," consist of an allocator who allocates quantities of merchandise to stores, a planner who works with the allocator to assess how much inventory to maintain on the basis of existing sales figures, and a buyer who makes inventory purchases. Together, members of the pod are supposed to ensure that the Company is correctly planning for the purchase and sale of items that were within the scope of their responsibility, and that inventory was in line with sales on an ongoing basis.

60. Each year, every pod is responsible for drafting a sales and inventory plan for its particular merchandise department for the upcoming year. This process involves working with senior executives in an iterative back and forth process of revisions and approvals by successively higher levels of executive authority. Immediately above each pod member are managers and directors, with allocation managers overseeing the allocators, Planning Directors

overseeing the planners, and General or Divisional Merchandising Managers overseeing the buyers. These managers reported in turn to two senior executives of the company, Michael Benkel, the EVP of Planning and Allocations, and Catherine David, the EVP of Merchandising, who worked alongside Defendants Turner and Smith and reported directly to them.

61. Each year, pods passed their plans to departmental managers, who, after working with the pod and revising the plan to their satisfaction, passed the plan up to the Company's senior executives for revision and approval. Pod members' yearly bonuses depended on whether the Company met its projected sales for the year.

62. According to a former Allocations Analyst at Pier 1's Texas headquarters from 2011 to 2014, after Benkel and David received yearly plans from the managers that oversaw each pod, they met with the Company's leadership and reviewed business figures before responding to departmental managers with approval or revisions. The Allocations Analyst, who was at the center of this process, stated that senior management always instructed most departmental pods to raise the sales plan, and could not recall a single instance throughout her three years at the Company where this did not happen to her department. Since inventory plans were tied directly to the sales plan, raising the sales plan meant raising the inventory orders as well, to accommodate for purportedly higher sales.

63. In the former Allocation Analyst's case, the sales plans that senior management pushed to her pod were "ridiculous." This was clear to Allocation Analysts because the Company used an advanced "Demand Chain Management" system, or "DCM," that closely tracked inventory and sales. The DCM contained checks and balances to ensure that inventory allocations did not outstrip actual demand, which it gathered from the Company's contemporaneous sales data. According to the Analyst, during fiscal year 2014 (which began in March 2013 and ended in March 2014), the Company began instructing allocators to manually

override the Company's own checks and balances, and to allocate more inventory, on top of the allocations calculated by the DCM as matching actual sales. The Analyst described these manual overrides of the DCM as "pretty well known" and the "way of life" at Pier 1. Soon, sales targets for multiple departments and merchandise lines had become so unrealistically aggressive, that the Analyst described them as having come from "Disneyland."

64. Another former Allocations Analyst at the Company's headquarters, who worked there from 2011 to 2015, also explained that as early as late 2013, Pier 1 stores began telling her that they could no longer take on inventory because they already had tractor trailers containing merchandise sitting on leased "off-site" properties. The Analyst thus thought that concerns with regard to excess inventory existed from the second half of fiscal year 2014 (which spanned September 2013 through March 2014) onwards, and throughout fiscal year 2015 (which ended on February 28, 2015). According to the Allocations Analyst, the concern was severe by at least early fiscal year 2015 (which began on March 2, 2014). Moreover, the Analyst's entire team felt throughout fiscal year 2014 (which began in March 2013) and 2015 that executives were providing them with "unrealistic" plans, as "the sales were not happening, [yet] we just had these outrageous inventories." According to the Analyst, Benkel and his team were responsible for preparing general allocation forecasts as well as allocation forecasts for each division.

65. Pier 1's allocation staff communicated their concerns about the Company's unrealistic plans to management, but to no avail. For example, the first Allocations Analyst discussed above, who worked at the Company from 2011 to 2014 stated that allocation and planning personnel communicated their concerns with the unrealistic allocations through the standard channels for revising plans, and that such concerns were repeatedly raised directly to EVPs Benkel and David at quarterly business review meetings, but the plans did not change. She also stated that, in the beginning of fiscal year 2015 (which began on March 2, 2014), over a

year after 1 Pier 1 had launched, the pod responsible for kitchen textiles communicated to management that they did not agree with the overly aggressive sales plan because not only did the department not have the sales to support the kind of growth that management had instructed it to plan for, the actual numbers suggested that sales would be down that year. However, the plans had come from senior executives such as Benkel, and there was no room to change them.

66. The second Allocations Analyst discussed above, who worked for the Company from 2011-2015, also stated that, beginning in the second half of calendar year 2013, "concerns were voiced often," and the existence of excess inventory was "common knowledge," but the plans never changed.

67. Moreover, planners would themselves compare Company goals made at the beginning of the year to actual sales and inventory figures on a monthly basis, and adjust their plans accordingly. In the process, they frequently found that the Company's performance was below what Pier 1 had originally planned, and communicated these discrepancies to senior executives in advance of the quarterly business reviews. However, the Executive Defendants did not adjust the goals.

68. Because she worked closely with supply and distribution personnel to ensure that proper inventory allocations reached Pier 1's stores, the first Allocations Analyst discussed above knew that excess inventory became "a problem for everyone, everywhere, from distribution centers to the stores." Even so, executives continued to push for more inventory to be sent to distribution centers and stores, and for buyers to continue buying more product, even though stores attempted to push back on receiving the inventory, and demanded less of it. The situation became so severe that stores resorted to citing fire codes and Americans with Disabilities Act compliance violations to resist the shipment of more inventory to their stores. Finally, the Analyst stated that stores were authorized to start renting outdoor storage units to

store the overflow of inventory, and that authorizations to do so shot up noticeably during fiscal year 2014.

69. A third former Allocations Analyst at Pier 1's headquarters, who was employed there from mid-2013 through mid-2014, stated that the Company needed to purchase a large amount of excess inventory in order to match the Company's sales goals. Departments thus increased store inventory simply because the plan demanded it, and the general consensus was that allocators were being asked to push inventory to stores without regard to actual sales.

70. Likewise, a former Buyer for Pier 1's furniture department, who was employed at the Company's headquarters from 2013 to 2015, recalled receiving a growth goal of 26% in April 2014 for the next fiscal year, and explained that throughout fiscal years 2014 and 2015, every group in the furniture department was given huge, high double-digit growth plans that could only be met through buying more inventory, which the Company's distribution centers were not prepared to handle. The growth targets were so extreme that the Buyer compared the situation at Pier 1 to the scene in "I Love Lucy," where chocolates kept coming down a conveyor belt but there was nowhere to put them, and stated that every buyer in her department believed that the Company's growth plans were "totally unattainable."

71. By the end of the first quarter of fiscal year 2015 (which ended on May 31, 2014), Pier 1 buyers already knew that they could not possibly make the targets set for the rest of the year. The Buyer herself was more than approximately 20% short of targets, something she communicated to senior executives at quarterly business review meetings, who reported the same directly to the Company's executives, including Defendants Smith and Turner. Specifically, the Buyer stated that her divisional manager asked her to prepare her quarterly reports precisely so the manager could present the reports directly to Smith, Turner, and Benkel, among others, and recalled at least one occasion when the manager stated after one such meeting that she had been

questioned intensely on "the numbers." Reiterating this point, the Buyer stated that "every" divisional manager made the same type of quarterly reports to the Executive Defendants, and that "everyone," including the CEO and senior VPs, "knew" that Pier 1 was not going to meet the plans. Finally, the Buyer stated that senior executives "oversold" the sales plans to investors and refused to deviate from them no matter what evidence they were presented with.

72. An Accounting System Analyst at Pier 1's headquarters from mid-2012 through early-2016, who was responsible for financial reporting and maintaining the functionality of the Company's accounting systems, also stated that Pier 1 had trouble planning the amount of inventory it would need—a fact later admitted by the Company and Defendant Smith in February 2015. For instance, the Company did not account for any transitional period that it may need to adjust to the omni-channel structure called for by the 1 Pier 1 initiative, but simply began issuing aggressive sales targets. Moreover, the Company's method for determining future sales involved taking the percentage increase from the prior year and adding additional growth on top of it, under the assumption that sales could grow the same amount as previous years, and 5-7% more beyond that, year after year. Finally, the Accounting System Analyst noted that the Company made no provision for the possibility that online sales would cannibalize in-store sales, and questioned the Company's practice of setting forecasts for the entire year and basing inventory and sales planning on such yearly forecasts, even though numerous unpredictable factors made such year-long goals unreliable at best. Once made, only minimal, unnoticeable adjustments were possible, regardless of what new information was received.

73. The fact that the Company's sales goals were unrealistic was also known by former Pier 1 employees who worked in departments that had nothing to do with inventory planning, accounting, or even sales. For example, a Marketing Campaign Specialist at the Company's headquarters from late-2013 to mid-2014 recalled that his superiors, director-level

managers who reported directly to executives, discussed how unrealistic and unreasonable sales goals were in fiscal year 2014.

74. The Marketing Campaign Specialist added that even though bonuses were dependent on the Company meeting its sales goals and employees strove to meet them, no employees aside from executives received bonuses in fiscal year 2014, which demonstrated that sales goals were not being reached. A Manager of Multi-Channel Production Services who worked at the Company's headquarters from late-2010 to late-2014, stated that she and her colleagues "knew" the sales targets given out were unrealistic, and that she received a bonus every year between 2010 and 2012, and even for a part of 2013, but the fact that from then on no bonuses were given out was a clear indication that the Company was not hitting its sales targets. At least eight other former employees provided similar assessments of the bonus to sales relationship. These include the former Buyer; Accounting System Analyst; and two of the three Allocation Analysts mentioned above; as well as a former Supervisor at Pier 1's Mansfield, Texas distribution center from late-2013 to mid-2014; a former Department Administrator from 2013 to 2016, who worked in the Department that handles Project Administration, Facilities, Store Planning, Real Estate, and Architecture; a former Trade & Product Compliance Specialist at the Company's headquarters from early-2008 to mid-2014; and a former Lead Quality Assurance Analyst at the Company's headquarters from early-2011 to late-2014 (speaking to calendar year 2014 only).

75. A former Quality Control Supervisor based at Pier 1's Ontario, California distribution center from 1994 to 2014, also stated that the Company bought inventory to match sales goals, but that it failed to reach these numbers because the sales that had been predicted simply did not exist, and the Company did nothing to revise the unrealistic outlook for years. Thus, the Quality Control Supervisor recalled "just busting at our seams" with inventory, a

phrase also used by two others to describe the Company's excess inventory, including one of the three Allocation Analysts mentioned above and a former Operations Supervisor at the Company's Maryland distribution center from mid-2013 to mid-2014. Similarly, an Analyst and Programmer for the IT department who worked for the Company at its Texas headquarters for over a decade and a half—from 1999 to 2015, recalled that Pier 1 "over-bought merchandise" "across the board" and that the "expectation was that they could sell more than they were able."

76. Thus, the sentiment that sales goals were unrealistic was so widespread that by the start of the Class Period, no less than five former employees working in planning and allocations—the very department responsible for matching inventory with forecasted sales—reported that sales goals had been overly aggressive, a fact that led directly to outrageous, excess inventories. Several of these former employees further confirmed the Executive Defendants' awareness that goals were out of sync with reality. Despite this knowledge, or, at a minimum, severely reckless disregard of the facts, Defendants Smith and Turner continued to falsely represent to the market that inventories were "clean" and "in line" with expectations, while failing to disclose that those goals were, in fact, not being met in real-time.

### 2. The Inventory Excess Across Pier 1's Stores and Distribution Network, Unequipped to Handle Such An Influx, Was Extreme

#### a. On the Basis of Unrealistic Sales Goals, the Company Purchased Excess Inventory

77. As discussed above, Pier 1 maintained six distribution centers across the country, in Ohio, Texas, California, Georgia, Maryland and Washington. Two of these (Ohio and Texas) also functioned as fulfillment centers for Pier 1's e-commerce business. When excess inventory began to accumulate, it was at these distribution centers that problems manifested, and from there, a domino effect led to inventory overflows at the Company's stores, which could only resort to setting up outdoor storage units for merchandise that the stores could no longer hold

indoors

78. Numerous former employees reported excessive inventories in the Company's distribution centers. The Department Administrator mentioned above, who was at the Company from 2013 to 2016, stated that she sometimes handled the bills for the extra storage units that distribution centers rented, that distribution centers and stores had rented a "ridiculous" number of these storage pods, and that it was not until mid-2015 that the Company began making attempts to reduce their use. The Department Administrator attributed many of these problems to the Company's hasty shift to e-commerce, an opinion also shared by the Lead Quality Assurance Analyst mentioned above, who thought that executives had vastly over-stated sales goals. The Texas distribution center Manager, who worked there from 2014 to 2015, also recounted being certain that the Company was incapable of forecasting inventory accurately, as he frequently found inventory that had been at the warehouse for years without being touched, because the merchandise had never been entered into the system.

79. A Warehouse Associate at the Ohio distribution center from mid-2013 through the end of 2013, confirmed the existence of excess inventory, and stated that starting in October 2013 and continuing past her departure, the center had to rent an additional warehouse several miles away from the Ohio distribution center to hold the overflow. The first Allocations Analyst mentioned above likewise recalled that in the first months of fiscal year 2015, in order to deal with inventory overflow, the Company instituted a program of adding secondary distribution centers as extensions of its larger regional facilities.

80. The same problems with excess inventory also existed at Pier 1's Texas, Maryland, and California distribution centers. For example, the second Allocations Analyst mentioned above, who was with the Company from 2011 to 2015, stated that the inventory situation at the Maryland distribution center was so severe at times that merchandise had to be

marked down before it even reached the stores, in order to clear the backlog.

81. Likewise, the Quality Control Supervisor at the Company's California distribution center, who was responsible for monitoring the quality of products delivered to all of the distribution centers in the network, recalled merchandise sitting at the Ontario distribution center for years without moving because of overbuying.

82. Pier 1's Georgia distribution center faced similar issues. A former Distribution Supervisor in Georgia from mid-2014 to mid-2015, stated that the Georgia facility was in crisis throughout her entire tenure at the Company, and suffered inventory backlogs that grew worse over the course of her time there.

83. These accounts are confirmed by satellite photos of Pier 1's distribution centers from prior to, during, or after the Class Period. As summarized in the table below, satellite photos (also attached hereto as Appendix A) show that during this time, the number of containers parked outside the Company's main distribution centers increased dramatically from a pre-Class Period date to the middle of the Class Period, and between two dates during the Class Period itself:

| Location | First Date Count (Pre-Class Period) | Second Date Count (During Class- Period) | Percentage Change from First to Second Count | Third Date Count (During or After Class Period) | Percentage Change from First to Third Count |
|---|---|---|---|---|---|
| Washington | 48 (May 4, 2013) | 65 (July 10, 2014) | +35% | 103 (Apr. 19, 2015) | +125% |
| Texas | 52 (Apr. 10, 2013) | 77 (Oct 2, 2014) | +48% | 50 (July 14, 2015) | -4%* |
| Georgia | 120 (Nov. 1, 2012) | 216 (Nov. 20, 2014) | +80% | N/A | N/A |
| Ohio | N/A | 74 (June 13, 2014) | N/A | 200 (Aug. 22, 2015) | +170% |
| California | 48 (Mar. 15, | 92 (Mar. 24, | +91% | 95 (Feb. 9, 2016) | +97% |

| | | | | | |
|---|---|---|---|---|---|
| | 2013) | 2015) | | | |

Note: Counts exclude tractor-trailer-sized containers that are connected to the warehouse building itself, on the conservative assumption that containers connected to the warehouse were in the process of being emptied, which may not have been the case. The Maryland distribution center has not been included in this chart because Google Earth does not carry Class Period satellite photos of that center.

