IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

TOWN OF DAVIE POLICE PENSION §
PLAN, individually and on behalf of all §
others similarly situated, §
§
                Plaintiff, §
§ Civil Action No. 3:15-CV-3415-D
VS. §
§
PIER 1 IMPORTS, INC., et al., §
§
                Defendants. §

MEMORANDUM OPINION
AND ORDER

In this putative class action alleging claims for securities fraud, in violation of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5 ("Rule 10b-5"), 17 C.F.R. § 240.10b-5, promulgated thereunder, the court must decide whether plaintiff has adequately pleaded its claims under the heightened pleading standards of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4. Concluding that it has not, the court grants defendants' motion to dismiss under Rules 12(b)(6) and 9(b), but it also permits plaintiff to replead.

I

Lead plaintiff the Municipal Employees' Retirement System of Michigan ("MERS") brings this putative class action against defendants Pier 1 Imports, Inc. ("Pier 1"), Pier 1's former chief executive officer, Alexander W. Smith ("Smith"), and Pier 1's former chief

financial officer, Charles H. Turner ("Turner").[1]  MERS alleges in its consolidated class action complaint ("complaint") that defendants committed securities fraud, in violation of the Exchange Act and Rule 10b-5, by, *inter alia*, misrepresenting and concealing from the market that Pier 1 had acquired excess inventory that far exceeded consumer demand, thereby creating a substantial risk that it would be necessary for Pier 1 to engage in costly price markdowns and incur other significant expenses associated with storing, tracking, and transporting the excess inventory.  MERS sues "on behalf of itself and all other persons or entities who purchased or otherwise acquired the publicly-traded common stock of [Pier 1] during the period from December 19, 2013 through December 17, 2015, inclusive (the 'Class Period') and were damaged thereby (the 'Class')."  Compl. 1.

Pier 1 is a specialty retailer that sells decorative home furnishings at more than 1,000 stores nationwide and through its website, Pier1.com.[2]  In 2007, when Smith became Pier 1's

---

[1]This class action—*Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*, No. 3:15-CV-3415-D (N.D. Tex. filed Oct. 21, 2015)—is the remaining case of two lawsuits. The other—*Kenney v. Pier 1 Imports, Inc.*, No. 3:15-CV-2798-D (N.D. Tex. filed Aug. 28, 2015—was voluntarily dismissed.  Three plaintiffs in this case initially moved for appointment as lead plaintiff under the PSLRA.  In *Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*, 2016 WL 1625774, at *5 (N.D. Tex. Apr. 25, 2016) (Fitzwater, J.), the court designated MERS as lead plaintiff.  MERS then filed the filed the complaint that defendants now move to dismiss.

[2]In deciding defendants' Rule 12(b)(6) motion, the court construes MERS's complaint in the light most favorable to MERS, accepts as true all well-pleaded factual allegations, and draws all reasonable inferences in MERS's favor.  *See, e.g., Lovick v. Ritemoney Ltd.*, 378 F.3d 433, 437 (5th Cir. 2004).  "The court's review [of a Rule 12(b)(6) motion] is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint."  *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

CEO, Pier 1 was in the midst of a financial crisis. According to the complaint, Pier 1 embarked on a series of expansion campaigns in the early 2000s, after its sales had reached $1 billion. But by 2007 it had become clear that Pier 1 had grown too quickly: sales plummeted, and the company reported a $227 million loss for that fiscal year. After Smith was appointed Pier 1's CEO, he adopted a cost-cutting strategy that centered around aggressive inventory management, including obtaining and maintaining a level of inventory in line with actual consumer demand.[3] The complaint alleges that Smith referred to this level of inventory as "clean inventory."[4] *Id.* ¶ 25. By 2009 Pier 1's financial condition had improved. But a shift in the industry toward online retail put new pressure on Pier 1 to enter the online market. In response, Smith and Turner developed an "omni-channel" initiative to integrate online and in-store sales. Referred to as "1 Pier 1," the initiative allowed customers to shop online and have their purchases shipped to their homes, or to pick them up at Pier 1's U.S. stores without incurring shipping charges. 1 Pier 1 launched in August 2012.

During a May 2013 conference call with analysts and investors, Pier 1 stated that it

---

[3]According to the complaint, Pier 1's actual inventory level was one of the most critical metrics to investors in analyzing Pier 1's value as a company, because it was a key measure of demand for the company's products and the growth of its revenue stream. The complaint alleges that, if inventory levels were to rise significantly (and outstrip actual sales and demand for Pier 1's products), this would create a backlog of merchandise that would be costly for Pier 1 to maintain and would result in inefficiencies at Pier 1's distribution centers. Those conditions would, in turn, require Pier 1 to "clear" excess inventory by marking down its merchandise, which would reduce the company's margins.

[4]The complaint alleges that "clean" inventory is a standard industry term that means that Pier 1's inventory level was not excessive, that it corresponded with actual demand, and that it did not require costly markdowns to clear. Compl. ¶ 5.

had upgraded its planning and allocation systems to accurately monitor and maintain inventory in line with sales. According to Pier 1, the system improved its "forecast accuracy" and "inventory control" and allowed it to "keep all distribution centers in optimal stock." *Id.* ¶ 171. During the Class Period, defendants represented to investors on various occasions that Pier 1 was operating with a "clean" inventory; that Pier 1's inventory was "well-controlled"; that there was not a "significant markdown risk"; and that Pier 1's inventory growth was the result of increasing sales

The complaint alleges that, despite the reassurances and optimistic forecasts from Pier 1 and its top executives, inventories at Pier 1's distribution centers[5] and stores were at unprecedented levels during the Class Period. The complaint asserts that, during fiscal years ("FYs") 2014 and 2015, "[Pier 1's] distribution centers were overflowing with excess inventory, its stores were 'busting at the seams' with merchandise, and [Pier 1] incurred undisclosed costs in order to store containers full of inventory at ports and rail yards and in

---

[5]According to the complaint:

> The items sold in Pier 1's retail locations and on its website are housed as inventory in six distribution and fulfillment centers located in Maryland, Ohio, Texas, California, Georgia, and Washington. Pier 1's merchandise is primarily imported from China and other foreign countries and shipped to the United States by boat, then delivered to the Company's distribution centers. At the distribution centers, Pier 1 stores the merchandise until it is further shipped to Pier 1 retail stores in each distribution center's region, or delivered directly to the consumer.

Compl. ¶ 40.

temporary storage facilities." *Id.* ¶ 7.

MERS alleges that Smith and Turner knew about—or were severely reckless in disregarding—Pier 1's excess inventory and markdown risk. During a March 2014 internal Pier 1 "town hall" meeting, Smith admitted that he was responsible for pushing overly high sales goals on Pier 1 employees and for underestimating what it would take to achieve these goals, and he acknowledged, among other things, that "[w]e became victims of our own ambition." *Id.* ¶ 8. MERS asserts that Pier 1 did not fully disclose to investors the true state of its inventory and markdown risk until late 2015.

According to the complaint, Pier 1 did not disclose to investors the existence and magnitude of its excess inventory and markdown risk until it made a series of "partial corrective disclosures" in 2015. *Id.* ¶ 9. On February 10, 2015 Pier 1 announced that there had been a "failure to adequately forecast the revenue and expenses in our business," *Id.* ¶ 114; that the company had "unplanned supply chain expenses" that included "incremental distribution center costs that affect our gross profit," *id.* ¶ 115; and that its CFO, Turner, a 22-year veteran of the company, was resigning effective immediately, at the age of 58. In response to these revelations, the price of Pier 1's stock fell 25% (from $16.97 per share on February 10, 2015 to $12.84 per share on February 11, 2015).

MERS alleges that, during the months that followed, Pier 1 made a series of misrepresentations that were intended to reassure investors, including that Pier 1's inventory complexion was "healthy" and that it did "not pose a significant immediate markdown risk." *Id*. ¶ 110. On September 24, 2015, however, Smith disclosed, *inter alia*, that Pier 1's

margins had been negatively impacted by "increased promotional and clearance activity," *id.* ¶ 121, and he admitted to "heavier than expected promotional and clearance markdowns, and excess costs in our distribution network," *id.* ¶ 123. The complaint alleges that, in response to these announcements, Pier 1's stock price fell by 12.2%.

Although over the next two months Pier 1 continued to minimize its inventory issues, Smith finally disclosed in December 2015 that Pier 1 had "encountered supply chain difficulties, stemming from an aggressive sales forecast that resulted in excess inventory and added costs," and that Pier 1's distribution centers had been disrupted by its "extremely high inventory levels." *id.* ¶ 128 (emphasis omitted). Smith also admitted that "over [the] last 18 months or [so] we got out of whack," and failed to "keep inventory and sales growing at approximately the same rate," *id.* ¶ 129 (alterations in original). He then explained that it would take 18 more months to get "[b]ack to our normal trajectory where sales and inventory are in sync." *Id.* Pier 1's stock price fell by another 20%, dropping from $16.97 per share on February 10, 2015 to $4.75 per share on December 17, 2015. MERS contends that post-Class Period events confirm that the "fraud" put Pier 1 in a catastrophic financial position, and, in September 2016, Pier 1 announced that Smith was departing as CEO at the end of the year.

On October 21, 2015 the Town of Davie Police Pension Plan filed suit against Pier 1, alleging violations of §§ 10(b) and 20(a) of the Exchange Act and of Rule 10b-5. Following proceedings required by the PSLRA, the court appointed MERS as lead plaintiff. MERS then filed the complaint that defendants now move to dismiss under Rules 12(b)(6)

and 9(b) and the PSLRA.  The court has heard oral argument on defendants' motion.

II

A

"In deciding a Rule 12(b)(6) motion to dismiss, the court evaluates the sufficiency of [the] complaint by accepting all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff."  *Bramlett v. Med. Protective Co. of Fort Wayne, Ind.*, 855 F.Supp.2d 615, 618 (N.D. Tex. 2012) (Fitzwater, C.J.) (internal quotation marks and brackets omitted) (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, 550 U.S. at 556); *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level[.]").  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'"  *Iqbal*, 556 U.S. at 679 (brackets omitted) (quoting Rule 8(a)(2)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678 (citation omitted).

Because MERS's complaint alleges fraud, MERS must plead the elements of its claims with the heightened particularity required by Rule 9(b). *See, e.g., Coates v. Heartland Wireless Commc'ns, Inc.*, 26 F.Supp.2d 910, 914 (N.D. Tex. 1998) (Fitzwater, J.). "Rule 9(b) imposes a heightened pleading standard for fraud claims and requires that a party state with particularity facts supporting each element of fraud." *Turner v. AmericaHomeKey Inc.*, 2011 WL 3606688, at *2 (N.D. Tex. Aug. 16, 2011) (Fitzwater, C.J.) (citing *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003)), *aff'd*, 514 Fed. Appx. 513 (5th Cir. 2013). "At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Turner*, 2011 WL 3606688, at *2 (quoting *Benchmark Elecs.*, 343 F.3d at 724). More colloquially, plaintiffs must plead the "who, what, when, where, and how" of the fraud. *United States ex rel. Williams v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 453 (5th Cir. 2005) (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)). Because Rule 9(b) must be "read in conjunction with [Rule] 8 which requires only a short and plain statement of the claim showing that the pleader is entitled to relief," "punctilious pleading detail" is not required. *Steiner v. Southmark Corp.*, 734 F. Supp. 269, 273 (N.D. Tex. 1990) (Fitzwater, J.) (internal quotation marks omitted) (quoting *Landry v. Air Line Pilots Ass'n Int'l AFL-CIO*, 892 F.2d 1238, 1264 (5th Cir. 1990)). "The court's key concern in assessing a complaint under Rule 9(b) is to determine whether the plaintiff seeks to redress specific

wrongs or whether the plaintiff instead seeks the opportunity to search out actionable wrongs." *Garcia v. Boyar & Miller, P.C.*, 2007 WL 2428572, at *4 (N.D. Tex. Aug. 28, 2007) (Fitzwater, J.) (citation omitted).