***** While the number of trailers was 4% lower at the Texas distribution center on the day of the July 2015 satellite fly-over than on the April 2013 satellite fly-over, at least one former employee, the Texas distribution center Inventory Control Specialist cited above, stated that throughout fiscal year 2014 and into fiscal year 2015, when he left the Company, the Texas distribution center was renting at least one separate warehouse from third party contractors of 180,000 square feet, and that during fiscal year 2015, it began renting two more, one of 150,000 square feet, and one of 80,000 square feet, for a total of 400,000 square feet, and continued to rent them after his departure (except for the 80,000 square foot facility, which has been shut down).

84. For example, the "before" and "during" satellite photos of the Georgia distribution center, which was not responsible for e-commerce, but which saw an 80% increase in parked, unattached trailers, are shown below:

**Photo 1 Dated November 1, 2012:**




**Photo 2 Dated November 20, 2014:**




85. An Administrative Assistant to a senior company executive, who worked at the Company's Texas headquarters from 2009 to 2014, also stated that not only were distribution centers renting out extra storage space, similar disarray and a search for solutions to the exploding inventory occurred at the store level. Because inventory had filled up stores' storage rooms, the Pier 1 stores began resorting to outdoor storage units. The Administrative Assistant explained that the stores ran out of storage room simply because merchandise was not selling.

86. The first Allocations Analyst discussed above, who worked at the Company's headquarters from 2011 to 2014, also explained that allocators had access to an in-house system used to track whether stores had appropriate quantities of merchandise, and this enabled them to see that certain stores had lower sales and accordingly did not need as much inventory. Even so, as fiscal year 2014 (which began in March 2013) got under way, management instructed allocators to raise in-store inventory amounts across the board, to levels that the stores could not absorb. Management justified these wholesale increases on the basis of the sales goals, but the Allocations Analyst found this perplexing, as the Company's planning and allocation systems were designed to automatically account for sales growth by ordering more replenishment inventory, and there was no need to radically raise the inventory levels prior to any actual growth

in demand. Indeed, as discussed above, during fiscal year 2014, allocators were manually pushing inventory allocations to the stores on top of what the Company's DCM allowed, almost as much as they were using the DCM itself.

87. According to a former Facilities Coordinator based at Pier 1's headquarters from 2000 to 2015 (who reviewed sales numbers in order to keep facilities services in line with what the stores were earning), rather than decrease the inventory for retail stores as Pier 1's e-commerce business grew and cannibalized sales from the retail stores, the Company continued to order increasing amounts of inventory for its retail stores as well. As a result, inventory piled up throughout the supply chain, and the Facilities Coordinator recalled instances after the launch of the e-commerce initiative, where the distribution centers were pushing an additional 30-50 feet of product each week to stores that had already been filled, in addition to pre-existing regular orders of approximately 20-30 feet of product.

88. According to the third Allocations Analyst mentioned above, who was at Pier 1 from mid-2013 through mid-2014 and responsible for replenishment and inventory management, the level of merchandise that was being bought during the entirety of her tenure was excessive in light of what the Company could actually sell. Indeed, the Analyst reported that during fiscal year 2014 (which began in March 2013), because lofty sales goals demanded corresponding increases in inventory, the Company was trying to hold a year's worth of supply at the distribution centers while the retail stores were "bursting at the seams." The Analyst's accounts also corroborated that Pier 1 used outdoor storage units to store inventory, stating that when she started at the Company less than a hundred stores had outdoor storage, and by the time she left in mid-2014, upper allocation management (who reported directly to Benkel) cited projections of approximately 300 stores using outdoor storage units by the next season, triple the number than when she started a year earlier, and growing.

**b. The Company Lacked the Infrastructure Necessary to Handle the Excess Inventory**

89. Not only did the Company purchase excess inventory compared to demand, Defendants failed to build the infrastructure—as Defendants claimed to investors they had—to process and store the excess inventory. During the Class Period, this exacted additional, undisclosed costs on the Company. For example, the Department Administrator cited above stated that the Company moved towards e-commerce "too fast, too soon," was not ready to handle the amount of inventory that was bought, and did not have sufficient infrastructure and manpower at the distribution centers to support the venture. Moreover, the third Allocations Analyst cited above stated that Pier 1 did not have the capacity to handle the inventory growth over fiscal year 2014, and should have put the infrastructure in place to handle the excess inventory before purchasing it. The second Allocations Analyst discussed above found that the Company's allocation capability compared unfavorably to the systems in use at Pier 1's competitors, where she had worked previously. In the Allocation Analyst's opinion, Pier 1's infrastructure was neither sophisticated nor scalable.

90. A Warehouse Associate, who worked at the Ohio distribution center from mid-2013 through the end of 2013, stated that the distribution center's equipment and vehicles were outdated, frequently malfunctioned, and that the Company did not take into account these inefficiencies when determining how fast employees could unload and sort merchandise, which contributed to the backlog. The first Allocations Analyst cited above also noted that backlogs hindered allocators because although products had already arrived at the distribution center, they were often unavailable for allocation because they were sitting in packed trailers on the distribution center's lot.

91. The former Distribution Supervisor in Georgia discussed above, stated that the Georgia facility had neither the virtual allocation space, nor the physical space, to store inventory

that was flooding in, problems that became worse over the Class Period. These problems were also exacerbated by the fact that the Company employed numerous "antiquated" inventory systems that were not mutually compatible.

92. A former Domestic Inventory Coordinator who worked at Company headquarters from mid-2008 to late-2014, stated that she felt that some of Pier 1's systems and practices were too antiquated to keep up with the pace of a supply chain under strain, and that the supply chain department was always short staffed. A Supervisor from late-2013 to mid-2014 at Pier 1's Mansfield, Texas distribution center, stated that the Company's warehousing system was "systematically broken," such that at his location "there was so much product coming in and nowhere to put it."

93. This Supervisor's distribution center also suffered from a host of infrastructural problems, which included everything from "inventory discrepancy" due to inadequate software, to lack of space and manpower, to safety problems arising from untrained forklift operators and inadequate racks that collapsed under excessive weight. The Supervisor attributed the host of safety problems and inefficiencies he witnessed during his time at Pier 1 to the unrealistic demands that the Company put on its logistical staff, and its tendency to value volume over employee safety.

94. A former Operations Supervisor at the Company's Maryland distribution center from mid-2013 to mid-2014, described similar problems, stating that the center had been equipped with inadequate storage racks that he had never seen elsewhere, un-sturdy enough that products would sometimes fall over when stacked.

95. Moreover, the Accounting System Analyst discussed above stated that the fact that the Company was systematically unprepared for the volumes of inventory created a domino effect that rippled far beyond the distribution and logistics network itself. Specifically, because

the Company had not prepared for the possibility of having to open secondary distribution centers and warehouses, the accounting and finance groups were unable to account for, and record, the expenses associated with these un-planned for measures, and did not know how to categorize them. Remarkably, the Analyst explained that the very fact that some of these expenses were being incurred by secondary distribution centers, contractors, and additional warehouses did not reach the accounting department until a long time after they had begun to accrue, and as a result were not recorded properly.

96. Thus, although the Company had represented that it had built systems that allowed it "to identify where and how much merchandise we need in order to keep all distribution centers in optimal stock," as these accounts demonstrate, Pier 1 was unprepared to handle inventory growth and its distribution centers were in disarray throughout the Class Period.

#### c. The Company's Inventory Problems Caused It to Incur Significant Costs

97. The cumulative effects of the Company's *ad hoc* measures to handle its increasing inventory in fact cost the Company significant amounts of money, which the Defendants failed to fully disclose to investors or attribute to the Company's inadequate infrastructure and excess inventory. Numerous former employees attested to these expenditures, of which senior executives were aware or were severely reckless in disregarding.

98. For example, the third Allocations Analyst cited above, working in Pier 1's allocations department at Company headquarters from mid-2013 through mid-2014, stated that distribution center costs increased dramatically because of unsold inventory, and that since inventory levels were excessive while she was there, she was not surprised when the Company eventually announced that it was facing increased costs.

99. The first Allocations Analyst cited above, who worked at Pier 1 from 2011-2014 and allocated inventory to stores, also stated that sending excess inventory to stores inevitably

increased labor costs at the distribution center and the stores.

100. The Distribution Center Supervisor at the Company's Georgia distribution center, cited above, also stated that not only was the Georgia distribution center incurring high per diem costs on containers that it failed to unload, which became a "very significant expense" toward the end of calendar year 2014, the facility also had to hire contractors to help unload excess containers, rent an extra storage yard, and pay additional port fees to carriers to hold loaded containers in the port nearest to the distribution center. The Supervisor stated that the facility's Profit and Loss statements, which the distribution center transmitted to corporate headquarters, showed these various extra costs. Lastly, the Supervisor stated that near the end of fiscal year 2014, Georgia, as well as multiple other distribution centers, received direction to stop unloading merchandise, even though each was heavily backlogged at the time.

101. The Accounting System Analyst cited above, who worked at Pier 1 from mid-2012 through early-2016, likewise noticed that the Company was having trouble controlling inventory costs at its distribution centers throughout fiscal years 2015 to 2016, and that those costs were well known in the finance department. The Analyst also stated that the size of the inventory influx was so great and the need to move through it so urgent, that the Company was devoting far less scrutiny to invoices for the contractors hired to help process the inventory backlog, and invoices were being "approved left and right." This led to a decline in cost control and the incursion of unnecessary expenses that could have been avoided.

102. A former employee of a Pier 1 subcontractor, who joined Pier 1 officially as an Inventory Control Specialist at the Texas distribution center, where he remained until late 2014, stated that the Company needed to hire a subcontractor to house excess inventory in a warehouse 15-20 minutes from Pier 1's Mansfield, Texas distribution center. Even so, during the 2014 holiday season the center had to rent out two more facilities to house excess inventory, and

continued to sustain per diem costs for containers that sat out on the lots, which the center was too understaffed and overcapacity to unload, even though employees were working from 4:00AM to midnight, every day, throughout much of fiscal year 2014. Overall, throughout fiscal year 2014 and into fiscal year 2015, when the former Inventory Control Specialist left the Company, the Texas distribution center was renting at least one separate warehouse from third party contractors of 180,000 square feet, and during fiscal year 2015, Pier 1 began renting two more, one of 150,000 square feet, and one of 80,000 square feet, for a total of 400,000 square feet, and continued to rent them after his departure (except for the 80,000 square foot facility, which has been shut down).

103. The Texas Distribution center Manager, cited above, stated that upon coming to the distribution center, he found a warehouse so mismanaged that there was no tracking at all for discarded items, and standard inventory tracking so deficient that "mountains" of random, unsorted products sat against the warehouse's back wall, which would pile-up and be thrown away on a monthly basis. The Manager also stated that Pier 1 employees kept excess inventory in so-called imaginary "Special Projects" locations, and that because there was "too much inventory," even in Pier 1 stores, stores would send pictures to distribution center employees showing that the space for inventory was already "maxed out to the ceiling." During his time at Pier 1, the Manager witnessed so much product waste that he estimated that at least $1 million of retail-value product was being discarded without being tracked each year. The Manager stated further that safety issues were "out of control," and recalled at least two third party locations serving his distribution center's overflow alone, which required expensive transportation of merchandise between the various warehouse locations. According to the Manager, "astronomical" sums were wasted on unnecessary inventory expenditures due to inefficiency and lack of oversight, and problems he witnessed included products being thrown away outright for

not having been inventoried and categorized, and containers that sat in the distribution center lot for months without being touched.

104. Indeed, the Manager recalled telling warehouse associates that inventory needed to be restructured to make it more efficient. In response, associates showed him untouched merchandise that had never been opened, which had sat in the warehouse for over a year, with some having sat for more than two years. The manager also witnessed containers of merchandise that were in the warehouse lot when he started at Pier 1 (late 2014), which were still there when he left (mid-2015), and described old merchandise stacked high, covered with a layer of black dust so thick that he could not see through it.

105. The Texas distribution center Supervisor recounted the infrastructural problems at the Texas distribution center, and stated that he imagined it would have had to set aside a "huge budget" on costly third party storage facilities and contractors. The second Allocations Analyst discussed above, working at the Company's headquarters, also noted that Defendant Smith had demanded as early as late 2013 that the Company needed to end the use of third party storage facilities. The Analyst explained that Smith was aware that stores had no standardized method for tracking what was being stored in outdoor storage units, and some were only keeping rough track with a notebook, and outdoor storage units were extremely expensive.

106. Indeed, the costs of a distribution network overburdened by excess inventory were so well known throughout the Company, that even employees outside of the distribution network were aware of them. For example, the Department Administrator cited above, stated that the costs of external storage became excessive, and that it was the size of these costs that caused management to end the Company's reliance on them at the end of 2015 and the beginning of 2016. The Department Administrator stated that, even as of February 2016, 418 out of Pier 1's 1,032 stores, or over 40% of the Company's retail locations, were still using outdoor storage

units, but recalled that the figure was far higher from 2013 to 2015.

107. In sum, former Pier 1 employees identified at least six sources of costs that resulted from Pier 1's excess inventory during the Class Period. These included costs due to (i) renting lots in order to store trailers; (ii) using outdoor storage pods at retail locations; (iii) hiring third party contractors to supplement insufficient manpower at distribution centers; (iv) paying fees to port facilities to hold containers that distribution centers could not absorb; (v) paying per diem fines to railway yards to hold containers that distribution centers could not absorb; and (vi) shipping merchandise between external warehouse facilities and the distribution centers. There also existed failures in Pier 1's accounting and internal controls that led to high and unnecessary expenses, which were approved without scrutiny because accounting personnel had been overwhelmed.

108. Because Defendants Smith and Turner had repeatedly assured investors during the Class Period that the Company was fully in "control" of its "clean" inventory, executives failed to disclose that Pier 1 was subject to these extraordinary costs, or properly attribute them to the Company's excess inventory level.