C

Pleadings in federal securities fraud actions must also comply with the strictures imposed by the PSLRA. *See* 15 U.S.C. § 78u-4(b). "The PSLRA has raised the pleading bar even higher and enhances Rule 9(b)'s particularity requirement for pleading fraud in two ways." *Neiman v. Bulmahn*, 854 F.3d 741, 746 (5th Cir. 2017) (quoting *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Doides, Inc.*, 810 F.3d 951, 956 (5th Cir. 2016)). "First the plaintiff must specify each statement alleged to have been misleading, and the reason or reasons why the statement is misleading." *Id.* (internal quotation marks and citation omitted); *see also* 15 U.S.C. § 78u-4(b)(1). "Second, for each act or omission alleged to be false or misleading, plaintiffs must state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." *Neiman*, 854 F.3d at 746 (internal quotation marks and citation omitted); *see also* 15 U.S.C. § 78u-4(b)(2)(A).

III

A

Plaintiff asserts two claims. Count I alleges that defendants violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Count II alleges that Smith and Turner are liable as control persons under § 20(a) of the Exchange Act.

- 9 -

To state a claim under Rule 10b-5, "a plaintiff must allege, in connection with the purchase or sale of securities, '(1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately caused [the plaintiff's] injury.'" *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406-07 (5th Cir. 2001) (quoting *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994)); *see also Neiman*, 854 F.3d at 746.

> [A] plaintiff pleading a false or misleading statement or omission as the basis for a section 10(b) and Rule 10b-5 securities fraud claim must, to avoid dismissal pursuant to Rule 9(b) and 15 U.S.C. §§ 78u-4(b)(1) & 78u-4(b)(3)(A) [the PSLRA]: (1) specify . . . each statement alleged to have been misleading, i.e., contended to be fraudulent; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representations; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.

*Neiman*, 854 F.3d at 746 (alterations and ellipses in original) (quoting *Goldstein v. MCI WorldCom*, 340 F.3d 238, 245 (5th Cir. 2003)).

"Under Section 20(a), a person who exerts control over a person who violates any provision of the Securities Exchange Act can be held jointly and severally liable with the primary actor of the underlying securities law violation." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 206 n.4 (5th Cir. 2009). Nonetheless, "[c]ontrol person liability is secondary only and cannot exist in the absence of a primary violation." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 383 (5th Cir. 2004)

(citing *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1021 n.8 (5th Cir. 1996)).

B

Defendants move to dismiss on the following grounds: the complaint does not satisfy the pleading requirements of Rule 9(b) and the PSLRA; the complaint does not plead the requisite strong inference of scienter; and the complaint does not adequately plead that defendants made any materially false or misleading statements or omissions.

In the complaint, MERS groups the alleged misstatements and omissions on which it bases its claims into the following four categories: first, statements concerning Pier 1's infrastructure and ability to control inventory; second, statements concerning Pier 1's purported "clean" inventory levels and lack of markdown risk; third, statements in documents filed with the SEC and Sarbanes-Oxley[6] ("SOX") certifications regarding Pier 1's inventory and inventory controls; and fourth, omissions that rendered defendants' statements materially false and misleading. The court will address each category of allegedly false or misleading statements in turn.

IV

The court begins with the statements alleged in category two, i.e., statements concerning Pier 1's purported "clean" inventory levels and lack of markdown risk.

A

In support of MERS's contention that defendants misrepresented that Pier 1's

---

[6]The Sarbanes-Oxley Act of 2002.

inventory was "clean" and did not carry a significant or substantial markdown risk,[7] it relies

on the following allegations of its complaint:

> On December 19, 2013, Smith claimed that Pier 1's inventories were "always well controlled"; Pier 1 claimed that it was focused on "strategically managing its inventory purchases and monitoring its inventory levels to correspond with consumer demand"; and Smith claimed that "[o]ur inventory levels are running now at sort of historical lows" and "not fluctuating very much, because we have such great processes for taking our mark-downs and clearing through the slow merchandise."

Ps. Br. 35 (alterations in original) (footnotes omitted) (citing and quoting Compl. ¶ 184).

> On February 28, 2014, Smith claimed, "We are entering fiscal 2015 in a clean inventory position."

*Id.* (citing and quoting Compl. ¶ 186).

> On April [10], 2014, Turner stated that Pier 1 was able to "enter fiscal 2015 in a clean inventory position."

*Id.* (citing and quoting Compl. ¶ 187).[8]

> On June 19, 2014, Smith was asked what was driving pressure on the Company's gross margin, and he responded that "in terms of the pressure it is not so much the markdown pressure, I mean we continue to run a very clean inventory as I know you know."

---

[7]In its brief, MERS repeatedly refers to a misrepresentation by Pier 1 that it had "no markdown risk." *See, e.g.,* P. Br. 34. But the complaint does not plausibly allege that any defendant actually stated that there was "no markdown risk." MERS alleges, at most, that defendants represented to investors that Pier 1 did not face a "significant" or "substantial" markdown risk. *See, e.g.,* Compl. ¶¶ 5, 52, 110, 119, 145, 146, 151, 189, 190, and 193.

[8]The complaint alleges that this earnings call occurred on April 10, 2014, but MERS's brief states that it occurred on April 1, 2014. The court has substituted the date alleged in the complaint.

*Id.* (citing and quoting Compl. ¶ 188).

> On December 18, 2014, when the Company reported a 25%
> increase in inventory, Pier 1 claimed the increase was necessary
> to "support higher sales," and Smith stated that "store level
> inventory has increased only slightly" and assured investors that
> "we do not see any significant markdown risk."

*Id.* (citing and quoting Compl. ¶ 189).

> On April 8, 2015, Smith assured investors that "[a]lthough fiscal
> 2015 ending inventories are higher than originally planned, their
> complexion is healthy and not believed to pose a substantial
> markdown risk."

*Id.* (alteration in original) (citing and quoting Compl. ¶ 193).

MERS also maintains that "'[c]lean' inventory is a standard industry term meaning

that Pier 1's inventory level was not excessive, that it corresponded with actual demand, and

that it did not require costly markdowns to clear." Compl. ¶ 5; *see also id.* ¶ 25 n.1

("Defendants have used the term 'clean' inventory on numerous occasions throughout the

past decade to describe inventory that was not excessive, tracked actual demand and carried

no markdown risk.").

B

As a preliminary matter, the court addresses defendants' contention that the statements

in category two—including defendants' use of the term "clean" inventory— "are not the kind

of concrete, verifiable, and objective facts that reasonable investors would rely upon in

making investment decisions." Ds. Br. 37. Defendants maintain that the term "clean" does

not have a definitive meaning and in no way can be said to convey particular percentages or

other quantifiable information that investors rely on in making investment decisions; that to the extent MERS defines "clean" as "inventory that was not excessive, tracked actual demand and carried no markdown risk," Compl. ¶ 25 n.1, none of Smith's prior statements supports MERS's conclusion that the term definitively means inventory with those three specific characteristics; and that MERS "has provided no case, treatise, or article providing *any* definition of the term." Ds. Reply 20.

MERS responds that defendants' statements concerning Pier 1's purportedly "clean" inventory and lack of markdown risk had commonly accepted and undisputed concrete meanings in the retail industry. It alleges in the complaint that "'[c]lean' inventory is a standard industry term meaning that Pier 1's inventory level was not excessive, that it corresponded with actual demand, and that it did not require costly markdowns to clear."[9] Compl. ¶ 5. In a footnote, MERS alleges:

> Defendants have used the term "clean" inventory on numerous occasions throughout the past decade to describe inventory that was not excessive, tracked actual demand and carried no markdown risk. For example, on a September 20, 2007 conference call with analyst, Defendant Turner stated: "The clearance event was very successful and we ended July with very clean inventory." On an April 10, 2008 conference call with analysts, Defendant Smith stated: "we will continue to stress our everyday fair values and use markdown dollars to clean up and manage our inventory." On a December 18, 2008 conference call with analysts, Defendant Smith informed listeners that if the Company's customers tighten spending, then "we'll end up discounting more to clean our inventories."

---

[9]At oral argument, MERS's counsel defined the term "clean" to mean "a lack of excess inventory markdown risk." Tr. Oral Arg. 34.

> Elsewhere in the industry, retailers like Gap Inc. and T.J. Maxx (Defendant Smith's former company) both use the term "clean" in the same manner. For example, on a February 26, 2014 conference call with analysts, T.J. Maxx's CEO stated, "[w]e stuck to our off-price discipline and took aggressive markdowns in January, particularly in apparel, to clear the product. Although this impacted merchandise margins, it allowed us to begin the new year with extremely clean inventories."

*Id.* ¶ 25 n.1.

The court concludes that MERS's allegations are insufficient to plausibly allege that defendants used the term "clean" in the way MERS describes. The allegations in the complaint, which refer to markdowns, discounts, and clearance, at most suggest that defendants had in the past used the term "clean" to refer to the inventory that remained after Pier 1 used markdowns to sell inventory that could not otherwise be sold. None of the statements MERS describes in footnote 1 supports the reasonable inference that "clean" refers to inventory that was "not excessive" or that "corresponded with actual demand."

C

To the extent that defendants represented to investors that Pier 1 did not face a "substantial" or "significant" markdown risk, used the term "clean" to refer to inventory that did not carry such a risk, or, as defendants argue, used the term "clean" "to refer to an absence of stockpiles of obsolete items that required clearance activity," Ds. Br. 22, and assuming *arguendo* that these statements constituted material misrepresentations,[10] the court

---

[10]Because the court assumes that these representations were "material misrepresentations," it does not address defendants' argument that these statements are not actionable because they are forward-looking and reflect expectations that products in

concludes that MERS's claim based on these statements fails because it has not adequately pleaded scienter.

To establish scienter in a securities fraud case, a plaintiff must show that the defendant made a misrepresentation or omission with "an intent to deceive, manipulate, or defraud," or that the defendant acted with "severe recklessness." *Southland*, 365 F.3d at 366 (internal quotation marks omitted) (quoting *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961-62 (5th Cir. 1981) (en banc)).

> [Severe recklessness] is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Neiman*, 854 F.3d at 747 (quoting *Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 684 (5th Cir. 2014)).

The Supreme Court has outlined a framework for analyzing motions to dismiss § 10(b) complaints based on a failure to plead a strong inference of scienter. First, as in any other motion to dismiss, the court accepts all factual allegations in the complaint as true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Second, the court considers the entire complaint, other sources typically examined in a 12(b)(6) motion, sources incorporated by reference into the complaint, and matters of which a court may take

---

inventory could be sold without costly, unplanned markdowns.

judicial notice. *Id.* Third, in determining whether the pleaded facts give rise to a strong inference of scienter, as required by the PSLRA, a court considers all of the facts alleged, taken collectively, and also takes into account plausible opposing inferences. *Id.* at 323. The inference of scienter need not be irrefutable, nor even the most compelling of all competing inferences, but must be strong in light of other inferences. *Id.* at 324. Ultimately, to create an inference of scienter, "the allegations in the complaint must be 'cogent and compelling,' not simply 'reasonable,' or 'permissible.'" *Diodes, Inc.*, 810 F.3d at 957 (quoting *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 727, 533 (5th Cir. 2008)).