#### d. Despite Defendants' Repeated Representations to the Contrary, the Company's Excess Inventory Presented Serious Markdown Risk

109. Not only did Pier 1's excess inventory lead to increased costs to carry it, but the excess inventory posed a serious, undisclosed markdown risk throughout the Class Period. The Executive Defendants addressed the issue multiple times by falsely and misleadingly claiming that Pier 1 had no "markdown risk" both affirmatively and in response to analysts' questions. For example, on June 19, 2014, Defendant Smith stated in response to one analyst's questions about margin pressure, that "it is not so much the markdown pressure, I mean we continue to run a very clean inventory as I know you know."

110. By the end of calendar year 2014, reported inventories had risen to an all-time high of $535.5 million, or over $100 million more than six months earlier, when Defendant Smith had last reassured the markets that Pier 1 was running a "very clean" inventory. However, by February 2015, the Company was forced to make the unexpected announcement that they had failed to accurately forecast inventory costs and sales, as well as Defendant Turner's "resignation." On March 2, 2015, barely a month after this announcement, the Company released an investor presentation that pointedly claimed again that "current inventory composition ***does not present an immediate or significant markdown risk***." The Company's interim CFO thereafter stated on an April 8, 2015 conference call with analysts that Pier 1's inventory levels were "healthy" and did "not pose a significant immediate markdown risk."

111. Despite these reassurances, Defendant Smith admitted during both the September 24, 2015 and December 16, 2015 conference calls with analysts and investors that Pier 1 was in fact undertaking "heavier than expected promotional and clearance markdowns," and that "on a really historical level, we've still got more clearance inventory than we used to have." In other words, by the end of the Class Period, Defendant Smith was forced to admit that Pier 1 had excess inventory that required unprecedented clearance markdowns. Indeed, on the December 16, 2015 conference call with analysts, Defendant Smith specifically admitted that over the "last 18 months or [so]," inventories had "got out of whack," and that as a result it would take at least "18 months" before the Company could return to its "normal trajectory where sales and inventory are in sync."

112. Thus, despite the Company' assurances to investors throughout the Class Period that growing inventories did "not pose" any markdown risk, and that its purportedly "clean" inventory meant it was subject to no margin pressure from markdowns, a massive, undisclosed inventory backlog forced Pier 1 to heavily markdown its inventory mere months after the last of

its assurances of a purportedly "healthy" inventory.

## V. PARTIAL DISCLOSURES AND THE GRADUAL EMERGENCE OF THE FULL IMPACT OF THE FRAUD

113. As discussed above, beginning on February 10, 2015, and through the end of the Class Period in December 2015, the true facts concerning the actual financial condition of Pier 1, specifically the Company's "extremely high inventory levels" and concomitant markdown risk, and lack of a scalable infrastructure, were revealed to investors and the public.

### A. February 10, 2015: Pier 1 Announces Higher Supply Chain Expenses and the Resignation of Its CFO, and the Stock Price Falls -25%

114. The Defendants' fraud began to be revealed on February 10, 2015, when the Company disclosed for the first time in a Form 8-K and press release that, at Pier 1, there had been during the Class Period a "failure to adequately forecast the revenue and expenses in our business."

115. The Company also specifically disclosed that its higher expenses had resulted from "unplanned supply chain expenses," which primarily included "incremental distribution center costs that affect our gross profit" – the very undisclosed problems at Pier 1's distribution centers alleged herein. The Company called its now-admitted inability to forecast sales and revenue a "financial issue" that it had now "aggressively addressed."

116. On February 10, 2015, the Company also announced that Pier 1's then-CFO, Defendant Turner, a 22-year veteran of the Company, suddenly "resigned," effective immediately, at the age of 58. Also included in Pier 1's announcement was a significant, previously-undisclosed increase to its selling, general and administrative ("SG&A") expenses.

117. Wall Street analysts expressed shock at these announcements:

a. On February 10, 2015, Barclays reported that Pier 1 had announced a "material shortfall in 4Q earnings."

b. On February 11, 2015, Morgan Stanley reported: "While missing forecasts is not uncommon for any company, it is difficult to reconcile the

size of PIR's [Pier One's] Q4 shortfall against comps that appear to be respectable relative to Street estimates… It points to such a significant 'over' forecast of sales and/or an 'under' forecast of expenses that it raises questions as to how well PIR grasps the contours of its financial model." Morgan Stanley also found that the cost of managing Pier 1's inventory had been "grossly under forecast" and explicitly questioned management's explanation that Pier 1's sales shortfall was isolated to the January-February 2015 timeframe, calling that "surprising."

c. On February 11, 2015, BB&T found it "somewhat inexplicable [that] Pier 1's supply chain expenses—which management should have a great degree of control over—are higher than expected."

d. On February 11, 2015, analysts from Credit Suisse stated that the problems the Company disclosed on February 10 "represent a major setback to our thesis," and that "the company has moved almost too quickly, and has not been equipped to deal with the transformation" in its business. Credit Suisse also expressed concern that the Company built "infrastructure that may not be scalable over time" and stated that "expenses were much higher than expected," with SG&A expenses $8 million higher than Credit Suisse had understood.

e. On February 11, 2015, Oppenheimer reported: "We are shocked and very disappointed by Tuesday night's announcement from Pier 1 Imports (PIR) that Q4 results will fall short of plan. It is now clear that our call that the 'worst was over' for PIR was premature… It might be some time before the company's expense infrastructure is adequate to support rapid online growth." Oppenheimer also stated that its analysts had spoken with Pier 1's management in the wake of its February 10 disclosures and that the conversation "suggests clearly that the company has significantly underestimated the costs associated with operating and expensing an online business."

f. On February 11, 2015, Wedbush reported that Pier 1's inventories were "bloated" and that "markdown risk is high." Wedbush also found that the Company's new SG&A guidance "implies that an element of the cost structure may be higher than planned" and that the "apparent lack of flexibility and contingency planning in the business model needs to be addressed as well."

g. On February 11, 2015, Wells Fargo reported that, "the company announced a margin shortfall, which was attributed to unplanned supply chain expenses and a 'failure to adequately forecast the P&L,' although we would point out this was more than just a miss versus expectations."

118. In response to the Company's shocking revelations on February 10, 2015, which partially revealed Defendants' fraud, the price of Pier 1's shares plummeted from $16.97 per

share on February 10, 2015 to $12.84 per share on February 11, 2015, or approximately 25%, on heavy trading volume.

**B. Pier 1 Falsely Reassures Investors that Its Inventory Would Normalize and that the Prior Increase in Inventory Did Not Present a Markdown Risk and that It Was "Transitory"**

119. On April 8, 2015, Pier 1 held its first conference call with analysts and investors to discuss the Company's earnings and operations after the February 2015 disclosures. During the conference call, the Company and Defendant Smith assured investors that the high inventory levels would abate and would not result in discounting or margin pressures. For instance, directly contrary to Wedbush's February 11, 2015 assessment that markdown risk was "high," the Company's interim-CFO stated that "the complexion of our current inventories level is healthy, and does not pose a significant immediate markdown risk." Defendant Smith further assured investors that "[w]e have done a very good job historically of keeping growth of inventory in line with sales growth" and "we are going to get back to doing a good job of it." Interim CFO, Laura Coffey, also claimed that "for seven out of the past eight years we have managed inventory growth more or less in line with sales, and expect to return to that cadence again going forward."

120. On April 8, 2015, Smith also claimed that the inventory issues would not have a lasting impact on the Company. In his words: "The issue that impacted our fourth-quarter results are transitory and have no bearing on the underlying strength of the Pier 1 Imports brand, nor our potential to drive organic growth and pursue new growth opportunities." Analysts received this news positively, with Barclays stating that, "management expressed confidence….that Pier 1 is not exposed to meaningful markdown risk." On this news, Pier 1's stock price increased by over 9% in one day.

**C. September 24, 2015: Pier 1 Discloses Markdowns and "Challenges" from Operating with Excess Inventory, and the Stock Price Falls -12.2%**

121. On September 24, 2015, despite Defendants' false reassurances to investors that Pier 1's inventory did not present a markdown risk and that any issues were only "transitory," Pier 1 stunned the market and again reported "disappointing" financial results. These included earnings per share of only $0.04, compared to Street estimates of $0.07. Defendant Smith also stated that the Company's margins had been negatively impacted by "increased promotional and clearance activity" – i.e., markdowns – as well as "inventory related issues without our distribution center network." Smith also partially admitted that, contrary to prior representations that Pier 1's increased inventory levels were in accordance with the Company's "plan," "operating with elevated inventories has been a challenge."

122. The Company also disclosed in a Form 8-K and press release filed with the SEC on September 24, 2015 that the Company faced a decline in merchandise margin that was "attributable to inventory related inefficiencies within the Company's distribution center network, as well as promotional markdowns and clearance activity to reduce inventory levels."

123. On a conference call with investors on September 24, 2015, Defendant Smith further admitted the lasting negative impact that the Company's excess inventory levels were having on the Company, and partially revealed that the problems were not "transitory." In his words:

> There are three principal factors that impacted our performance this quarter: slightly softer than expected Company comp sales, heavier than expected promotional and clearance markdowns, and excess costs in our distribution network. . . .
>
> Suffice it to say, we will continue to feel the effects of our elevated inventory levels the remainder of this year. This is particularly frustrating, and we are disappointed about the impact it's having on our margins and profitability. . . . [G]iven the slow turning nature of our inventory, it's taking several quarters to work through this. . . . We expect our distribution centers to begin operating with increased

> efficiency – levels of efficiency beginning in the fourth quarter, with the financial benefits beginning to manifest in FY17. I'll remind you of what I remind myself every day when I look in the mirror. Nothing good happens when you have too much inventory. . . . [T]he area of greatest challenge has been merchandise margin. This is largely the consequence of too much inventory. As I outlined earlier, we are in the throes of working this down.

124. Wall Street analysts expressed further shock and disappointment at these disclosures, which contradicted the Company's prior assurances that the excess inventory was "transitory" and did not present a markdown risk:

a. On September 25, 2015, BB&T analysts wrote that they were "disappointed by the earnings miss, which was largely driven by Pier 1's ongoing excess inventory issues." BB&T further reported that it was "particularly surprised by the extent of markdowns required to work through excess inventory given management's earlier assertions this would not be a significant issue."

b. On September 25, 2015, Morgan Stanley wrote a report entitled "Cleaner Inventories But at a Greater Cost," that "the clearing out of excess inventory came at a significant cost," as the Company missed earnings per share targets by 40%.

c. On September 25, 2015, SunTrust Robinson Humphrey wrote that Pier 1 "continues to work through both elevated inventory levels and distribution center inefficiencies, which we believe will weigh on margins through at least year-end. (That said, in light of these challenges, we question why management didn't take a more conservative route when issuing guidance for the quarter.)"

d. On September 25, 2015, Wedbush wrote that Pier 1 "faced tremendous markdown pressure to clear excess inventories."

e. On September 29, 2015, Oppenheimer analyst Brian Nagel discussed a call with Pier One's new CFO, Jeff Boyer. Nagel wrote that "working inventories down to a more manageable level" remained a "key focus" for Pier 1, but that inventory at Pier 1 was "unlikely to prove 'clean' until early in … Feb. 2017."

125. On the September 24, 2015 news of Pier 1's continuing, excess inventory levels and the need to engage in significant markdown and clearance efforts to clear the undisclosed inventory backlog, shares of Pier 1 fell from $8.67 per share on September 24, 2015 to $7.61 share on September 25, 2015, or 12.2%, on high trading volume.

**D. Pier 1 Falsely Attempts to Minimize the Scale of Its Excess Inventory**

126. Even after these disclosures, Pier 1 attempted to diminish the scale and cause of the markdown risk that it had been facing. For example, in its second quarter 2016 Form 10-Q, filed with the SEC on October 7, 2015, a mere two weeks after it had disclosed significantly elevated markdown and clearance efforts to rid itself of excess inventory, the Company continued to describe increasing inventories as "primarily due to the seasonal build of inventory for the fall and holiday selling seasons." This implied that continuing inventory build-ups were not attributable to excessive orders, but to course-of-business holiday sales.

127. Moreover, on October 22, 2015, the Company released a presentation to investors that stated pointedly, and in bold, that "overly optimistic sales forecast in ***Q4 FY 2015*** resulted in elevated inventory levels." While that statement conceded that inventory levels were excessive, it falsely attributed it to a single quarter of missed forecasts. In fact, Defendants had made unrealistic sales plans since at least the beginning of fiscal year 2014.

**E. December 16, 2015: Pier 1 Discloses Negative Financial Results from Its Excess Inventory, and that Inventory Will Not Track Sales Again Until the End of Fiscal Year 2017, and the Stock Price Falls -20%**

128. Finally, on December 16, 2015, when announcing its further disappointing fiscal third quarter 2016 financial results, Defendant Smith further admitted that Pier 1 had operated with "excess inventory" as a direct result of the Company's unrealistic sales goals, which resulted in problems at the Company's distribution centers and undisclosed, added costs. Smith further disclosed that the amount of excess inventory was so great that, despite Pier 1 having marked down much of its excess merchandise, the Company was still not operating with an "acceptable" level of inventory and still needed to perform additional work to improve the state of the Company's distribution centers. In Smith's words:

> We're in the process of completing our omni-channel transformation. And we encountered supply chain difficulties,

> stemming from an aggressive sales forecast that resulted in ***excess inventory*** and ***added costs***. We're making inroads towards bringing inventory levels down to an acceptable level this year, and driving supply chain efficiency over the long term. . . . Michael Benkel and his global supply chain team are making progress in stabilizing the performance of our DCs [distribution centers], which as you know, have been disrupted by our ***extremely high inventory levels***. There's still much work to do to get productivity levels back to satisfactory, and we have engaged third parties to help us with the process. . . . We are dissatisfied with our financial performance, and we recognize that this has been a trying period for our fellow shareholders.

129. Also, in response to an analyst's question about whether there were still "more opportunities to take inventory down," Smith admitted that, rather than having over-forecast sales for a single quarter (the fourth quarter of 2015), the Company had failed to keep inventory that tracked sales for ***the last 18 months***, and that reducing Pier 1's inventory level to a point that it accurately tracked sales would take at least ***another 18 months***:

> [F]or many years, we managed to keep inventory and sales growing at approximately the same rate. And then over [the] last 18 months or [so] we got out of whack. So our plan is to keep – we'll get the inventory down this year, and then we'll bring it down a bit further in FY17. So that over the next 18 months we're back to our normal trajectory where sales and inventory are in sync.[4]

130. On the December 16, 2015 conference call with analysts and investors, Pier 1's new CFO, Jeff Boyer, also disclosed that the Company experienced a year-over-year contraction in merchandise margin (from 59.5% in the third quarter of fiscal year 2015 to 55.7% in third quarter of fiscal year 2016), and that approximately 200 basis points of that contraction was "related to the recognition of incremental supply chain costs as the affected inventory is sold,"

---

[4] Smith reiterated this point during the Company's April 13, 2016 conference call with analysts, when he stated that, "if you look at our track record on inventory, we did a really good job for a lot of years at keeping inventory growth in line with sales growth. And our plan is, ***by the end of this current fiscal year [fiscal year 2017]*** to get back to the position that we should always have been in ***if those two had moved in sync***. So once we get back to where we should be, which will be ***the end of this year***, as far as the Pier 1 brand is concerned, we'll try and make sure that sales and inventory are pretty much in lockstep."

which are "due to increased handling, expenses and detention penalties for the elevated inventory levels"—indicating that the costs of storing the excess inventory would continue to weigh on the Company's financials even as the "extremely high" amount of excess inventory was being sold.