Building on this framework, the Fifth Circuit has stated that "allegations of motive and opportunity standing alone" are not enough to establish scienter, but such circumstantial evidence may "meaningfully enhance the strength of the inference of scienter." *Ind. Elec. Workers' Pension Trust Fund IBEW*, 537 F.3d at 533. The Fifth Circuit has also rejected the group pleading approach to scienter, which would allow a plaintiff to prove state of mind through the collective knowledge of all the corporation's officers and employees. *Id.* Instead, a court looks only to the state of mind of the corporate officials who made or issued the alleged misleading statement to determine whether a complaint sufficiently pleads scienter. *Id.*

D

The court concludes that the complaint fails to plausibly allege that defendants acted with an intent to deceive, manipulate, or defraud when they stated that Pier 1's inventory was "clean" and that they did not see a "significant" or "substantial" markdown risk.

First, MERS has failed to adequately plead that Smith or Turner had a motive to mislead the public during the Class Period. In its brief, MERS contends that Smith and Turner were motivated to inflate Pier 1's stock price during the Class Period because Pier 1 had recently introduced performance-based stock awards for Smith and Turner that were tied to the company's share price and that were set to vest only three months after the end of the Class Period; that Smith and Turner were motivated to maintain excess inventory without markdowns because writing down the actual cost of obsolete or unmarketable merchandise would negatively impact Pier 1's earnings and stock price; and that Smith and Turner were motivated to commit fraud because, once they committed to the 1 Pier 1 strategy, the success of Pier 1 (and their own careers) depended on it. MERS maintains that

> after Defendants realized they had set sales goals that were admittedly in excess of actual demand, they concealed the fact that they ordered excess inventory and misrepresented the inventory levels as "clean," "healthy," "on plan," and "support[ing] higher sales," all while Pier 1 accumulated excess inventory. Once Defendants embarked on their gamble to make "1 Pier 1" a success, they failed to timely disclose the Company's excess inventory in the reckless hope that the situation would somehow right itself. . . . The 2015 disclosures of Pier 1's inventory crisis resulted in numerous swift and harsh consequences for Pier 1, Smith, and Turner. Defendants were motivated to avoid these outcomes. Smith and Turner both left the Company, Pier 1 lost credibility, its profit margins shrank dramatically as it worked through the excess inventory, and its stock price fell sharply. Thus, contrary to Defendants' argument, Smith and Turner had strong motives to forestall the day of reckoning in hopes they could avoid it.

P. Br. 14-15 (alteration in original) (citation omitted).

MERS's explanation for why defendants would have been motivated to conceal excess inventory from investors is insufficient to support a strong inference of scienter. MERS does not allege that defendants purchased or sold any stock during the Class Period. It asserts that Smith and Turner were motivated to artificially inflate Pier 1's stock price because their performance-based stock awards were tied to Pier 1's share price, and that they were set to vest shortly after the conclusion of the Class Period.[11] It is settled, however, that

> [i]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated. On a practical level, were the opposite true, the executives of virtually every corporation in the United States would be subject to fraud allegations. It does not follow that because executives have components of their compensation keyed to performance, one can infer fraudulent intent.

*Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 434 (5th Cir. 2002) (quoting *Tuchman*, 14 F.3d at 1068-69); *see also Magruder v. Halliburton Co.*, 2009 WL 854656, at *8 (N.D. Tex. Mar. 31, 2009) (Lynn, J.) ("generalized financial motives will not support an inference of scienter."). To the extent MERS suggests that Smith and Turner were motivated to conceal

---

[11]Defendants contend that MERS's allegations ignore how Pier 1's compensation is actually structured—the awards of TSR performance-based restricted shares do not vest at all and are forfeited if Pier 1's stock fails to meet an objective performance criteria by the end of a three-year measurement period running from the date of the award; that MERS has failed to allege the implausible scheme that defendants could have artificially inflated the stock for such a long period of time and do not allege that any TSR performance-based shares ever vested; and that buying inventory for sales that do not materialize can quickly result in a deleterious effect on earnings and stock performance, and Smith and Turner had the incentive in all forms of long-term compensation to avoid these consequences, supporting a strong inference that the issues Pier 1 experienced were, at most, a result of inaccurate forecasting, not fraud.

the fact that Pier 1 had ordered excess inventory in order to preserve their positions within the company, the court concludes below, *see infra* § IV(D)(5), that Turner's resignation, followed more than one year later by Smith's resignation, is more likely probative only of the fact that the company was failing.[12]

2

Second, it is undisputed that, for each quarter and fiscal year during the Class Period, Pier 1's financial statements accurately disclosed the amount of Pier 1's inventory, that Pier 1's inventory levels were steadily increasing, and that Pier 1 had made investments to improve its ability to store and handle its increasing inventories.[13] Defendants also disclosed during quarterly earnings calls throughout the Class Period that Pier 1's inventory was up versus prior years (9% in Q1 FY15, 15% in Q2 FY15, and 25% in Q3 FY15), and that Pier 1's sales results during this period were disappointing and had failed to meet expectations.[14]

---

[12]MERS correctly notes in its brief that a lack of motive is not fatal to its claim. But "[w]here, as here, the plaintiff . . . [has] not alleged a clear motive for the alleged misstatements or omissions, the strength of [the] circumstantial evidence of scienter must be correspondingly greater." *Neiman*, 854 F.3d at 748 (some alterations in original) (quoting *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 644 (5th Cir. 2005)).

[13]Pier 1 disclosed that it had increased its storage capacity in its distribution centers by almost 2 million square feet of space from March 2, 2013 to February 27, 2016.

[14]*See, e.g.* Ds. App. 715 (4/10/14 Earnings Call) ("[S]ales and earnings in the holiday quarter were pressured by the significant weather disruption . . . . The quarter was disappointing for all of us."); *id.* at 736 (6/19/14 Earnings Call) ("[O]verall the quarter did not unfold as we planned. Store sales and profitability were disappointing, impacted by soft traffic and a higher level of promotional activity than we anticipated."); *id.* at 754-55 (9/17/14 Earnings Call) ("In the second quarter, subdued store traffic resulted in sales below our expectations. . . . So, from a sales and margin standpoint, the first half did not unfold as we anticipated."); *id.* at 777 (12/18/14 Earnings Call) ("After a strong start in September, our

- 20 -

In fact, during the Q3 FY15 earnings call on December 18, 2014, defendants disclosed that inventory growth was then in excess of sales growth and was expected to remain in that condition for multiple quarters. *See* Ds. App. 781 ("We continue to expect inventories to be up approximately 20% at year-end. Inventory growth is expected to subside and more closely approximate the growth in sales beginning with the FY16 second quarter."). In documents filed with the SEC, defendants also disclosed the risk that Pier 1 could inaccurately predict future sales and the impact this would have on inventory levels and markdowns, especially during the fourth quarter.[15]

The fact that defendants repeatedly disclosed throughout the Class Period Pier 1's increasing inventory, disappointing sales, and the risk of markdowns seriously undercuts a strong inference of scienter. *See Neiman*, 854 F.3d at 750 ("[T]he fact that ATP continuously disclosed its worsening cash position belies a claim of scienter."). This is because it would

---

third-quarter sales were somewhat softer than anticipated. . . . The soft store traffic patterns that we saw in Q2 continued into Q3."); *id.* at 430 (2/10/15 Press Release) (disclosing "softer than expected sales in January and February" and noting that January sales were "well below our forecast, which had overestimated the recapture of lost sales from last year's storms."); *id.* at 804 (4/8/15 Earnings Call) ("Over the past year particularly, our financial performance against our self-stated objectives and guidance has been poor.").

[15]*See, e.g.,* Ds. App. 348 (FY14 10-K) ("The Company's failure to anticipate, predict and respond in a timely manner to changing decorative home furnishing and gift trends could lead to lower sales and additional discounts and markdowns in an effort to clear merchandise, which could have a negative impact on merchandise margins."); *id.* at 351 (noting that successful execution of 1 Pier 1 strategy depends, *inter alia*, on "adequate and accurate inventory levels," and that "[s]evere weather or failure to predict consumer demand correctly during [the holiday selling season] could result in lost sales or gross margin erosion if merchandise must be marked down significantly to clear inventory."); *see also* Ds. App. 461-464 (FY15 10-K) (substantially similar disclosure of risk factors as in FY14 10-K).

have made little sense for defendants to simultaneously disclose to, and attempt to mislead, the public about Pier 1's inventory levels, sales, and the risk of markdowns. *Id.*; *see also Diodes*, 810 F.3d at 960 (noting that fact that "Diodes did not attempt to conceal the labor shortage problem—it repeatedly alerted investors that labor issues would affect the company's output and correctly predicted the extent to which these issues would affect the company's bottom line"—was "fatal" to plaintiff's scienter argument); *Owens v. Jastrow*, 789 F.3d 529, 541 (5th Cir. 2015) ("Additional transparency . . . further negates the inference of scienter."). A much more plausible explanation is that although defendants likely realized that Pier 1's inventory was not tracking sales, they expected that Pier 1 would be able to sell down its excess inventory in future quarters without having to mark the inventory down at greater than normal levels.[16]

3

Third, MERS alleges that, even though Pier 1 had excess inventory on day one of the Class Period, it continued to purchase inventory throughout the Class Period. *See* Compl. ¶ 57 ("It became clear to the Executive Defendants by the beginning of the Class Period that the unrealistic sales they had predicted were not materializing and would not any time soon. However, even as they realized the gravity of the situation, they continued to direct Pier 1's buyers to purchase merchandise and inventory at unsustainably high levels."). But if

---

[16]At oral argument, defendants' counsel asserted that Pier 1 typically marks down roughly half of its inventory on a regular basis. *See* Tr. Oral Arg. 15 ("After all, roughly half of what Pier 1 s[e]lls is disclosed to be sold at a discount.").

defendants had known that Pier 1's inventory was not "clean," or that there was a strong likelihood that its existing inventory would have to be marked down more than usual in order to sell it, they would have had no reason to exacerbate the problem by adding more inventory to Pier 1's allegedly already overflowing distribution centers and stores. In other words, it would not have made sense for Pier 1 to continue to purchase inventory during the Class Period had defendants known that Pier 1's current inventory was not "clean," or that there was a "significant" or "substantial" markdown risk. As defendants argue, "[t]he more plausible and compelling inference is that defendants actually believed at the time the purchases were made that the inventory could be sold." Ds. Br. 15.

4

Fourth, the timing of Pier 1's February 10, 2015 disclosure of "unplanned supply chain expenses," "incremental distribution center costs that affect our gross profit," and a "failure to adequately forecast" finances, and, in September and December of 2015, that Pier 1 was "engaged in heavy discounting and that markdowns were negatively impacting its margins," P. Br. 29-30, does not support a strong inference of scienter. It is true that, as late as December 18, 2014, Turner stated that a 25% year-on-year growth in inventory was partly due to "additional inventory to support higher sales," Ds. App. 781, and Smith stated that he "d[id] not see any significant mark down risk," *id.* at 779, from this additional inventory. MERS contends that the temporal proximity between these and other "false reassurances," followed by "stark contradictions," demonstrate scienter. The court disagrees. In *Plotkin v. IP Axess Inc.*, 407 F.3d 690 (5th Cir. 2005), on which MERS relies, the panel noted that

"allegations of later-emerging facts can, *in some circumstances*, provide warrant for inferences about an earlier situation. For example, the fact that a business files for bankruptcy on 'Day Two,' may, *under the right surrounding circumstances*, provide grounds for inferring that the business was performing poorly on 'Day One.'" *Id.* at 698 (emphasis added) (citing *Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000)). But the "right surrounding circumstances" are not present here.