131. Boyer further disclosed on December 16, 2015 that Pier 1's distribution centers had not been operating at "acceptable level of efficiencies," and that, as of that time (and after making what Boyer described as "solid progress" to address "supply chain issues"), only "four of our six DCs [distribution centers] have returned to acceptable levels of efficiencies" – meaning that two of Pier 1's distribution centers were ***still*** not operating at acceptable levels of efficiencies. Boyer also disclosed that "the inventory costing effect of these issues will continue to impact margins in the fourth quarter and into the first quarter of FY17."

132. The Company's December 16, 2015 disclosures stunned the market. Indeed, on December 17, 2015, *The Wall Street Journal* reported that "What Pier 1 failed to anticipate was that growth in e-commerce business wouldn't simply be additive to its overall sales. It also meant less traffic to its brick and mortar stores where costs are fixed. That left Pier 1 with ***too much inventory***."[5]

133. Analysts responded negatively to Pier 1's December 16, 2015 disclosures, viewing them as further damaging management's credibility:

a. On December 16, 2015, BB&T reported that, "Pier 1 Imports' stunning fall from grace continued in Q3'15 in our opinion, with the company's top line and gross margin well worse than we expected."

b. During the Company's December 16, 2015 conference call, a Credit Suisse analyst stated that, "as you look at supply chain, I think the impact this quarter was a little bit bigger than expected and above prior quarters."

---

[5] Indeed, as the Company further admitted in its Form 10-K for fiscal year 2016, filed with the SEC on April 26, 2016, the Company's margins fell from 58.4% of sales for fiscal year 2015 to 55.3% of sales for fiscal year 2016, and "[t]he year-over-year decline in merchandise margin as a percentage of sales was primarily attributable to promotional and clearance activity and inventory-related inefficiencies within the Company's distribution center network."

c. On December 16, 2015, Jefferies reported that "any light at end of [the] tunnel just got dimmer."

d. On December 17, 2015, Deutsche Bank reported that: "sales and comps turned negative in the quarter which is a major red flag in our view. . . We believe the 3Q results and guidance confirm the situation is worse than feared, and we are downgrading the shares from Hold to Sell as we believe PIR [Pier One] is still in the earlier stages of a vicious cycle."

e. Also on December 17, 2015, Wells Fargo reported that the inventory issues are "now expected to spill over into Q1 17" and "[g]ross margins continue to plummet down +400 bps for the second consecutive quarter) and are now expected to decline +300 bps in Q4 due to a continuation of increased promotional activity and the fallout from elevated inventory levels and higher supply-chain expenses."

134. On the news of the Company's December 16, 2015 disclosures, the price of shares of Pier 1 dropped 20%, falling from $5.95 per share to $4.75 per share on high trading volume.

## VI. ADDITIONAL ALLEGATIONS OF SCIENTER

135. Numerous facts, considered individually and collectively, demonstrate that Pier 1 and Defendants Smith and Turner knew, or were severely reckless in not knowing, that: (i) the Executive Defendants' claims that Pier 1's inventory was "clean" and in line with its forecasts and e-commerce strategy were false because the Company had an "extremely high" amount of excess inventory that it was unable to timely clear without aggressive markdowns; and (ii) Pier 1 lacked the infrastructure, warehousing, and staff to properly store and process the inventory it had accumulated, which caused the Company to incur undisclosed costs.

136. First, the Executive Defendants' direct involvement in and awareness of inventory is confirmed by the reports of numerous former Pier 1 employees who observed Defendants Smith and Turner's personal involvement with inventory and sales data. For example:

a. A former Business Analyst at Pier 1's Texas headquarters from 2012 to 2013, stated that he was responsible for crafting detailed daily, weekly, and monthly reports on key Company metrics, including sales numbers, inventory figures, and purchases that would increase inventory. These reports, the Business Analyst stated, went directly to Defendants Smith and Turner.

b. The second former Allocations Analyst cited above, who was employed at the Company's headquarters, stated that the unrealistic plans her team received throughout 2014 and 2015 came from "the top," with the senior VPs of each division being given plans by higher executives—which could only have been Defendants Smith and Turner since they were the next level up—and told to implement them. The Analyst also stated that planning and allocations staff "constantly compare[d] inventory to sales," and reports on sales to inventory balance were created daily, made accessible to anyone in the Company, and sent directly to Defendants Smith and Turner on a daily basis, in e-mails on which she was copied.

c. The Analyst further explained that inventory issues were discussed "all the time," that reports on the status of inventory and buying plans were handed out at every meeting she ever attended, and that these reports "absolutely" went to Defendants Smith and Turner, who received the reports every morning by e-mail. Concluding firmly that Defendant Turner knew of the scale of the excess inventory, the Analyst stated that during at least one review meeting in mid-2014, Defendant Smith personally acknowledged that inventory problems were pervasive, something that was already common knowledge by then. The Analyst also explained that executives, including Benkel, attended weekly "markdown meetings" every Monday, where the Company's exposure to markdowns would be discussed in detail, down to the type of products that were going out of season and therefore had to be discounted to sell.

d. The Quality Control Supervisor based out of the California distribution center, who was formerly employed with the Company for nearly 20 years, directly attributed changes in inventory management and purchasing to CEO Smith, and stated that under Smith's leadership the Company maintained a practice of buying large amounts of inventory on the basis of high sales goals, and continued to do so without attempting to flush excess inventory, even when sales did not materialize.

e. The former Analyst and Programmer for Pier 1's IT department, who worked for the Company for over a decade and a half at its Texas headquarters, also stated that Defendant Turner was responsible for sales goals.

f. The former Accounting Systems Analyst employed at the Company's Texas headquarters from 2012 to 2016, recounted at least one instance in which Defendant Smith personally admitted to employees at an internal Pier 1 town hall meeting, that Smith was responsible for pushing overly high sales goals on Pier 1 employees, and that he had underestimated what it would take to achieve those goals. Multiple other former Pier 1 employees, including the Buyer discussed above, the second Allocations Analyst discussed above, and the Department Administrator, all independently discussed the occurrence of the same town hall meeting, held during calendar year 2014, attended by numerous employees, and held at the Bass Performance Hall in downtown Fort Worth, as well as the fact that Defendant Smith admitted that the Company had been overly ambitious with its goals and merchandise purchases. The Department Administrator, in

particular, recalled finding the event "insulting" given the contrast between the luxury of the venue, the money spent on flying regional managers in to attend the meeting, and the negative state of affairs at the Company that the Company's executives discussed at the internal Pier 1 meeting. The former Accounting System Analyst described Defendant Smith's approximately one-hour speech as a series of admissions of planning, infrastructural, and execution failures, followed by Smith's personal admission that these failures were Smith's own "fault."

Indeed, images posted to social media from the March 2014 Pier 1 town hall event show Smith speaking at the Bass Performance Hall and rehearsing with a presentation that stated that "We became victims of our own ambition." When the former Accounting System Analyst was read that phrase from the slide in the first image below, he described it as a "perfect representation" of the types of admissions he heard Smith make that day, and concluded that it summed up the series of failures that Smith recounted, and that if he had a copy of the presentation, he would "have no doubt that [the slide] was in there."




Source: Bass Performance Hall's "Vine" Page, photo dated March 17, 2014.

The following images, which show the decorations for the presentation and Smith speaking in front of them, match the first image above, and corroborate that the above image is from Pier 1's March 2014 town hall meeting.



Source: Net Streaming Live Webcasting's Facebook Page, photos dated March 20, 2014.



Source: Net Streaming Live Webcasting's Facebook Page, photos dated March 20, 2014.

On April 10, 2014, less than a month after these images were taken, Defendant Smith represented to analysts during a conference call that "I know that we will be successful because we are ambitious, we are talented and we have built an optimistic and success focused culture which will guide our way." In a press release disseminated the same day, Smith also stated that the Company was "in the best shape strategically we have ever been, and we are excited to see new and existing customers respond so positively to '1 Pier 1'." These diametrically opposed messages from Smith to internal employees (i.e., that Pier 1 was a

"victim" of its "ambitions") versus public investors (i.e., that Pier 1 would be successful because of its ambition), further support a strong inference of scienter.

g. The former Pier 1 Trade & Product Compliance Specialist, cited above, who left the Company in mid-2014, stated that although she could not recall exactly when it occurred, she attended the same town hall meeting described by other employees. The Compliance Specialist stated that the meeting left her with the impression that Pier 1 had "tackled too much of e-commerce at once," and were not ready for it when they began the initiative. However, the Company had continued to bring in more inventory even though the e-commerce program itself was not working as it should. As a result, logistical backlogs developed, as excess inventory built up in warehouses.

h. The Pier 1 Administrative Assistant discussed above, who formerly worked at the Company's Texas headquarters from 2009 to 2014 as an Administrative Assistant to a senior Company executive, and who had frequent access to meetings between Pier 1's top executives by virtue of her role, stated that Defendant Turner always attended quarterly "How Is It Selling" meetings, where detailed discussions were held on how products were selling each season and why, in order to prepare for the same season in the following year. At these meetings, Defendant Turner was always very attentive and hands-on. In addition, both Smith and Turner also attended numerous weekly "markdown meetings" on marketing, planning, and allocation, where discussions were held with regard to that week's inventory and what to mark down. Finally, one or other of Defendant Smith or Turner always attended quarterly "Open-to-Buy" meetings, during which executives discussed the inventory and sales figures.

i. The first Allocations Analyst, cited above, recalled Defendants Smith and Turner's frequent attendance at formal business reviews that occurred every quarter, during which allocation teams composed of allocators, planners, and inventory buyers presented their business metrics for the prior quarter and explained their strategy for the coming quarter. At such meetings, the CEO and former CFO were made aware multiple times of the imbalance between inventory and sales goals. When asked, the Analyst explained that even if they did not obtain such knowledge from the meetings themselves, Defendants Smith and Turner should have been informed of the problem by other senior executives who worked closely with planners and allocators. Moreover, the Company's planners produced weekly "Open-to-Buy" reports, which gave a quarterly breakdown of what the Company's sales, margin and unit sales were. Accessible to everyone in Merchandising, Allocation, and Buying and sent to executives including Defendant Smith, the report contained all of the quarterly goals broken down by month and quarter, as well as the then most up-to-date annual goal. From this report, employees could see what the plan was, the actual results every quarter and if Pier 1 was meeting the plan.

137. These statements further confirm that not only did the Executive Defendants have access to internal reporting that showed the Company's inventory levels to be excessive, but also

that they paid close attention to the Company's inventory and sales at internal meetings, and even internally acknowledged Pier 1's inventory crisis as early as early-2014.

138. These allegations of the Executive Defendants' access to information showing the true, undisclosed state of the Company, as well as Defendant Smith's admission to Company employees in that regard nearly a year before the first of the Class Period disclosures occurred (all while assuring the market that the Company was in its "best shape"), raise a strong inference of scienter.

139. Second, former Pier 1 employees repeatedly identified the same set of executives, all of whom reported directly either to the Smith or Turner, or to named executives who worked alongside them, as having been personally involved with inventory allocation and planning, and fully informed by the Company's buyers and allocators of the misalignment between inventory and sales. For instance:

a. The first Allocations Analyst discussed above identified numerous senior Pier 1 managers and executives, who were aware of the massive and growing inventory imbalance throughout the Class Period. Among others, these individuals included the EVP of allocation, Michael Benkel, who presided over inventory management, and the EVP of Merchandising, Catherine David, as well as a number of Vice Presidents and Senior Managers that worked under them; and

b. The Administrative Assistant stated that Sharon Leite, who was in charge of stores, should have been aware of excessive inventory at store locations, and that David and Benkel had major roles in making sales goals.

140. Former Pier 1 employees described each of the individuals named above as having personal knowledge of the Company's excess inventory, and each of them held senior positions and responsibilities in Pier 1's corporate hierarchy. Importantly, every single one of the Company's Forms 10-K from 2010 onwards listed David, Benkel, and Leite as among the key "Executive Officers of the Company," alongside Defendants Smith and Turner.

141. Moreover, Defendant Smith himself repeatedly touted the importance of Benkel and Leite to the Company. For instance, during a presentation to analysts on May 7, 2013, the

Company announced improvements to its inventory system that would purportedly better enable it to keep pace with demand. Defendant Smith introduced Benkel to elaborate on the details of these systems, stating, "Michael Benkel, Executive Vice President of Planning and Allocation, is responsible of [sic] the team that has done so much to improve sales and margin, the science behind the art." On the Company's September 24, 2015 analyst call, Smith also praised Benkel's purportedly "outstanding job creating a strong and effective merchandise, planning, and allocations function" while serving as the Head of Planning and Allocations, and described Leite, EVP of Sales, as "a wonderful field leader." These statements demonstrate Smith's own close working relationship with the other senior executives who were identified by former employees as having been personally involved in inventory allocation and sales planning, and who were closely connected to the staff operating in the field and fully informed of the excess inventory at the Company's distribution centers and retail stores (which, throughout the Class Period, was far from being the "clean" inventory that Smith and Turner repeatedly communicated to the market). The fact that the Executive Defendants' colleagues and direct subordinates were aware of the Company's excess inventory and failed sales plans raises the strong inference that their immediate superiors (the Executive Defendants themselves) were as well, or were severely reckless in disregarding such facts.

142. Third, the definitiveness with which the Executive Defendants repeatedly spoke of a "clean" and "controlled" inventory with no markdown risk contrasts sharply with the sheer scale of the undisclosed problems that were plaguing the Company throughout the Class Period. The inventory backlog at Pier 1 was so massive and material that the CEO and former CFO of the Company could not but have known about it. As Defendant Smith admitted during the final Class Period conference call with analysts on December 16, 2015, it would take the Company "18 months" to return to its "normal trajectory where sales and inventory are in sync." Yet,

Smith had assured investors in June 2015, a mere six months earlier, that Pier 1's inventory situation was stabilizing, and that the Company's allocators had done a "great job" adjusting Pier 1's inventory and sales goals. The fact that within six months after this June 2015 statement, inventories, rather than stabilizing as promised, were at the point that it would take at least ***18 months*** to bring them back in line with sales, strongly indicates that at the time the June 2015 statement was made, it was materially false and misleading, and inventories already constituted a many-month-long backlog.