As the court has noted, throughout the Class Period, defendants *did* disclose that Pier 1's inventory levels were increasing and that its sales were disappointing. *See, e.g., Neiman*, 854 F.3d at 751 (stating that *Plotkin* did not aid inference of scienter where company indicated in May 2012 that "it was within its financing capability" and declared bankruptcy three months later, because company had disclosed its capital position and liquidity concerns in May 2012). Moreover, the predictive nature of the December 18, 2014 comments—Turner's prediction that higher sales would support Pier 1's increased inventory, and Smith's prediction that the products in inventory could be sold without costly, unplanned markdowns—leaves open the possibility that circumstances would later change. As defendants argue, MERS has not made any particularized allegation that defendants' earlier statements were false when made.

> To the contrary, the allegations lead to a more compelling inference that intervening events, such as (1) sales falling below expectations in the critical fourth quarter of FY15, (2) an intervening appreciation of the fact that costs were exceeding forecasts, (3) continued sales disappointments in FY16, contributing to a gradual realization that online sales were cannibalizing stores sales rather than adding to them, and (4)

> clearance activity driven by flagging sales of outdoor products,
> account for the later negative announcements.

Ds. Br. 32.

5

Fifth, neither Turner's February 10, 2015 resignation nor Smith's September 2016 resignation supports a strong inference of scienter. Turner's resignation, which coincided with Pier 1's announcement that Pier 1 had "fail[ed] to adequately forecast the revenues and expenses in our business," P. Br. 10, and disclosure of higher expenses resulting from "unplanned supply chain expenses," *id.*, that included "incremental distribution center costs that affect our gross profit," *id.*, and Smith's resignation, "one month after Plaintiff detailed Smith's personal role in the fraud in its Complaint, and nine months after Smith's announcement that the Company's inventories had been out of sync with sales for 18 months," *id.* at 31, do not support a "strong inference" that these defendants knew that their representations regarding Pier 1's "clean" inventory or lack of a significant or substantial markdown risk were false when made. "If anything, the defendants' resignations indicate that the struggling company no longer had faith in its executives. This does not raise a strong inference of scienter." *In re Azurix Corp. Sec. Litig.*, 198 F.Supp.2d 862, 891 (S.D. Tex. 2002), *aff'd sub. nom Rosenzweig v. Azurix Corp.*, 332 F.3d 854 (5th Cir. 2003); *Rosenzweig*, 332 F.3d at 867 ("[T]he successive resignations of key officials, as the district court stated, is more likely probative only of the fact that the company was failing.").

E

MERS has also failed to plead with particularity facts giving rise to a strong inference that Smith or Turner knew or were severely reckless in not knowing that there was a substantial markdown risk or that "in using the term 'clean inventory,' [defendants] knew that Pier 1 was stuck with a material amount of obsolete merchandise that required clearance markdowns."[17]  Ds. Br. 23.

1

MERS contends that Smith's admissions during a March 2014 annual town hall meeting "that Pier 1 was failing in its 1 Pier 1 strategy" and that "[w]e became victims of our own ambition" alone support a strong inference of scienter.  P. Br. 18.  MERS posits that Smith's candid internal admission that Pier 1 had become a "victim" of its own ambition

_____

[17]MERS contends:

> Even under Defendants' new definition of "clean," Plaintiff has alleged the existence of obsolete, non-clean inventory.  Plaintiff quotes Pier 1 buyers who complained of large quantities of product not reaching stores in season because of distribution backlogs and alleges that "such merchandise quickly became dead weight if not sold in season" (¶ 160), the inventory backlog led to product being marked down even before it reached stores (¶¶ 56, 80, 112), and product that was still on tractor trailers in the distribution center lots could not even be allocated to stores (¶ 64).

P. Br. 42 n.47.  These allegations are insufficient, however, to support the strong inference that defendants knew or were severely reckless in disregarding that their statements on February 28, 2014, April 10, 2014, and June 19, 2014 describing inventory as "clean" misrepresented that there was "an absence of stockpiles of obsolete items that required clearance activity."  P. Br. 41 (quoting Ds. Br. 22).

contrasts with his false public reassurances one month later, including his statement on April 10, 2014 that Pier 1 was in "the best shape strategically we have ever been," *id.* at 19 (emphasis omitted); that although defendants argue that MERS fails to take into consideration the context of Smith's presentation, defendants do not themselves offer any context to clarify any supposed ambiguities in Smith's statement; and that even if Smith's statements could properly be characterized as a hindsight assessment of past performance, Smith made the negative assessment four months into the Class Period, and Pier 1 never disclosed it and continued to carry excess inventory through the end of the Class Period.[18]

MERS's allegations regarding the March 2014 town hall meeting are insufficient to support a strong inference of scienter. MERS asserts that "Smith personally admitted to employees at an internal Pier 1 town hall meeting that [he] was responsible for pushing overly high sales goals on Pier 1 employees, and that he had underestimated what it would take to achieve those goals"; that "Smith admitted that [Pier 1] had been overly ambitious with its goals and merchandise purchases"; that "Smith's approximately one-hour speech [w]as a series of admissions of planning, infrastructural, and execution failures, followed by Smith's personal admission that these failures were Smith's own 'fault,'"; and that Smith

---

[18]Contrary to what MERS argues, defendants *did* disclose their negative assessment of Pier 1's performance on numerous occasions after March 2014. For example, during an April 10, 2014 earnings call, Smith characterized FY14 as one in which "we encountered some challenges along the way and concluded with a tough fourth-quarter." Ds. App. 715. In any event, as defendants argue, "[a]ssessing that the company had overly-optimistic ambition in FY14 is in no way inconsistent with believing that ambition would be an ingredient of success going forward or believing that the company was in great shape to succeed going forward." Ds. Br. 31.

used a PowerPoint slide that stated "[w]e became victims of our own ambition."  Compl. ¶

136(f).  These allegations at most support the inference that Smith took responsibility during

the town hall meeting for Pier 1's overly ambitious sales goals and merchandise purchases.[19]

But a failure to meet sales goals does not of itself establish knowledge of, or severe

recklessness in disregarding, a "significant" or "substantial" markdown risk, as the court

explains below.  *See infra* § IV(E)(2).

2

MERS contends that, given the importance of inventory and markdown risk to Pier

1, and the magnitude of Pier 1's excess inventory and subsequent markdowns, Smith and

Turner must have known, or recklessly disregarded, that their statements regarding "clean"

inventory and markdown risk were not true.  MERS posits that avoiding markdowns and

ensuring that Pier 1's inventory tracked consumer demand were critically important to Pier

1's success, and that analysts, investors, and Pier 1 executives were therefore highly focused

on its inventory levels; analysts or Pier 1 executives raised the status of Pier 1's inventory

on every quarterly Pier 1 earnings call; there was nothing more central to Pier 1's core

operations than ensuring the success of the 1 Pier 1 initiative, and Pier 1's inventory was a

critical indicator of the success of 1 Pier 1; it is "exceedingly unlikely" that a CEO would

have been unaware of problems affecting the company's major products; there were obvious

---

[19]MERS has not plausibly alleged that Smith stated that Pier 1 was "failing in its 1
Pier 1 strategy," or that Smith even discussed Pier 1's "inventory troubles" during the 2014
town hall meeting.  P. Br. 18.

signs of trouble, including the company's failure to meet its sales goals and the resulting failure to pay bonuses to employees, the inefficiencies at the distribution centers, systemic reliance on off-site storage to hold the overflowing inventory at distribution centers and stores, and the concomitant costs of these excesses; Smith was personally aware that Pier 1 held significant amounts of excess inventory in temporary storage units at hundreds of stores, because in late 2013 he ordered Pier 1 to stop using them; Pier 1 admitted in December 2015 that its inventory had failed to track sales for the past 18 months, and that it had so much excess inventory that it would take another 18 months for inventory to again track sales; the significant markdowns to which Pier 1 resorted support a strong inference that its products were highly overpriced at the time that defendants claimed that Pier 1 faced no significant markdown risk;[20] by personally making statements about Pier 1's "clean" inventory level, lack of markdown risk, and "healthy" inventory "complexion," Smith and Turner held themselves out as knowledgeable regarding Pier 1's inventory, markdown risk, and the reasons for any increase in inventory, which supports a strong inference of scienter; and Smith and Turner made "unhedged denials" of excess inventory in response to direct questions from analysts and in response to analyst reports claiming that "markdown risk is high," and a denial means that the speaker is on notice of potential problems and presumably investigated them before making the denial.

Essentially, MERS's arguments boil down to the contention that inventory and

---

[20]One analyst concluded that Pier 1 had to miss its previously publicized internal sales goals by $100 million to produce the announced shortfall.

markdowns were critically important to Pier 1, and that the amount of excess inventory was so large, and the markdowns to which Pier 1 ultimately resorted were so significant, that as CEO and CFO of Pier 1, Smith and Turner either knew or were severely reckless in disregarding that Pier 1's inventory was not "clean," and that Pier 1 *did* face a significant or substantial markdown risk.  The court disagrees.

First, Smith's and Turner's positions as CEO and CFO do not aid MERS's scienter allegations.  As a general matter, "[a] pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company."  *Neiman*, 854 F.3d at 749 (alteration in original) (quoting *Abrams*, 292 F.3d at 432).  Although the Fifth Circuit has held that, occasionally, "special circumstances" permit a plaintiff to plead scienter by pleading a defendant's position in the company, such circumstances are not present here.  *Id.* (citing *Nathenson*, 267 F.3d at 425).

> The "special circumstances" cases exhibit some combination of four considerations that might tip the scales in favor of an inference of scienter.  First, the smaller the company the more likely it is that corporate executives would be familiar with the intricacies of day to day operations.  Second, the transaction at issue may have been critical to the company's continued vitality.  Third, the misrepresented or omitted information at issue would have been readily apparent to the speaker.  Fourth, the defendant's statements were internally inconsistent with one another.

*Diodes*, 810 F.3d at 959 (internal citations omitted).  Here, Pier 1 has 24,000 employees, thousands of stores, six distribution centers, and a large online presence.  And MERS does not allege that defendants' statements were internally inconsistent.  Regarding the second and

third factors, MERS contends that "it was critical for Pier 1 to ensure that its inventory was in line with actual sales and consumer demand."  P. Br. 4.  But allegations that, generally, the management of inventory was critical to Pier 1's success support only the inference that Smith and Turner would likely have been aware of Pier 1's inventory levels and sales figures. As the court explains below, based on the "healthy" mix of inventory, it would not have been readily apparent to Smith or Turner that there was a significant markdown risk or that the existing inventory was not "clean."

Second, allegations that Smith and Turner must have, or should have, known that Pier 1 had excess inventory and that Pier 1 was not meeting its sales goals do not support a strong inference that Smith or Turner knew, at the time they represented that Pier 1's inventory was "clean" or did not carry a "substantial" or "significant" markdown risk, that these statements were not true.  In their brief, defendants contend that markdown risk is a function of the mix of the inventory.  Defendants contend, and MERS does not dispute, that

> certain inventory is more susceptible to becoming obsolete and requiring clearance markdowns, such as purely seasonal merchandise and new products that fail to take root with customers.  On the other hand, Pier 1 has many proven products that are consistently sold throughout the year, year after year, without markdowns.