143. Moreover, numerous former employees who worked at Company sites across the United States, including its Fort Worth headquarters, corroborated the existence of excess inventory and numerous infrastructural and logistical problems that arose from the excess inventory during the Class Period. These accounts reflect the real conditions within a distribution network for which Defendant Turner was personally responsible, and a planning and allocation department that Defendant Smith had himself brought into existence. Thus, at precisely the times the Executive Defendants were making definitive assurances to the contrary, Pier 1's excess inventory and distribution center inefficiencies. This contrast between the Executives Defendants' representations and the later, admitted scale of the Company's inventory problems raise the strong inference that both Smith and Turner knew of, or were severely reckless in disregarding, the existence of the excess inventory, and inventory's failure to track sales and demand.

144. <u>Fourth</u>, Pier 1 and the Executive Defendants made their materially false and misleading statements and omissions within close temporal proximity to later disclosures of inconsistent information. For example, on a Form 8-K, filed with the SEC on September 17, 2014, the Company represented that it had "refined" its financial models and was expecting improvement in its metrics as a result. Less than five months later, Defendant Turner, the CFO

who was responsible for financial planning, departed the Company, and Smith admitted that Pier 1 had failed to forecast sales and expenses, and that financial metrics, rather than improve, had worsened.

145. Moreover, as late as December 2014, Defendant Turner still maintained that increasing inventory was necessary "to support higher sales," and Smith stated that he did "not see any significant mark down risk," an optimistic outlook that was re-affirmed by the Company in a press release and a Form 8-K filed with the SEC on January 8, 2015. However, only a month later, Defendant Turner departed Pier 1, and the Company and Defendant Smith made their first partial disclosure of the fraud.

146. Similarly, on March 2, 2015, less than a month after its first partial disclosure of the fraud, the Company released an investor presentation that stated again that "current inventory composition does not present an immediate or significant markdown risk," followed by an April 8, 2015 statement by Defendant Turner's interim replacement—made during a conference call with analysts—that the "complexion" of the Company's inventory was "healthy and does not pose a significant immediate markdown risk." Moreover, even as late as June 2015, the Company and Smith were continuing to assure the market that Pier 1's inventory was on track to stabilize and that its sales and inventory forecasting had been brought back in sync, but a mere three months later, Pier 1 revealed high clearance activity, followed by an inventory backlog that would take 18 months to sell down. The short amount of time between these mutually-contradictory disclosures, made in the midst of a series of corrective disclosures, raises a strong inference of scienter.

147. Fifth, the fact that Defendant Turner's sudden "resignation" was announced simultaneously with the Company's February 10, 2015 disclosures of the Company's failure to accurately forecast sales and expenses raises a strong inference that Turner knew or was severely

reckless in disregarding the Company's excess inventory and related costs. First, Turner was personally responsible for generating the Company's sales goals, a fact confirmed by his "resignation" following disclosures that these very sales goals not adequately calculated. Second, news coverage of Turner's "resignation" was nearly unanimous in concluding that it was a thinly-disguised forcible termination of Turner for having "botched" sales goals. Defendant Smith was also quoted as stating at the time that "[t]he failure to adequately forecast the revenue and expenses in our business is a financial issue which has been aggressively addressed," which was a clear reference to Turner's termination.

148. In addition, according to Turner's "Confidential Retirement Agreement," attached to Pier 1's 2015 Form 10-K, Turner received a lump-sum payment of $1.08 million from Pier 1 in "retirement benefits." However, according to the Company's May 9, 2014 proxy statement (the last before Turner's termination), Turner would have been entitled to receive more than $5.7 million in case of "Involuntary" Termination or "Early Retirement," provided that such departures were "without cause." In case of a stated "for cause" termination, Turner was entitled to nothing.

149. According to the Company's Supplemental Retirement Plan, filed with the SEC on January 7, 2009, "Cause" is defined to mean that an individual: "(a) Misappropriated, has stolen or embezzled funds of the Employer; or (b) Committed an act of deceit, fraud, or willful misconduct or otherwise acted in bad faith, adverse to the best interests of the Employer." Although the Company did not publicly subject Turner to a "for cause" termination, the fact that he failed to qualify for the compensation that would have been due to him for a truly "without cause" departure raises a strong inference that he engaged in knowing or severely reckless misconduct in connection with the Company's admitted failure to accurately control its inventory. The fact that no succession plan had been in place at the time that Turner left, and

that the Company had to appoint an "interim CFO" to take over Turner's role, further raises a strong inference that Turner did not simply resign but was suddenly forced out of the Company for knowing or severely reckless misconduct.

150. Sixth, as both Defendants Smith and Turner have admitted, the Company's inventory level was one of Pier 1's most important financial metrics, a subject of intense market scrutiny and concern, and a topic on which Smith and Turner made numerous public statements during the Class Period. Given the importance of this metric to the Company's value and the value of its stock, analysts were intensely focused on it both before and during the Class Period. The Executive Defendants, who were the Company's highest-ranking leaders, made a litany of statements about these subjects in response to analyst questions, and were well aware that analysts were relying on the veracity of their statements.

151. For example, even after admitting that it needed to mark down its merchandise and that its CFO "resigned," Pier 1 continued to maintain that it was in control of its inventories. Specifically, Defendant Smith assured investors in an April 8, 2015 press release that the Company's inventories were "healthy and not believed to pose a substantial markdown risk." In reality, as of December 2015, even after addressing the excess inventory with promotions and markdowns, Defendant Smith stated that the Company was still carrying excess inventory and that it would be another 18 months before inventory and sales are "in sync."

152. The Executive Defendants personally addressed inventory issues either affirmatively or in response to analysts' questions in every single conference call they had with analysts prior to and throughout the Class Period. Specifically, Defendants Smith and Turner repeatedly reassured the market that they were in full control of inventory, that increasing inventories would not lead to markdowns, and that investors had no need to worry about margin pressure. For instance, on a December 19, 2013 call with analysts, Defendant Turner stated that

inventories were "in line with our expectations," something that was "due in part to the added control over inventories we have achieved from investments from our planning and allocation systems." When questioned during a conference call in June 2014 about pressure on the Company's margins, Defendant Smith falsely reassured analysts that pressures on margins during the first half of the year were not the result of overstocking, stating, "we continue to run a very clean inventory as I know you know."

153. In light of the fact that the Executive Defendants made numerous reassuring statements to the market on a topic of immense importance to Pier 1's value, it was incumbent on them to ensure they understood the true facts concerning the subject on which they spoke. Either the Executive Defendants possessed the knowledge of the Company's inventory, purported lack of markdown risk, and margins that they claimed to have, in which case they knew that their statements touting Pier 1's "control" over its purportedly "clean" inventories were false and misleading, or they lacked the knowledge they claimed to have, in which case their conduct was severely reckless.

154. Seventh, Defendants were on notice of the importance of the accuracy of reported inventory and disclosures of markdown risk because Pier 1's public disclosures on inventory drew the attention of the SEC, which sent a letter to the Defendants on February 19, 2013, requesting clarification on a range of issues from the Company's fiscal year 2012 Form 10-K, including the Company's inventory levels. Specifically, the SEC letter stated that, "[i]f any of the increase in inventory levels is related to potentially unsustainable decreases in merchandise markdowns, then discuss this in your results of operations." In a response to the SEC filed on March 4, 2013 and signed by Defendant Turner, the Defendants stated, "The Company does not believe this increase in inventory levels is related to potentially unsustainable decreases in merchandise markdowns." Defendants were thus well aware of specific regulatory scrutiny of

the Company's disclosures regarding inventory and markdown risk, and of the importance of ensuring that the Company's public disclosures in that regard were truthful and accurate.

155. Eighth, the Executive Defendants were motivated to deceive the investing public as to the reality of the Company's inventory because their compensation was tied directly to the Company's stock price. Specifically, on March 7, 2013 and April 18, 2013, mere months before the start of the Class Period, Pier 1's Board of Directors introduced, first for Defendant Smith, and then for the remaining executives of the Company, for the first time Total Shareholder Returns, or "TSR," as a metric in awarding long-term performance-based stock options, a major component of Smith's and Turner's compensation packages.[6]

156. Thus, as the Company's stock price peaked in 2013, Defendant Smith's compensation peaked with it, rising from a little over $6 million in 2011, during which year Pier 1's stock hovered around $10, to over $18 million in 2013, when the stock peaked at over $25. Defendant Smith's materially false and misleading statements to investors in late 2013, 2014 and 2015 artificially inflated the Company's stock price.

157. Not only was the CEO's compensation tied to TSR, approximately 25% of the remaining named executives'—Defendant Turner's among them—equity awards were also awarded based on Pier 1's stock performance against a peer group, an amount that equaled over 42% of the performance-based stock awards awarded to them during the Class Period. Moreover, Defendants Smith and Turner were also motivated to keep excess levels of inventory at Pier 1, and not mark them down, because writing down the actual cost of deteriorated, obsolete or un-marketable merchandise could negatively impact Pier 1's stock price. As FASB Accounting Standards Codification 330-10-35-2 states: "[I]n accounting for inventories, a loss

[6] Pier 1's TSR is calculated by taking the year-over-year growth in a $100 investment in the Company's stock, over the four-fiscal-year period prior to the year in which compensation is awarded to an executive. As such, it is in essence a measure of how much the stock price has increased or declined.

shall be recognized whenever the utility of goods is impaired by damage, deterioration, obsolescence, changes in price levels, or other causes" and "[t]he measurement of such losses shall be accomplished by applying the rule of pricing inventories at the lower of cost or market." The need to recognize a significant loss in this regard and account for obsolete or less valuable merchandise during the Class Period would have had a negative impact on the Company's financial results and its stock price. The fact that the Executive Defendants' fraud during the Class Period matches almost exactly the time that their compensation first came to be tied directly to the Company's stock price performance provides a further strong inference of scienter.

158. Ninth, throughout the Class Period, Defendants engaged in a series of share repurchases and dividend increases to conceal the true state of affairs at the Company. These include a $200 million share repurchase for use through late 2013 and the first half of 2014, and another $200 million program announced in April 2014, for repurchases through the end of 2015. The Company also announced a 20% dividend increase in December 2013, and another sudden, 17% dividend increase in April 2015, the latter as it was struggling—and failing—to come to grips with excessive inventories that it could not sell without markdowns. Commentary from analysts showed that these stock repurchases were effective in increasing public investor confidence in the Company's performance while the Company was internally experiencing a stark mismatch between inventory and sales. For example, BB&T stated on December 19, 2013 that, "we believe the 20% dividend hike demonstrates management's confidence in the Company's long-term prospects." On April 9, 2015, Wells Fargo stated that management "signaled some confidence in expectations by raising its dividend." Finally, on April 15, 2014, Barclays reported that the "accelerated buyback underscores management's conviction in an operating performance rebound," and on April 9, 2015 that, "we are encouraged by . . . the

[17%] quarterly dividend increase."

159. Tenth, the very nature of Pier 1's business and its supply chain supports a strong inference that Smith and Turner were aware of, or were severely reckless in disregarding, the Company's excess inventory and its costs.

160. First, Pier 1's business is highly seasonal, with product mixes tailored to both season and holiday. As such, Pier 1's seasonal merchandise, if not sold while in season, automatically creates markdown pressure on the Company's margins. Perceiving this risk only requires knowing the contemporaneous contents of the Company's inventory and the time of year. Moreover, senior executives, including Benkel, attended weekly "markdown meetings" where they held detailed discussions on which products had to be marked down and why, such as those products that had gone out of season. This level of attentiveness to markdowns and the seasonal nature of Pier 1's goods further raises a strong inference that the Executive Defendants knew or were severely reckless in disregarding the markdown risk posed by the excess inventory, which included seasonally-obsolete goods. For example, the second Pier 1 Buyer, discussed above, explained that backlogs in the distribution networks were a challenge for buyers, who had to manage inventories at the store level, because delays meant that products that should have been in the store by August would not reach the store until December. Not only did this present a problem as a matter of maintaining availability in the face of customer demand, it was an especially pressing concern for seasonal inventory, which buyers were instructed to move ahead of all else as such merchandise quickly became dead weight if not sold in season. For example:

a. The former IT department Analyst and Programmer, recalled that quantities of 2014 Christmas season merchandise could not reach stores in time because of inventory backlogs.

b. The former Buyer cited above, described the domino effect of excess inventories, and stated that she knew multiple buyers who had 2014 Christmas products that

never reached the floors because they sat in distribution center backlogs, and that even with extra man power and prioritization, a large quantity of seasonal product never made it to the stores during her time at the Company. Frequently, she would look for a product to be put into retail locations, only to be told that it was at an off-site facility, inaccessible in the immediate sense even to distribution center employees.

c. The second Allocations Analyst cited above stated that at times during her employment at Pier 1, she would be unable to allocate product that had arrived, but remained sitting in the inventory backlog, out of reach, for "months." The problem became severe enough that seasonal products were sometimes marked down before they even left the distribution center, because they had gone out of season.

161. Second, excess inventory carries with it added costs, and Company executives would have become aware of those increased costs as they were being paid.

162. Eleventh, not only did Pier 1 staff directly inform senior executives that the Company's sales targets throughout fiscal years 2014 and 2015 were unrealistic, numerous former employees of the Company all explained that Pier 1's failure to grant bonuses in those fiscal years further showed that the Company's internal sales goals were not being met. As discussed above, Pier 1 operated with a bonus model whereby Company-wide bonuses were based on whether or not sales targets were being met for the year. Accordingly, and as described above, numerous former employees remarked that neither they nor anyone in their groups received bonuses for fiscal years 2014 or 2015, and that this was a clear indication that the Company was failing to meet its sales goals.

163. Since Pier 1 employees were not paid bonuses for two fiscal years because sales targets were not met, Defendants Smith and Turner themselves, who presided over the Company and its finances, either knew or were severely reckless in disregarding that such targets were unrealistic and not being met in real time.

164. Twelfth, Defendants Smith and Turner were two of the longest-serving senior executives at the Company, with Defendant Smith serving as Pier 1's CEO for nearly a decade,

and Defendant Turner having been at the Company for over 22 years prior to his termination, 15 of which as its CFO. In those roles, both Defendants had a long history of being intimately involved in both overseeing the Company's inventory level and supply chain expenses, including by addressing these issues on investor conference calls for years prior to and during of the Class Period.

165. Indeed, Defendant Smith declared his plan to closely manage the Company's inventory from the moment he assumed the role of CEO, and was personally responsible for the creation of Pier 1's current planning and allocation department—the department responsible for managing purchases and purportedly ensuring that inventory was in line with sales. In his very first conference call with analysts as CEO on April 12, 2007, Smith outlined the goals of his tenure. Specifically, he called his merchandising strategy the "center of all things," and listed as one of his six major "priorities" the creation of a new allocation and planning department led by a member of the executive team, specifically tasked with achieving "balanced inventory" levels. On the same call, Smith also informed investors that the "supply chain distribution or logistics area of the business will now report to Cary Turner," who would from that point on oversee the Company's distribution network, as well as coordinate a major review of "every part" of Pier 1's supply chain.