Ds. Br. 21.  Defendants maintain that excess inventory in the latter category can be managed by adjusting future purchases; that, accordingly, excess inventory is not *per se* inventory that

is not "clean"[21]; and that the complaint lacks any attempt to show that the inventory that Pier 1 held was of a nature to create a known markdown risk. Moreover, in describing Pier 1's inventory as "clean" or not subject to a substantial markdown risk, defendants consistently referred to the nature of the inventory and the fact that inventory growth was not primarily in goods likely to be marked down. For example, during an April 10, 2014 earnings call, Turner described "an increased level of promotional activity *and the clearing of seasonal inventory* . . . [which] allowed us to enter fiscal 2015 in a clean inventory position." Ds. App. 719 (emphasis added). During a September 17, 2014 earnings call, Smith stated that "a relatively small percentage of our purchases are in merchandise which has a short shelf life." *Id.* at 767. During the December 18, 2014 earnings call, Smith stated that "[b]ecause *the inventory growth is not in seasonal goods*, we do not see any significant mark down risk." *Id.* at 779 (emphasis added). During an April 8, 2015 earnings call, interim CFO Laura Coffey stated that

> the complexion of our current inventories level is healthy, and does not pose a significant immediate markdown risk. *Approximately half of our inventory is comprised of new and seasonal SKUs, including outdoor, while the remaining 50% is comprised of long-standing collections of our products that do well for us day in and day out.*

*Id.* at 808 (emphasis added).

MERS does not allege that the excess inventory that built up during the Class Period

---

[21]Defendants maintain that they used the term "clean inventory" to refer to an absence of stockpiles of obsolete items that required clearance activity.

was seasonal or particularly susceptible to becoming obsolete (and thus subject to markdowns), much less that defendants knew that Pier 1's excess inventory was of such a character. Defendants thus would have had no reason to predict a significant markdown risk since Pier 1 can manage its non-seasonal, non-obsolete inventory by adjusting future purchases. MERS has at most alleged that defendants' belief that Pier 1 did not face a significant markdown risk, based on the perceived "healthy" mix of inventory (i.e., a mix of inventory that did not contain a material amount of obsolete merchandise that required clearance markdowns), ultimately turned out to be wrong. But predictions that do not come true or even that are negligent are insufficient to support a strong inference of securities fraud. "[P]oor business judgment—even if attributable to monetary incentives—does not establish an inference of recklessness that is cogent and compelling [and] thus strong in light of other explanations. We do not recognize allegations of fraud by hindsight." *Owens*, 789 F.3d at 544-45 (alteration in original) (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 187 (2d Cir. 2014)); *see also Abrams*, 292 F.3d at 433 (noting that failure to follow GAAP "can easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action"). Considered holistically, MERS's allegations do not raise a strong inference of severe recklessness that is at least as compelling as the competing inference that Smith and Turner did not know, or negligently predicted, that Pier 1 would not have to mark its excess inventory down in order to sell it.

MERS relies on Smith's and Turner's receipt of detailed daily, weekly, and monthly reports of Pier 1's inventory figures as evidence of scienter. It alleges that "planning and allocations staff 'constantly compare[d] inventory to sales,' and reports on sales to inventory balance were created daily, made accessible to anyone in the Company, and sent directly to Defendants Smith and Turner on a daily basis," Compl. ¶ 136(b); that Smith and Turner attended meetings during which inventory figures (and whether inventory tracked sales) were discussed in detail; that Smith and Turner also attended numerous "markdown meetings" during which discussions were held regarding that week's inventory and what to mark down, and "Open-to-Buy" meetings during which executives discussed the inventory and sales figures; and that divisional managers made quarterly reports directly to Smith and Turner in which they reported that sales were not tracking purchases.

Recently, the Fifth Circuit held in *Neiman* that "for allegations concerning internal corporate reports alone to support a strong inference of scienter (1) the complaint must have 'corroborating details regarding the contents of allegedly contrary reports, their authors and recipients[,]'and (2) the corporate reports be connected to the speaking executive in a persuasive way." *Neiman*, 854 F.3d at 748 (citations omitted). MERS's allegations fail on the first element because MERS does not allege any specific information that was provided to or acknowledged by defendants that would support a strong inference of scienter. MERS alleges that Smith and Turner received reports on Pier 1's sales and inventory, but it does not allege that any of these reports contained information demonstrating a "significant" or

"substantial" markdown risk. And while MERS alleges that Smith and Turner attended numerous meetings, including weekly "markdown meetings," there is no allegation that the meetings revealed any markdown activity outside of the norm. To the extent MERS alleges that Smith and Turner were informed that Pier 1 was not meeting its sales goals, this allegation is insufficient to plausibly allege that Smith or Turner believed that Pier 1 would not meet its sales goals in the future, or that its current inventory was subject to a "substantial" or "significant" markdown risk.

F

In sum, MERS has failed to plead facts that would support the strong inference that defendants misrepresented Pier 1's inventory as "clean" and not presenting a "substantial" or "significant" markdown risk with "an intent to deceive, manipulate, or defraud," or that defendants acted with "severe recklessness." *Southland*, 365 F.3d at 366 (citation and internal quotation marks omitted). At most, the complaint supports an inference that Smith and Turner were negligent in setting sales goals, managing inventory, and forecasting future sales. But "negligence, oversight or simple *mismanagement* [do not] rise to the standard necessary to support a securities fraud action." *Abrams*, 29 F.3d at 433. Here, there is little support for a plausible—much less strong—inference that defendants knowingly or with reckless disregard misstated the character of Pier 1's inventory or the markdown risk. As the court has explained, MERS has at most alleged fraud by hindsight. But "[t]he securities laws do not entitle plaintiffs to bring claims based on fraud by hindsight." *Coates v. Heartland Wireless Commnc'ns, Inc.*, 100 F.Supp.2d 417, 429 (N.D. Tex. 2000) (Fitzwater, J.) (citing

*Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978)); *see also Rosenzweig*, 332 F.3d at 867-68 (affirming dismissal of securities fraud class action where certain factual underpinnings on which plaintiffs relied were hindsight assessments of defendants' performance); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 248-49 (5th Cir. 2009) (defining "fraud by hindsight" as case where "a plaintiff alleges that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly," or where "there is no contemporaneous evidence at all that defendants knew earlier what they chose not to disclose until later" (citation omitted)). Accordingly, to the extent MERS bases its claim on the misrepresentations described in category two, the court grants defendants' motion to dismiss on the ground that MERS has failed to plead a strong inference of scienter.

V

The court next considers the alleged misstatements in category one, i.e., statements concerning Pier 1's infrastructure and its ability to control inventory.

A

MERS alleges in is complaint that defendants falsely represented to investors that Pier 1 had inventory systems in place to adequately control its inventory (when it did not) and to keep its distribution centers and stores in optimal stock (which they were not):

> On December 19, 2013, Smith claimed that [Pier 1] had "been investing over the last few years a lot in systems . . . which allow[] us to grow sales and not go crazy with inventory," and Turner reported that inventory had increased by only "3% over last year," which was purportedly "due in part to the added control over inventories we have achieved from investments from our planning and allocation systems."

P. Br. 37-38 (quoting and citing Compl. ¶ 175).

> On April 10, 2014, Smith claimed that Pier 1's "planning and allocation capabilities" were "sophisticated" and that "[o]ur merchandise and field teams are well prepared for this level of expansion."

*Id*. at 38 (quoting and citing Compl. ¶ 177).

> On April 8, 2015, when discussing the Company's February 2015 partial disclosure of the fraud (which included the parture of CFO Turner), Smith also made the materially false and misleading claim that "[t]he issue that impacted our fourth-quarter results are . . . transitory and have no bearing on the underlying strength of the Pier 1 Imports brand."

*Id.* (quoting and citing Compl. ¶ 182).

> On June 17, 2015, Smith claimed that Pier 1's "store inventories are extraordinarily well-controlled."

*Id.* (quoting and citing Compl. ¶ 182).[22]

In the complaint, MERS alleges that these statements were materially false and

misleading because, during the Class Period, Pier 1

> (i) had "unrealistic" internal sales goals; (ii) purchased and carried excess, rather than "clean" inventory that exceeded actual sales and consumer demand; (iii) failed to "always" control Pier 1's inventory; (iv) operated distribution centers flooded with excess inventory that operated inefficiently; (v) internally overrode its own "DCM" system that was designed to ensure that inventory levels matched actual sales, in order to push excess inventory to already over-crowded Pier 1 stores; (vi) had stores that rented costly external storage pods to hold

---

[22]The complaint contains additional alleged misrepresentations regarding Pier 1's infrastructure and ability to control inventory. The court is limiting its discussion to the alleged misrepresentations that MERS addresses in its response brief.

excess inventory; (vii) lacked infrastructure that could efficiently handle the excess inventory and the sheer size of that excess; (viii) incurred extraordinary costs from carrying excess inventory, including labor, fines paid to railyards and ports, the cost of external storage space and additional warehouse rentals, as well as third party contractors that the Company hired to help manage the inventory; and (ix) bore such a large inventory backlog that, as the Company later disclosed, it would take Pier 1 more than a year for the Company's inventory levels to track sales again.

*Id.* ¶ 176 (citations omitted).

B

Defendants contend that, to the extent MERS challenges their statements in December 2013 and April 2014 that inventories were well-controlled, these statements are too vague to support a securities fraud claim. To the extent the term "well-controlled" was intended to communicate that inventory levels were not excessive, management's beliefs regarding whether inventory levels were excessive necessarily implicates predictions about sales, and MERS has not alleged facts demonstrating that defendants knew in December 2013 or April 2014 that inventory levels were excessive relative to the sales predicted to occur in FY15; the complaint fails to plead that defendants knew, in December 2013 or April 2014, that the inventory levels did then, or eventually would, exceed Pier 1's infrastructural capabilities; despite general accounts from confidential witnesses of problems at stores and distribution centers, there is no allegation that defendants were informed of a material inventory problem that exceeded company norms; and there are no allegations to show that defendants knew that costs for handling inventory would exceed forecasts. Defendants maintain that another

possible meaning for control of inventories is ensuring that the company did not have large stockpiles of obsolete inventory, such as out-of-date seasonal inventory or SKUs[23] that were not selling, but that there is no particularized allegation that Pier 1 was stuck with an unusual amount of obsolete inventory in December 2013 or April 2014. Defendants next argue that a third possible meaning for control of inventories is the process and systems for planning inventory purchases and allocating them to stores; that MERS complains about defendants' statements during this same timeframe about the sophistication of these capabilities and the investments that had been made in planning and allocation systems that were said to give control over inventories, but MERS does not allege that the investments to improve these systems did not in fact happen or that these investments were ineffective in improving past performance; and that the complaint contains no detailed allegations that show what the issues were or that defendants were aware of these issues. Defendants argue that to the extent MERS bases its claim on defendants' disclosures regarding store level inventories, including the December 2014 statement that "store level inventory has increased only slightly" and a June 2015 statement that "the impact of that inventory is felt most intensely by the distribution centers because our store inventories are extraordinarily well-controlled," MERS relies solely on anecdotal snapshots from confidential witnesses working in discrete areas of the company, and those few snapshots, even if true, cannot be the basis of a challenge to the accuracy of overall company data regarding store inventory levels. Finally,

---

[23]"SKU" is an acronym for stock-keeping unit.

defendants argue that there is no allegation that Pier 1 was not in fact focused on inventory, making conservative inventory purchases, and strategically managing inventory; that the fact that inventory became excessive merely alleges fraud by hindsight; that the fact that Pier 1 made a later assessment that its sales targets were aggressive both fails to show that it knew the targets to be wrong at the time they were set or that the inventory purchases were not considered "conservative" in other ways (e.g., by making "conservative" purchases of non-seasonal inventory that had a longer life-span and proven SKUs with a higher chance of success); that Turner's "historical low" reference in December 2013 was to levels of *clearance* inventory, not overall inventory,[24] and MERS does not allege that the statements regarding clearance inventory were false; and that Pier 1 disclosed its actual inventory levels, which showed inventory levels increasing over time before eventually decreasing and under those circumstances, there can be no misrepresentation of present or past fact.