166. In the years that followed, both Smith and Turner repeatedly emphasized the Company's and the executive team's purported focus on inventory as a key component of the Company's business and a crucial factor in its post-recession turn-around. For example, in late-2008, in response to the NYSE's notice to the Company that its stock may face delisting because it had begun to trade below the $1.00 threshold, Turner stated on a December 18, 2008 conference call with analysts that "the number one thing, we as a Management team, is focused on is our inventory levels." The Company's Form 8-K, filed with the SEC on the same day,

again reiterated Pier 1's "focus[] on managing inventory levels," and the Company's 10-Q, filed the next month, continued to emphasize the management team's attentiveness to inventory.

167. During the Company's next conference call with analysts, on April 7, 2009, Turner attributed the Company's improving financial metrics to a "continued focus" on inventory, and Smith stated that "accurate buying, lower supply chain costs, and clean inventory" had led directly to lightening pressure on the Company's margins. As the Company's stock rebounded post-recession, Smith stated in a June 16, 2011 conference call with analysts that Pier 1 faced no markdown risk because "we have done a really good job at managing inventory." Importantly, every single one of the Company's Forms 10-K and 10-Q for the years 2009 to 2012 repeated the Company's claimed "focus" on managing inventory levels, and every single Form 10-K from 2012 onwards—overlapping with the Class Period and signed by Defendants Smith and Turner (until Turner's February 2015 departure)—stated explicitly that the Company was always "focus[ed] on strategically managing inventory levels and closely monitoring merchandise purchases to keep inventory in line with consumer demand."

168. <u>Thirteenth</u>, not only did Defendants Smith and Turner personally preside over the implementation of the above-described overhaul of Pier 1's inventory planning and allocation functions as well as its entire distribution network, Smith repeatedly admitted that senior Pier 1 executives were personally knowledgeable of and frequently discussed the Company's inventory levels. For example:

a. On a September 19, 2013 call with analysts, Smith stated in response to a question about inventory that senior executives "***spent a lot of time debating***" the management of clearance inventory levels.

b. On December 19, 2013, Smith participated in an earnings call where an analyst asked him about the Company's control over its inventory. In response, Smith stated, "I want to pick you up on that question about [whether] inventory is well controlled. ***Ours are always well controlled***." Smith then emphasized in response to the analyst's follow-up questions, that, "I think the point about our inventory, David, is ***obviously we think about it a lot***. We've been investing over the last

few years a lot in systems, of course, in terms of our allocation replenishment systems, but also in investing in people and our planning and allocation functions. I think we are really getting the results of all of that investment now, which allows us to ***grow sales and not go crazy with inventory***."

c. On April 8, 2015, two months after the disclosures that led to Defendant Turner's "resignation," Smith declared his intention to return the Company's inventory to a level commensurate with sales on a conference call, stating that "[w]e have done a very good job historically of keeping growth of inventory in line with sales growth. ***This one year we did a bad job of that***, and we are going to get back to doing a good job of it."

d. On September 24, 2015, Smith again emphasized his attentiveness to inventory, stating on a conference call that, "I'll remind you of what ***I remind myself every day when I look in the mirror. Nothing good ever happens when you have too much inventory***, but good things will happen as we return to the sales and inventory relationship that we have sustained for many years."

169. Having thus emphasized their personal focus on inventory, the Executive Defendants cannot now claim that they were not aware of the extent to which excess inventory had piled up across the Company's distribution network and stores, particularly after admitting the existence of the problem and committing to resolve it during the Class Period.

170. <u>Fourteenth</u>, the Executive Defendants themselves represented on numerous occasions either on calls with analysts or in the Company's SEC filings, that at all times prior to and throughout the Class Period, Smith and Turner had ready access to detailed internal Company data on inventory levels, sales, and how the two metrics were or were not correlated with one another. As discussed further below, not only did one former Business Analyst responsible for creating reports on inventory and sales state that Smith and Turner received those reports directly, a fact confirmed by a former Allocations Analyst who was herself copied on the e-mails in which the Executive Defendants received daily inventory and sales reports, Company executives made statements that raise the strong inference that the Executive Defendants were aware of, or were severely reckless in disregarding the Company's excess inventory and failure to track sales at all relevant times.

171. For example, during a May 7, 2013 presentation to analysts, Defendant Smith introduced Michael Benkel, EVP of Planning and Allocations, who gave a detailed overview of the Company's deployment of a new inventory planning system, which he called "an enhanced open device system for forecasting sales and inventory at both the department and class level." This system, he explained, "has provided our planners with the ability to forecast their department sales, margin and inventory by channel and at a more granular margin component level than in the past . . ." which "allows our planners to have a more accurate view of their individual SKU plans . . . improving forecast accuracy and inventory control." Indeed, he emphasized that the new planning system was built specifically to leverage the "allocation and replenishment system sales forecast," and that "these systems allow us to identify where and how much merchandise we need in order to keep all distribution centers in optimal stock," which had purportedly improved in-stock accuracy at our distribution centers. In other words, Benkel, Pier 1's point man on planning and allocations, who had been hired and appointed to his position by the CEO and reported directly to him, and who was directly responsible for overseeing the Company's inventory levels, stated that the Company kept close track of inventory levels and sales, through proprietary internal data-keeping and analytics systems built in-house, whose stated purpose was precisely to allow the Company to make more accurate forecasts.

172. Having touted the fact that they possessed a sophisticated system for tracking inventory that gathered information from the Company's distribution centers and reported it to senior executives, Defendants Smith and Turner cannot now claim that they were unaware of the Company's excess inventory and that it was out of sync with both sales and demand. This is especially the case, given the sheer number of former employees who have recounted scenes of excess inventory at the Company's distribution centers and stores, and the use of costly temporary solutions such as on-site outdoor storage, and the rental of railway lots to store full

containers. Thus, these admissions that the Company and senior executives possessed detailed inventory and sales data and purported to review it raises a strong inference that the Executive Defendants knew or were severely reckless in disregarding that Pier 1's inventory exceeded sales, all while they represented inventory as "clean."

173. Fifteenth, the Defendants' fraud was revealed through a series of partial disclosures, spread over the course of nearly an entire year. The first disclosure, that the Company had failed to keep inventory in line with sales, occurred on February 10, 2015, and was accompanied by the immediate and sudden termination of the Company's CFO. After this first, dramatic disclosure, followed by the departure of a long-time senior executive, it is not plausible that the executives who remained, including Smith, did not know that the Company's inventory did not match its sales or that it would take the Company an extended period of time to ensure that inventory tracked sales. Yet, for ten more months, Defendant Smith and the Company continued to hide the full truth from the investing public, and misrepresented that the Company was on track to return to an optimal inventory, and to build profitability over the remaining part of fiscal 2016.

## VII. FALSE AND MISLEADING STATEMENTS

174. Defendants made materially false and misleading statements and/or omissions of material fact during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Among other things, Defendants falsely and misleadingly represented to investors during the Class Period that: (i) Pier 1 had inventory systems in place to keep all Pier 1 distribution centers in optimal stock; (ii) Pier 1's inventory levels were "clean" and at "historical lows"; (iii) the Company's inventory levels did not present markdown risk; and (iv) Pier 1 had adequate infrastructure, warehousing and staff to store and process its inventory.

### A. Defendants' Materially False and Misleading Statements Concerning the Company's Infrastructure, and Its Ability to Control Inventory

175. On December 19, 2013, Defendant Smith stated during a conference call with analysts that Pier 1's inventories were "***always well controlled***," and "I think the point about our inventory . . . is obviously we think about it a lot. ***We've been investing over the last few years a lot in systems***, of course, in terms of our allocation replenishment systems, but also in investing in people and our planning and allocation functions. I think we are really getting the results of all of that investment now, which allows us to ***grow sales and not go crazy with inventory***." On the same conference call, Defendant Turner reported that inventory had increased by only "3% over last year," which was purportedly "due in part to the ***added control over inventories*** we have achieved from investments from our planning and allocation systems."

176. These statements were materially false and misleading. Contrary to Smith's claims that Pier 1 "always" controlled its inventory, that its investments in systems had allowed Pier 1 to increase sales without dramatically increasing (or "going crazy") with inventory, and that the Company had the ability to "scale" its infrastructure as its inventory increased, during the Class Period, the Company (i) had "unrealistic" internal sales goals (¶¶ 62-76); (ii) purchased and carried excess, rather than "clean" inventory that exceeded actual sales and consumer demand (¶¶ 77-88); (iii) failed to "always" control Pier 1's inventory (¶¶ 97-112); (iv) operated distribution centers flooded with excess inventory that operated inefficiently (¶¶ 89-118, 121-131); (v) internally overrode its own "DCM" system that was designed to ensure that inventory levels matched actual sales, in order to push excess inventory to already over-crowded Pier 1 stores (¶¶ 62-63, 86); (vi) had stores that rented costly external storage pods to hold excess inventory (¶¶ 66-68, 85, 88, 105-106); (vii) lacked infrastructure that could efficiently handle the excess inventory and the sheer size of that excess (¶¶ 89-96); (viii) incurred extraordinary costs from carrying excess inventory, including labor, fines paid to railyards and ports, the cost of

external storage space and additional warehouse rentals, as well as third party contractors that the Company hired to help manage the inventory (¶¶ 97-108); and (ix) bore such a large inventory backlog that, as the Company later disclosed, it would take Pier 1 more than a year for the Company's inventory levels to track sales again (¶¶ 111, 126-134). Indeed, according to at least one former employee, the second Allocations Analyst cited above, who was employed at the Company from 2011 to 2015, and who had worked for other retailers previously, the Company's allocations infrastructure was neither sophisticated nor scalable.

177. On April 10, 2014, Pier 1 held a conference call with analysts and investors to discuss the Company's earnings and operations. During the call, where Defendant Turner was also present, Defendant Smith stated that, "because we run our business with a single inventory and our planning and allocation capabilities are ***so sophisticated***, we expect our inventory growth to be well-controlled as it was in fiscal 2014," and "[o]ur merchandise and field teams are well prepared for this level of expansion."

178. These statements were materially false and misleading when made, for the reasons set forth in paragraph 176 above. Indeed, according to at least one former employee, the second Allocations Analyst cited above, who was employed at the Company from 2011 to 2015, and who had worked for other retailers previously, the Company's allocations infrastructure was neither sophisticated nor scalable.

179. As a result, Pier 1 did not have "sophisticated" planning and allocation capabilities, or "well-controlled" inventories in fiscal 2014, and the Company's merchandise and field teams were not "well prepared" for the Company's expansion.

180. On September 17, 2014, the Company filed a Form 8-K with the SEC that discussed the Company's financial model and forecasting capabilities. Specifically, under the heading "Refined Intermediate-Term Financial Model," the Company stated that it had "created

a new business model and ***refined its financial model*** and expects, in the subsequent two fiscal years, on an annual basis beginning with fiscal 2016, to ***achieve progressive improvement across all of its financial metrics***."

181. These statements were materially false and misleading when made. Indeed, for the reasons set forth in paragraph 176 above, less than five months later (in February 2015), Defendant Smith admitted that the Company was incapable of "adequately forecast[ing] the revenue and expenses in our business," and the Company terminated its CFO, Defendant Turner.

182. On April 8, 2015, Pier 1 held a conference call with analysts and investors to discuss the Company's earnings and operations in the wake of the February 2015 disclosures. Seeking to reassure investors, Defendant Smith claimed that: "The issue that impacted our fourth-quarter results are ***transitory*** and have no bearing on the underlying strength of the Pier 1 Imports brand, nor our potential to drive organic growth and pursue new growth opportunities," and stated that "the investments of the past few years into our ***distribution center network*** will continue to bear fruit, and ***enable us to generate further improvement in merchandise margin dollars*** going forward." On June 17, 2015, Defendant Smith further stated during an earnings call that although the Company's "inventories are much too high . . . the impact of that inventory is felt most intensely by the distribution centers because ***our store inventories are extraordinarily well-controlled***."

183. These statements were materially false and misleading for the reasons set forth in paragraph 176 above. Indeed, contrary to Smith's assertion that the "issue" the Company was facing was "transitory," Smith later admitted in December 2015 that the Company's problems with excess inventory were so significant that it would in fact take Pier 1 18 months to bring its inventory levels in line with sales. In addition, contrary to Smith's claim that Pier 1's store inventories were "extraordinarily well-controlled," the stores were themselves "busting at the

seams," and over 40% of the Company's retail stores stored excess inventory in external storage "pods" as of February 2016.

### B. Defendants' Materially False and Misleading Statements Concerning Pier 1's Purported "Clean" Inventory Levels and Lack of Markdown Risk

184. On December 19, 2013, Pier 1 issued a press release filed on Form 8-K with the SEC, announcing the Company's fiscal third quarter 2014 financial results ("Third Quarter 2014 Form 8-K"). In the Third Quarter 2014 Form 8-K, Pier 1 reported that inventory had increased 2.8% from a year prior, "which was in line with management's expectations and reflect[ed] the Company's focus on ***strategically managing its inventory purchases and monitoring its inventory levels to correspond with consumer demand***." On a conference call with analysts held the same day, where Defendant Turner was also present, Defendant Smith also stated: "Our inventory levels are running now at sort of ***historical lows***. Frankly, they are not fluctuating very much, because ***we have such great processes for taking our mark-downs and clearing through the slow merchandise***."

185. These statements were materially false and misleading when made for the reasons set forth in paragraph 176 above. Indeed, contrary to Smith's claims that Pier 1 was "strategically managing its inventory purchases and monitoring its inventory levels to correspond with consumer demand" and timely taking "mark-downs and clearing through the slow merchandise," and that Pier 1's inventory was at a "historical low," even the Company's publicly-reported inventory numbers as of the third quarter of fiscal year 2014 were at a ***historical high*** of over $429 million, a figure that had not been surpassed since prior to 2007.

186. On February 28, 2014, Pier 1 preannounced its fiscal 2014 fourth quarter results in a Form 8-K and press release filed with the SEC. Defendant Smith stated in the press release that, "We are entering fiscal 2015 in a ***clean inventory position***." This statement was materially false and misleading when made for the reasons set forth in paragraph 176 above. Indeed, the

Company was not in a "clean" inventory position and in fact faced significant, undisclosed markdown risk.

187. During an April 10, 2014 conference call with analysts, which Defendant Smith also attended, Defendant Turner claimed that Pier 1 had been able "to enter fiscal 2015 in a ***clean inventory position***." This statement was materially false and misleading when made for the reasons set forth in paragraph 176 above. Indeed, the Company was not in a "clean" inventory position and in fact faced significant, undisclosed markdown risk.