MERS responds by arguing that the statements about Pier 1's ability to control inventory were false and misleading for the reasons alleged in ¶ 176 of the complaint, and

---

[24]Turner stated during the December 19, 2013 earnings call:

> Let me talk about the *clearance inventory* first. I think you've heard us speak on previous calls. Our inventory levels are running now at sort of historical lows. Frankly, they are not fluctuating very much, because we have such great processes for taking our mark-downs and clearing through the slow merchandise. You know we have said in the past that it is—you do lose some sales when your inventory, your *clearance inventory* goes down.

Ds. App. 703 (emphasis added).

because Pier 1 did not in fact have inventory systems in place to keep its distribution centers in optimal stock and inventory under control; that according to at least one former Pier 1 employee, Pier 1's allocations infrastructure was neither sophisticated nor scalable; and that contrary to Smith's assertion that the issue that impacted Pier 1's fourth quarter results was "transitory" and "ha[d] no bearing on the underlying strength of the Pier 1 Imports brand," Pier 1's excess inventory *was* having a long-lasting negative impact on the company since by December 16, 2015 Pier 1 disclosed that it still had "extremely high inventory levels" and that "there was *still much to do* to get productivity levels back to satisfactory," P. Br. 38. MERS also maintains that Smith's claim that Pier 1's store inventories were "extraordinarily well-controlled" was directly contrary to the fact that Pier 1 held significant amounts of excess inventory in temporary storage units at hundreds of its stores, and that "Smith was personally aware of these units because, as of late 2013, he ordered that the Company stop using them but it did not." *Id.* at 25.

## C

Certain broad, generalized statements that constitute mere "puffery" are inactionable under § 10(b) and Rule 10b-5. *See Southland*, 365 F.3d at 372; *Nathenson*, 267 F.3d at 419; *accord In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570-71 (6th Cir. 2004); *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (per curiam). Statements "are non-actionable puffery [if] they are 'of the vague and optimistic type that cannot support a securities fraud action . . . and contain no concrete factual or material misrepresentation.'" *Southland*, 365 F.3d at 372 (ellipsis in original) (quoting *Lain v. Evans*, 123 F.Supp.2d 344,

348 (N.D. Tex. 2002) (Sanders, J.)).  "Such statements are either mere corporate puffery or hyperbole that a reasonable investor would not view as significantly changing the general gist of available information, and thus, are not material, even if they were misleading."  *In re Ford Motor Co.*, 381 F.3d at 570.

> Courts everywhere have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.

*Id.* at 570-71 (internal quotation marks omitted) (citing, *inter alia*, *Nathenson*, 267 F.3d at 404, 419).

For example, in *Nathenson* the plaintiffs alleged that the defendant drug manufacturer violated § 10(b) and Rule 10b-5 by, *inter alia*, representing that the results of a new drug's clinical trial were generally positive and by describing the drug as "a 'fast-acting,' 'improved formulation,'" while failing to disclose that the clinical trial's methodology was flawed. *Nathenson*, 267 F.3d at 419.  The *Nathenson* panel concluded that these statements were "nothing more than inactionable 'puffing,'" constituting "optimistic generalizations, and therefore [could not] support the plaintiffs' claim." *Id.*  And in *Southland* the plaintiffs alleged that a defendant made material misrepresentations when it "made generally positive statements about demand for [its] products and services." *Southland*, 365 F.3d at 371.  The court concluded that these statements were not material, but they were "non-actionable puffery." *Id.* at 372.  Similarly, the Sixth Circuit concluded that the defendant's general

statements about quality—e.g., that it "has made 'quality a top priority'"—were inactionable puffery, even if misleading. *In re Ford Motor Co.*, 381 F.3d at 570; *see also, e.g., Milano v. Perot Sys. Corp.*, 2006 WL 929325, at *6-7 (N.D. Tex. Mar. 31, 2006) (Fitzwater, J.) (holding that statements that company's strategy was to hire, train, and retain employees who were "highly motivated," had "strong character," and possessed "leadership traits," "are as a matter of law too general to be material" because "general statements about character, combined with [the company's] omission of facts about its purported line of business could not have *materially* mislead the reasonable investor about the character of Perot's employees.").

In contrast, in *Plotkin* the plaintiffs alleged that the defendants violated § 10(b) and Rule 10b-5 by, *inter alia*, falsely announcing that the defendant company had entered into a contract "call[ing] for an annual commitment of $25 million dollars of net purchases," when the purchaser was "actually a very small company with reported [annual] revenues of $7 million" and filed for bankruptcy only eight months later. *Plotkin*, 407 F.3d at 697-98. The defendants asserted, and the *Plotkin* panel agreed as a general proposition, "that generalized, positive statements about a company's prospects are not actionable under federal securities law." *Id*. at 698. But the panel declined to apply this principle to "the announcement of signed, allegedly lucrative contracts," which was "a statement of fact, not a generalized positive statement." *Id*.

D

Many of defendants' statements regarding Pier 1's infrastructure and ability to control

inventory are, as a matter of law, too general to be material. The reasonable investor would have relied on objective facts in determining the value of Pier 1's stock; defendants' generalized statements that Pier 1's planning and allocation capabilities were "sophisticated," that its field teams were "well prepared," or that Pier 1's investment in systems that would allow it to "grow sales and not go crazy with inventory," would not have been significant. *See Southland*, 365 F.3d at 372 ("Because analysts 'rely on facts in determining the value of a security,' these statements 'are certainly not specific enough to perpetrate a fraud on the market.'" (quoting *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993))). Nor is it important that Smith believed that the issues from the fourth quarter of FY14 were "transitory," i.e., they would eventually resolve, and that these issues did not impact the underlying "strength" of the brand.[25]

As for defendants' statements that Pier 1's inventories were "well-controlled," Compl. ¶ 177, or that its store inventories were "extraordinarily well-controlled," *id.* ¶ 182, although MERS alleges that the term "clean" was a standard industry term, it does not similarly allege that the term "well controlled" had any commonly understood meaning in the retail context. In their brief, defendants offer three possibilities for the meaning of "well controlled": (1) inventory levels were not excessive; (2) Pier 1 did not have large stockpiles of obsolete

---

[25]Assuming *arguendo* that Smith's April 8, 2015 statement that "[t]he issue that impacted our fourth-quarter results are transitory and have no bearing on the underlying strength of the Pier 1 Imports brand," Compl. ¶ 182 (emphasis omitted), was not immaterial, MERS argues only that Pier 1's excess inventory "was having a long-lasting negative impact on the Company." P. Br. 38. MERS has not alleged that Pier 1's "brand" was in any way affected by the fourth-quarter issues Smith described.

inventory, such as out-of-date seasonal inventory or SKUs that were not selling; or (3) Pier 1 had a process and systems for planning inventory purchases and allocating them to stores. Far from clarifying what it perceives to be the intended meaning of the word "controlled," MERS argues in its response that the quoted statements were materially false and misleading "because Pier 1 did not in fact have inventory systems in place to keep its distribution centers and stores in optimal stock, and inventory under control." P. Br. 38. But MERS has not actually alleged that Pier 1 did not in fact have "inventory systems" in place; and it offers no concrete understanding of what it means to keep distribution centers and stores in "optimal stock" or inventory "under control."[26]

In *Novak* the Second Circuit addressed the question whether statements that inventory was "in good shape" or "under control" were actionable. *Novak*, 216 F.3d at 315. The plaintiff investors in *Novak* pleaded facts demonstrating that certain management officials of the defendant retail store, AnnTaylor, acted intentionally and deliberately to inflate the company's reported financial results artificially by knowingly sanctioning fraudulent inventory management practices. *Id.* at 304. The complaint particularized, through direct evidence, the individual defendants' involvement in a "box and hold" cover-up scheme whereby out-of-date inventory that constituted as much at 34% of the total inventory was

---

[26]The dictionary defines "control" as "[t]o adjust to a requirement; regulate." American Heritage Dictionary (5th ed. 2011). Assuming *arguendo* that, in using the term "well controlled," defendants intended to imply that Pier 1's inventories were "well-adjusted," or "well-regulated," this still begs the question: how much inventory is too much? Even MERS concedes that, while too much inventory imposes hefty costs, "too little can do damage too, reducing a firm's sales and gross margin." Compl. ¶ 32.

stored in several warehouses during the class period deliberately to avoid markdowns. *Id.*

In response to the defendants' argument that their statements regarding AnnTaylor's

inventory were not actionable, the court held:

> [w]hile statements containing simple economic projections, expressions of optimism, and other puffery are insufficient, defendants may be liable for misrepresentations of existing facts. Here, the complaint alleges that the defendants did more than just offer rosy predictions; the defendants stated that the inventory situation was "in good shape" or "under control" while they allegedly knew that the contrary was true. Assuming, as we must at this stage, the accuracy of the plaintiffs' allegations about AnnTaylor's "Box and Hold" practices, these statements were plainly false and misleading.

*Id.* at 315; *see also New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 Fed. Appx. 10, 15 (2d

Cir. 2011) (holding that statement that company was "managing its inventory well" or that

"inventory problems were aberrations" constituted actionable misstatement).

*Novak* is factually distinguishable from this case.[27]  Nonetheless, properly pleaded,

a complaint based on a statement that inventory was "well controlled" *could* adequately

allege a misrepresentation of existing facts.  And because defendants offer at least three

---

[27]In *Novak* the plaintiffs alleged that the defendants "knowingly and intentionally issued financial statements that overstated AnnTaylor's financial condition by accounting for inventory that they knew to be obsolete and nearly worthless at inflated values and by deliberately failing to adhere to the Company's publicly stated markdown policy." *Novak*, 216 F.3d at 304.  In this case, there is no allegation that defendants, or in fact anyone at Pier 1, knew that Pier 1's excess inventory was obsolete or that defendants failed to adhere to any company policy.

possible meanings of the phrase "well controlled,"[28] the court will assume *arguendo* that defendants' statements that Pier 1's inventories were "well controlled" or that its store inventories were "extraordinarily well-controlled" are sufficiently material to support a securities fraud claim.

## E

The court next considers whether MERS has pleaded a strong inference of scienter with respect to Smith's statement on December 19, 2013 that Pier 1's inventories were "always well controlled," Compl. ¶ 175; Turner's statement the same day that Pier 1 had achieved "added control over inventories . . . from investments from our planning and allocation systems," *id.*; and Smith's statement on April 10, 2014 that "we expect our inventory growth to be well-controlled as it was in fiscal 2014," *id.* ¶ 177.

## 1

To the extent defendants used the phrase "well controlled" to mean that Pier 1 had a process and systems for planning inventory purchases and allocating them to stores, the court concludes that MERS has not plausibly alleged that Pier 1 did *not* have such a system. In fact, MERS specifically alleges that Pier 1 used "an advanced 'Demand Chain Management' system, or 'DCM,' that closely tracked inventory and sales. The DCM contained checks and

---

[28]Because MERS does not offer any competing definitions, the court will assume, as defendants argue in their brief, that the phrase "well controlled" means: (1) inventory levels were not excessive; (2) Pier 1 did not have large stockpiles of obsolete inventory, such as out-of-date seasonal inventory or SKUs that were not selling; or (3) Pier 1 had a process and systems for planning inventory purchases and allocating them to stores.

balances to ensure that inventory allocations did not outstrip actual demand, which it gathered from the Company's contemporaneous sales data." *Id*. ¶ 63.