188. On June 19, 2014, the Company held an earnings conference call to discuss its financial results for the first fiscal quarter of 2015. On that call, where Defendant Turner was also present, an analyst with Wells Fargo asked what was driving pressure on the Company's gross margin. Defendant Smith responded: "so in terms of the pressure it is ***not so much the markdown pressure***, I mean we continue to run a ***very clean inventory*** as I know you know." This statement was materially false and misleading when made for the reasons set forth in paragraph 176 above. Indeed, the Company was not in a "very clean" inventory position and in fact faced significant, undisclosed markdown risk.

189. On December 18, 2014, the Company issued a press release announcing its financial results for its fiscal third quarter 2015. In the press release, which was also filed with the SEC on Form 8-K, the Company claimed that while inventories had increased 25% from the prior year period, this additional inventory was necessary "***to support higher sales***," a claim which Pier 1 repeated in its Form 10-Q filed with the SEC on January 7, 2015, signed by Defendants Smith and Turner. On a conference call with analysts held December 18, 2014 and attended by both Executive Defendants, Defendant Smith stated that while total inventory had increased from the previous year, "store level inventory has increased only slightly," and assured investors that "***we do not see any significant mark down risk***."

190. These statements were materially false and misleading when made for the reasons set forth in paragraph 176 above. Indeed, contrary to the Company's and Smith's claims that the increased inventory was necessary to "support higher sales," that "store level inventory had increased only slightly" and that Pier 1 did "not see any significant mark down risk," the Company carried excess inventory and faced significant undisclosed mark down risk.

191. On January 8, 2015, the Company issued a press release which was also filed with the SEC on Form 8-K, announcing Pier 1 financial results for December 2014. In the press release, Defendant Smith stated that "the business is well-positioned as we head into the early spring selling season."

192. The foregoing statement was materially false and misleading when made for the reasons set forth in paragraph 176 above. Indeed, contrary to Smith's claim that Pier 1 was "well-positioned" heading into the spring selling season, a mere month after this statement, on February 10, 2015, Pier 1 issued a press release announcing that it had "higher than forecast expenses, primarily related to incremental supply chain costs," and the CFO (Defendant Turner) departed the Company. The close proximity in time between the January 2015 false statement and the Company's February 10, 2015 disclosures is further evidence of its falsity. Indeed, on February 11, 2015, Morgan Stanley questioned management's explanation in February 2015 that Pier 1's sales shortfall was isolated to the January-February 2015 timeframe, calling that explanation "surprising."

193. On April 8, 2015, Pier 1 issued a press release announcing its financial results for fiscal year 2015 and fiscal fourth quarter 2015. In the press release, which was also filed with the SEC on Form 8-K, Defendant Smith assured investors that "[a]lthough fiscal 2015 ending inventories are higher than originally planned, their ***complexion is healthy and not believed to pose a substantial markdown risk***." On an earnings call with analysts held the same day, the

Company's interim-CFO Laura Coffey echoed Smith's claim, stating that the "complexion of our current inventories level is healthy, and ***does not pose a significant immediate markdown risk***."

194. These statements were materially false and misleading when made for the reasons set forth in paragraph 176 above. Indeed, contrary to Smith's assertion that the Company's inventory was "healthy" and did not pose a "substantial markdown risk," the Company carried excess inventory and faced significant undisclosed mark down risk.

195. On a June 17, 2015 Pier 1 earnings conference call with analysts, Defendant Smith, responding to an analyst's questions about whether Pier 1's inventory was on-track to stabilize, stated: "I think so. I think as the time has gone on, the teams have done a great job at re-forecasting and adjusting their Open-To-Buys. . ."

196. These statements were materially false and misleading when made for the reasons set forth in paragraph 176 above. Indeed, at this very time, Pier 1's inventory was apparently still rising. The Company and Defendant Smith admitted in their September 24 and December 16, 2015 disclosures that inventories were in fact excessive and required extensive markdowns to sell off.

197. In addition, throughout the Class Period, each of the Company's Forms 10-K, filed with the SEC on April 29, 2014 and April 28, 2015, and signed by Defendants Smith and Turner (except for the April 28, 2015 filing, which Turner did not sign because it was filed after his departure from the Company), stated that "[t]he Company's focus remains on making ***conservative inventory purchases***" and "managing those inventories." Moreover, the Company's fiscal year 2014 Form 10-K, filed with the SEC on April 29, 2014, stated that it "continues to focus on strategically managing inventory levels and closely monitoring merchandise purchases to ***keep inventory in line with demand***."

198. These statements were materially false and misleading when made for the reasons set forth in paragraph 176 above. Indeed, the Company's inventory purchases were not "conservative" and, as the Company has admitted, Pier 1 did not "keep inventory in line with demand."

**C. Defendants' Materially False and Misleading Statements and Certifications as to the Company's Inventory and Internal Controls**

199. The Company's Forms 10-Q, filed with the SEC on January 8, 2014, July 9, 2014, October 8, 2014, and January 7, 2014, and signed by Defendants Smith and Turner, falsely and misleadingly reported that stated inventory was "in-line with the Company's expectations." These statements were materially false and misleading when made for the reasons set forth in paragraph 176 above, as well as because the Company was not meeting its sales goals in real time. Throughout the Class Period, the Company's Forms 10-K and 10-Q also included certifications pursuant to Exchange Act Rules 13a-14(a) and 15d-14(a) and the Sarbanes-Oxley Act of 2002 (i.e., the SOX Certifications). These SOX Certifications, filed with the Company's Class Period Forms 10-Q on January 8, 2014, July 9, 2014, October 8, 2014, January 7, 2015, July 8, 2015, and October 7, 2015, and in the Company's Class Period Forms 10-K, filed with the SEC on April 29, 2014 and April 28, 2015, were each signed by Defendants Smith and Turner (prior to Turner's February 2015 "resignation").

200. Pier 1's SOX Certifications falsely affirmed that Pier 1's public filings were accurate, and falsely certified that Defendants Smith and Turner had designed and implemented internal controls over financial reporting that provided reasonable assurance that the Company's financial reporting was reliable and complied with Generally Accepted Accounting Principles ("GAAP"). Specifically, the SOX Certifications provided, in relevant part:

> 1. I have reviewed this Annual Report on Form 10-K [or Quarterly Report on Form 10-Q] of Pier 1 Imports, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

> 5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

201. These statements were materially false and misleading when made for the reasons set forth in paragraph 176 above. Indeed, these SOX certifications failed to disclose the deficiencies in Pier 1's internal controls that led the Company to amass excess inventory that far exceeded demand, subjected Pier 1 to undisclosed costs, and led to undisclosed markdown risk, contracted margins and reduced earnings per share. As at least one former employee of the accounting department confirmed, and as set forth in paragraph 95 above, Pier 1's accounting systems did not timely record and report the costs that the Company accrued, and Pier 1 struggled with undisclosed inventory backlogs throughout its distribution network.

**D. Defendants' Material Omissions that Rendered their Statements Materially False and Misleading**

202. The foregoing statements were also materially false and misleading for their failure to disclose other material, non-public facts whose non-disclosure rendered the Defendants' statements materially misleading. During the Class Period, the Defendants failed to disclose the material adverse facts below that were in existence at the time each of the foregoing materially false and misleading statements was made, the disclosure of which would have led to declines in Pier 1's stock price at an earlier date:

a. Despite repeated push-back from its own employees, the Executive Defendants set "unrealistic" and "totally unattainable" sales goals (¶¶ 62-76);

b. The Company amassed excess, rather than "clean" inventory (¶¶ 77-88);

c. As Pier 1 has now admitted, Pier 1's excess inventory exceeded actual sales and consumer demand (¶¶ 97-112, 121-131);

d. Pier 1 had internally overrode its own fail-safe system that was designed to ensure that inventory levels matched actual sales, in order to push excess inventory to already over-crowded Pier 1 stores (¶¶ 62-63, 86);

e. As a result of the Company's inventory backlog, Pier 1 paid significant amounts to store its excess inventory at ports and in temporary storage locations for its distribution centers and stores, and failed to timely report those costs (¶¶ 97-108);

f. At Pier 1 distribution centers, the Company carried massive amounts of excess inventory in tractor-trailer containers, other temporary containers, third party warehouses, and in parking lots. Because it sat idle in these locations, much of this inventory was unavailable for allocation to stores, its allocation was costly and inefficient, and it became obsolete (¶¶ 160-161);

g. At Pier 1 stores, aisles were filled with large amounts of excess, unsold inventory and even after the end of the Class Period, when the Company had undertaken enormous clearance activities, at least 418, or 40% of Pier 1's stores still kept excess inventory in expensive, external storage pods or other storage units (¶¶ 66-68, 85, 88, 105-106);

h. The Company repeatedly failed to meet its own internal sales goals, and, as a result, did not pay bonuses to its employees. Because employees' bonuses were tied to the Company making its sales numbers, this meant the Company was repeatedly not meeting its own internal sales plan (¶¶ 61-74);

i. The Company's massive inventory meant that the excess, unsold merchandise posed a serious, undisclosed markdown risk (¶¶ 109-112, 126-134); and

j. The inventory backlog was so large that, as the Company later disclosed, it would take Pier 1 more than a year for the Company's inventory levels to track sales again (¶¶ 126-134).

203. Defendants' statements with regard to Pier 1's inventory and its inventory management infrastructure throughout the Class Period were not only materially false and

misleading because they sought to affirmatively represent Pier 1's inventory as "clean," but also because they omitted these above-referenced material facts necessary to make the statements not misleading when made. These omissions were later revealed by Defendants' later admissions that, for a long time prior to the revelations: (i) Pier 1's inventories were excessive and exceeded demand; (ii) supply chain inefficiencies arising from inventory backlogs had exacted previously undisclosed costs; and (iii) the Company was experiencing substantial markdown risk that caused Pier 1's margins to contract.

204. In addition, throughout the Class Period, the Company's Forms 10-K and 10-Q were materially false and misleading because they failed to disclose the information required by Item 303 of Regulation S-K. Item 303 requires the disclosure of known trends that will affect future revenue, specifically: "known trends . . . that have had or that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues." GAAP regulation ASC 275-10 similarly requires that a company disclose risks and uncertainties that could significantly affect the amounts reported in financial statements in the near term, and specifically raises inventory as an example of the type of disclosure it was designed to require, stating: "carrying inventories at the lower of cost or market is based on ***an assumption that there will be sufficient demand for that product in the future to be able to sell the quantity on hand without incurring losses on the sales or, if market is used, that it can be estimated***." Thus, it was precisely in order to prevent the type of fraud that occurred in this case that ASC 275-10 noted that "many users of financial statements . . . often assume an unwarranted degree of reliability in financial statements" that contain similar estimates, and that the "disclosure required by this [regulation] should help dispel any such erroneous assumptions."

205. Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 require disclosure of forward-looking information." Indeed, the SEC has stated that

Item 303 is "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company…with particular emphasis on the registrant's prospects for the future." *See* Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989). Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." *See* Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 8350, 2003 WL 22996757, at *11 (Dec. 19, 2003).

206. Disclosure of known trends and forward-looking information concerning the registrant's revenue are required by Item 303 "where a trend, demand, commitment, event or uncertainty is both [i] presently known to management and [ii] reasonably likely to have material effects on the registrant's financial condition or results of operations." *See* Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989).

207. As set forth in detail above, both of these conditions were satisfied here. First, the trends of Pier 1's excess inventory levels that exceeded demand, the concomitant markdown risk, Pier 1's distribution center inefficiencies, and the related costs of rising inventory were "known" to the Executive Defendants and other members of management. Second, the facts and allegations set forth above establish that these trends were "reasonably likely to have material effects on [Pier 1's] financial condition or results of operations." Indeed, as set forth above, as a direct result of these trends, Pier 1 incurred numerous undisclosed costs, experienced extraordinary inefficiencies, and suffered costly markdowns, all of which negatively impacted its

revenues and margins.

208. Thus, pursuant to Item 303, Defendants were required to disclose during the Class Period (but did not): (i) the existence of trends within the Company, namely that excess inventory had risen to levels that would require at least 18 months to sell-off and would negatively impact margins and earnings per share; and (ii) whether the dramatic increase in inventory that was out of line with demand had or was reasonably expected to have a "material . . . unfavorable impact on . . . revenues." Moreover, under GAAP Regulation ASC 275-10, Defendants were required to disclose the markdown risk Pier 1's excess inventories presented, or otherwise to disclose its inventory figures consistently with the markdown risk inherent in their size. Defendants failed to disclose this information during the Class Period.

## VIII. LOSS CAUSATION

209. The market price of Pier 1's publicly traded common stock was artificially inflated by the material misstatements and omissions alleged herein, including the misstatements and omissions about the Company's excess inventory.

210. The artificial inflation in Pier 1's stock price was removed when the facts, conditions, and risks misstated and omitted by Defendants were revealed to the market. The information was disseminated through partial disclosures on February 10, 2015, September 24, 2015, and December 17, 2015, which revealed on a piecemeal basis the nature and true extent of the Defendants' scheme to conceal excess inventory at the Company's retail stores and distribution centers, and their material negative impact on Pier 1. These disclosures, more particularly described below, reduced the amount of inflation in the price of Pier 1's publicly-traded stock, causing economic injury to Lead Plaintiff and other members of the Class.

211. On February 10, 2015, Pier 1 disclosed "unplanned" expenses, primarily related to supply chain costs associated with the 1 Pier 1 initiative, which included "incremental

distribution center costs that affect our gross profit." Defendant Smith also announced that Pier 1 had failed to "adequately forecast the revenue and expenses" for the business and that inventory would remain elevated through the fiscal year. The Company also announced the immediate resignation of its CFO, Defendant Turner. In response to this news, the price of Pier 1's shares plummeted from $16.97 per share on February 10, 2015 to $12.84 per share on February 11, 2015, or approximately 25%, on heavy volume.

212. Notwithstanding this partially corrective information, Defendants' prior false statements and omissions continued to operate as a fraud on the market because the February 10 disclosure failed to disclose the full extent of the fraud, and Defendants continued to make misrepresentations to investors.

213. Then, on September 24, 2015, the Company disclosed margin pressures from increased promotional and clearance activity in addition to inventory-related inefficiencies within its distribution center network. On this news, shares of Pier 1 fell from $8.67 per share on September 24, 2015 to $7.61 share on September 25, 2015, or 12.2%, on high trading volume.