MERS alleges that, according to a confidential source,

> during fiscal year 2014 (which began in March 2013 and ended in March 2014), the Company began instructing allocators to manually override the Company's own checks and balances, and to allocate more inventory, on top of the allocations calculated by the DCM as matching actual sales. The Analyst described these manual overrides of the DCM as "pretty well known" and the "way of life" at Pier 1. Soon, sales targets for multiple departments and merchandise lines had become so unrealistically aggressive, that the Analyst described them as having come from "Disneyland."

*Id.* An allegation that "the Company" began instructing allocators to manually override the company's inventory management system to allocate more inventory to Pier 1's stores does not alone support the conclusion that Pier 1's inventory was not "well controlled." Indeed, it is certainly feasible that, in certain instances, human managers would have a better understanding of sales trends or may make a business decision to act differently from the computer. *See, e.g.,* Ds. Br. 17 ("There is nothing nefarious about corporate management applying human judgment to modify computer guidance. . . . [T]he allegations at most show a difference of 'opinion' between management and a computer program regarding sales predictions, a far cry from anything that could plead a strong inference of scienter.").

Moreover, even if the manual overrides *did* tend to show generally that Pier 1's inventory was not "well controlled," MERS does not allege that, at the time of the December 19, 2013 or April 10, 2014 statements describing the inventory as "well controlled," Smith

or Turner knew, or was severely reckless in disregarding, that "the Company" had begun to instruct allocators to manually override the DCM system. Allegations that the overrides were "pretty well known" or the "way of life" at Pier 1 are insufficient to support a "strong inference" of scienter.

2

To the extent defendants used the phrase "well controlled" to mean either that Pier 1's inventory levels were not excessive, or that Pier 1 did not have large stockpiles of obsolete inventory, such as out-of-date seasonal inventory or SKUs that were not selling, MERS has failed to plausibly allege a strong inference of scienter.

MERS's scienter allegations, most of which are described above, *see supra* § IV(D)-(E), at most permit the inference that defendants knew during the Class Period about Pier 1's increasing inventory levels and disappointing sales. But MERS has not alleged any facts that would permit the strong inference that, at the time of the December 19, 2013 or April 10, 2014 statements, Smith or Turner knew, or was severely reckless in disregarding, that Pier 1's inventory levels were "excessive" or that Pier 1 had large stockpiles of obsolete inventory. MERS alleges that "excess inventory existed from the second half of fiscal year 2014 (which spanned September 2013 through March 2014) onwards, and throughout fiscal year 2015 (which ended on February 28, 2015)" and that "the concern was severe by at least early fiscal year 2015 (which began on March 2, 2014)." Compl. ¶ 64. But high or even excess levels of inventory are not the same as "excessive" inventory. At least in the context of this case, it is reasonable to infer that inventory is only "excessive" if it cannot be sold

- 49 -

without marking down the price.  As defendants argue in their brief, "Management's beliefs regarding whether inventory levels were excessive necessarily implicate predictions about sales.  [MERS] has not alleged facts demonstrating that defendants knew in December 2013 and April 2014 that inventory levels were excessive relative to the sales that were predicted to occur during FY15."  Ds. Br. 43-44.  The pleaded facts do not permit the strong inference that Smith or Turner knew as early as December 19, 2013 or April 10, 2014, when they described Pier 1's inventory as "well controlled," that Pier 1 had an excessive amount of inventory that it would not be able to sell without costly, unplanned markdowns.  For the reasons the court has explained above, *see supra* § IV(E)(2), because Pier 1's high levels of inventory were "healthy" in the sense that Pier 1 did not have a large amount of out-of-date seasonal inventory or SKUs that were not selling—or, at least, MERS has not alleged otherwise—and because "healthy" inventory can be managed by adjusting future purchases, the facts alleged do not permit the strong inference that defendants knew or should have known that Pier 1's inventory levels were "excessive."

Nor has MERS alleged that defendants knew or were reckless in disregarding the fact that Pier 1 had large stockpiles of obsolete inventory, such as out-of-date seasonal inventory or SKUs that were not selling.  MERS alleges that "the inventory situation at the Maryland distribution center was so severe at times that merchandise had to be marked down before it even reached the stores, in order to clear the backlog," Compl. ¶ 80; that the former IT department Analyst and Programmer "recalled that quantities of 2014 Christmas season merchandise could not reach stores in time because of inventory backlogs," *id.* at ¶ 160; that

a former buyer "described the domino effect of excess inventories, and stated that she knew multiple buyers who had 2014 Christmas products that never reached the floors because they sat in distribution center backlogs, and that . . . a large quantity of seasonal product never made it to the stores during her time at the Company," *id.*; that "[t]he problem became severe enough that seasonal products were sometimes marked down before they even left the distribution center, because they had gone out of season," *id.*; and that

> [t]he Texas Distribution center Manager . . . stated that upon coming to the distribution center, he found a warehouse so mismanaged that there was no tracking at all for discarded items, and standard inventory tracking so deficient that "mountains" of random, unsorted products sat against the warehouse's back wall, which would pile-up and be thrown away on a monthly basis. . . . During his time at Pier 1, the Manager witnessed so much product waste that he estimated that at least $1 million of retail-value product was being discarded without being tracked each year,

*id.* at ¶ 103. None of these allegations, however, supports the strong inference that, at the time of the December 19, 2013 or April 10, 2014 statements, Smith or Turner knew or was severely reckless in disregarding large stockpiles of obsolete inventory. MERS's allegations regarding the 2014 Christmas products that never reached stores post-date the alleged misstatements at issue. And regarding the Texas distribution center, MERS does not allege when the "mountains" of random, unsorted products piled up (and, specifically, whether this happened before or after the December 19, 2013 and April 10, 2014 statements); whether this happened at more than one warehouse or was, instead, limited to the Texas distribution center, or who was aware of these facts, other than the Texas distribution center Manager.

F

On June 17, 2015 Smith stated during an earnings call that, although Pier 1's "inventories are much too high and so the impact of that inventory is felt most intensely by the [distribution centers] because our store inventories are extraordinarily well-controlled." Ds. App. 833. MERS alleges that this statement was false and misleading because, "contrary to Smith's claim that Pier 1's store inventories were 'extraordinarily well-controlled,' the stores were themselves 'busting at the seams,' and over 40% of the Company's retail stores stored excess inventory in external storage 'pods' as of February 2016." Compl. ¶ 183. Defendants argue that

> [MERS] relies solely on anecdotal snapshots from confidential witnesses working in discrete areas of the company; those few snapshots, even if true, cannot be the basis of a challenge to the accuracy of overall company data regarding store inventory levels. [MERS] provides no allegations of internal data or reports showing these statements to be false.

Ds. Br. 45. MERS does not specifically respond to this argument in its brief.

Pier 1 operates more than 1,000 Pier 1 Imports stores. *See* Compl. ¶ 106 (referring to Pier 1's 1,032 stores). Although MERS generally describes Pier 1's stores as "'busting at the seams,' with merchandise," *id.* ¶ 7; "overflows at the Company's stores, which could only resort to setting up outdoor storage units for merchandise that the stores could no longer hold indoors," *id.* ¶ 77; and projections, in mid-2014 "of approximately 300 stores using outdoor storage units by the next season," *id.* ¶ 88, and alleges that a former Department Administrator stated that, as of February 2016, over 40% of Pier 1's retail locations were still

using outdoor storage units, "but recalled that the figure was far higher from 2013 to 2015," *id.* ¶ 106, MERS has not alleged that Smith knew or should have known, at the time of his June 17, 2015 statement, that Pier 1's stores were not "extraordinarily well-controlled." For example, MERS does not plead the number of stores that were "busting at the seams," the amount of excess inventory that was being stored at any particular outdoor storage unit, or that Smith knew what the inventory levels were any of the individual stores. In fact, MERS's only allegation that relates to Smith's actual knowledge of store inventories is that "Smith had demanded as early as late 2013 that the Company needed to end the use of third party storage facilities." *Id.* ¶ 105. A demand that stores cease using third party storage facilities 1½ years before the statement that Pier 1's stores were "extraordinarily well-controlled" is insufficient to support a strong inference of scienter. And even accepting as true the allegation that, as of February 2016, over 40% of Pier 1's retail locations were using outdoor storage units,[29] MERS has not alleged the amount of inventory being stored in any of these outdoor storage units or that Smith was, or should have been, aware that the stores continued to use them.

---

[29]Even if 40% of Pier 1 stores were still using outdoor storage units in some way on June 17, 2015, this would mean that 60% of Pier 1 stores were *not* using storage units and could very likely have had "extraordinarily well-controlled" inventories as Smith described.

MERS alleges in support of the alleged misstatements in category three that Pier 1's Forms 10-Q, filed with the SEC on January 8, 2014, July 9, 2014, October 8, 2014, and January 7, 2014, and signed by Smith and Turner, falsely and misleadingly reported that stated inventory was "in-line with the Company's expectations." *Id.* ¶ 199. MERS also asserts that Pier 1's SOX certifications

> falsely affirmed that Pier 1's public filings were accurate, and falsely certified that Defendants Smith and Turner had designated and implemented internal controls over financial reporting that provided reasonable assurance that the Company's financial reporting was reliable and complied with Generally Accepted Accounting Principles ("GAAP").

*Id.* ¶ 200. MERS contends that the SOX certifications were misleading because they failed to disclose the alleged deficiencies in Pier 1's internal controls that led the company to amass excess inventory that far exceeded demand, subjected Pier 1 to undisclosed costs, and led to undisclosed markdown risk, contracted margins, and reduced earnings per share.

Defendants contend that MERS has not made any particularized allegation that Pier 1's financial statements contained material misstatements or omissions, much less that defendants were aware of glaring accounting irregularities or other red flags. MERS responds that it

> has alleged specifically when, how, and by whose signatures the Class Period SOX certifications were made false, and the numerous warning signs (e.g., the town hall meeting, the Company overriding its DCM system, and the widespread use

of outdoor storage, and the existence of obsolete inventory) that alerted Defendants to the certifications' falsity.

P. Br. 39.

B

MERS contends that the following statements in Pier 1's Forms 10-Q and 10-K were false and misleading: (1) Pier's 1's inventory was "in-line with the Company's expectations," P. Br. 39 (quoting Compl. ¶ 199); (2) Pier 1's internal controls were adequate; and (3) Pier 1's public filings were accurate. MERS has not pleaded a plausible claim based on these statements.

First, to the extent MERS bases its claim on Pier 1's statement in its Forms 10-Q, filed on January 8, 2014, July 9, 2014, October 8, 2014, and January 7, 2014, that inventory was "in-line with the Company's expectations," MERS has not plausibly alleged that Pier 1 did not expect the increases in inventory it describes. For example, in Pier 1's Form 10-Q, dated January 8, 2014, which defendants have included in their appendix,[30] Pier 1 stated:

> Inventory levels at the end of the third quarter of fiscal 2014 were $429.1 million, an increase of $11.5 million, or 2.8%, from the third quarter of fiscal 2013 and in line with the Company's expectations. The increase in inventories primarily resulted from the normal seasonal build of merchandise for the holidays, additional inventory to support e-Commerce sales and the broadening of assortments under the Company's special merchandise order program known as "Express Request." At the end of fiscal 2014, inventory is expected to increase 5% to

---

[30]In deciding defendants' motion, the court is permitted to consider this document, which is "attached to the motion to dismiss" and "central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.)*, 594 F.3d at 387.

8% over last fiscal year end.