214. Notwithstanding this partially corrective information, Defendants' prior false statements and omissions continued to operate as a fraud on the market because the September 24 disclosure failed to disclose the full extent of the fraud, and Defendants continued to make misrepresentations to investors.

| **Date of Corrective Disclosure** | **Corrective Disclosure** | **Common Stock Price Change By Close Of Market Next Day** | **S&P 500 Price Change** |
|---|---|---|---|

| | | | |
|---|---|---|---|
| February 10, 2015 | Announcement of Defendant Turner's resignation and the Company's forecasting failures. | $16.97 per share on day of disclosure. Closed next day at $12.84.<br><br>**Percentage change: -25%** | $2,068.59 on day of disclosure. Closed next day at $2,068.53.<br><br>**Percentage change: -0.0029%** |
| September 24, 2015 | Announcement of margin pressures due to markdown activities, as well as supply chain inefficiencies. | $8.67 per share on day of disclosure. Closed next day at $7.61.<br><br>**Percentage change: -12.2%** | $1,932.24 on day of disclosure. Closed next day at $1,931.34.<br><br>**Percentage change: -0.046%** |
| December 16, 2015 | Announcement that it would be 18 months before inventory was in sync with sales. | $5.95 per share on the day of disclosure. Closed next day at $4.75.<br><br>**Percentage change: -20%** | $2,073.07 on day of disclosure. Closed next day at $2,041.89.<br><br>**Percentage change: -1.5%** |

215. Next, on December 16, 2015, Pier 1 shocked the market, reporting that it had failed to keep inventory that tracked sales for the last 18 months, and that it would take another 18 months for Pier 1's inventory level to accurately track sales. On this news, shares of Pier 1 dropped 20%, falling from $5.95 per share to $4.75 per share on high trading volume. As illustrated by the chart below, each of these loss-causing disclosures occurred against a backdrop of little to no movements in the wider stock market:

Note: Each of the disclosures was made after markets had closed on the date of the disclosure and as such, each date-of-disclosure stock price is quoted as of close of market on that day. Accordingly, all market trades on the basis of the information disclosed occurred on the day after the disclosure.

216. None of these disclosures was sufficient on its own to fully remove the inflation from Pier 1's stock price because each of them only partially revealed the conditions, risks and trends that had been concealed from investors. The corrective impact of the disclosures alleged herein was tempered by Defendants' continued misstatements and omissions about Pier 1's purported success in building out its infrastructure to manage growing inventory levels due to the

1 Pier 1 initiative and its "clean" inventory levels with no markdown risk. These misrepresentations and omissions inflated and maintained the prices of Pier 1's publicly traded stock at levels that were artificially inflated, inducing members of the Class to continue purchasing Pier 1's common stock even after the truth began to partially enter the market.

## IX. PRESUMPTION OF RELIANCE

217. At all relevant times, the market for Pier 1's common stock was efficient for the following reasons, among others:

a. Pier 1 stock met the requirements for listing, and was listed and actively traded on the NYSE, an open, developed and highly efficient and automated market;

b. As a regulated issuer, Pier 1 filed periodic public reports with the SEC and NYSE;

c. The price of Pier 1 common stock reacted promptly to the dissemination of new information regarding the Company;

d. Pier 1 common stock was actively traded throughout the Class Period, with substantial trading volume and average weekly turnover and high institutional investor participation. The average daily trading volume for Pier 1 common stock during the Class Period was 2,348,248 shares and the average weekly volume as a percentage of shares outstanding was 12%;

e. Pier 1 regularly and publicly communicated with investors via SEC filings and established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

f. Pier 1 was followed extensively by the media, and by numerous securities analysts employed by at least 22 major brokerage firms who wrote at least 279 analyst reports about Pier 1 during the Class Period which were distributed to those brokerage firms' sales forces and certain customers. Each of these reports was publicly available and entered the public market place.

218. As a result of the foregoing, the market for Pier 1 common stock promptly digested current information regarding Pier 1 from all publicly available sources and reflected

such information in the price of Pier 1 stock. Under these circumstances, all purchasers of Pier 1 common stock during the Class Period suffered similar injury through their purchases of Pier 1 common stock at artificially inflated prices, and the presumption of reliance applies.

219. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's excess inventory and its related trends, costs, and markdown risk and undisclosed impact on margins and earnings per share—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Pier 1's inventory, distribution centers, costs and markdown risk, as set forth above, that requirement is satisfied here.

## X. <u>CLASS ACTION ALLEGATIONS</u>

220. Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the publicly-traded common stock of Pier 1 during the Class Period. Excluded from the Class are Defendants and their families, directors, and officers of Pier 1 and their families and affiliates.

221. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of Class members' claims in a class action will provide substantial benefits to the parties and the Court. Pier 1 has over 86 million shares of common stock outstanding, owned by thousands of investors.

222. There is a well-defined community of interest in the questions of law and fact

involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a. Whether Defendants violated the Exchange Act;

b. Whether Defendants misrepresented material facts;

c. Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d. Whether Defendants knew or were severely reckless in disregarding that their statements and/or omissions were false and misleading;

e. Whether the price of Pier 1 common stock was artificially inflated;

f. Whether Defendants' conduct caused the members of the Class to sustain damages; and

g. The extent of damage sustained by Class members and the appropriate measure of damages.

223. Lead Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

224. Lead Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Lead Plaintiff has no interests which conflict with those of the Class.

225. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

226. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false and misleading statements pleaded in this Complaint.

227. None of the statements complained of herein was a forward-looking statement.

Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Pier 1's reported inventories, including the Company's "clean" inventory, purported lack of markdown risk, inventory costs, internal controls over financial reporting, and the condition of the Company's distribution centers, stores and supply chain, among others.

228. To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Pier 1's reported inventories, including the Company's inventory costs, internal controls over financial reporting, and the condition of the Company's distribution centers, stores and supply chain, among others. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Pier 1 were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

229. To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those materially false and misleading forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false or misleading, and/or the false and misleading forward-looking statement was authorized and/or approved by an executive officer of Pier 1 who knew that the statement was false or misleading when made.

## XII. CLAIMS FOR RELIEF

### COUNT I

**For Violation of Section 10(b) of the Exchange Act And Rule 10b-5 Promulgated Thereunder (Against All Defendants)**

230. Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

231. This Count is asserted on behalf of all members of the Class against all Defendants (Pier 1, Smith and Turner) for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

232. During the Class Period, Defendants disseminated or approved the false and misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

233. Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Pier 1 common stock during the Class Period. As detailed herein, the misrepresentations contained in, or the material facts omitted from, those statements included, but were not limited to Pier 1's excess inventory, its true markdown risk, undisclosed inefficiencies and costs in its distribution centers and supply chain, poor infrastructure, and inadequacy of internal controls.

234. Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class; made various untrue and/or misleading statements of material facts and omitted to state

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above materially false and misleading statements intentionally or with reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Pier 1 common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiff and the Class, regarding, among other things, Pier 1's excess inventory, its true markdown risk, undisclosed inefficiencies and costs in its distribution centers and supply chain, poor infrastructure, and inadequacy of internal controls; (b) artificially inflate and maintain the market price of Pier 1 common stock; and (c) cause Lead Plaintiff and other members of the Class to purchase Pier 1 common stock at artificially inflated prices and suffer losses when the true facts became known.

235. Defendant Pier 1 is liable for all materially false and misleading statements made during the Class Period, as alleged above, including the false and misleading statements in:

i. Pier 1's Form 8-K, filed with the SEC on December 19, 2013 (¶¶ 175, 184);

ii. Pier 1's Form 10-Q, filed with the SEC on January 8, 2014 (¶¶ 199-208);

iii. Pier 1's Form 8-K, filed with the SEC on February 28, 2014 (¶ 45-46, 186);

iv. Pier 1's Form 10-K, filed with the SEC on April 29, 2014 (¶¶ 4, 197, 199-208);

v. Pier 1's Form 10-Q, filed with the SEC on July 9, 2014 (¶¶ 199-208);

vi. Pier 1's Form 8-K, filed with the SEC on September 17, 2014 (¶¶ 50-51, 144, 180);

vii. Pier 1's Form 10-Q, filed with the SEC on October 8, 2014 (¶¶ 199-208);

viii. Pier 1's Form 8-K, filed with the SEC on December 18, 2014 (¶¶ 5, 21, 52-53, 189-190);

ix. Pier 1's Form 10-Q, filed with the SEC on January 7, 2015 (¶¶ 189-190, 199-208);

x. Pier 1's Form 8-K, filed with the SEC on January 8, 2015 (¶¶ 54, 145, 191-192);

xi. Pier 1's Form 8-K, filed with the SEC on April 8, 2015 (¶¶ 6-11, 110-112, 119-120, 146, 151, 168, 182, 193-194);

xii. Pier 1's Form 10-K, filed with the SEC on April 28, 2015 (¶¶ 197, 199-208);

xiii. Pier 1's Form 10-Q, filed with the SEC on July 8, 2015 (¶¶ 199-208); and

xiv. Pier 1's Form 10-Q, filed with the SEC on October 7, 2015 (¶¶ 199-208).

236. Defendant Pier 1 is further liable for the false and misleading statements made by Pier 1 officers in press releases and during conference calls and at conferences with investors and analysts, as alleged above, as the makers of such statements under the principle of respondeat superior. These statements are set forth in ¶¶ 175-198 above.

237. Defendants Smith and Turner, as top executive officers of the Company during their respective tenures, are liable as direct participants in the wrongs complained of herein. Defendants Smith and Turner are liable for the false and misleading statements they personally made and/or signed as follows:

<u>Defendant Smith</u>

i. Defendant Smith signed: (1) the Forms 10-Q that the Company filed with the SEC on January 8, 2014, July 9, 2014, October 8, 2014, January 7, 2015, July 8, 2015, and October 7, 2015; and (2) the Forms 10-K that the Company filed with the SEC on April 29, 2014 and April 28, 2015. Defendant Smith also made statements in press releases and participated in conference calls with securities analysts, in which Pier 1's financial condition was presented and discussed. Specifically, Defendant Smith made false and misleading statements on the Company's earnings conference calls held on December 19, 2013, April 10, 2014, June 19, 2014, December 18, 2014, April 8, 2015, and June 17, 2015, and in Pier 1 press releases disseminated on February 28, 2014, January 8, 2015, and April 8, 2015. Aside from the conference calls and presentations that occurred after his "resignation," Defendant Turner was also present during each of these conference calls.

<u>Defendant Turner</u>

ii. Defendant Turner signed: (1) the Forms 10-Q that the Company filed with the SEC on January 8, 2014, July 9, 2014, October 8, 2014, and January 7, 2015; and

> (2) the Form 10-K that the Company filed with the SEC on April 29, 2014. Defendant Turner also participated in conference calls with securities analysts, during which Pier 1's financial condition was presented and discussed. Specifically, Defendant Turner made false and misleading statements on the Company's earnings conference calls held on December 19, 2013 and April 10, 2014. Defendant Smith was also present during each of these conference calls.

238. As described above, Defendants Pier 1, Turner and Smith acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Pier 1 stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

239. The above allegations, as well as the allegations pertaining to the overall scope and breadth of the fraud at Pier 1, which resulted in continuous and material misstatements of the Company's excess inventory, its true markdown risk, undisclosed inefficiencies and costs in its distribution centers and supply chain, poor infrastructure, and inadequacy of internal controls, and related material omissions, establish a strong inference that Defendants Smith and Turner acted with scienter in making the materially false and misleading statements set forth above during the Class Period.

240. Lead Plaintiff and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Pier 1 common stock, which inflation was removed from the prices of their shares when the true facts became known. Lead Plaintiff and the Class would not have purchased Pier 1 common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' materially false and misleading statements.

241. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages attributable to the fraud alleged

herein in connection with their purchases of Pier 1 common stock during the Class Period.

## COUNT II

### For Violations of Section 20(a) of The Exchange Act (Against The Executive Defendants)

242. Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

243. This Count is asserted on behalf of all members of the Class against each of the Executive Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

244. During their tenures as senior officers of Pier 1, Smith and Turner were each a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers of Pier 1, the Executive Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. Each of these Defendants was able to and did control, directly and indirectly, the content of the following public statements made by Pier 1 during their tenures at the Company during the Class Period, which include Pier 1's materially false and misleading financial statements contained therein, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein:

Defendant Smith (who was Pier 1's CEO throughout the Class Period):

i. **2013**: December 19, 2013 conference call; December 19, 2013 Form 8-K;

ii. **2014**: January 8, 2014 Form 10-Q; February 28, 2014 Form 8-K; April 29, 2014 Form 10-K; April 10, 2014 conference call with analysts; July 9, 2014 Form 10-Q; September 17, 2014 Form 8-K; October 8, 2014 Form 10-Q; December 18, 2014 Form 8-K; December 18, 2014 conference call with analysts;

iii. **2015**: January 7, 2015 Form 10-Q; January 8, 2015 Form 8-K; April 8, 2015 conference call with analysts; April 8, 2015 Form 8-K; April 28, 2015 Form 10-K; June 17, 2015, conference call with

analysts; July 8, 2015 Form 10-Q; and October 7, 2015 Form 10-Q.

Defendant Turner (who was Pier 1's CFO from the beginning of the Class Period until February 10, 2015):

i. **2013**: December 19, 2013 conference call; December 19, 2013 Form 8-K;

ii. **2014**: January 8, 2014 Form 10-Q; February 28, 2014 Form 8-K; April 29, 2014 Form 10-K; April 10, 2014 conference call with analysts; July 9, 2014 Form 10-Q; September 17, 2014 Form 8-K; October 8, 2014 Form 10-Q; December 18, 2014 Form 8-K; December 18, 2014 conference call with analysts;

iii. **2015**: January 7, 2015 Form 10-Q; and January 8, 2015 Form 8-K.

245. In their capacities as senior corporate officers of the Company, and as more fully described above, the Executive Defendants had direct involvement in the day-to-day operations of the Company, in reviewing and managing its financial compliance, internal control procedures, and its accounting and reporting functions. The Executive Defendants signed materially false and misleading Pier 1 SEC filings during the Class Period, and were directly involved in certifying and/or approving the false statements disseminated by Pier 1 during the Class Period. As a result of the foregoing, the Executive Defendants, as a group and individually, were controlling persons of Pier 1 within the meaning of Section 20(a) of the Exchange Act.

246. As set forth above, Pier 1 violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of Pier 1 and as a result of their own aforementioned conduct, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Pier 1 common stock. Moreover, as detailed above, during the respective times these

Defendants served as officers and/or directors of Pier 1, each of these Defendants was culpable for the material misstatements and omissions made by Pier 1, as set forth above.

247. As a direct and proximate result of the Executive Defendants' conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases or acquisitions of Pier 1 common stock.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Lead Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XIV. JURY DEMAND

Lead Plaintiff demands a trial by jury.

DATED: August 8, 2016

Respectfully submitted,

/s/ David T. Moran
David T. Moran
Texas Bar No. 14419400
**JACKSON WALKER LLP**
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
Telephone: (214) 953-6051
Facsimile: (214) 661-6677
dmoran@jw.com

*Liaison Counsel for Lead Plaintiff Municipal Employees' Retirement System of Michigan*

Adam Wierzbowski
Angus Ni
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
adam@blbglaw.com
angus.ni@blbglaw.com

*Counsel for Lead Plaintiff Municipal Employees' Retirement System of Michigan and Lead Counsel for the Putative Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 8, 2016, I electronically filed the above Consolidated Class Action Complaint for Violations of the Federal Securities Laws with the Clerk of the Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

/s/ *David T. Moran*
David T. Moran