Ds. App. 311.  Not only did Pier 1 fully disclose the increase in its inventory, it explained *why* there was an increase, i.e., why the increase in inventory would have been expected: growing inventory to support predicted e-Commerce sales and the special merchandise order program and the normal seasonal build of merchandise for the holidays.  Because MERS has not plausibly alleged that Pier 1 did *not* expect the increases in inventory it describes for the reasons it describes, MERS has not plausibly alleged that these statements in Pier 1's Form 10-Q filings were materially false or misleading.

Regarding Pier 1's affirmation in its SOX certifications that "Pier 1's public filings were accurate, and . . . that Defendants Smith and Turner had designated and implemented internal controls over financial reporting that provided reasonable assurance that the Company's financial reporting was reliable and complied with Generally Accepted Accounting Principles ('GAAP')," Compl. ¶ 200, MERS has not plausibly alleged an actionable misstatement.  MERS does not plead anywhere in the complaint that Pier 1 did *not* have internal controls over financial reporting that provided reasonable assurance that Pier 1's financial reporting was reliable and complied with GAAP.  And the general assertion that "Pier 1's SOX Certifications falsely affirmed that Pier 1's public filings were accurate," *id.*, is insufficient to allege a claim for securities fraud under Rules 12(b)(6), 9(b), and the PSLRA.  Other than Pier 1's statement that its inventory was "in-line with the Company's expectations," MERS has not alleged that any particular statement in any of Pier 1's Forms 10-K or 10-Q was false or misleading.

Second, even if Pier 1's January 8, 2014, July 9, 2014, October 8, 2014, and January 7, 2014 Forms 10-Q *did* contain false or misleading statements, MERS has not adequately alleged a strong inference of scienter. Signed SOX certifications support scienter only "if the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions." *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 555 (5th Cir. 2007) (citation omitted). A defendant's signature on a SOX certification, without more, does not support a strong scienter inference. *Id.*; *see also Dawes v. Imperial Sugar Co.*, 975 F.Supp.2d 666, 693 (S.D. Tex. 2013). MERS has not alleged any glaring accounting irregularities or red flags that would support a strong inference that Smith or Turner knew, in signing the SOX certifications, that Pier 1's financial statements contained material misstatements or omissions.

VII

A

In support of category four, the complaint alleges that defendants failed to disclose material adverse facts that were in existence at the time each of the materially false and misleading statements alleged in the complaint was made, and that the disclosure of these material adverse facts would have led to declines in Pier 1's stock price at an earlier date. *See* Compl. ¶ 202 (listing material adverse facts that should have been disclosed). In addition, MERS alleges that defendants failed to disclose "known trends . . . that have had or that the registrant reasonably expects will have a material . . . unfavorable impact on . . .

revenues," *id*. at  204, as required by Item 303 of Regulation S-K:

> First, the trends of Pier 1's distribution center inefficiencies, and the related costs of rising inventory were "known" to the Executive Defendants and other members of management. Second, the facts and allegations set forth above establish that these trends were "reasonably likely to have material effects on [Pier 1's] financial condition or results of operations." Indeed, . . . as a direct result of these trends, Pier 1 incurred numerous undisclosed costs, experienced extraordinary inefficiencies, and suffered costly markdowns, all of which negatively impacted its revenues and margins.

*Id.* ¶ 207.

## B

Defendants contend that MERS's claims of fraud by omission should be dismissed because the alleged omissions are largely duplicative of the arguments MERS makes in asserting that affirmative statements were misleading; MERS has not demonstrated that any statement defendants made was in fact misleading so as to trigger a duty to disclose something additional; there is no allegation that demonstrates that defendants intentionally omitted material information to investors; and regarding Item 303 of Regulation S-K, there is no allegation that establishes a recognizable trend that defendants omitted to disclose.

MERS responds that, during the Class Period, when defendants made false statements concerning Pier 1's inventory, infrastructure, and markdown risk, they had a duty to disclose all material facts concerning these disclosures, and that Pier 1 failed to disclose the trend that inventory had risen to an excess level and that this was reasonably expected to have a "material . . . unfavorable impact on . . . revenues." P. Br. 40 (ellipses in original) (quoting

Compl. ¶ 208).

C

When securities fraud claims are based on alleged fraudulent omissions, "additional analysis" is required. *Magruder*, 2009 WL 854656, at *4. This is because the familiar pleading requirements under Rule 9(b) and the PSLRA "do[] not fit omissions as well as misrepresentations." *In re Odyssey Healthcare, Inc. Sec. Litig.*, 424 F.Supp.2d 880, 892 (N.D. Tex. Sept. 29, 2005) (Godbey, J.). "In cases concerning fraudulent misrepresentation and omission of facts, Rule 9(b) typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the representations misleading." *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 381 (5th Cir. 2004) (citations omitted); *see also R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) ("[T]he plaintiff must plead not only why the statement at issue is incomplete but why that incompleteness makes the statement misleading or untrue." (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002))). "[I]t bears emphasis that § 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (quoting 17 C.F.R. § 240.10b-5).

D

In the complaint, MERS lists ten "material adverse facts . . . that were in existence at

the time of each of the foregoing materially false and misleading statements."[31]

---

[31]The material adverse facts that were allegedly omitted are:

    a.    Despite repeated push-back from its own employees, the Executive Defendants set "unrealistic" and "totally unattainable" sales goals (¶¶ 62-76);

    b.    The Company amassed excess, rather than "clean" inventory (¶¶ 77-88);

    c.    As Pier 1 has now admitted, Pier 1's excess inventory exceeded actual sales and consumer demand (¶¶ 97-112, 121-131);

    d.    Pier 1 had internally overrode its own fail-safe system that was designed to ensure that inventory levels matched actual sales, in order to push excess inventory to already over-crowded Pier 1 stores (¶¶ 62-63, 86);

    e.    As a result of the Company's inventory backlog, Pier 1 paid significant amounts to store its excess inventory at ports and in temporary storage locations for its distribution centers and stores, and failed to timely report those costs (¶¶ 97-108);

    f.    At Pier 1 distribution centers, the Company carried massive amounts of excess inventory in tractor-trailer containers, other temporary containers, third party warehouses, and in parking lots. Because it sat idle in these locations, much of this inventory was unavailable for allocation to stores, its allocation was costly and inefficient, and it became obsolete (¶¶ 160-161);

    g.    At Pier 1 stores, aisles were filled with large amounts of excess, unsold inventory and even after the end of the Class Period, when the Company had undertaken enormous clearance activities, at least 418, or 40% of Pier 1's stores still kept excess inventory in expensive, external storage pods or other storage units (¶¶ 66-68, 85, 88, 105-106);

    h.    The Company repeatedly failed to meet its own internal sales goals, and, as a result, did not pay bonuses to its employees. Because employees' bonuses were tied to the Company making its sales numbers, this meant the Company was repeatedly not meeting its own internal

Compl. ¶ 202.  It alleges that

> [d]efendants' statements with regard to Pier 1's inventory and
> its inventory management infrastructure throughout the Class
> Period were not only materially false and misleading because
> they sought to affirmatively represent Pier 1's inventory as
> "clean," but also because they omitted these above-referenced
> material facts necessary to make the statements not misleading
> when made.

*Id.* ¶ 203.  These allegations are insufficient under Rule 9(b) and the PSLRA to state a claim

for securities fraud based on a fraudulent omission.

Generally, a corporation is not liable under the securities laws merely because it failed

to disclose all material information it possessed.  *Ind. Elec. Workers' Pension Tr. Fund*

*IBEW*, 537 F.3d at 541 (citations omitted).  Rather, liability for nondisclosure can only arise

if the plaintiff alleges facts that give rise to a duty to speak.  *Id.* (citing *Kaplan v. Utilicorp*

*United, Inc*., 9 F.3d 405, 407 (5th Cir. 1993)).  MERS does not explain in the complaint or

in its response brief *why* defendants had an affirmative duty to disclose any of the "material

adverse facts" listed in ¶ 202 of the complaint.  The conclusory allegation that the "above-

referenced material facts" were "necessary to make the statements not misleading when

---

          sales plan (¶¶ 61-74);

  i.       The Company's massive inventory meant that the excess,
unsold merchandise posed a serious, undisclosed
markdown risk (¶¶ 109-112, 126-134); and

  j.       The inventory backlog was so large that, as the Company
later disclosed, it would take Pier 1 more than a year for
the Company's inventory levels to track sales again (¶¶
126-134).

Compl. ¶ 202.

made," *id.* ¶ 203, is insufficient under Rule 9(b) and the PSLRA to state a claim for securities fraud based on a fraudulent omission. Stated differently, MERS has failed to plead, other than in very generalized terms, any particular statement made by defendants that omitted facts necessary to make the statement true.

E

To the extent MERS alleges that defendants are liable for failing to disclose "known trends . . . that have had or that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues," *id.* ¶ 204 (ellipses in original), as required by Item 303 of Regulation S-K ("Item 303"), the Fifth Circuit has not held that Item 303 creates a duty to disclose under the Exchange Act, and other circuits are divided on the question. *Compare Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (Item 303 creates an actionable duty to disclose), *with In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014) (Item 303 does not create a duty to disclose under the Securities Act). But even assuming *arguendo* that Item 303 *does* create a duty to disclose, MERS only alleges that defendants were required to disclose "that excess inventory had risen to levels that would require at least 18 months to sell-off and would negatively impact margins and earnings per share." Compl. ¶ 208. Defendants *did* in fact disclose precisely these facts, when Smith stated on December 16, 2015 that Pier 1 had "encountered supply chain difficulties, stemming from an aggressive sales forecast that resulted in excess inventory and added costs." Ds. App. 874; *see also id.* (disclosing that performance of Pier 1's distribution centers had "been disrupted by our extremely high inventory levels."). MERS has not

alleged that defendants reasonably expected the trends MERS has identified (i.e., Pier 1's excess inventory levels that exceeded demand, the concomitant markdown risk, Pier 1's distribution center inefficiencies, and related costs of rising inventory) would have a material unfavorable impact on revenues at any point prior to Smith's December 16, 2015 announcement.

Accordingly, the court grants defendants' motion to dismiss MERS's claims based on allegations of fraud by omission.

## VIII

MERS also seeks to hold Smith and Turner liable as control persons under § 20(a) of the Exchange Act. "Control person liability is secondary only and cannot exist in the absence of a primary violation." *Southland*, 365 F.3d at 383 (citing *Lovelace*, 78 F.3d at 1021 n.8). Because MERS has failed to plausibly plead a primary violation under § 10(b) of the Exchange Act and Rule 10b-5, the court also dismisses MERS's § 20(a) claim against defendants.

## IX

Having concluded that MERS has in some respects failed to plead a material misrepresentation, and, in other respects to plead a strong inference of scienter, as required by the PSLRA, the court must decide whether to allow MERS to replead. This court's approach in cases decided under the PSLRA has been to allow plaintiffs at least one opportunity to replead after the court has filed an opinion identifying defects in a complaint.

> Although § 78u-4(b)(3)(A) of the PSLRA states that "[i]n any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met," there is nothing in this language that indicates that district courts are required to dismiss securities fraud claims without first granting leave to amend. . . . Because a more carefully drafted complaint might state a claim upon which relief may be granted, the court grants plaintiffs an opportunity to amend their complaint.

*Coates*, 26 F.Supp.2d at 923. The court will adhere to this procedure in the present case and allow MERS to replead.

\* \* \*

Defendants' motion to dismiss is granted. The court grants MERS 45 days from the date this memorandum opinion and order is filed to file an amended complaint that complies with the PSLRA and Rule 9(b) and states a plausible claim on which relief can be granted.

**SO ORDERED**.

August 10, 2017.

SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE