**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

TOWN OF DAVIE POLICE PENSION PLAN, individually and on behalf of all others similarly situated,

Plaintiff,

v.

PIER 1 IMPORTS, INC., ALEXANDER W. SMITH, and CHARLES H. TURNER.

Defendants.

Case No. 15-cv-3415

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

JURY TRIAL DEMANDED

## TABLE OF CONTENTS


I. PRELIMINARY STATEMENT ..... 1

II. JURISDICTION AND VENUE ..... 7

III. PARTIES ..... 8

A. Lead Plaintiff ..... 8

B. Defendants ..... 8

IV. BACKGROUND ..... 9

A. Pier 1's Specialty, Trend-Based Fashion-Retail Business ..... 9

1. Pier 1's Inventory Level Is a Critical Metric ..... 10

2. Pier 1's Day-to-Day Products Are Highly Susceptible to Obsolescence and Markdown Risk ..... 12

B. The 1 Pier 1 Initiative ..... 15

V. SMITH, TURNER AND PIER 1 MADE SEVERELY RECKLESS CLAIMS FALSE CLAIMS TO INVESTORS ..... 18

A. Pier 1 Told Investors that It Marks Down "Slow Moving" Merchandise But Had an Internal Limit on "Markdown Dollars" ..... 18

B. Defendants Falsely Told Investors that Pier 1 Had Clean Inventory, No Immediate, Significant or Substantial Markdown Risk, and Scalable Infrastructure ..... 19

C. In Reality, Pier 1 Carried Excess Inventory and Significant Markdown Risk with Non-Scalable Infrastructure ..... 22

1. Defendants Ordered Massive Amounts of Inventory, While Ignoring that Actual Sales Were Insufficient to Clear It ..... 25

2. The Inventory Excess Across Pier 1's Non-Scalable Stores and Distribution Network Exceeded Company Norms ..... 34

a. Pier 1 Purchased Excess Inventory ..... 34

b. Pier 1's Infrastructure Was Non-Scalable ..... 40

c. Pier 1's Inventory Problems Caused It to Incur Significant Costs ..... 41

d. Despite Smith, Turner and Pier 1's Repeated Claims to the Contrary, Pier 1's Abnormally High Inventory Presented Significant and Substantial Markdown Risk.....47

3. Pier 1's Undisclosed Markdown Risk Was Caused by Pier 1 Recklessly Over-buying Inventory, and Not Purported Intervening Events..... 48

VI. PARTIAL DISCLOSURES AND THE GRADUAL EMERGENCE OF THE FULL IMPACT OF THE FRAUD..... 55

A. February 10, 2015: Pier 1 Announces Lowered Earnings Guidance, Higher Supply Chain Expenses and the Resignation of Its CFO; Stock Price Falls 25%..... 55

B. Pier 1 Continues to Falsely Reassures Investors..... 57

C. September 24, 2015: Pier 1 Discloses Markdowns and "Challenges" from Operating with Excess Inventory; Stock Price Falls 12.2%..... 58

D. December 16, 2015: Pier 1 Discloses Continued Inventory Problems and that Inventory Will Not Track Sales Again Until the End of Fiscal Year 2017; Stock Price Falls 20%..... 60

VII. ADDITIONAL ALLEGATIONS OF SCIENTER..... 63

VIII. FALSE AND MISLEADING STATEMENTS..... 86

A. False and Misleading Statements and Omissions Concerning Pier 1's Financial Metrics..... 86

B. False and Misleading Statements and Omissions Concerning Pier 1's Non-Scalable Distribution Network..... 96

C. False and Misleading Statements and Omissions Concerning Pier 1's Purported "Clean" Inventory Levels and Markdown Risk..... 99

D. False and Misleading Statements and Certifications as to the Company's Inventory and Internal Controls..... 106

E. Defendants Omitted to Disclose the Known, Material Tr ends of Significant and Growing Markdown Risk and Increasing Costs Tied to Excess Inventory..... 108

IX. LOSS CAUSATION..... 110

X. PRESUMPTION OF RELIANCE..... 113

XI. CLASS ACTION ALLEGATIONS..... 115

XII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ..... 116

XIII. CLAIMS FOR RELIEF ..... 117

XIV. PRAYER FOR RELIEF ..... 123

XV. JURY DEMAND ..... 124

Lead Plaintiff the Municipal Employees' Retirement System of Michigan ("Lead Plaintiff") brings this action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, on behalf of itself and all other persons or entities who purchased or otherwise acquired the publicly-traded common stock of Pier 1 Imports, Inc. ("Pier 1" or the "Company") during the period from April 10, 2014 through December 17, 2015, inclusive (the "Class Period") and were damaged thereby (the "Class"). Lead Plaintiff brings this action against Defendants Pier 1 and Pier 1's former chief executive officer ("CEO") Alexander W. Smith, and former chief financial officer ("CFO") Charles H. Turner. (Smith and Turner are referred to collectively herein as the "Executive Defendants"; and, collectively with Pier 1, the "Defendants").

Lead Plaintiff alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters. Lead Plaintiff's information and belief are based on the ongoing independent investigation of its undersigned counsel. This investigation includes a review and analysis of: (i) Pier 1's public filings with the U.S. Securities and Exchange Commission (the "SEC"); (ii) research reports by securities and financial analysts; (iii) transcripts of Pier 1's conference calls with analysts and investors; (iv) Pier 1 presentations, press releases, and reports; (v) news and media reports concerning the Company; (vi) data reflecting the pricing of Pier 1 securities; (vii) information provided by former Pier 1 employees; (viii) other material and data concerning the Company, as identified herein; and (ix) the expert report of retailing expert Mark Cohen (attached hereto as **Exhibit A**). Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by the Defendants or are exclusively within their custody or control.

## I. PRELIMINARY STATEMENT

1. This case is about Pier 1 and its two most senior former executives (Smith and

Turner) committing securities fraud when, after excess inventory accumulated at Pier 1, after the excess inventory imposed significant costs on the Company, and after this resulted in significant markdown risk, Defendants, with severe recklessness, falsely and misleadingly misrepresented to investors the true state of affairs at Pier 1.

2. Pier 1 is a home furnishings retailer that sells its products through more than 1,000 stores in the United States and Canada, as well as via its e-commerce website, Pier1.com. In mid-2012, before the Class Period, Pier 1 began its "1 Pier 1" omni-channel initiative. Under "1 Pier 1," the Company launched its e-commerce business to complement its traditional, brick-and-mortar retail stores.

3. During the Class Period, the Company touted the success of "1 Pier 1" and Defendants assured investors that "[W]e have the resources and infrastructure in place to scale the business." As time went on, inventory increased but sales did not meet expectations, resulting in immediate and significant markdown risk by the beginning of the Class Period. Despite that reality, Pier 1 repeatedly assured investors that the Company remained a solid investment because its increasing inventory was "clean" and did not present "immediate," "significant" or "substantial" markdown risk.

4. Indeed, it was critical for Pier 1 to actually ensure it did not over-buy its inventory or carry excess amounts of it, because inventory is expensive to store, track, and transport. Pier 1's business is based on fashion trends, changing consumer tastes, seasonality, and the need to constantly present new types and colors of products to consumers. These characteristics render Pier 1's products particularly susceptible to becoming obsolete. Pier 1 also arranges its products in highly-curated arrangements that change from year to year such that if a product does not sell in a given quarter it will be increasingly difficult, if not impossible, to incorporate it into the next season's or year's arrangements.

5. As a result, any slow-moving inventory at Pier 1 would quickly become difficult or impossible to sell at the original retail price. In fact, Pier 1 represented to its investors that "[t]he Company reviews its inventory levels in order to identify ***slow-moving merchandise*** and uses merchandise markdowns to sell such merchandise." Pier 1 also assured investors that "Markdowns are recorded to reduce the retail price of such slow-moving merchandise ***as needed***."

6. However, markdowns, once instituted, would cut into the Company's gross profit, cause Pier 1's margins to contract, and put at risk the Executive Defendants' incentive compensation, which was directly linked to the Company's financial metrics. As a result, inventory and markdown risk were critical metrics used by analysts and investors to determine whether to invest in Pier 1 stock during the Class Period. Unbeknownst to investors, however, Pier 1 was carrying abnormally high amounts of slow-moving inventory that represented significant markdown risk.

7. To conceal this fact, Defendants made repeated false claims to investors during the Class Period that materially misrepresented and omitted that Pier 1 had over-purchased inventory, and faced immediate, significant and substantial markdown risk. As Pier 1 only belatedly admitted, the Company operated for at least 18 months during the Class Period with a level of inventory that was "out of whack with demand."

8. Defendants also hid from investors that Pier 1 lacked the scalable infrastructure to store and transport the excess inventory it accumulated, and hid from investors that Pier 1's distribution centers were operating with inefficiencies that were serious enough that they negatively impacted the Company's financial results. Specifically, Pier 1 incurred significant undisclosed costs to store and transport the excess merchandise that its over-burdened distribution network was not equipped to handle.

9. These conditions – a material excess inventory problem that exceeded Company

norms, significant markdown risk and undisclosed costs – were manifest inside the Company and apparent to the Executive Defendants. As alleged herein, and further supported by the attached Expert Report of retail expert Mark Cohen, there were numerous red flags of excess inventory, significant markdown risk and undisclosed costs at Pier 1, all of which the Executive Defendants were aware.

10. For example, CEO Smith admitted during an internal March 2014 Pier 1 town hall meeting that he was responsible for pushing overly high sales goals on Pier 1's employees, and underestimating what it would take to achieve them. In his presentation, he acknowledged that "[w]e became victims of our own ambition."

11. During the Class Period, there was a sharp, abnormal divergence between the growth of inventory and the growth of sales at Pier 1 – based on underlying inventory and sales data that Smith and Turner personally communicated to the market. As a result of the shortfalls, Pier 1 informed its employees (in a letter personally signed by Smith) that it would not pay them bonuses.

12. Thousands of shipping containers full of unsold merchandise that was unavailable for allocation to Pier 1 stores sat outside Pier 1's six distribution centers. Indeed, by October 2014, former CEO Smith personally inquired of a former employee how he planned to deal with an almost 1,000-container backlog sitting outside of the Baltimore distribution center – which by its nature was inventory at serious risk of markdown. The unopened inventory in shipping containers across Pier 1's business represented massive amounts of Pier 1 capital not being put to use to generate cash for the business but was instead aging, depreciating, and costing the Company millions of dollars in temporary storage fees and shipping costs and fines.

13. Since Pier 1's distribution centers and logistics network were flooded with excess merchandise, Pier 1 needed to resort to employing outside labor and using third parties to shuttle

the products. Non-discretionary expenditures related to capital improvements (such as improved racking to increase storage capacity of existing warehouses) were also approximately 6-7 times higher than the yearly average for the previous decade, and during 2014 and 2015, Smith and Turner personally signed off on capital acquisition requests.

14. Yet, throughout the Class Period, Defendants repeatedly told investors that Pier 1 was operating with a "clean" inventory, without the need for significant markdowns. For example, on December 18, 2014, Smith claimed that Pier 1 did "not see any significant markdown risk" and on March 2, 2015, the Company said that "current inventory composition does not present an immediate or significant markdown risk."

15. These and other repeated misrepresentations artificially inflated the price of Pier 1 common stock because the Company in fact faced significant markdown risk and its distribution centers were operating with material inefficiencies. In fact, shortly after Defendants made these claims, Pier 1 began drastic markdowns to clear out the excess inventory, which harmed Pier 1's margins and only barely scratched the surface of the mountain of excess inventory at Pier 1.

16. The truth began to emerge through a series of partial corrective disclosures throughout 2015. Specifically, on February 10, 2015, Pier 1 announced that it had higher costs resulting from "unplanned supply chain expenses," and that Pier 1 had "aggressively addressed" the Company's failure to accurately forecast revenues and expenses by terminating Defendant Turner as the Company's CFO. Analysts, who had been told until as late as January 2015 that inventories were "in line" with expectations, were shocked, and described the increased supply chain expenses as "inexplicable," calling the announcement a "major setback," and concluding that "markdown risk" was "high." The news also surprised investors and sent the Company's stock plummeting nearly 25%, from $16.97 per share on February 10, 2015 to close at $12.84 on February 11, 2015.

17. Even after this first revelation, Defendants continued to misrepresent the true state of affairs at Pier 1. As late as April 8, 2015, a mere eight months before the end of the Class Period and while inventories were in fact at historic highs, Pier 1 told investors that its inventory complexion was "healthy," that any inventory-related issues were only "transitory" and that Pier 1's inventory did "not pose a significant immediate markdown risk." However, within months of these representations, Defendants revealed that inventories were excessive and that Pier 1 was taking extensive markdowns to sell down the excess.

18. On September 24, 2015, contrary to Smith's recent assurances, Pier 1 announced that its inventory had caused "issues" within its supply chain, that there were "inventory related inefficiencies within the Company's distribution center network," and that it needed to resort to increased clearance activity to sell off the excess. On a conference call that day, Smith disclosed that Pier 1 would "continue to feel the effects of our elevated inventory levels the remainder of the year," and even recounted that he reminds himself in the mirror "every day" that "nothing good happens when you have too much inventory," and that "we are in the throes of working this down."

19. Analysts expressed further shock at the Company's disclosures, writing that they were "particularly surprised" by the "extent of markdowns," given "management's earlier assertions this would not be a significant issue." In response to the Company's disclosures, which were sharply divergent from Defendants' prior representations, the price of Pier 1 stock fell by more than 12%, from $8.67 per share on September 24, 2015 to $7.61 on September 25, 2015. One analyst concluded in the wake of the announcement, and after a call with Pier 1 management, that inventories would not be "clean until . . . Feb. 2017," more than 19 months into the future.

20. Finally, on December 16, 2015, Pier 1 confirmed for the first time that it would take at least 18 months before inventory levels were in line with actual demand, with Smith describing the Company's inventory levels as "***extremely high***." The Company's interim CFO also disclosed

that only four of the Company's six distribution centers were operating with "acceptable levels of efficiencies." Analysts described these disclosures as part of a "stunning fall from grace," with Pier 1's top line and gross margin "well worse than we expected." One analyst concluded that the Company would have had to miss its previously publicized internal sales goals by a staggering $100 million in order to produce the announced shortfall. In response to these disclosures, Pier 1's shares again plummeted by 20% in one day, from $5.95 per share on December 16, 2015 to $4.75 on December 17, 2015.

21. In all, as the Company revealed piecemeal to the public the true magnitude and severity of its exposure to markdown risk, caused by excess inventory, Pier 1's stock dropped from a Class Period high of $18.57 on April 28, 2014 to $4.75 on December 17, 2015, a staggering reduction of over 65%.

## II. JURISDICTION AND VENUE

22. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

23. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Pier 1 maintains its executive offices in this District and many of the acts and conduct that constitute the violations of law complained of herein, including the dissemination to the public of materially false and misleading information, occurred in and/or was issued from this District.

24. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities

markets.

## III. PARTIES

### A. Lead Plaintiff

25. Lead Plaintiff the Municipal Employees' Retirement System of Michigan ("Lead Plaintiff" or "MERS") is tax-exempt governmental pension plan trust and a Michigan statutory public corporation and instrumentality of its participating municipalities and courts. MERS administers over 2,000 plans on behalf of 850 Michigan municipal employers and represents over 115,000 participants. As of March 31, 2016, MERS had approximately $9.3 billion in total assets. As reflected in the certification filed with the Court (ECF No. 14), MERS purchased Pier 1 common stock during the Class Period and was damaged thereby. On April 25, 2016, this Court appointed MERS as Lead Plaintiff for this litigation.

### B. Defendants

26. Defendant Pier 1 is a Delaware corporation with its principal executive offices located at 100 Pier 1 Place, Fort Worth, Texas, 76102. During the Class Period, the Company's common stock traded on the New York Stock Exchange ("NYSE"), which is an efficient market, under the ticker symbol "PIR." As of December 2015, the end of the Class Period, Pier 1 had over 83 million shares of common stock outstanding.

27. Defendant Alexander W. Smith ("Smith") served as Pier 1's President and CEO from February 2007 through his resignation on December 31, 2016. During the Class Period, Defendant Smith reviewed, approved, and signed Pier 1's materially false and misleading SEC filings and certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), and made materially false and misleading statements in Pier 1 press releases and on Pier 1 conference calls with securities analysts, where Pier 1's financial condition was presented and discussed.

28. Defendant Charles H. Turner ("Turner") served as Pier 1's CFO from August 1999

until February 2015. Prior to his "early retirement" from the Company on February 11, 2015 at the age of 58, Turner had been a Pier 1 employee for 22 years and previously served as Pier 1 Executive Vice President ("EVP"), Senior Vice President of Stores and Controller and Principal Accounting Officer. During the Class Period, Defendant Turner reviewed, approved, and signed Pier 1's materially false and misleading SEC filings and SOX Certifications, and made materially false and misleading statements on Pier 1 conference calls with securities analysts, during which Pier 1's financial condition was presented and discussed.

29. The Executive Defendants, Smith and Turner, were the two most senior executives at Pier 1 during the Class Period, and had the power and authority to control, and did control, the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Smith and Turner were each provided with copies of the Company's reports and press releases alleged herein to be materially false and misleading prior to, or shortly after, their issuance and had the ability and opportunity to issue them, prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, Smith and Turner each knew or were severely reckless in disregarding that the adverse facts detailed herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## IV. BACKGROUND

### A. Pier 1's Specialty, Trend-Based Fashion-Retail Business

30. Pier 1 is a specialty retailer of decorative home furnishings with over 1,000 retail stores that also sells merchandise through its website, Pier1.com. In the early 2000s, having reached sales of over $1 billion, the Company embarked on a series of expansion campaigns. By 2007, however, it became clear that Pier 1 had grown too quickly. Sales plummeted, and the

Company reported a staggering $227 million loss for fiscal year 2007. As a result, Pier 1 terminated its CEO and hired as a new CEO Defendant Alex Smith, a retail veteran with over two decades of experience in operations and merchandising at major retailers.

31. Smith became Pier 1's CEO effective February 19, 2007, following seven consecutive quarterly losses at the Company. As CEO, Smith adopted a cost-cutting strategy centered around aggressive inventory management.

**1. Pier 1's Inventory Level Is a Critical Metric**

32. Pier 1's actual inventory value was one of the most critical metrics to investors in analyzing Pier 1's value as a company because it represents the value of an asset on Pier 1's balance sheet that Pier 1 could use to generate revenue. However, when Pier 1's inventory is slow-moving and is not being sold or reaching stores and consumers, then the value of the inventory needs to be marked down. Marking down the value of the merchandise results in a lower reported asset on Pier 1's balance sheet and a reduction in the Company's margins.

33. For these reasons, Pier 1 listed "Inventories" as one of its seven "Critical Accounting Policies" in every one of its Forms 10-K filed with the SEC since at least 2005 and throughout the Class Period. Every single Pier 1 Form 10-K from 2012 onwards also claimed that the Company was "focusing on strategically managing inventory levels and closely monitoring merchandise purchases to keep inventory in line with consumer demand."

34. Analysts were also focused on the Company's inventory levels, and repeatedly discussed that topic with Defendants Smith and Turner on conference calls and in numerous analyst reports issued before and during the Class Period. Indeed, analysts or Company executives raised the status of Pier 1's inventory on every single quarterly earnings call for as long as these calls have been transcribed and published, including throughout the Class Period.

35. Accordingly, on his very first conference call with analysts and investors as Pier

1's CEO on April 12, 2007, Defendant Smith outlined his strategy to improve Pier 1's business and stressed the need to ensure that inventory levels were commensurate with actual consumer demand. On the call, Smith presented his six-point action plan that focused heavily on cost-cutting through managing inventory and tracking sales. Smith announced the creation of a new department at Pier 1 specifically tasked with overseeing "inventory levels, markdowns and purchase-order managements." Smith stated that this group would synchronize Pier 1's inventory with sales by managing purchases and initiating markdowns for excess merchandise, "so that everything from assortment planning through to store allocation and everything in between will be carefully and thoughtfully planned and executed." Smith also announced that a member of the Company's executive team would run the department and report directly to him, and emphasized the importance of the Company's inventory levels, stating that, "We know that a carefully balanced inventory by department, category and SKU[1] at an individual store level is ***essential***."

36. In order to have an efficient inventory management system with better distribution, Defendant Smith also announced on April 12, 2007 that Pier 1 would "tighten up our supply chain," in order to "drive down costs, reduce lead times, and increase inventory turn." The person chosen to lead this effort was Pier 1's CFO at the time, Defendant Turner. Turner was tasked with taking over Pier 1's entire supply chain distribution system, and conducting a review of "every part of the supply chain," from "freight costs" to "transportation and delivery contracts," to "the use of outside storage facilities."

37. Over time, as Pier 1 faced other obstacles, the factor that the Company pointed to as being critical to overcoming problems it faced was its ability to achieve and maintain proper

---

[1] A Stock Keeping Unit, or "SKU," is a standard retail industry term indicating a distinct type of item for sale. For example, each of Pier 1's individual lines of merchandise, such as a certain type of chair or dish, has a distinct SKU, and all items within that merchandise line would carry the same SKU number.

levels of inventory. In December 2008, Pier 1's stock price fell below the New York Stock Exchange's de-listing threshold for the first time, and on December 15, 2008, the Company received notice that its stock was no longer in compliance with listing requirements. On December 18, 2008, Turner stressed on a conference call with investors that, as the Company tried to weather this development and a serious downturn in its business, "***the number one thing, we as a Management team, is focused on is our inventory levels***."

38. After peaking in 2007, reported inventory at Pier 1 declined each year from 2008 to 2011, and in one year alone, from 2008 to 2009, Pier 1 slashed reported inventory by $100 million. Pier 1's financial position strengthened as the Company maintained levels of inventory that matched consumer demand, with cash growing as inventory declined, and Defendants touted how the Company was aggressively "focus[ing] on managing inventory levels." During the Company's April 7, 2009 earnings call, Turner thus attributed the Company's improving financial metrics to a "continued focus" on inventory, and Smith stated that "accurate buying, lower supply chain costs, [and] clean inventory" had reduced pressure on the Company's margins.

**2. Pier 1's Day-to-Day Products Are Highly Susceptible to Obsolescence and Markdown Risk**

39. As supported by Pier 1's own disclosures and as explained by retail expert Mark Cohen in his attached expert report (incorporated herein by reference), retail products' susceptibility to obsolescence and markdown risk ranges from "basic" or "staple" products (which are less susceptible to markdown risk) to "fashion" and "seasonal" products (which are highly susceptible to markdown risk).

40. Basic or staple products are products that a retailer can sell year after year without the demand for them declining significantly as a function of time. These kinds of products, which are utilitarian items with no style component, include goods like men's basic white shirts and are not highly susceptible to markdown risk.

41. Fashion products, on the other hand, have significant elements of style, color and adornment that render them subject to changing trends. The sale of fashion products is heavily dependent on consumers' changing tastes, and such products are highly susceptible to markdown risk.

42. As Professor Cohen opines in his report, Pier 1 is primarily a specialty fashion and seasonal home goods retailer, with products that are dependent on consumers' changing tastes. Accordingly, as a general matter, if Pier 1's products do not sell in a timely manner, it is highly unlikely that they will successfully sell at the originally offered price, and they are thus highly susceptible to markdown risk and becoming obsolete.

43. Indeed, Pier 1 describes itself as a "specialty" retailer that sells unique products subject to changing consumer tastes. In Pier 1's 2013 and 2014 Forms 10-K, filed with the SEC on April 30, 2013 and April 29, 2014, and signed by Defendants Smith and Turner, Pier 1 stated that:

> The success of the Company's ***specialty retail business*** depends largely upon its ability to predict ***trends*** in home furnishings consistently and to provide merchandise that satisfies consumer demand ***in a timely manner***. ***Consumer preferences often change*** and may not be reasonably predicted. . . . As a result, the Company may be vulnerable to evolving home furnishing ***trends***, changes in customer ***preferences***, and pricing shifts. . . .

44. As Defendant Smith also stated during a conference call with analysts on December 14, 2016, "***Our products reflect current fashion trends*** but are interpreted in our own way with an emphasis on color, finishes and embellishments, sparking our customer's creativity with ***product she won't find elsewhere***."

45. Since Pier 1 must constantly change its product offerings in order to offer new, contemporary items to its customers, Pier 1's products are highly susceptible to markdown risk. As Pier 1 stated in its 2014 and 2015 Forms 10-K, "[m]anagement believes" that Pier 1 is competing for sales "on the basis of pricing and quality of products, ***constantly changing***

***merchandise assortment***, visual presentation of its merchandise and customer service." As a result, any products that do not sell in a given quarter or year cannot be incorporated into the new, changing product assortments.

46. Pier 1 also told investors during the March 2015 Raymond James Institutional Investors conference that, "The Experience" of shopping at Pier 1 was achieved by Pier 1 ***"Always"*** having ***"something new and different for the shopper to discover by frequently changing displays and inventory***." According to Pier 1's presentation at that conference, the Company's "Audience" is "Women who are passionate about home decor and see it as a means to express themselves through color, ***new ideas and one-of-a-kind items***."

47. On April 8, 2015, Defendant Smith also stated during an earnings call that, "our teams continued to raise the bar in their ability to create ***unique special and trend-right*** products, which are well-priced and resonate with our customers." Similarly, on Pier 1's June 17, 2015 earnings call, Smith again emphasized that Pier 1's main "strategies include … ensuring that we continue to offer ***unique on-trend*** merchandise," and added that "[o]ur merchandising team is executing well, and continues to do a great job developing the ***unique, special, and trend-right*** products that our customers expect from Pier 1 Imports."

48. Smith further emphasized the importance of offering new products to Pier 1 customers during an April 13, 2016 earnings call, stating that, "***our customer is responding extremely well to newness*** . . . . [S]he's liking ***newness***."

49. In fact, Pier 1 boasts on its website that, the Company regularly receives "1,000s of new arrivals":




50. Pier 1's "bread and butter" is thus the sale of products that are highly susceptible to markdown risk because the products are based on rapidly-changing consumer tastes and seasonal shifts, including Pier 1's need to constantly change and update its product offerings.

51. Pier 1's products are further susceptible to markdown risk because Pier 1 presents its products in groupings and vignettes whose colors and styles are matched and coordinated with one another. As Defendant Smith said on December 14, 2016, Pier 1's assortments are "highly edited," "cohesive" and "speak with one voice." Thus, if a given item in a grouping does not sell in a given year, it becomes obsolete because it is difficult to integrate that merchandise into a subsequent year's offerings, as it will be out of color and style and not fit within the next year's assortment.

52. Since Pier 1's forward assortments are not identical to the existing goods in the pipeline, the Company needed to keep buying new inventory even when it was carrying excess amounts of it because it is the sales of new assortments that drive Pier 1's business. Halting the purchase of new inventory at any time would have seriously disrupted its business and also signaled to the market that the Company's strategies were a failure.

**B. The 1 Pier 1 Initiative**

53. Despite its past turnaround, Pier 1 faced growing pressure to enter the online retail space from internet-based retail competitors like Wayfair and Amazon. In response, the Executive

Defendants planned for Pier 1 to develop an "omni-channel" approach that would integrate online and in-store retail sales. Referred to as "1 Pier 1," the initiative allowed customers to shop in the Company's online store and either have their purchases shipped to their homes, or pick them up at Pier 1's U.S. stores without incurring shipping charges. On August 23, 2012, the Company announced the official launch of its brand new e-commerce platform.

54. The Company's development of its 1 Pier 1 initiative required substantial investments in Pier 1's inventory management and distribution network. As an integral component of 1 Pier 1, the Company claimed that it upgraded its planning and allocation systems to accurately monitor and maintain inventory. During a May 7, 2013 conference call with analysts and investors, Defendant Smith introduced the members of his executive team, including Michael Benkel (EVP of Planning and Allocations), who discussed the purported capabilities of Pier 1's system. During his presentation, Benkel claimed that "over the past few years, we've made tremendous improvements to our system to support the merchandising team, specifically focusing on four planning and allocation systems." In that regard, Benkel detailed the Company's purportedly upgraded ability to monitor and control inventory, stating:

> First, we have a relatively new planning system to manage our SKU level plans and forecast. We built this system internally rather than buying one so that we could customize it to the unique complexity of our business and, at the same time, building capabilities to accommodate future growth.
>
> Some of the key factors we considered when developing the system include our six distribution centers and the different transit times needed to ***keep each one in optimal inventory***. We also took into account the very lead times from our vendors and distinct ocean transit times from the many countries we buy from.
>
> We quickly felt the benefits of our investment in this new system and forecast accuracy at the SKU level. This has resulted in more accurate projection, improved assortment planning ***and optimal DC [Distribution Center] inventories*** to drive sales. Additionally, in keeping with our 1 Pier 1 vision, the systems enable us to forecast at the SKU level across both our stores and e-commerce businesses.

55. Emphasizing the fact that the system provided the executive team with visibility into these key metrics, Benkel added:

> Reporting was also a key factor when we built the new planning system. Previously, we lacked a flexible reporting tool to measure our performance at the individual SKU level in comparison to how it was planned . . . Now, ***we have the ability to quickly and accurately measure how a SKU performs to its plan and, by measuring its performance, we know where and how we can improve***.

56. Analysts responded positively to these developments. For example, on May 7, 2013, Barclays reported that "Benkel, EVP of Planning and Allocation highlighted the upgraded tech systems Pier 1 teams are using to manage SKU forecasts. The teams are now able to accurately measure how individual SKUs are performing and maximize the productivity of all assortments. Overall, Pier 1 is using better data analytics across the business to drive sell-through of products." Barclays concluded: "[w]e believe that the company's initiatives will continue to drive robust same-store sales and merchandise margins." The next day, Jeffries also reported that "Benkel, EVP Planning and Allocations, gave a strong presentation about how recent investments in analytics will drive improvements in inventory management going forward, including the optimization of the assortment by store, speedier replenishment, and channel integration."

57. On May 10, 2013, analysts at Telsey Advisory Group similarly reported, under the heading "Planning and Allocations," that "In recent years, Pier 1 has made significant investments and enhancements to the IT systems used to forecast, plan and allocate inventory to distribution centers and stores. This has resulted in more accurate SKU plans by week, better in stocks, easier reporting of best and worst performing items, compressed replenishment times, and more optimal inventory levels at the company's six Distribution centers [distribution centers]." On May 17, 2013, Deutsche Bank called Pier 1 a "21st Century Growth Story" in its report on the Company's May 7, 2013 presentation, and stated that, "[r]ecent investments in infrastructure" will help support

growth in market share, including "a new allocating system [that] . . . resulted in better inventory accuracy at the DC level, a SKU planning system, a new SKU / store assortment system, and an open-to-buy system." Deutsche Bank concluded, "[w]e maintain our Buy rating as we continue to believe the Street is under-estimating the true longer-term sales and earnings potential and that upward revisions to estimates should drive share price appreciation going forward."

58. Defendants also assured investors that Pier 1 had built the required infrastructure, staffing, and systems to ensure that Pier 1 kept clean inventory levels as it executed on its omni-channel strategy. For example, on December 19, 2013, Smith stated, in response to an analyst's questions about Pier 1's ability to control its inventory:

> I think ***the point about our inventory*** . . . is ***obviously we think about it a lot***. We've been investing over the last few years a lot in systems, of course, in terms of our allocation replenishment systems, but also in investing in people and our planning and allocation functions. I think we're really getting the results of all of that investment now, which allows us to ***grow sales and not go crazy with inventory***.

59. Thus, by five months before the Class Period at the latest, Pier 1 claimed to possess a state-of-the-art inventory management system, built in-house, that provided the data and real-time awareness that the Company needed to measure inventory, compare inventory to the Company's sales plan, and thereby purchase inventory in line with actual sales and consumer demand. These claims were well-received by analysts, who widely reported their confidence in the Company and attributed this confidence to the infrastructural improvements the Company touted.

## V. SMITH, TURNER AND PIER 1 MADE SEVERELY RECKLESS CLAIMS FALSE CLAIMS TO INVESTORS

### A. Pier 1 Told Investors that It Marks Down "Slow Moving" Merchandise But Had an Internal Limit on "Markdown Dollars"

60. Because of changing tastes, the age of inventory at Pier 1 is a critical metric because

the longer that inventory is held, the less likely it is to be sold off. Moreover, even any basic, staple merchandise that has zero perishability becomes costly if it is held for long periods of time and does not sell, because it represents an opportunity cost: the purchase of such merchandise has consumed cash that is not productive because it is not converting to profitable sales, while consuming storage space.

61. As a result, Pier 1 represented to its investors, including in its Form 10-K filed with the SEC on April 29, 2014, that "[t]he Company reviews its inventory levels in order to identify ***slow-moving merchandise*** and uses merchandise markdowns to sell such merchandise. Markdowns are recorded to reduce the retail price of such slow-moving merchandise ***as needed***." Pier 1 thus warrants that it marks down merchandise not only if it is entirely non-saleable or "obsolete," but if it is "slow-moving."

62. However, rather than clearing through its slow-moving merchandise through as-needed markdowns, Pier 1 executives set an internal limit on the amount of "markdown dollars" Pier 1 would take in a given quarter. As a result, Pier 1 executives repeatedly pushed back on numerous recommendations from their own employees to mark down merchandise and resisted markdowns. The executives did so because marking down the merchandise would reduce the dollar value of Pier 1's inventory (an asset on the balance sheet) while shrinking the Company's gross profits and margins. Taking these steps would have further jeopardized the Executive Defendants' incentive-based compensation and put millions of dollars of their compensation at further risk.

### B. Defendants Falsely Told Investors that Pier 1 Had Clean Inventory, No Immediate, Significant or Substantial Markdown Risk, and Scalable Infrastructure

63. The items sold in Pier 1's retail locations and on its website are housed as inventory in six distribution and fulfillment centers located in Maryland, Ohio, Texas, California, Georgia,

and Washington. Pier 1's merchandise is primarily imported from China and other foreign countries and shipped to the United States by boat, then delivered to the Company's distribution centers. At the distribution centers, Pier 1 stores the merchandise until it is further shipped to Pier 1 retail stores in each distribution center's region, or delivered directly to the consumer.

64. Throughout the Class Period, Defendant Smith repeatedly assured the market of Pier 1's ability to handle the 1 Pier 1-related inventory buildup and on each of these occasions, analysts relied upon and responded positively to Smith's claims. For example, on April 10, 2014, the first day of the Class Period, Defendant Smith stated during an earnings call that, "we have the resources and infrastructure in place to scale the business." Smith also added that, strategically, Pier 1 was "in the best shape we have ever been and [we] look forward to a year of strong growth in fiscal 2015." As discussed below, these claims were in sharp contrast to Smith's internal admissions, just weeks earlier, that Pier 1 was the "victims of our own ambition," including planning, infrastructural and execution failures.

65. However, analysts responded positively to the Company's public claims about its inventory, with Barclays reporting the same day that the "inventory position is in line with management's expectations," and "Pier 1 plans to end 1Q with inventories up in-line with sales growth." Barclays further praised "Pier 1's investments outside of e-commerce," noting that it "now has the ability to manage its SKU level plans and forecasts, effectively allowing the company to better target customer demand patterns together with efficient inventory management at the company's existing store-focused distribution centers."

66. Defendants' assurances that Pier 1 managed its inventory levels to track actual sales and consumer demand continued through fiscal year 2015. For example, Smith reassured the market during an earnings conference call on June 19, 2014 that any margin pressures were due to a promotional environment and "not so much [to] markdown pressure," and "we continue to run a

very clean inventory as I know you know." On the same day, Barclays reported that it was "confident in the company's ability to manage pricing and promotions longer term." The next day, analysts at Argus Institutional Partners also wrote in response to the Company's statements that, "management said that the gross margin was pressured by a highly promotional retail environment and a shift to e-commerce sales" and "[w]e believe that gross margin is being pressured by promotions to drive traffic rather than by markdowns resulting from bad inventory management." Similarly, Barrington Research Associates wrote that, "[i]nventory is in good shape," and Jeffries concluded that "we continue to have a lot of conviction in our long-term outlook on PIR . . . Pier 1 runs a very tight ship on inventory these days."

67. Then, on September 17, 2014, the Company issued a press release announcing its financial results for the fiscal second quarter of 2015. While the Company also reported that inventory had increased 15.5% from the prior year, it repeated that the increase was "in line with management's expectations." Additionally, in response to questions from analysts, Defendant Turner attributed the increases in inventory not to excess product or poor sales, but instead to the need to take on more inventory in advance of Chinese New Year.

68. Analysts credited Turner's explanation for the Company's inventory increases. KeyBanc Capital Markets reported on September 17, 2014 that Pier 1's inventory was "in line with its expectations" and that the reported increase was due to Pier 1's new distribution center, growth in the Company's e-commerce business, and early receipt of inventory due to Chinese New Year.

69. Through the end of calendar year 2014, Pier 1 continued to emphasize that its inventory did not necessitate further markdowns or create margin pressures. On December 18, 2014, the Company issued a press release announcing its financial results for fiscal third quarter 2015, and reaffirmed its previously-issued guidance for fiscal year 2015. With respect to Pier 1's

inventory levels, Defendant Turner announced that while inventories had increased 25% year-on-year, this additional inventory was necessary "to support higher sales," and Defendant Smith stated that while total inventory was up, "we do not see any significant markdown risk."

70. Analysts continued to credit these claims by Defendants. For example, Oppenheimer reported on December 19, 2014 that "[c]omments from management suggest that higher inventories are consistent with the company's plans and should position PIR well for the balance of the holiday selling season and early seasonal sales in 2015."

71. Pier 1 followed up on these assurances with a January 8, 2015 announcement that over the holiday season, the Company enjoyed an 8.2% increase in comparable store sales. In the press release, Defendant Smith projected success and optimism, stating that "[t]raffic to the brand was up nicely and sell-through on our holiday assortments was on plan," and "the business is well-positioned as we head into the early spring selling season." Analysts viewed this announcement as further evidence that the Company was "once again finding its footing and positioned to deliver in coming quarters," and the price of Pier 1's common stock jumped another 6.5% that day.

### C. In Reality, Pier 1 Carried Excess Inventory and Significant Markdown Risk with Non-Scalable Infrastructure

72. As discussed above, Defendants Smith, Turner, and Pier 1 repeatedly claimed during the Class Period that Pier 1 was operating with "clean" inventory and did not have immediate, significant or substantial markdown risk. However, in contrast to the these claims, and as the Company has now admitted, Pier 1 did not maintain a "clean" inventory level during the Class Period and there was a significant need for mass markdowns.

73. As Pier 1 has now ***admitted***, inventories at the Company's distribution centers and stores were so excessive that, as the Company only disclosed in December 2015, it would take Pier 1 at least ***18 months*** to return to a point where its inventory was "clean."

74. As investors only learned at the end of the Class Period, in order to reduce the

excess inventory, the Company had to engage in massive product markdowns over several quarters that seriously eroded Pier 1's profit margins and cut its earnings per share, sending its stock price down sharply. Contrary to Defendants' claims, such an excessive inventory backlog does not accumulate overnight or in just a single quarter.

75. Indeed, Defendants ignored repeated red flags during the Class Period that Pier 1 had accumulated inventory at a rate that was far outside of the norm at the Company, and that there was a significant pending need for mass markdowns to clear the excess. The below graph plots the percentage change in inventory, and the percentage change in sales, at Pier 1 between fiscal years 2011 and 2016 (calendar years March 2010 to March 2016). Arrows indicate the start and end of the Class Period:




76. As this graph reflects, during the Class Period, Pier 1 experienced a drastic, out of the ordinary spike in its percentage increase in inventory versus sales, which represented abnormally high levels of markdown risk. But, rather than disclose the true existence of the significant markdown risk, Defendants hid it from investors and affirmatively made false

representations to the contrary.

77. For example, as shown in the graph below, despite the fact that, at distinct points in time during the Class Period it was clear that Pier 1's increase in inventory was not being matched by increases in sales, and that there was immediate, significant and substantial markdown risk, Defendants recklessly and falsely claimed to investors that Pier 1 "d[id] not see any significant markdown risk"; that "[c]urrent inventory composition does not present an immediate or significant markdown risk"; and that "[t]he complexion of our current inventories level … does not pose a significant immediate markdown risk":




78. In addition, Smith's December 16, 2015statement above that, even after six months

of taking significant markdowns, Pier 1 still, "on a really historical level," had "more clearance inventory than we used to have" and "we're at very, very early stages in [the] process" of bringing inventories back into line, shows that, throughout the Class Period, Pier 1 carried historically high amounts of merchandise with significant markdown risk.

### 1. Defendants Ordered Massive Amounts of Inventory, While Ignoring that Actual Sales Were Insufficient to Clear It

79. In connection with the October 2012 launch of 1 Pier 1, the Executive Defendants prepared sales goals and parallel inventory increases that were dramatically out of line with actual consumer demand and sales. However, although Pier 1 had over-bought inventory and carried significant markdown risk, rather than informing the Company's investors of what had happened, Defendants hid the truth.

80. As confirmed by numerous former Pier 1 employees, who worked in Company locations across the country, Pier 1's distribution centers were filled with so much excess inventory that large numbers of full shipping containers were left in ports, railyards and parking lots, unable to be unloaded because warehouses and stores had run out of room. Even as Defendant Smith was telling the market that Pier 1 was running a "very clean inventory," stores were resorting to renting outdoor storage space to accommodate the excess merchandise, and distribution centers were forced to pay fines to keep loaded containers in railway yards and ports. As discussed below, the Executive Defendants knew or were severely reckless in disregarding that inventory was at excessive levels, which gave rise to the need for significant and costly markdowns, and that the Company was incurring massive costs resulting from attempts to store the inventory temporarily.

81. Pier 1 inventories are managed by small teams based out of merchandise departments divided by the types of merchandise. The teams, known as "pods," consist of an allocator who allocates quantities of merchandise to stores, a planner who works with the allocator to assess how much inventory to maintain on the basis of existing sales figures, and a buyer who

makes inventory purchases. Together, members of the pod are supposed to ensure that the Company is correctly planning for the purchase and sale of items that were within the scope of their responsibility, and that inventory was in line with sales on an ongoing basis.

82. Each year, every pod is responsible for drafting a sales and inventory plan for its particular merchandise department for the upcoming year. This process involves working with senior executives. Immediately above each pod member are managers and directors, with allocation managers overseeing the allocators, Planning Directors overseeing the planners, and General or Divisional Merchandising Managers overseeing the buyers. These managers reported in turn to two senior executives of the company, Michael Benkel, the EVP of Planning and Allocations, and Catherine David, the EVP of Merchandising, who worked alongside Defendants Turner and Smith and reported directly to them.

83. Each year, pods passed their plans to departmental managers, who, after working with the pod and revising the plan to their satisfaction, passed the plan up to the Company's senior executives for revision and approval. Pod members' yearly bonuses depended on whether the Company met its projected sales for the year.

84. According to a former Allocations Analyst at Pier 1's Texas headquarters from 2011 to 2014, after Benkel and David received yearly plans from the managers that oversaw each pod, they met with the Company's leadership and reviewed business figures before responding to departmental managers with approval or revisions. The Allocations Analyst, who was at the center of this process, stated that senior management always instructed most departmental pods to raise the sales plan, and could not recall a single instance throughout her three years at the Company where this did not happen to her department. Since inventory plans were tied directly to the sales plan, raising the sales plan meant raising the inventory orders as well, to accommodate for purportedly higher sales.

85. In the former Allocation Analyst's case, the sales plans that senior management pushed to her pod were "ridiculous." This was clear to Allocation Analysts because the Company used an advanced "Demand Chain Management" system, or "DCM," that closely tracked inventory and sales. The DCM contained checks and balances to ensure that inventory allocations did not outstrip actual demand, which it gathered from the Company's contemporaneous sales data. According to the Analyst, during fiscal year 2014 (which began in March 2013 and ended in March 2014), the Company began instructing allocators to manually override the Company's own checks and balances, and to allocate more inventory, on top of the allocations calculated by the DCM as matching actual sales. The Analyst described these manual overrides of the DCM as "pretty well known" and the "way of life" at Pier 1. Soon, sales targets for multiple departments and merchandise lines had become so unrealistically aggressive, that the Analyst described them as having come from "Disneyland."

86. As a matter of fact, the human managers who overrode the DCM system did not have a better understanding of sales trends and did not make better business decisions than the DCM system. Based on Pier 1 executives' reckless decisions, Pier 1 contemporaneously carried excess inventory and significant markdown risk, had an over-burdened supply chain, and ended the Class Period in a financial crisis, with its stock price falling sharply.

87. Another former Allocations Analyst at the Company's headquarters, who worked there from 2011 to 2015, also explained that as early as late 2013, Pier 1 stores began telling her that they could no longer take on inventory because they already had tractor trailers containing merchandise sitting on leased "off-site" properties. The Analyst thus thought that concerns with regard to excess inventory existed from the second half of fiscal year 2014 (which spanned September 2013 through March 2014) onwards, and throughout fiscal year 2015 (which ended on February 28, 2015). According to the Allocations Analyst, the concern was severe by at least early

fiscal year 2015 (which began on March 2, 2014). Moreover, the Analyst's entire team felt throughout fiscal year 2014 (which began in March 2013) and 2015 that executives were providing them with "unrealistic" plans, as "the sales were not happening, [yet] we just had these outrageous inventories." According to the Analyst, Benkel and his team were responsible for preparing general allocation forecasts as well as allocation forecasts for each division.

88. Pier 1's allocation staff communicated their concerns about the Company's unrealistic plans to management, but to no avail. For example, the first Allocations Analyst discussed above, who worked at the Company from 2011 to 2014 stated that allocation and planning personnel communicated their concerns with the unrealistic allocations through the standard channels for revising plans, and that such concerns were repeatedly raised directly to EVPs Benkel and David at quarterly business review meetings, but the plans did not change. She also stated that, in the beginning of fiscal year 2015 (which began on March 2, 2014), over a year after 1 Pier 1 had launched, the pod responsible for kitchen textiles communicated to management that they did not agree with the overly aggressive sales plan because not only did the department not have the sales to support the kind of growth that management had instructed it to plan for, the actual numbers suggested that sales would be down that year. However, the plans had come from senior executives such as Benkel, and there was no room to change them.

89. The second Allocations Analyst discussed above, who worked for the Company from 2011-2015, also stated that, beginning in the second half of calendar year 2013, "concerns were voiced often," and the existence of excess inventory was "common knowledge," but the plans never changed.

90. Moreover, planners would themselves compare Company goals made at the beginning of the year to actual sales and inventory figures on a monthly basis, and adjust their plans accordingly. In the process, they frequently found that the Company's performance was

below what Pier 1 had originally planned, and communicated these discrepancies to senior executives in advance of the quarterly business reviews. However, the Executive Defendants did not adjust the goals.

91. Because she worked closely with supply and distribution personnel to ensure that proper inventory allocations reached Pier 1's stores, the first Allocations Analyst discussed above knew that excess inventory became "a problem for everyone, everywhere, from distribution centers to the stores." Even so, executives continued to push for more inventory to be sent to distribution centers and stores, and for buyers to continue buying more product, even though stores attempted to push back on receiving the inventory, and demanded less of it. The situation became so severe that stores resorted to citing fire codes and Americans with Disabilities Act compliance violations to resist the shipment of more inventory to their stores. Finally, the Analyst stated that stores were authorized to start renting outdoor storage units to store the overflow of inventory, and that authorizations to do so shot up noticeably during fiscal year 2014.

92. A third former Allocations Analyst at Pier 1's headquarters, who was employed there from mid-2013 through mid-2014, stated that the Company needed to purchase a large amount of excess inventory in order to match the Company's sales goals. Departments thus increased store inventory simply because the plan demanded it, and the general consensus was that allocators were being asked to push inventory to stores without regard to actual sales.

93. Likewise, a former Buyer for Pier 1's furniture department, who was employed at the Company's headquarters from 2013 to 2015, recalled receiving a growth goal of 26% in April 2014 for the next fiscal year, and explained that throughout fiscal years 2014 and 2015, every group in the furniture department was given huge, high double-digit growth plans that could only be met through buying more inventory, which the Company's distribution centers were not prepared to handle. The growth targets were so extreme that the Buyer compared the situation at

Pier 1 to the scene in "I Love Lucy," where chocolates kept coming down a conveyor belt but there was nowhere to put them, and stated that every buyer in her department believed that the Company's growth plans were "totally unattainable."

94. By the end of the first quarter of fiscal year 2015 (which ended on May 31, 2014), Pier 1 buyers already knew that they could not possibly make the targets set for the rest of the year. The Buyer herself was more than approximately 20% short of targets, something she communicated to senior executives at quarterly business review meetings, who reported the same directly to the Company's executives, including Defendants Smith and Turner. Specifically, the Buyer stated that her divisional manager asked her to prepare her quarterly reports precisely so the manager could present the reports directly to Smith, Turner, and Benkel, among others, and recalled at least one occasion when the manager stated after one such meeting that she had been questioned intensely on "the numbers." Reiterating this point, the Buyer stated that "every" divisional manager made the same type of quarterly reports to the Executive Defendants, and that "everyone," including the CEO and senior VPs, "knew" that Pier 1 was not going to meet the plans. Finally, the Buyer stated that senior executives "oversold" the sales plans to investors and refused to deviate from them no matter what evidence they were presented with.

95. An Accounting System Analyst at Pier 1's headquarters from mid-2012 through early-2016, who was responsible for financial reporting and maintaining the functionality of the Company's accounting systems, also stated that Pier 1 had trouble planning the amount of inventory it would need—a fact later admitted by the Company and Defendant Smith in February 2015. For instance, the Company did not account for any transitional period that it may need to adjust to the omni-channel structure called for by the 1 Pier 1 initiative, but simply began issuing aggressive sales targets. Moreover, the Company's method for determining future sales involved taking the percentage increase from the prior year and adding additional growth on top of it, under

the assumption that sales could grow the same amount as previous years, and 5-7% more beyond that, year after year. Finally, the Accounting System Analyst noted that the Company made no provision for the possibility that online sales would cannibalize in-store sales, and questioned the Company's practice of setting forecasts for the entire year and basing inventory and sales planning on such yearly forecasts, even though numerous unpredictable factors made such year-long goals unreliable at best. Once made, only minimal, unnoticeable adjustments were possible, regardless of what new information was received.

96. Another former Buyer for Pier 1, who was employed between 2011 and May 2014 at Pier 1's headquarters, and whose responsibilities included executing product purchases in advance of the launch of 1 Pier 1, explained that the excess inventory Pier 1 built up by mid-2014 resulted from purchases in advance of 1 Pier 1. Specifically, Pier 1 dramatically increased the SKU count for the online store. Defendant Smith was involved in deciding what products to purchase, and as she mapped out her SKU buys, the Buyer met with Defendant Smith, who gave his instructions on how to arrange the products and present them on the website. When asked how Pier 1 tracked inventory performance, the former Buyer explained that Pier 1's systems tracked the percentage sell-through of product, and it was obvious when a product was not moving when, for example, only 2% of the inventory had sold against a projection of 10-20% by a certain time. According to the former Buyer, by early 2014, it was obvious from the sales data that extremely aggressive sales goals could not be met that year. The Buyer explained that Smith and Turner would certainly have known about sales performance and the Company's inventory levels, because they were on the same distribution lists for the daily sales performance data that she was on. Furthermore, in March or April of 2014, employees at her level had received a letter from Smith informing them that they would not receive bonuses that quarter.

97. The former Buyer further explained that the Company's markdown process was

predicated on presenting certain margin figures to Wall Street. To maintain those figures, the Company could not take markdowns that would negatively impact margins. Pier 1 did not have an inventory aging system; instead, each year the Company had a certain total markdown dollar figure that was decided by the Company's senior executives, and then assigned to the various departments. Markdowns were not allowed to exceed this figure. As a result, even when inventory was excessive, markdowns would not be taken if they would exceed the total markdown dollars. Buyers like herself would submit markdown requests, and be denied or told to delay them.

98. The fact that the Company's sales goals were unrealistic was also known by former Pier 1 employees who worked in departments that had nothing to do with inventory planning, accounting, or even sales. For example, a Marketing Campaign Specialist at the Company's headquarters from late-2013 to mid-2014 recalled that his superiors, director-level managers who reported directly to executives, discussed how unrealistic and unreasonable sales goals were in fiscal year 2014.

99. The Marketing Campaign Specialist added that even though bonuses were dependent on the Company meeting its sales goals and employees strove to meet them, no employees aside from executives received bonuses in fiscal year 2014, which demonstrated that sales goals were not being reached. A Manager of Multi-Channel Production Services who worked at the Company's headquarters from late-2010 to late-2014, stated that she and her colleagues "knew" the sales targets given out were unrealistic, and that she received a bonus every year between 2010 and 2012, and even for a part of 2013, but the fact that from then on no bonuses were given out was a clear indication that the Company was not hitting its sales targets. At least eight other former employees provided similar assessments of the bonus to sales relationship. These include the former Buyer; Accounting System Analyst; and two of the three Allocation Analysts mentioned above; as well as a former Supervisor at Pier 1's Mansfield, Texas distribution

center from late-2013 to mid-2014; a former Department Administrator from 2013 to 2016, who worked in the Department that handles Project Administration, Facilities, Store Planning, Real Estate, and Architecture; a former Trade & Product Compliance Specialist at the Company's headquarters from early-2008 to mid-2014; and a former Lead Quality Assurance Analyst at the Company's headquarters from early-2011 to late-2014 (speaking to calendar year 2014 only).

100. A former Quality Control Supervisor based at Pier 1's Ontario, California distribution center from 1994 to 2014, also stated that the Company bought inventory to match sales goals, but that it failed to reach these numbers because the sales that had been predicted simply did not exist, and the Company did nothing to revise the unrealistic outlook for years. Thus, the Quality Control Supervisor recalled "just busting at our seams" with inventory, a phrase also used by two others to describe the Company's excess inventory, including one of the three Allocation Analysts mentioned above and a former Operations Supervisor at the Company's Maryland distribution center from mid-2013 to mid-2014. Similarly, an Analyst and Programmer for the IT department who worked for the Company at its Texas headquarters for over a decade and a half—from 1999 to 2015, recalled that Pier 1 "over-bought merchandise" "across the board" and that the "expectation was that they could sell more than they were able."

101. Thus, the recognition that sales goals were unrealistic was so widespread that by the start of the Class Period, no less than five former employees working in planning and allocations—the very department responsible for matching inventory with forecasted sales—reported that sales goals had been overly aggressive, a fact that led directly to outrageous, excess inventories. Several of these former employees further confirmed the Executive Defendants' awareness that goals were out of sync with reality. Despite this knowledge, or, at a minimum, severely reckless disregard of the facts, Defendants Smith and Turner continued to falsely represent to the market that inventories were "clean" and that Pier 1 did not have significant

markdown risk.

### 2. The Inventory Excess Across Pier 1's Non-Scalable Stores and Distribution Network Exceeded Company Norms

#### a. Pier 1 Purchased Excess Inventory

102. As discussed above, Pier 1 maintained six distribution centers across the country, in Ohio, Texas, California, Georgia, Maryland and Washington. Two of these (Ohio and Texas) also functioned as fulfillment centers for Pier 1's e-commerce business. When excess inventory began to accumulate, it was at these distribution centers that problems manifested, and from there, a domino effect led to inventory overflows at the Company's stores, which could only resort to setting up outdoor storage units for merchandise that the stores could no longer hold indoors

103. Numerous former employees reported excessive inventories in the Company's distribution centers. The Department Administrator mentioned above, who was at the Company from 2013 to 2016, stated that she sometimes handled the bills for the extra storage units that distribution centers rented, that distribution centers and stores had rented a "ridiculous" number of these storage pods, and that it was not until mid-2015 that the Company began making attempts to reduce their use. The Department Administrator attributed many of these problems to the Company's hasty shift to e-commerce, an opinion also shared by the Lead Quality Assurance Analyst mentioned above, who thought that executives had vastly over-stated sales goals. The Texas distribution center Manager, who worked there from 2014 to 2015, also recounted being certain that the Company was incapable of forecasting inventory accurately, as he frequently found inventory that had been at the warehouse for years without being touched, because the merchandise had never been entered into the system.

104. The former IT department Analyst and Programmer, recalled that quantities of 2014 Christmas season merchandise could not reach stores in time because of inventory backlogs. Similarly, the first former Buyer cited above, described the domino effect of excess inventories,

and stated that she knew multiple buyers who had 2014 Christmas products that never reached the floors because they sat in distribution center backlogs, and that even with extra man power and prioritization, a large quantity of seasonal product never made it to the stores during her time at the Company. Frequently, she would look for a product to be put into retail locations, only to be told that it was at an off-site facility, inaccessible in the immediate sense even to distribution center employees. The second Allocations Analyst cited above stated that at times during her employment at Pier 1, she would be unable to allocate product that had arrived, but remained sitting in the inventory backlog, out of reach, for "months." The problem became severe enough that seasonal products were sometimes marked down before they even left the distribution center, because they had gone out of season.

105. A Warehouse Associate at the Ohio distribution center from mid-2013 through the end of 2013, confirmed the existence of excess inventory, and stated that starting in October 2013 and continuing past her departure, the center had to rent an additional warehouse several miles away from the Ohio distribution center to hold the overflow. The first Allocations Analyst mentioned above likewise recalled that in the first months of fiscal year 2015, in order to deal with inventory overflow, the Company instituted a program of adding secondary distribution centers as extensions of its larger regional facilities.

106. The same problems with excess inventory also existed at Pier 1's Texas, Maryland, and California distribution centers. For example, the second Allocations Analyst mentioned above, who was with the Company from 2011 to 2015, stated that the inventory situation at the Maryland distribution center was so severe at times that merchandise had to be marked down before it even reached the stores, in order to clear the backlog.

107. Likewise, the Quality Control Supervisor at the Company's California distribution center, who was responsible for monitoring the quality of products delivered to all of the

distribution centers in the network, recalled merchandise sitting at the Ontario distribution center for years without moving because of overbuying.

108. Pier 1's Georgia distribution center faced similar issues. A former Distribution Supervisor in Georgia from mid-2014 to mid-2015, stated that the Georgia facility was in crisis throughout her entire tenure at the Company, and suffered inventory backlogs that grew worse over the course of her time there.

109. These accounts are confirmed by satellite photos of Pier 1's distribution centers from prior to, during, or after the Class Period. As summarized in the table below, satellite photos (also attached hereto as **Exhibit B**) show that during this time, the number of containers parked outside the Company's main distribution centers increased dramatically from a pre-Class Period date to the middle of the Class Period, and between two dates during the Class Period itself:

| **Location** | **First Date Count (Pre-Class Period)** | **Second Date Count (During Class- Period)** | **Percentage Change from First to Second Count** | **Third Date Count (During or After Class Period)** | **Percentage Change from First to Third Count** |
|---|---|---|---|---|---|
| Washington | 48 (May 4, 2013) | 65 (July 10, 2014) | +35% | 103 (Apr. 19, 2015) | +125% |
| Texas | 52 (Apr. 10, 2013) | 77 (Oct 2, 2014) | +48% | 50 (July 14, 2015) | -4%* |
| Georgia | 120 (Nov. 1, 2012) | 216 (Nov. 20, 2014) | +80% | N/A | N/A |
| Ohio | N/A | 74 (June 13, 2014) | N/A | 200 (Aug. 22, 2015) | +170% |
| California | 48 (Mar. 15, 2013) | 92 (Mar. 24, 2015) | +91% | 95 (Feb. 9, 2016) | +97% |

Note: Counts exclude tractor-trailer-sized containers that are connected to the warehouse building itself, on the conservative assumption that containers connected to the warehouse were in the process of being emptied, which may not have been the case. The Maryland distribution center has not been included in this chart because Google Earth does not carry Class Period satellite photos of that center.

* While the number of trailers was 4% lower at the Texas distribution center on the day of the July 2015 satellite fly-over than on the April 2013 satellite fly-over, at least one former employee, the Texas distribution center Inventory Control Specialist cited above, stated that throughout fiscal year 2014 and into fiscal year 2015, when he left the Company, the Texas distribution center was renting at least one separate warehouse from third party contractors of 180,000 square feet, and that during fiscal year 2015, it began renting two more, one of 150,000 square feet, and one of 80,000 square feet, for a total of 400,000 square feet, and continued to rent them after his departure (except for the 80,000 square foot facility, which has been shut down).

110. For example, the "before" and "during" satellite photos of the Georgia distribution center, which was not responsible for e-commerce, but which saw an 80% increase in parked, unattached trailers, are shown below:

**Photo 1 Dated November 1, 2012:**




**Photo 2 Dated November 20, 2014:**



111. A former Director of Distribution and Transportation based out of Pier 1's headquarters during the Class Period stated that in 2014 and 2015, containers sitting outside the distribution centers because they were not able to be unloaded was a major problem, with the number of containers being "extremely high." Perhaps most astoundingly, he related that there were ***almost 1,000 containers*** sitting in the yard of the Baltimore distribution center at times between July 2014 through May 2015, as a result of the inventory backlog. To deal with the inventory backlog, Pier 1 was forced to take a variety of temporary measures, such as renting external warehouses.

112. An Administrative Assistant to a senior company executive, who worked at the Company's Texas headquarters from 2009 to 2014, also stated that not only were distribution centers renting out extra storage space, similar disarray and a search for solutions to the exploding inventory occurred at the store level. Because inventory had filled up stores' storage rooms, the Pier 1 stores began resorting to outdoor storage units. The Administrative Assistant explained that the stores ran out of storage room simply because merchandise was not selling.

113. The first Allocations Analyst discussed above, who worked at the Company's headquarters from 2011 to 2014, also explained that allocators had access to an in-house system used to track whether stores had appropriate quantities of merchandise, and this enabled them to see that certain stores had lower sales and accordingly did not need as much inventory. Even so, as fiscal year 2014 (which began in March 2013) got under way, management instructed allocators to raise in-store inventory amounts across the board, to levels that the stores could not absorb. Management justified these wholesale increases on the basis of the sales goals, but the Allocations Analyst found this perplexing, as the Company's planning and allocation systems were designed to automatically account for sales growth by ordering more replenishment inventory, and there was no need to radically raise the inventory levels prior to any actual growth in demand. Indeed,

as discussed above, during fiscal year 2014, allocators were manually pushing inventory allocations to the stores on top of what the Company's DCM allowed, almost as much as they were using the DCM itself.

114. According to a former Facilities Coordinator based at Pier 1's headquarters from 2000 to 2015 (who reviewed sales numbers in order to keep facilities services in line with what the stores were earning), rather than decrease the inventory for retail stores as Pier 1's e-commerce business grew and cannibalized sales from the retail stores, the Company continued to order increasing amounts of inventory for its retail stores as well. As a result, inventory piled up throughout the supply chain, and the Facilities Coordinator recalled instances after the launch of the e-commerce initiative, where the distribution centers were pushing an additional 30-50 feet of product each week to stores that had already been filled, in addition to pre-existing regular orders of approximately 20-30 feet of product.

115. According to the third Allocations Analyst mentioned above, who was at Pier 1 from mid-2013 through mid-2014 and responsible for replenishment and inventory management, the level of merchandise that was being bought during the entirety of her tenure was excessive in light of what the Company could actually sell. Indeed, the Analyst reported that during fiscal year 2014 (which began in March 2013), because lofty sales goals demanded corresponding increases in inventory, the Company was trying to hold a year's worth of supply at the distribution centers while the retail stores were "bursting at the seams." The Analyst's accounts also corroborated that Pier 1 used outdoor storage units to store inventory, stating that when she started at the Company less than a hundred stores had outdoor storage, and by the time she left in mid-2014, upper allocation management (who reported directly to Benkel) cited projections of approximately 300 stores using outdoor storage units by the next season, triple the number than when she started a year earlier, and growing.

### b. Pier 1's Infrastructure Was Non-Scalable

116. Not only did the Company purchase excess inventory compared to demand, Defendants failed to build the infrastructure in advance—as Defendants claimed to investors they had—to process and store the excess inventory. During the Class Period, this exacted additional, undisclosed costs on the Company. For example, the Department Administrator cited above stated that the Company moved towards e-commerce "too fast, too soon," was not ready to handle the amount of inventory that was bought, and did not have sufficient infrastructure and manpower at the distribution centers to support the venture. The first Allocations Analyst cited above noted that backlogs hindered allocators because although products had already arrived at the distribution center, they were often unavailable for allocation because they were sitting in packed trailers on the distribution center's lot. Likewise, the third Allocations Analyst cited above stated that Pier 1 did not have the capacity to handle the inventory growth over fiscal year 2014, and should have put the infrastructure in place to handle the excess inventory before purchasing it.

117. The former Distribution Supervisor in Georgia discussed above, stated that the Georgia facility had neither the virtual allocation space, nor the physical space, to store inventory that was flooding in, problems that became worse over the Class Period. These problems were also exacerbated by the fact that the Company employed numerous "antiquated" inventory systems that were not mutually compatible.

118. A former Domestic Inventory Coordinator who worked at Company headquarters from mid-2008 to late-2014, stated that she felt that some of Pier 1's systems and practices were too antiquated to keep up with the pace of a supply chain under strain, and that the supply chain department was always short staffed. A Supervisor from late-2013 to mid-2014 at Pier 1's Mansfield, Texas distribution center, stated that the Company's warehousing system was "systematically broken," such that at his location "there was so much product coming in and

nowhere to put it."

119. This Supervisor's distribution center also suffered from a host of infrastructural problems, which included everything from "inventory discrepancy" due to inadequate software, to lack of space and manpower, to safety problems arising from untrained forklift operators and inadequate racks that collapsed under excessive weight. The Supervisor attributed the host of safety problems and inefficiencies he witnessed during his time at Pier 1 to the unrealistic demands that the Company put on its logistical staff, and its tendency to value volume over employee safety.

120. A former Operations Supervisor at the Company's Maryland distribution center from mid-2013 to mid-2014 described similar problems, stating that the center had been equipped with inadequate storage racks that he had never seen elsewhere, un-sturdy enough that products would sometimes fall over when stacked.

121. Thus, although Defendant Smith represented on April 10, 2014 that Pier 1 had "the resources and infrastructure in place to scale the business," as these accounts demonstrate, Pier 1 was unprepared to handle inventory growth, its distribution network was not scalable, and its distribution centers were in disarray throughout the Class Period.

#### c. Pier 1's Inventory Problems Caused It to Incur Significant Costs

122. The cumulative effects of the Company's *ad hoc* measures to handle its increasing inventory in fact cost the Company significant amounts of money, which the Defendants failed to fully disclose to investors or attribute to the Company's inadequate infrastructure and excess inventory. Numerous former employees attested to these expenditures, of which senior executives were aware or were severely reckless in disregarding.

123. For example, a former Pier 1 Supply Chain Manager and Manager of Logistics Services based out of Pier 1's headquarters between January 2014 and March 2017, explained that to handle the inventory influx, non-discretionary expenditures related to capital improvements

(such as improved racking to increase storage capacity of existing warehouses) were ***approximately 6-7 times higher than the yearly average for the previous decade***. For example, in 2014 Pier 1 had to spend over $10 million on racking alone to handle incoming inventory. Moreover, non-discretionary third party fees (such as shuttling costs and third party warehouse rentals) during each of calendar years 2014 and 2015 were enormous, costs for renting third party warehouses alone topped $1 million per year, and shuttling costs between distribution centers and third party warehouses exceeded $1 million in at least two distribution center locations in 2014. In addition, Pier 1 was forced to rent large amounts of equipment which it did not have in order to process the inventory backlog, including, for example, over 120 forklifts at the rate of about $1,500 per month at various periods during 2014-2015.

124. The former Supply Chain Manager explained further that for capital expenditures over $250,000, he had to submit a Capital Acquisition Request (or "CAR") for Smith and Turner's signature. Because the process was cumbersome, the former Supply Chain Manager tried to group requested funds so as to minimize the frequency of the CARs, and recalled writing multiple million-dollar requests during his tenure. During 2014 and 2015, he saw at least two dozen CARs above $250,000 returned with Smith and Turner's signatures.

125. Also, according to the former Director of Distribution and Transportation referred to above, among the many incidental costs Pier 1 sustained as a result of the excess inventory were shuttling costs between the third party warehouses and main Distribution centers. Because Pier 1 shipped from one location in each distribution center, when Pier 1 rented third party warehouses, product had to be shuttled from these off-site locations to the central shipping location before shipping to stores. These costs were very high and were new costs that Pier 1 did not have before. These costs were reported regularly, and Turner held monthly meetings to review Profit & Loss ("P&L") rollups.

126. The former Director of Distribution and Transportation recalled one instance in approximately October 2014, when Smith approached him to inquire about his efforts at processing the thousand-container backlog at the Baltimore distribution center. The former Director of Distribution recalled explaining to Smith the efforts they were undertaking to reduce the backlog, and reporting to Smith during the interaction that it would take six months before inventory flow would be "back to normal." The actual time turned out to be much longer. Summarizing the situation in 2014 and 2015, the former Director explained that all of the Distribution centers with the exception of the DuPont location (which was the smallest), were constantly trying to "catch up" with the long inventory backlog, which held up seasonal products from being processed in time for the selling season. The former Director used the word "clean" inventory when describing the goal he was attempting to achieve. When asked what he meant by the word, the former Director replied that it meant inventory that was "current." The former Director further explained that ***inventory was not "clean" in late 2014 because thousands of containers were sitting outside of Distribution centers across the distribution network***, which were months away from being processed into usable inventory by the Distribution centers—which is by nature inventory at risk.

127. In addition, the third Allocations Analyst cited above, working in Pier 1's allocations department at Company headquarters from mid-2013 through mid-2014, stated that distribution center costs increased dramatically because of unsold inventory, and that since inventory levels were excessive while she was there, she was not surprised when the Company eventually announced that it was facing increased costs.

128. The first Allocations Analyst cited above, who worked at Pier 1 from 2011-2014 and allocated inventory to stores, also stated that sending excess inventory to stores inevitably increased labor costs at the distribution center and the stores.

129. The Distribution Center Supervisor at the Company's Georgia distribution center, cited above, also stated that not only was the Georgia distribution center incurring high per diem costs on containers that it failed to unload, which became a "very significant expense" toward the end of calendar year 2014, the facility also had to hire contractors to help unload excess containers, rent an extra storage yard, and pay additional port fees to carriers to hold loaded containers in the port nearest to the distribution center. The Supervisor stated that the facility's Profit and Loss statements, which the distribution center transmitted to corporate headquarters, showed these various extra costs. Lastly, the Supervisor stated that near the end of fiscal year 2014, Georgia, as well as multiple other distribution centers, received direction to stop unloading merchandise, even though each was heavily backlogged at the time.

130. The Accounting System Analyst cited above, who worked at Pier 1 from mid-2012 through early-2016, likewise noticed that the Company was having trouble controlling inventory costs at its distribution centers throughout fiscal years 2015 to 2016, and that those costs were well known in the finance department. The Analyst also stated that the size of the inventory influx was so great and the need to move through it so urgent, that the Company was devoting far less scrutiny to invoices for the contractors hired to help process the inventory backlog, and invoices were being "approved left and right." This led to a decline in cost control and the incursion of unnecessary expenses that could have been avoided.

131. A former employee of a Pier 1 subcontractor, who joined Pier 1 officially as an Inventory Control Specialist at the Texas distribution center, where he remained until late 2014, stated that the Company needed to hire a subcontractor to house excess inventory in a warehouse 15-20 minutes from Pier 1's Mansfield, Texas distribution center. Even so, during the 2014 holiday season the center had to rent out two more facilities to house excess inventory, and continued to sustain per diem costs for containers that sat out on the lots, which the center was too

understaffed and overcapacity to unload, even though employees were working from 4:00AM to midnight, every day, throughout much of fiscal year 2014. Overall, throughout fiscal year 2014 and into fiscal year 2015, when the former Inventory Control Specialist left the Company, the Texas distribution center was renting at least one separate warehouse from third party contractors of 180,000 square feet, and during fiscal year 2015, Pier 1 began renting two more, one of 150,000 square feet, and one of 80,000 square feet, for a total of 400,000 square feet, and continued to rent them after his departure (except for the 80,000 square foot facility, which has been shut down).

132. The Texas Distribution Center Manager, cited above, stated that upon coming to the distribution center, he found a warehouse so mismanaged that there was no tracking at all for discarded items, and standard inventory tracking so deficient that "mountains" of random, unsorted products sat against the warehouse's back wall, which would pile-up and be thrown away on a monthly basis. The Manager also stated that Pier 1 employees kept excess inventory in so-called imaginary "Special Projects" locations, and that because there was "too much inventory," even in Pier 1 stores, stores would send pictures to distribution center employees showing that the space for inventory was already "maxed out to the ceiling." During his time at Pier 1, the Manager witnessed so much product waste that he estimated that at least $1 million of retail-value product was being discarded without being tracked each year. The Manager stated further that safety issues were "out of control," and recalled at least two third party locations serving his distribution center's overflow alone, which required expensive transportation of merchandise between the various warehouse locations. According to the Manager, "astronomical" sums were wasted on unnecessary inventory expenditures due to inefficiency and lack of oversight, and problems he witnessed included products being thrown away outright for not having been inventoried and categorized, and containers that sat in the distribution center lot for months without being touched.

133. Indeed, the Manager recalled telling warehouse associates that inventory needed to

be restructured to make it more efficient. In response, associates showed him untouched merchandise that had never been opened, which had sat in the warehouse for over a year, with some having sat for more than two years. The manager also witnessed containers of merchandise that were in the warehouse lot when he started at Pier 1 (late 2014), which were still there when he left (mid-2015), and described old merchandise stacked high, covered with a layer of black dust so thick that he could not see through it.

134. The Texas Distribution Center Supervisor recounted the infrastructural problems at the Texas Distribution Center, and stated that he imagined it would have had to set aside a "huge budget" on costly third party storage facilities and contractors. The second Allocations Analyst discussed above, working at the Company's headquarters, also noted that Defendant Smith had demanded as early as late 2013 that the Company needed to end the use of third party storage facilities. The Analyst explained that Smith was aware that stores had no standardized method for tracking what was being stored in outdoor storage units, and some were only keeping rough track with a notebook, and outdoor storage units were extremely expensive.

135. Indeed, the costs of a distribution network overburdened by excess inventory were so well known throughout the Company, that even employees outside of the distribution network were aware of them. For example, the Department Administrator cited above, stated that the costs of external storage became excessive, and that it was the size of these costs that caused management to end the Company's reliance on them at the end of 2015 and the beginning of 2016. The Department Administrator stated that, even as of February 2016, 418 out of Pier 1's 1,032 stores, or over 40% of the Company's retail locations, were still using outdoor storage units, but recalled that the figure was far higher from 2013 to 2015.

136. In sum, former Pier 1 employees identified at least six sources of costs that resulted from Pier 1's excess inventory during the Class Period. These included costs due to (i) renting

lots in order to store trailers; (ii) using outdoor storage pods at retail locations; (iii) hiring third party contractors to supplement insufficient manpower at distribution centers; (iv) paying fees to port facilities to hold containers that distribution centers could not absorb; (v) paying per diem fines to railway yards to hold containers that distribution centers could not absorb; and (vi) shipping merchandise between external warehouse facilities and the distribution centers. There also existed failures in Pier 1's accounting and internal controls that led to high and unnecessary expenses, which were approved without scrutiny because accounting personnel had been overwhelmed.

137. Defendants Smith and Turner, however, failed to disclose that Pier 1 was subject to these extraordinary costs, or properly attribute them to the Company's excess inventory level.

**d. Despite Smith, Turner and Pier 1's Repeated Claims to the Contrary, Pier 1's Abnormally High Inventory Presented Significant and Substantial Markdown Risk**

138. Not only did Pier 1's excess inventory lead to increased costs to carry it, but the excess inventory posed a significant and substantial, undisclosed markdown risk throughout the Class Period. The Executive Defendants addressed the issue multiple times by falsely and misleadingly claiming that Pier 1 had no significant or substantial markdown risk both affirmatively and in response to analysts' questions. For example, on June 19, 2014, Defendant Smith stated in response to one analyst's questions about margin pressure, that "it is not so much the markdown pressure, I mean we continue to run a very clean inventory as I know you know."

139. By the end of calendar year 2014, reported inventories had risen to an all-time high of $535.5 million, or over $100 million more than six months earlier, when Defendant Smith had last reassured the markets that Pier 1 was running a "very clean" inventory. However, by February 2015, the Company was forced to make the unexpected announcement that they had failed to accurately forecast inventory costs and sales, as well as Defendant Turner's "resignation." On

March 2, 2015, barely a month after the Company's CFO had departed and Pier 1's stock price fell sharply in response, the Company released an investor presentation that pointedly claimed again that "current inventory composition ***does not present an immediate or significant markdown risk***." The Company's interim CFO thereafter stated on an April 8, 2015 conference call with analysts that Pier 1's inventory levels were "healthy" and did "not pose a significant immediate markdown risk."

140. Despite these reassurances, Defendant Smith admitted during both the September 24, 2015 and December 16, 2015 conference calls with analysts and investors that Pier 1 was in fact undertaking "heavier than expected promotional and clearance markdowns," and that "***on a really historical level, we've still got more clearance inventory than we used to have***." In other words, by the end of the Class Period, Defendant Smith was forced to admit that Pier 1 had excess inventory that required unprecedented clearance markdowns. Indeed, on the December 16, 2015 conference call with analysts, Defendant Smith specifically admitted that over the "last 18 months or [so]," inventories had "got out of whack," and that as a result it would take at least "18 months" before the Company could return to its "normal trajectory where sales and inventory are in sync."

141. Thus, despite the Company' assurances to investors throughout the Class Period that growing inventories did "not pose" any immediate, significant or substantial markdown risk, and that its purportedly "clean" inventory meant it was not subject to meaningful margin pressure from markdowns, a massive, undisclosed inventory backlog forced Pier 1 to heavily markdown its inventory shortly after the last of its assurances of a purportedly "healthy" inventory.

### 3. Pier 1's Undisclosed Markdown Risk Was Caused by Pier 1 Recklessly Over-buying Inventory, and Not Purported Intervening Events

142. As Defendants have now admitted, the undisclosed markdown risk and excess costs that Pier 1 incurred were the result of Pier 1 over-buying merchandise and previously-undisclosed inefficiencies in Pier 1's distribution center:

- On September 24, 2015, Smith admitted that: "The second item pressuring our merchandise margins is the operational issues within our distribution centers. And just to remind everyone, we are talking about the distribution centers that service our stores. . . . ***The area of greatest challenge has been merchandise margin***. This is largely the consequence of ***too much inventory***. As I outlined earlier, ***we are in the throes of working this down***."

- On Pier 1's September 24, 2015 call with investors, an analyst asked, in light of recent clearance activity, "why didn't we see more of a benefit from the clearance activity on the sales line?" Smith responded, "When you're selling ***a high amount of clearance merchandise***, it doesn't necessarily . . . generate a lot of extra sales. It generates a lot of extra units at a lower average ticket, so you don't necessarily get a bump on the sales. But what you do do, of course, is burn through a lot of cost of goods sold." Boyer added that, "that's what we're seeing, is we're seeing unit movement without the sales dollars being lifted because we're burning through them. From an execution standpoint, … these clearance events were largely within the store for our current traffic. So, in fact, ***we were really just <u>moving that customer from a regular price sale to a clearance price sale</u>. So we largely didn't get incremental sales***, … but largely we burned through units." In other words, as a result of the markdowns, Pier 1 customers were buying what they normally would, but just at a lower price.

- On the September 24, 2015 call, Smith also stated that: "If we look at the achieved margin on our marked down merchandise and if we look at the achieved margin on our full-price merchandise, and our achieved margin on our promotional merchandise, those numbers really are rock solid compared with previous years. ***What has changed is the mix***, so ***<u>we're selling less full price at the full margin</u>*** and a little less promotional ***<u>and a lot more clearance</u>***, and that's really what dragged the number down. So if you're asking, so in terms of your question, I think ***a lot of this is <u>self-inflicted</u> in one way or another***."

- On September 24, 2015, Boyer admitted that Pier 1 "***bought too much inventory, we need to clear through it***."

- Smith also admitted that, "[W]e've told you that we are at our best, we're at about 50/50. So 50% of our sales are regular, full-priced sales, and the other 50% is mixed between clearance and promo[tional], but with a heavy emphasis on the promotional pricing rather than the clearance pricing. Because that's obviously a higher margin. And ***you will not be surprised to know that, that is <u>not the mix</u> that we achieved in the second quarter of this year***."

- Boyer also admitted on September 24, 2015 that Pier 1 was slowing down its purchases of its purportedly durable merchandise: "I think we will continue to see moderation in our receipt flow, particularly on the regular rebuy product replenishment product." In other words, Pier 1 had over-bought product that it would typically consider durable or "regular rebuy product." As Boyer added: "***[W]e'll continue to work that down*** until we get that right balance."

143. As Linda Carter, a retail management consultant, has explained:

> ***Over-buying is the #1 cause of excessive markdowns***. Stores don't go out of business due to high markdowns. They go out of business because they can't move the merchandise quickly enough to bring in the required cash to meet their obligations…. When it comes to sales and merchandise choices, a professional buyer's only concern should be ***how quickly the inventory will convert to cash***….

That is precisely what happened here: Pier 1 over-bought inventory, Smith admitted it during the Company's internal March 2014 town hall meeting, and Pier 1 failed to admit that fact to investors until the very end of the Class Period.

144. In addition, one significant cost of marking down and reducing the inventory at Pier 1 was a reduction in merchandise margin:

- As Boyer stated after the Class Period, on April 13, 2016, "The biggest pressure point in fiscal 2016 was at the ***merchandise margin level***. As we've talked about on prior calls, promotional clearance pressures, necessary in order to clear inventory and remain competitive, and distribution inefficiencies contributed to the decline in merchandise margin. We're pleased with the inventory reductions we were able to achieve which were ahead of our targets, but ***these reductions did come at some cost***."

- Boyer added on April 13, 2016 that, "For the full fiscal 2016, merchandise margin was 55.3% of sales, a decline of 310 basis points compared to 58.4% last year. ***Almost two-thirds of the decline is attributable to promotional and/or clearance markdown pricing***, ***with the majority of the balance due to costs associated with inefficiencies in our distribution centers***. … [T]he inventory costing and recognition effects of our fiscal 2016 operational issues will ***abate beginning with the second quarter of fiscal 2017***." That day, Boyer reported that inventory was "$406 million, ***representing a decline of approximately 15% versus a year ago***."

145. As Defendants now admit, the Company experienced shrinking margins and increased costs in part because of the undisclosed problems at the distribution centers caused by the fact that Pier 1 was not prepared for the sharp increase in inventory and did not have a scalable business in place. The Company in fact had to resort to costly measures, including temporary, expensive fixes to handle the inventory. The fact that the additional storage space was temporary demonstrates that the inventory backlog during the Class Period was significantly out of the ordinary for Pier 1 and that Pier 1 itself lacked a scalable infrastructure:

- As Boyer admitted on September 24, 2015: "Our elevated inventory levels have caused capacity constraints and incremental handling costs within our Distribution centers. We increased our capacity by ***re-racking the Distribution centers*** and moving into additional storage space, most of which is ***temporary*** and a lesser amount permanent. In addition, the situation required additional handling efforts to hold, manage and process the higher inventory levels. These activities resulted in added cost and impacted our productivity levels."

- On September 24, 2015, Boyer added that, "On the supply chain piece, … [a]bout half of those costs are due to ***temporary*** storage, detention, demurrage, and those are all inventory related."

- On December 16, 2015, during a conference call with analysts, Defendant Smith stated that: "[W]e encountered ***supply chain difficulties***, stemming from an aggressive sales forecast that resulted in excess inventory and added costs. . . . Michael Benkel and his global supply chain team are making progress in stabilizing the performance of our Distribution centers [distribution centers], which as you know, have been disrupted by our ***extremely high inventory levels***. There's still much work to do to get productivity levels back to satisfactory, and we have engaged third parties to help us with the process. . . . We are dissatisfied with our financial performance, and we recognize that this has been a trying period for our fellow shareholders." Smith added that Pier 1's improved merchandise margin was attributable to the Company then "getting rid of the drag that we had on our margin with all the ***supply chain inefficiencies***."

- Smith also explained after the Class Period, on April 13, 2016, that "Our total sales and Company comp sales in fiscal 2016 registered low single-digit increases on a constant currency basis. Both sales and earnings were pressured by internal and external factors, namely ***our inventory issues*** and the intensely, promotional competitive environment which we've discussed on previous calls."

146. The problems Pier 1 disclosed at the end of the Class Period were not the result of purported intervening events.

147. The massive markdown risk that Pier 1 first disclosed in 2015 was not the result of sales falling below expectations in the fourth quarter of 2015. Prior to the first corrective disclosure in this case on February 10, 2015, partially revealing the truth about Defendants' fraud, Defendants made repeated positive representations to investors about the success of fiscal fourth quarter 2015 (November 30, 2014 to February 28, 2015, which included the critical cyber Monday and Christmas/New Year holiday shopping season):

- On December 18, 2014, Smith told investors that Pier 1 "finished ***particularly strong*** with our five day event surrounding Thanksgiving" and Turner stated that "[w]e finished November on a high note ***buoyed by the strength of Thanksgiving weekend***."

- On December 18, 2014, Smith further told investors that Pier 1's inventory had grown, but "[b]ecause the inventory growth is not in seasonal goods, ***we do not see any significant markdown risk***."

- Also on December 18, 2014, Smith stated that "Our merchants have done a terrific job putting together a compelling and cohesive product assortment for holiday, which is ***clearly resonating with our customers***, ***judging by our sell-through***."

- On January 8, 2015, Defendant Smith stated in a Form 8-K filed that day that, "We are pleased with our December sales performance," that "Traffic to the brand was up nicely and ***sell-through on our holiday assortments was on plan***," and that "[W]e believe the business is well-positioned as we head into the early spring selling season."

148. Laura Coffey, interim Pier 1 CFO, also stated on April 8, 2015 that, "total sales in the fourth quarter [of 2015] were up 5.4% to $544 million, and the Company's comparable store sales increased 5.7%." The Company's sales performance in the fourth quarter of 2015 therefore did not cause the massive markdown risk disclosed in 2015.

149. According to Defendant Smith himself, Pier 1's undisclosed excess inventory and markdown risk also did not principally result from poor sales. He told investors as late as March 2, 2015 (after Pier 1 had fired Turner as its CFO and after the Company acknowledged the existence of excessive distribution center costs) that the problems the Company was facing were ***not*** tied to a lack of sales. In Smith's own words: "***We have not had a sales problem***. ***We've had robust sales even through these transformational years***."

150. During the March 2, 2015 investor conference, Smith ruled out that the problems the Company was facing were tied to Pier 1's e-Commerce efforts. In Smith's own words: "I do want to make one point, which I think there [has] been some confusion about, all of this has nothing to do with our fulfillment centers that are fulfilling our e-Commerce business. They have

performed extraordinarily well all the way through." Smith further stated on this point that Pier 1's inventory levels were too high but that, "the inventory levels are not to do with the large quantity of these e-Comm SKUs, as we buy relatively small quantities of those." As Smith also explained, the blame lay with the distribution centers: "This has to do with the ways of merchandising in our six distribution centers, which supply our stores." Smith tried to assure investors that "I can say that it's transitory. It is a speed bump. . . . Our business is extraordinarily healthy. We are in a really strong position and our customers love what we do."

151. The fact that, as Defendants disclosed in February 2015, the Company's costs were exceeding forecasts is also a byproduct of the over-buying of inventory and does not itself explain the massive markdown risk that Pier 1 later first reported in 2015. Even after Pier 1's February 2015 disclosure that costs were exceeding forecasts, Defendants continued to make false statements about a purported lack of markdown risk. This includes Smith's April 8, 2015 false claim that, "[a]lthough fiscal 2015 ending inventories are higher than originally planned, their complexion is healthy and not believed to pose a substantial markdown risk," and interim-CFO Laura Coffey's claim the same day that, "Importantly, the complexion of our current inventories level is healthy, and does not pose a significant immediate markdown risk."

152. Pier 1 also did not come to a "gradual" realization in fiscal year 2016 that online traffic was cannibalizing store traffic. Instead, Defendants were aware of this trend for several quarters. As Turner stated during Pier 1's June 19, 2014 earnings call: "It is clear to us at this stage the comparable-store sales are quickly becoming less and less meaningful in terms of the total picture." Smith also stated on September 17, 2014 that "No doubt, we said there [is] ***no question that the store traffic has been soft***." Likewise, during Pier 1's September 17, 2014 earnings call, Defendant Smith stated, "In both the first- and second-quarters, Pier 1 Imports brand traffic remained healthy, but comp store traffic was down slightly. ***We believe that the decline is***

***reflective of*** a general malaise, as well as ***a shift in purchasing behavior from stores to the internet***." As Smith also stated during Pier 1's fiscal second quarter 2016 conference call on September 24, 2015, "the store traffic is down on a year-on-year basis, ***which is what we've seen for the last five, six quarters***, I think, yes, so ***it's a fairly consistent pattern***." These statements confirm that Defendants knew of cannibalization of as early as mid-2014 (just after the start of the Class Period).

153. Pier 1 also typically engages in markdowns of outdoor furniture every year and the fact that it engaged in markdowns of outdoor furniture in the summer of 2015 does not explain the massive markdown risk that Pier 1 disclosed in September 2015. Nor does it explain the fact that the Company continued to take markdowns of its products through the end of the Class Period, long after the end of the outdoor furniture season. Also, according to the Company, Pier 1's sales of outdoor furniture were generally successful and its clearance of outdoor furniture in June 2015 went according to plan and it is therefore most plausible that Pier 1's outdoor furniture was sold off by the end of June 2015:

- As Smith explained on March 2, 2015: "Outdoor furniture has been extraordinarily successful for us. We have a good in-store assortment that we have been able to really leverage the customers' demand there."

- As Coffey explained on June 17, 2015, "our inventory in outdoor furniture was higher than planned at the end of Q1, and ***we are moving through that by way of our June clearance event.***"

154. According to Smith, Pier 1's undisclosed excess inventory and markdown risk were also not the result of bad weather. On June 17, 2015, Defendant Smith stated that, "We sort of – we talk about the weather, but ***that always seems a little lame***."

155. It is also not plausible that Pier 1's 18 month backlog of inventory disclosed at or near the end of the Class Period consisted entirely of only seasonal products because, as Smith has stated in the past, Pier 1 clears out seasonal inventory shortly after each season ends, and has the

ability to do so extremely rapidly. For example, on December 19, 2013, Smith stated that, if there is any excess Christmas product, "we will put that product on clearance ***the day after Christmas and it will go very, very quickly***. ***So we don't see any jeopardy there***."

## VI. PARTIAL DISCLOSURES AND THE GRADUAL EMERGENCE OF THE FULL IMPACT OF THE FRAUD

156. As discussed above, beginning on February 10, 2015, and through the end of the Class Period in December 2015, the true facts concerning the actual financial condition of Pier 1, specifically the Company's "extremely high inventory levels" and concomitant markdown risk, and lack of a scalable infrastructure, were revealed to investors and the public.

### A. February 10, 2015: Pier 1 Announces Lowered Earnings Guidance, Higher Supply Chain Expenses and the Resignation of Its CFO; Stock Price Falls 25%

157. The Defendants' fraud began to be revealed on February 10, 2015, when the Company sharply reduced its financial guidance for the fiscal year ending February 28, 2015, and disclosed for the first time in a Form 8-K and press release that, at Pier 1, there had been during the Class Period a "failure to adequately forecast the revenue and expenses in our business."

158. Indeed, on February 10, 2015, Pier 1 stunned investors when it announced that it was lowering its earnings guidance for fiscal 2015, which the Company had just reiterated on December 18.

159. The Company also specifically disclosed that its higher expenses had resulted from "unplanned supply chain expenses," which primarily included "incremental distribution center costs that affect our gross profit" – the very undisclosed problems at Pier 1's distribution centers alleged herein. The Company called its now-admitted inability to forecast sales and revenue a "financial issue" that it had now "aggressively addressed."

160. On February 10, 2015, the Company also announced that Pier 1's then-CFO, Defendant Turner, a 22-year veteran of the Company, suddenly "resigned," effective immediately,

at the age of 58. Also included in Pier 1's announcement was a significant, previously-undisclosed increase to its selling, general and administrative ("SG&A") expenses.

161. Wall Street analysts expressed shock at these announcements:

a. On February 10, 2015, Barclays reported that Pier 1 had announced a "material shortfall in 4Q earnings."

b. On February 11, 2015, Morgan Stanley reported: "While missing forecasts is not uncommon for any company, it is difficult to reconcile the size of PIR's [Pier One's] Q4 shortfall against comps that appear to be respectable relative to Street estimates… It points to such a significant 'over' forecast of sales and/or an 'under' forecast of expenses that it raises questions as to how well PIR grasps the contours of its financial model." Morgan Stanley also found that the cost of managing Pier 1's inventory had been "grossly under forecast" and explicitly questioned management's explanation that Pier 1's sales shortfall was isolated to the January-February 2015 timeframe, calling that "surprising."

c. On February 11, 2015, BB&T found it "somewhat inexplicable [that] Pier 1's supply chain expenses—which management should have a great degree of control over—are higher than expected."

d. On February 11, 2015, analysts from Credit Suisse stated that the problems the Company disclosed on February 10 "represent a major setback to our thesis," and that "the company has moved almost too quickly, and has not been equipped to deal with the transformation" in its business. Credit Suisse also expressed concern that the Company built "infrastructure that may not be scalable over time" and stated that "expenses were much higher than expected," with SG&A expenses $8 million higher than Credit Suisse had understood.

e. On February 11, 2015, Oppenheimer reported: "We are shocked and very disappointed by Tuesday night's announcement from Pier 1 Imports (PIR) that Q4 results will fall short of plan. It is now clear that our call that the 'worst was over' for PIR was premature… It might be some time before the company's expense infrastructure is adequate to support rapid online growth." Oppenheimer also stated that its analysts had spoken with Pier 1's management in the wake of its February 10 disclosures and that the conversation "suggests clearly that the company has significantly underestimated the costs associated with operating and expensing an online business."

f. On February 11, 2015, Wedbush reported that Pier 1's inventories were "bloated" and that "markdown risk is high." Wedbush also found that the Company's new SG&A guidance "implies that an element of the cost structure may be higher than planned" and that the "apparent lack of flexibility and contingency planning in the business model needs to be

addressed as well."

g. On February 11, 2015, Wells Fargo reported that, "the company announced a margin shortfall, which was attributed to unplanned supply chain expenses and a 'failure to adequately forecast the P&L,' although we would point out this was more than just a miss versus expectations."

h. On February 14, 2015, the *Dallas Morning News* quoted Wolfe Research analysts as describing Pier 1's announcements as a "shockingly poor outcome for the fourth quarter."

162. In response to the Company's shocking revelations on February 10, 2015, which partially revealed Defendants' fraud, the price of Pier 1's shares plummeted from $16.97 per share on February 10, 2015 to $12.84 per share on February 11, 2015, or approximately 25%, on heavy trading volume.

**B. Pier 1 Continues to Falsely Reassures Investors**

163. On April 8, 2015, Pier 1 held its first conference call with analysts and investors to discuss the Company's earnings and operations after the February 2015 disclosures. During the conference call, the Company and Defendant Smith assured investors that the high inventory levels would abate and would not result in discounting or margin pressures. For instance, directly contrary to Wedbush's February 11, 2015 assessment that markdown risk was "high," the Company's interim-CFO stated that "the complexion of our current inventories level is healthy, and does not pose a significant immediate markdown risk." Defendant Smith further assured investors that "[w]e have done a very good job historically of keeping growth of inventory in line with sales growth" and "we are going to get back to doing a good job of it." Interim CFO, Laura Coffey, also claimed that "for seven out of the past eight years we have managed inventory growth more or less in line with sales, and expect to return to that cadence again going forward."

164. On April 8, 2015, Smith also claimed that the inventory issues would not have a lasting impact on the Company. In his words: "The issue that impacted our fourth-quarter results are transitory and have no bearing on the underlying strength of the Pier 1 Imports brand, nor our

potential to drive organic growth and pursue new growth opportunities." Analysts received this news positively, with Barclays stating that, "management expressed confidence….that Pier 1 is not exposed to meaningful markdown risk." On this news, Pier 1's stock price increased by over 9% in one day.

### C. September 24, 2015: Pier 1 Discloses Markdowns and "Challenges" from Operating with Excess Inventory; Stock Price Falls 12.2%

165. On September 24, 2015, despite Defendants' false reassurances to investors that Pier 1's inventory did not present a markdown risk and that any issues were only "transitory," Pier 1 stunned the market and again reported "disappointing" financial results and significantly reduced its earnings guidance for fiscal 2016, which Pier 1 attributed to margin pressures from increased promotional and clearance activity, as well as inventory related issues within its distribution center network. Specifically, Pier 1 lowered its earnings guidance for fiscal 2016 to $0.56 to $0.64 per share, ***down 26% from previously-issued guidance***. The reduction included earnings per share of only $0.04, compared to Street estimates of $0.07. Defendant Smith also stated that the Company's margins had been negatively impacted by "increased promotional and clearance activity" – i.e., markdowns – as well as "inventory related issues without our distribution center network." Smith also partially admitted that, contrary to prior representations that Pier 1's increased inventory levels were in accordance with the Company's "plan," "operating with elevated inventories has been a challenge."

166. The Company also disclosed in a Form 8-K and press release filed with the SEC on September 24, 2015 that the Company faced a decline in merchandise margin that was "attributable to inventory related inefficiencies within the Company's distribution center network, as well as promotional markdowns and clearance activity to reduce inventory levels."

167. On a conference call with investors on September 24, 2015, Defendant Smith further admitted the lasting negative impact that the Company's excess inventory levels were

having on the Company, and partially revealed that the problems were not "transitory." In his words:

> There are three principal factors that impacted our performance this quarter: slightly softer than expected Company comp sales, heavier than expected promotional and clearance markdowns, and excess costs in our distribution network. . . .
>
> Suffice it to say, we will continue to feel the effects of our elevated inventory levels the remainder of this year. This is particularly frustrating, and we are disappointed about the impact it's having on our margins and profitability. . . . ***[G]iven the slow turning nature of our inventory***, it's taking several quarters to work through this. . . . We expect our distribution centers to begin operating with increased efficiency – levels of efficiency beginning in the fourth quarter, with the financial benefits beginning to manifest in FY17. I'll remind you of what I remind myself every day when I look in the mirror. Nothing good happens when you have too much inventory. . . . ***[T]he area of greatest challenge has been merchandise margin. This is largely the consequence of too much inventory. As I outlined earlier, we are in the throes of working this down***.

168. Wall Street analysts expressed further shock and disappointment at these disclosures, which contradicted the Company's prior assurances that the excess inventory was "transitory" and did not present a markdown risk:

a. On September 25, 2015, BB&T analysts wrote that they were "disappointed by the earnings miss, which was largely driven by Pier 1's ongoing excess inventory issues." BB&T further reported that it was "particularly surprised by the extent of markdowns required to work through excess inventory given management's earlier assertions this would not be a significant issue."

b. On September 25, 2015, Morgan Stanley wrote a report entitled "Cleaner Inventories But at a Greater Cost," that "the clearing out of excess inventory came at a significant cost," as the Company missed earnings per share targets by 40%.

c. On September 25, 2015, SunTrust Robinson Humphrey wrote that Pier 1 "continues to work through both elevated inventory levels and distribution center inefficiencies, which we believe will weigh on margins through at least year-end. (That said, in light of these challenges, we question why management didn't take a more conservative route when issuing guidance for the quarter.)"

d. On September 25, 2015, Wedbush wrote that Pier 1 "faced tremendous markdown pressure to clear excess inventories."

e. On September 29, 2015, Oppenheimer analyst Brian Nagel discussed a call with Pier One's new CFO, Jeff Boyer. Nagel wrote that "working inventories down to a more manageable level" remained a "key focus" for Pier 1, but that inventory at Pier 1 was "unlikely to prove 'clean' until early in … Feb. 2017."

169. On the September 24, 2015 news of Pier 1's continuing, excess inventory levels and the need to engage in significant markdown and clearance efforts to clear the undisclosed inventory backlog, shares of Pier 1 fell from $8.67 per share on September 24, 2015 to $7.61 share on September 25, 2015, or 12.2%, on high trading volume.

### D. December 16, 2015: Pier 1 Discloses Continued Inventory Problems and that Inventory Will Not Track Sales Again Until the End of Fiscal Year 2017; Stock Price Falls 20%

170. Finally, on December 16, 2015, when announcing its further disappointing fiscal third quarter 2016 financial results, Defendant Smith further admitted that Pier 1 had operated with "excess inventory" as a direct result of the Company's unrealistic sales goals, which resulted in problems at the Company's distribution centers and undisclosed, added costs. Smith further disclosed that the amount of excess inventory was so great that, despite Pier 1 having marked down much of its excess merchandise, the Company was still not operating with an "acceptable" level of inventory and still needed to perform additional work to improve the state of the Company's distribution centers. In Smith's words:

> We're in the process of completing our omni-channel transformation. And we encountered supply chain difficulties, stemming from an aggressive sales forecast that resulted in ***excess inventory*** and ***added costs***. We're making inroads towards bringing inventory levels down to an acceptable level this year, and driving supply chain efficiency over the long term. . . . Michael Benkel and his global supply chain team are making progress in stabilizing the performance of our Distribution centers [distribution centers], which as you know, have been disrupted by our ***extremely high inventory levels***. There's still much work to do to get productivity levels back to satisfactory, and we have engaged third parties to help us with the process. . . . We are dissatisfied with our financial performance, and we recognize that this has been a trying period for our fellow shareholders.

> …
>
> [o]n a really historical level, we've still got more clearance inventory than we used to have. … So when we think about next year, and as Jeff said, ***we're at very, very early stages in that process***. But we do expect markdown discounts to come down a little bit next year, which ***will hopefully give us some flexibility on promotional discounts***.

171. Also, in response to an analyst's question about whether there were still "more opportunities to take inventory down," Smith admitted that, rather than having over-forecast sales for a single quarter (the fourth quarter of 2015), the Company had failed to keep inventory that tracked sales for ***the last 18 months***, and that reducing Pier 1's inventory level to a point that it accurately tracked sales would take at least ***another 18 months***:

> [F]or many years, we managed to keep inventory and sales growing at approximately the same rate. And then over [the] last 18 months or [so] we got out of whack. So our plan is to keep – we'll get the inventory down this year, and then we'll bring it down a bit further in FY17. So that over the next 18 months we're back to our normal trajectory where sales and inventory are in sync.[2]

172. On the December 16, 2015 conference call with analysts and investors, Pier 1's new CFO, Jeff Boyer, also disclosed that the Company experienced a year-over-year contraction in merchandise margin (from 59.5% in the third quarter of fiscal year 2015 to 55.7% in third quarter of fiscal year 2016), and that approximately 200 basis points of that contraction was "related to the recognition of incremental supply chain costs as the affected inventory is sold," which are "due to increased handling, expenses and detention penalties for the elevated inventory levels"—indicating that the costs of storing the excess inventory would continue to weigh on the

---

[2] Smith reiterated this point during the Company's April 13, 2016 conference call with analysts, when he stated that, "if you look at our track record on inventory, we did a really good job for a lot of years at keeping inventory growth in line with sales growth. And our plan is, ***by the end of this current fiscal year [fiscal year 2017]*** to get back to the position that we should always have been in ***if those two had moved in sync***. So once we get back to where we should be, which will be ***the end of this year***, as far as the Pier 1 brand is concerned, we'll try and make sure that sales and inventory are pretty much in lockstep."

Company's financials even as the "extremely high" amount of excess inventory was being sold.

173. Boyer further disclosed on December 16, 2015 that Pier 1's distribution centers had not been operating at "acceptable level of efficiencies," and that, as of that time (and after making what Boyer described as "solid progress" to address "supply chain issues"), only "four of our six Distribution centers [distribution centers] have returned to acceptable levels of efficiencies" – meaning that two of Pier 1's distribution centers were ***still*** not operating at acceptable levels of efficiencies. Boyer also disclosed that "the inventory costing effect of these issues will continue to impact margins in the fourth quarter and into the first quarter of FY17."

174. Indeed, as the Company further admitted in its Form 10-K for fiscal year 2016, filed with the SEC on April 26, 2016, the Company's margins fell from 58.4% of sales for fiscal year 2015 to 55.3% of sales for fiscal year 2016, and "[t]he year-over-year decline in merchandise margin as a percentage of sales was primarily attributable to promotional and clearance activity and inventory-related inefficiencies within the Company's distribution center network."

175. Analysts responded negatively to Pier 1's December 16, 2015 disclosures, viewing them as further damaging management's credibility:

a. On December 16, 2015, BB&T reported that, "Pier 1 Imports' stunning fall from grace continued in Q3'15 in our opinion, with the company's top line and gross margin well worse than we expected."

b. During the Company's December 16, 2015 conference call, a Credit Suisse analyst stated that, "as you look at supply chain, I think the impact this quarter was a little bit bigger than expected and above prior quarters."

c. On December 16, 2015, Jefferies reported that "any light at end of [the] tunnel just got dimmer."

d. On December 17, 2015, Deutsche Bank reported that: "sales and comps turned negative in the quarter which is a major red flag in our view. . . We believe the 3Q results and guidance confirm the situation is worse than feared, and we are downgrading the shares from Hold to Sell as we believe PIR [Pier One] is still in the earlier stages of a vicious cycle."

e. Also on December 17, 2015, Wells Fargo reported that the inventory issues are "now expected to spill over into Q1 17" and "[g]ross margins continue

> to plummet down +400 bps for the second consecutive quarter) and are now expected to decline +300 bps in Q4 due to a continuation of increased promotional activity and the fallout from elevated inventory levels and higher supply-chain expenses."

176. On the news of the Company's December 16, 2015 disclosures, the price of shares of Pier 1 dropped 20%, falling from $5.95 per share to $4.75 per share on high trading volume.

## VII. ADDITIONAL ALLEGATIONS OF SCIENTER

177. Numerous facts, considered individually and collectively, demonstrate that Pier 1 and Defendants Smith and Turner knew, or were severely reckless in not knowing, that: (i) the Executive Defendants' claims that Pier 1's inventory was "clean" and not subject to immediate, significant or substantial markdown risk were materially false and misleading because the Company had an "extremely high" amount of excess inventory that it was unable to timely clear without aggressive markdowns; and (ii) Pier 1 lacked the infrastructure, warehousing, and staff to properly store and process the inventory it had accumulated, which caused the Company to incur undisclosed costs.

178. First, multiple facts show that the Executive Defendants were personally aware of the Pier 1's excess inventory and aware of numerous red flags that Pier 1 was exposed to significant markdown risk. For example:

a. Pier 1's former Director of Distribution and Transportation during the Class Period recalled Defendant Smith approaching him on one occasion in approximately October 2014 to ask about ongoing efforts to process the 1,000 container backlog outside of the Baltimore distribution center. The Director of Distribution and Transportation told Smith in reply that it would take "at least" six months before the inventory flow returned to normal, and recalled the actual time it took to have been much longer. This was a red flag of abnormally high costs and markdown risk. *See also* Cohen Report.

b. Pier 1's former Supply Chain Manager during the Class Period recalled at least two dozen Capital Acquisition Requests, requesting more than $250,000 to deal with expenses arising from handling excess inventory, delivered and returned with Smith and Turner's signatures on them during 2014 and 2015. The Supply Chain Manager himself wrote multiple million-dollar request of this type, which were sent

to and signed by Smith and Turner. This was a further red flag of abnormally high costs and markdown risk. *See Id.*

c. As explained by Plaintiff's expert, Professor Mark Cohen, retail CEOs and CFOs spend substantial amounts of their time monitoring their company's inventory as a routine part of their job. During the Class Period, numerous additional red flags indicated that the Company had immediate, significant, and substantial markdown risk arising from its excess inventory. These red flags included:

(i) Abnormally high rates of inventory increase versus rates of sales increase;

(ii) Abnormally high distribution center costs related to the handling of inventory backlogs;

(iii) The fact that while Pier 1 dramatically increased its storage capacity during the Class Period, "most" of that increase in storage space was "temporary";

(iv) The abnormally high number of backlogged shipping containers sitting outside of Pier 1's distribution centers, unable to be unloaded due to the backlog across the entire distribution center network;

(v) Systematic reliance on third party labor and rented equipment;

(vi) The Company's failure to pay bonuses to employees as well as the Executive Defendants themselves during fiscal years 2015 and 2016;

(vii) Overrides of the demand chain management system;

(viii) Defendant Smith's March 2014 town hall meeting admission (discussed below);

(ix) The Company's February 2015 admission that Pier 1 failed to adequately forecast revenue and expenses and the related departure of its CFO; and

(x) Analyst commentary. As Professor Cohen explained, each of these were red flags of significant markdown risk that no retail CEO or CFO could have ignored. Defendants therefore either were alerted by these red flags of the significant markdown risk represented by Pier 1's excess inventory, or recklessly ignored them in making their statements to investors.

d. Pier 1 executives also set ahead of time the amount of "markdown dollars" Pier 1 could take and denied requests by employees to mark down additional products during the Class Period.

179. Second, the Executive Defendants' direct access to, receipt, and actual awareness of information related inventory throughout the Class Period is confirmed by the reports of

numerous former Pier 1 employees. For example:

a. A former Business Analyst at Pier 1's Texas headquarters from 2012 to 2013, stated that he was responsible for crafting detailed daily, weekly, and monthly reports on key Company metrics, including sales numbers, inventory figures, and purchases that would increase inventory. These reports, the Business Analyst stated, went directly to Defendants Smith and Turner.

b. Corroborating the Business Analyst's account, the former Buyer for Pier 1 between 2011 and May 2014 stated that Smith and Turner were on the same distribution lists for daily sales and performance data as she was. By early 2014, these reports showed that extremely aggressive sales goals could not be met that year.

c. The second former Allocations Analyst cited above, who was employed at the Company's headquarters, stated that the unrealistic plans her team received throughout 2014 and 2015 came from "the top," with the senior VPs of each division being given plans by higher executives—which could only have been Defendants Smith and Turner since they were the next level up—and told to implement them. The Analyst also stated that planning and allocations staff "constantly compare[d] inventory to sales," and reports on sales to inventory balance were created daily, made accessible to anyone in the Company, and sent directly to Defendants Smith and Turner on a daily basis, in e-mails on which she was copied.

d. The Analyst further explained that inventory issues were discussed "all the time," that reports on the status of inventory and buying plans were handed out at every meeting she ever attended, and that these reports "absolutely" went to Defendants Smith and Turner, who received the reports every morning by e-mail. Concluding firmly that Defendant Turner knew of the scale of the excess inventory, the Analyst stated that during at least one review meeting in mid-2014, Defendant Smith ***personally acknowledged that inventory problems were pervasive***, something that was already common knowledge by then. The Analyst also explained that executives, including Benkel, attended weekly "markdown meetings" every Monday, where the Company's exposure to markdowns would be discussed in detail, down to the type of products that were going out of season and therefore had to be discounted to sell.

e. The Quality Control Supervisor based out of the California distribution center, who was formerly employed with the Company for nearly 20 years, directly attributed changes in inventory management and purchasing to CEO Smith, and stated that under Smith's leadership the Company maintained a practice of buying large amounts of inventory on the basis of high sales goals during the Class Period, and continued to do so without attempting to flush excess inventory, even when sales did not materialize.

f. The former Analyst and Programmer for Pier 1's IT department, who worked for the Company for over a decade and a half at its Texas headquarters, also stated that Defendant Turner was responsible for sales goals.

g. The former Accounting Systems Analyst employed at the Company's Texas headquarters from 2012 to 2016, recounted at least one instance in which Defendant Smith personally admitted to employees at an internal Pier 1 town hall meeting, that Smith was responsible for pushing overly high sales goals on Pier 1 employees, and that he had underestimated what it would take to achieve those goals. Multiple other former Pier 1 employees, including the first Buyer discussed above, the second Allocations Analyst discussed above, and the Department Administrator, all independently discussed the occurrence of the same town hall meeting, held during calendar year 2014, attended by numerous employees, and held at the Bass Performance Hall in downtown Fort Worth, as well as the fact that Defendant Smith admitted that the Company had been overly ambitious with its goals and merchandise purchases. The Department Administrator, in particular, recalled finding the event "insulting" given the contrast between the luxury of the venue, the money spent on flying regional managers in to attend the meeting, and the negative state of affairs at the Company that the Company's executives discussed at the internal Pier 1 meeting. The former Accounting System Analyst described Defendant Smith's approximately one-hour speech as a series of admissions of planning, infrastructural, and execution failures, followed by Smith's personal admission that these failures were Smith's own "fault."

Indeed, images posted to social media from the March 2014 Pier 1 town hall event show Smith speaking at the Bass Performance Hall and rehearsing with a presentation that stated that "We became victims of our own ambition." When the former Accounting System Analyst was read that phrase from the slide in the first image below, he described it as a "perfect representation" of the types of admissions he heard Smith make that day, and concluded that it summed up the series of failures that Smith recounted, and that if he had a copy of the presentation, he would "have no doubt that [the slide] was in there."




Source: Bass Performance Hall's "Vine" Page, photo dated March 17, 2014.

The following images, which show the decorations for the presentation and Smith speaking in front of them, match the first image above, and corroborate that the above image is from Pier 1's March 2014 town hall meeting.



Source: Net Streaming Live Webcasting's Facebook Page, photos dated March 20, 2014.



Source: Net Streaming Live Webcasting's Facebook Page, photos dated March 20, 2014.

On April 10, 2014, less than a month after these images were taken, Defendant Smith represented to analysts during a conference call that "I know that we will be successful because we are ambitious, we are talented and we have built an optimistic and success focused culture which will guide our way." In a press release

disseminated the same day, Smith also stated that the Company was "in the best shape strategically we have ever been, and we are excited to see new and existing customers respond so positively to '1 Pier 1'." These diametrically opposed messages from Smith to internal employees (i.e., that Pier 1 was a "victim" of its "ambition") versus public investors (i.e., that Pier 1 would be successful because of its ambition), are consistent with Defendants' "doubling-down" on a gamble with already excessive inventory even after becoming aware of existing inventory risks. Defendants were driven to do so by their incentive compensation (discussed further below). This further supports a strong inference of scienter.

h. The former Pier 1 Trade & Product Compliance Specialist, cited above, who left the Company in mid-2014, stated that although she could not recall exactly when it occurred, she attended the same town hall meeting described by other employees. The Compliance Specialist stated that the meeting left her with the impression that Pier 1 had "tackled too much of e-commerce at once," and were not ready for it when they began the initiative. However, the Company had continued to bring in more inventory even though the e-commerce program itself was not working as it should. As a result, logistical backlogs developed, as excess inventory built up in warehouses.

i. The Pier 1 Administrative Assistant discussed above, who formerly worked at the Company's Texas headquarters from 2009 to 2014 as an Administrative Assistant to a senior Company executive, and who had frequent access to meetings between Pier 1's top executives by virtue of her role, stated that Defendant Turner always attended quarterly "How Is It Selling" meetings, where detailed discussions were held on how products were selling each season and why, in order to prepare for the same season in the following year. At these meetings, Defendant Turner was always very attentive and hands-on. In addition, both Smith and Turner also attended numerous weekly "markdown meetings" on marketing, planning, and allocation, where discussions were held with regard to that week's inventory and what to mark down. Finally, one or other of Defendant Smith or Turner always attended quarterly "Open-to-Buy" meetings, during which executives discussed the inventory and sales figures.

j. The first Allocations Analyst, cited above, recalled Defendants Smith and Turner's frequent attendance at formal business reviews that occurred every quarter, during which allocation teams composed of allocators, planners, and inventory buyers presented their business metrics for the prior quarter and explained their strategy for the coming quarter. At such meetings, the CEO and former CFO were made aware multiple times of the imbalance between inventory and sales goals. When asked, the Analyst explained that even if they did not obtain such knowledge from the meetings themselves, Defendants Smith and Turner should have been informed of the problem by other senior executives who worked closely with planners and allocators. Moreover, the Company's planners produced weekly "Open-to-Buy" reports, which gave a quarterly breakdown of what the Company's sales, margin and unit sales were. Accessible to everyone in Merchandising, Allocation, and Buying and sent to executives including Defendant Smith, the report contained all of the quarterly goals broken down by month and quarter, as well as the then most

up-to-date annual goal. From this report, employees could see what the plan was, the actual results every quarter and if Pier 1 was meeting the plan.

180. These statements further confirm that not only did the Executive Defendants have access to internal reporting that showed the Company's inventory levels to be excessive, but also that they paid close attention to the Company's inventory and sales at internal meetings, and even internally acknowledged Pier 1's inventory crisis as early as early-2014.

181. These allegations of the Executive Defendants' access to information showing the true, undisclosed state of the Company, as well as Defendant Smith's admission to Company employees in that regard nearly a year before the first of the Class Period disclosures occurred (all while assuring the market that the Company was in its "best shape"), raise a strong inference of scienter.

182. Third, former Pier 1 employees repeatedly identified the same set of executives, all of whom reported directly either to the Smith or Turner, or to named executives who worked alongside them, as having been personally involved with inventory allocation and planning, and fully informed by the Company's buyers and allocators of the misalignment between inventory and sales. For instance:

a. The first Allocations Analyst discussed above identified numerous senior Pier 1 managers and executives, who were aware of the massive and growing inventory imbalance throughout the Class Period. Among others, these individuals included the EVP of allocation, Michael Benkel, who presided over inventory management, and the EVP of Merchandising, Catherine David, as well as a number of Vice Presidents and Senior Managers that worked under them; and

b. The Administrative Assistant stated that Sharon Leite, who was in charge of stores, should have been aware of excessive inventory at store locations, and that David and Benkel had major roles in making sales goals.

183. Former Pier 1 employees described each of the individuals named above as having personal knowledge of the Company's excess inventory, and each of them held senior positions and responsibilities in Pier 1's corporate hierarchy. Importantly, every single one of the

Company's Forms 10-K from 2010 onwards listed David, Benkel, and Leite as among the key "Executive Officers of the Company," alongside Defendants Smith and Turner.

184. Moreover, Defendant Smith himself repeatedly touted the importance of Benkel and Leite to the Company. For instance, during a presentation to analysts on May 7, 2013, the Company announced improvements to its inventory system that would purportedly better enable it to keep pace with demand. Defendant Smith introduced Benkel to elaborate on the details of these systems, stating, "Michael Benkel, Executive Vice President of Planning and Allocation, is responsible of [sic] the team that has done so much to improve sales and margin, the science behind the art." On the Company's September 24, 2015 analyst call, Smith also praised Benkel's purportedly "outstanding job creating a strong and effective merchandise, planning, and allocations function" while serving as the Head of Planning and Allocations, and described Leite, EVP of Sales, as "a wonderful field leader." These statements demonstrate Smith's own close working relationship with the other senior executives who were identified by former employees as having been personally involved in inventory allocation and sales planning, and who were closely connected to the staff operating in the field and fully informed of the excess inventory at the Company's distribution centers and retail stores (which, throughout the Class Period, was far from being the "clean" inventory that Smith and Turner repeatedly communicated to the market). The fact that the Executive Defendants' colleagues and direct subordinates were aware of the Company's excess inventory and failed sales plans raises the strong inference that their immediate superiors (the Executive Defendants themselves) were as well, or were severely reckless in disregarding such facts.

185. <u>Fourth</u>, the definitiveness with which the Executive Defendants repeatedly spoke of a "clean" inventory with no immediate, significant, or substantial markdown risk contrasts sharply with the sheer scale of the undisclosed problems that were plaguing the Company

throughout the Class Period. The inventory backlog at Pier 1 was so massive and material that the CEO and former CFO of the Company could not but have known about it. As Defendant Smith admitted during the final Class Period conference call with analysts on December 16, 2015, it would take the Company "18 months" to return to its "normal trajectory where sales and inventory are in sync." Yet, Smith had assured investors in June 2015, a mere six months earlier, that Pier 1's inventory situation was stabilizing, and that the Company's allocators had done a "great job" adjusting Pier 1's inventory and sales goals. The fact that within six months after this June 2015 statement, inventories, rather than stabilizing as promised, were at the point that it would take at least ***18 months*** to bring them back in line with sales, strongly indicates that at the time the June 2015 statement was made, it was materially false and misleading, and inventories already constituted a many-month-long backlog.

186. Moreover, numerous former employees who worked at Company sites across the United States, including its Fort Worth headquarters, corroborated the existence of excess inventory and numerous infrastructural and logistical problems that arose from the excess inventory during the Class Period. These accounts reflect the real conditions within a distribution network for which Defendant Turner was personally responsible, and a planning and allocation department that Defendant Smith had himself brought into existence. Thus, at precisely the times the Executive Defendants were making definitive assurances to the contrary, Pier 1's excess inventory and distribution center inefficiencies. This contrast between the Executives Defendants' representations and the later, admitted scale of the Company's inventory problems raise the strong inference that both Smith and Turner knew of, or were severely reckless in disregarding, the existence of the excess inventory, and inventory's failure to track sales and demand.

187. Fifth, Pier 1 and the Executive Defendants made their materially false and misleading statements and omissions within close temporal proximity to later disclosures of

inconsistent information. For example, on December 18, 2014, Defendant Smith stated during an earnings call that "[w]e do not see any significant markdown risk." Less than two months that statement, Defendant Turner, the CFO who was responsible for financial planning, departed the Company, and Smith admitted that Pier 1 had failed to forecast sales and expenses, and that financial metrics, rather than improve, had worsened.

188. Moreover, as late as December 2014, Defendant Turner still maintained that increasing inventory was necessary "to support higher sales," and Smith stated that he did "not see any significant markdown risk," an optimistic outlook that was re-affirmed by the Company in a press release and a Form 8-K filed with the SEC on January 8, 2015. However, only a month later, Defendant Turner departed Pier 1, and the Company and Defendant Smith made their first partial disclosure of the fraud.

189. Similarly, on March 2, 2015, less than a month after its first partial disclosure of the fraud, the Company released an investor presentation that stated again that "current inventory composition does not present an immediate or significant markdown risk," followed by an April 8, 2015 statement by Defendant Turner's interim replacement—made during a conference call with analysts—that the "complexion" of the Company's inventory was "healthy and does not pose a significant immediate markdown risk." Moreover, even as late as June 2015, the Company and Smith were continuing to assure the market that Pier 1's inventory was on track to stabilize and that its sales and inventory forecasting had been brought back in sync, but a mere three months later, Pier 1 revealed high clearance activity, followed by an inventory backlog that would take 18 months to sell down. The short amount of time between these mutually-contradictory disclosures, made in the midst of a series of corrective disclosures, raises a strong inference of scienter.

190. Sixth, the fact that Defendant Turner's sudden "resignation" was announced simultaneously with the Company's February 10, 2015 disclosures of the Company's failure to

accurately forecast sales and expenses raises a strong inference that Turner knew or was severely reckless in disregarding the Company's excess inventory and related costs. First, Turner was personally responsible for generating the Company's sales goals, a fact confirmed by his "resignation" following disclosures that these very sales goals not adequately calculated. Second, news coverage of Turner's "resignation" was nearly unanimous in concluding that it was a thinly-disguised forcible termination of Turner for having "botched" sales goals. Defendant Smith was also quoted as stating at the time that "[t]he failure to adequately forecast the revenue and expenses in our business is a financial issue which has been aggressively addressed," which was a clear reference to Turner's termination. The fact that no succession plan had been in place at the time that Turner left, and that the Company had to appoint an "interim CFO" to take over Turner's role, further raises a strong inference that Turner did not simply resign but was suddenly forced out of the Company for knowing or severely reckless misconduct. Furthermore, following Defendant Turner's resignation, Pier 1's interim-CFO immediately began specifically disclosing the temporary expenses incidental to handling excess inventory. Given that Pier 1 had been incurring the exact same expenses for at least a year prior to Turner's "resignation," this conspicuous change in disclosure practices supports the strong inference that Defendant Turner had withheld material information from investors.

191. Furthermore, on September 9, 2016, exactly one month after the August 8, 2016 filing of the prior Consolidated Class Action Complaint, Defendant Alex Smith announced that he would retire at the end of 2016. Smith then left Pier 1 effective December 31, 2016, even before the next CEO candidate had been found. Pier 1 was then left with only an interim CEO for four months while Pier 1's Board of Directors searched for a permanent replacement for Defendant Smith.

192. Seventh, as both Defendants Smith and Turner have admitted, the Company's

inventory level was one of Pier 1's most important financial metrics, a subject of intense market scrutiny and concern, and a topic on which Smith and Turner made numerous public statements during the Class Period. Given the importance of this metric to the Company's value and the value of its stock, analysts were intensely focused on it both before and during the Class Period. The Executive Defendants, who were the Company's highest-ranking leaders, made a litany of statements about these subjects in response to analyst questions, and were well aware that analysts were relying on the veracity of their statements.

193. For example, even after admitting that it needed to mark down its merchandise and that its CFO "resigned," Pier 1 continued to maintain, including in an April 8, 2015 press release that the Company's inventories were "healthy and not believed to pose a substantial markdown risk." In reality, as of December 2015, even after addressing the excess inventory with promotions and markdowns, Defendant Smith stated that the Company was still carrying excess inventory and that it would be another 18 months before inventory and sales are "in sync."

194. The Executive Defendants personally addressed inventory issues either affirmatively or in response to analysts' questions in every single conference call they had with analysts prior to and throughout the Class Period. For instance, on a December 19, 2013 call with analysts, Defendant Turner stated that inventories were "in line with our expectations," something that was "due in part to the added control over inventories we have achieved from investments from our planning and allocation systems." When questioned during a conference call in June 2014 about pressure on the Company's margins, Defendant Smith falsely reassured analysts that pressures on margins during the first half of the year were not the result of overstocking, stating, "we continue to run a very clean inventory as I know you know."

195. In light of the fact that the Executive Defendants made numerous reassuring statements to the market on a topic of immense importance to Pier 1's value, it was incumbent on

them to ensure they understood the true facts concerning the subject on which they spoke. Either the Executive Defendants possessed the knowledge of the Company's inventory, purported lack of markdown risk, and margins that they claimed to have, in which case they knew that their statements touting Pier 1's purportedly "clean" inventories and lack of significant markdown risk were false and misleading, or they lacked the knowledge they claimed to have, in which case their conduct was severely reckless.

196. Eighth, Defendants were on notice of the importance of the accuracy of reported inventory and disclosures of markdown risk because Pier 1's public disclosures on inventory drew the attention of the SEC, which sent a letter to the Defendants on February 19, 2013, requesting clarification on a range of issues from the Company's fiscal year 2012 Form 10-K, including the Company's inventory levels. Specifically, the SEC letter stated that, "[i]f any of the increase in inventory levels is related to potentially unsustainable decreases in merchandise markdowns, then discuss this in your results of operations." In a response to the SEC filed on March 4, 2013 and signed by Defendant Turner, the Defendants stated, "The Company does not believe this increase in inventory levels is related to potentially unsustainable decreases in merchandise markdowns." Defendants were thus well aware of specific regulatory scrutiny of the Company's disclosures regarding inventory and markdown risk, and of the importance of ensuring that the Company's public disclosures in that regard were truthful and accurate.

197. Ninth, Defendants were highly motivated by their compensation programs to withhold material information concerning markdown risk and to delay necessary markdowns. Throughout the Class Period, in addition to Defendant Smith's annual base salary of $1.25 million, and Defendant Turner's annual base salary of $475,000, both had the "opportunity" to receive "at-risk" compensation amounting to an extraordinarily large proportion of their total potential compensation through: (i) annual cash bonuses; and (ii) longer term incentive compensation in the

form of restricted stock awards that vested according to certain metrics. Thus, each year, Defendants were rewarded cash bonuses on the basis of three benchmark company-wide EBITDA[3] figures, ranging from a low "threshold" figure, a median "target" figure, and a high-end "maximum" figure. For Smith, "threshold" performance in fiscal years 2014 and 2015 would have rewarded him with a bonus worth 11.5% of his salary. "Target" performance in these fiscal years would have earned him a bonus of 115% of his salary ($1,437,500), and "maximum" performance would have earned him a bonus of 288% of his salary ($3,600,000). Performance at these respective benchmarks would have brought Turner bonuses of 8% ($38,000), 80% ($380,000), and 200% ($950,000) of his salary. The ability to respectively triple and double their salaries by aiming for a highly specific metric that was directly influenced by markdowns were extraordinary motivators, causing Defendants Smith and Turner to resist necessary markdowns throughout much of the Class Period.

198. Notably, for fiscal year 2016, the fiscal year ***after*** inventory had ballooned to liquidation levels and ***after*** Defendant Turner had "resigned," Defendant Smith negotiated a ***higher threshold performance bonus*** of 34.5% of his salary as compared to 11.5% previously, exchanging it for a ***lower maximum-performance bonus***, which declined to 230% from 288% of his salary. The threshold EBITDA performance goal also declined from a targeted $238 million in 2015 to $174.5 million in 2016, a drop of $63.5 million, and even ***lower*** than the Company's achieved fiscal 2015 EBITDA. Pier 1's proxy statements disclosed that annual compensation recommendations are made to the Board "prior to" the start of the fiscal year and during the first month of the fiscal year. Thus, these revisions to Defendant Smith's compensation, which foresaw lower financial performance for Pier 1, would have been negotiated before or in the first month after March 1, 2015, right around the time when the Company and Smith were still representing

[3] Earnings Before Interest, Taxes, Depreciation And Amortization.

to investors that "current inventory composition ***does not present an immediate or significant markdown risk***," and that "[inventory] ***complexion is healthy and not believed to pose a substantial markdown risk***."

199. In addition to their performance-based cash bonuses, the Executive Defendants were also entitled to long-term stock-based incentives, awarded yearly, that vested one third each year according to the how far the Company went towards meeting the median "target" EBITDA goal for that year.[4] Notably, Pier 1's annual proxy statements also explained that:

> Over each three-year performance (vesting) period, if the Profit Goal is not satisfied in any fiscal year, those performance-based shares that do not vest ***may still vest if the <u>sum of the three years' Realized Profits</u> equals or exceeds the sum of the three individual years' Profit Goals at the 100% level.***

200. Thus, in fiscal year 2014, Pier 1 reported that, for both Executive Defendants:

> The Realized Profit for fiscal 2014 was $230,600,000 and, as a result, only 60.4% of the shares for fiscal 2014 vested … upon the date of filing of Pier 1 Imports' Annual Report on Form 10-K. The ***balance of the shares that did not vest in fiscal 2014 may vest in fiscal 2015 or 2016 under this arrangement***.

201. The incentive structure meant for Defendant Smith that, in fiscal year 2015, in addition to the 142,500 shares (worth $2,014,950) that could have vested under his incentive stock awards from fiscal years 2013 to 2015, he could also recover a portion of the 40% of shares that failed to vest in 2014 if he exceeded the "target" EBITDA by a certain amount. To the extent that he failed to meet the 2015 EBITA goal and all or a portion of his incentive stock did not vest in that year, he again had two more bites at the apple in fiscal years 2016 and 2017. A similar pattern held true for Defendant Turner as well. Thus, failures to meet annual EBITDA targets, rather than

[4] The "target" EBITDA was the same as that underlying the Executive Defendants' cash bonuses. If the company only satisfied a portion of the EBITDA target, the shares vested as follows: 100% of the Profit Goal — 100% of the shares; 96% of the Profit Goal — 90% of the shares; 92% of the Profit Goal — 80% of the shares; 88% of the Profit Goal — 70% of the shares; 84% of the Profit Goal — 60% of the shares; and 80% of the Profit Goal — 50% of the shares. If the company's EBITDA was below the threshold goal, no shares would vest.

decrease the Executive Defendants' potential compensation for the coming year, actually ***increased*** it, greatly incentivizing them to "double down" on bets that did not go well one year. As the below graph, taken from Pier 1's fiscal year 2016 proxy statement, shows, an overwhelming ***81% of Defendant Smith's compensation***, and ***63% of Defendant Turner's compensation***—extraordinarily large proportions—was "at risk" in the above-described manner:




202. Furthermore, because the annual EBITDA target excluded "unusual or non-recurring charges," temporary, non-recurring expenses related to managing highly excessive inventory would likely not be factored into Defendants' bonus and incentive stock vesting calculations. Thus, during fiscal year 2015—the core of the Class Period, and which lasted from March 2, 2014 to February 28, 2015, both Executive Defendants had an enormous incentive to resist larger than normal markdowns (which would have severely reduced EBITDA), as well as to rely on temporary storage measures to manage the inventory problem rather than commit to long-term solutions such as painful liquidation sales. These incentives also motivated Defendants to recklessly "double down" on their massive inventory gamble even after enormous excess inventory had developed, in the reckless hope that outsize sales would materialize to absorb the inventory without the need for painful, across-the-board markdowns. If they succeeded in 2015 where they had failed in 2014, they would have been entitled to compensation that did not vest in 2014. Indeed, even after Turner had resigned, Smith continued to attempt to delay the inevitable

by describing Pier 1's inventory complexion as "healthy" and devoid of "immediate significant markdown risk," avoiding full disclosure of the sheer scale of Pier 1's inventory disaster at that time.

203. Finally, the Executive Defendants were motivated to deceive the investing public as to the reality of the Company's inventory because a further portion of their incentive compensation was tied directly to the Company's stock price. Specifically, mere months before the start of the Class Period, Pier 1's Board of Directors introduced Total Shareholder Returns, or "TSR," as the measure that would decide the vesting of approximately 40% of the Executives' long-term performance-based stock options awarded from fiscal year 2014 onwards. These TSR-based restricted shares, awarded at the beginning of fiscal year 2014, were scheduled to vest at the end of fiscal year 2016—a little more than two months after the Class Period. According to Pier 1's Class Period proxy statements, at the end of fiscal year 2016, the restricted, TSR-based shares awarded in fiscal year 2014 would vest or not depending on whether Pier 1's TSR achieved certain percentile ranks (with 41% as the threshold) against the TSR of a group of competitor companies. Thus, TSR-related performance was not measured by any single determinable figure known to Defendants, but depended on the relative performance of Pier 1's TSR against its competitors, whose TSR performance, as well as Pier 1's own, were constantly changing.

204. Thus, Defendants did not know at any given time during the Class Period what their percentile rank would be at the end of the measurement period given the present state of Pier 1's share performance, since the ranking would only be calculated at the end of fiscal year 2016 and Pier 1's and its competitors' TSR could change between the present and that future point in time. Defendants were therefore always motivated to inflate Pier 1's TSR on a continuing basis, including by making materially false and misleading statements to investors in 2014 and 2015.

205. Indeed, as shown in the graph below, Defendants' multiple false and misleading

reassurances that there was no "significant" or "immediate markdown risk" succeeded in inflating the Company's stock price even after the first corrective disclosure had occurred and Defendant Turner had been terminated.




206. Tenth, throughout the Class Period, Defendants engaged in a series of share repurchases and dividend increases to conceal the true state of affairs at the Company. These include a $200 million share repurchase for use through the first half of 2014, and another $200 million program announced on April 10, 2014 (the first day of the Class Period), for repurchases through the end of 2015. The Company also announced a 17% dividend increase in April 2015 as it was struggling—and failing—to come to grips with excessive inventories that it could not sell without markdowns. Commentary from analysts showed that these stock repurchases were effective in increasing public investor confidence in the Company's performance while the Company was experiencing a stark mismatch between inventory and sales. For example, on April

9, 2015, Wells Fargo stated that management "signaled some confidence in expectations by raising its dividend." Similarly, on April 15, 2014, Barclays reported that the "accelerated buyback underscores management's conviction in an operating performance rebound," and on April 9, 2015 that, "we are encouraged by . . . the [17%] quarterly dividend increase." Indeed, these stock buybacks and dividend raises are further evidence of the motivating power of the Executive Defendants' TSR-based incentive compensation, since Pier 1's TSR calculation took into account dividend payments, and, as discussed, Defendants' share buybacks can and did artificially inflate Pier 1's share price.

207. Eleventh, Defendants Smith and Turner were two of the longest-serving senior executives at the Company, with Defendant Smith serving as Pier 1's CEO for nearly a decade, and Defendant Turner having been at the Company for over 22 years prior to his termination, 15 of which as its CFO. In those roles, both Defendants had a long history of being intimately involved in both overseeing the Company's inventory level and supply chain expenses, including by addressing these issues on investor conference calls for years prior to and during of the Class Period.

208. Indeed, Defendant Smith declared his plan to closely manage the Company's inventory from the moment he assumed the role of CEO, and was personally responsible for the creation of Pier 1's current planning and allocation department—the department responsible for managing purchases and purportedly ensuring that inventory was in line with sales. In his very first conference call with analysts as CEO on April 12, 2007, Smith outlined the goals of his tenure. Specifically, he called his merchandising strategy the "center of all things," and listed as one of his six major "priorities" the creation of a new allocation and planning department led by a member of the executive team, specifically tasked with achieving "balanced inventory" levels. On the same call, Smith also informed investors that the "supply chain distribution or logistics area of the

business will now report to Cary Turner," who would from that point on oversee the Company's distribution network, as well as coordinate a major review of "every part" of Pier 1's supply chain.

209. In the years that followed, both Smith and Turner repeatedly emphasized the Company's and the executive team's purported focus on inventory as a key component of the Company's business and a crucial factor in its post-recession turn-around. For example, in late-2008, in response to the NYSE's notice to the Company that its stock may face delisting because it had begun to trade below the $1.00 threshold, Turner stated on a December 18, 2008 conference call with analysts that "the number one thing, we as a Management team, is focused on is our inventory levels." The Company's Form 8-K, filed with the SEC on the same day, again reiterated Pier 1's "focus[] on managing inventory levels," and the Company's 10-Q, filed the next month, continued to emphasize the management team's attentiveness to inventory.

210. During the Company's next conference call with analysts, on April 7, 2009, Turner attributed the Company's improving financial metrics to a "continued focus" on inventory, and Smith stated that "accurate buying, lower supply chain costs, and clean inventory" had led directly to lightening pressure on the Company's margins. As the Company's stock rebounded post-recession, Smith stated in a June 16, 2011 conference call with analysts that Pier 1 faced no significant markdown risk because "we have done a really good job at managing inventory." Importantly, every single one of the Company's Forms 10-K and 10-Q for the years 2009 to 2012 repeated the Company's claimed "focus" on managing inventory levels, and every single Form 10-K from 2012 onwards—overlapping with the Class Period and signed by Defendants Smith and Turner (until Turner's February 2015 departure)—stated explicitly that the Company was always "focus[ed] on strategically managing inventory levels and closely monitoring merchandise purchases to keep inventory in line with consumer demand."

211. Twelfth, not only did Defendants Smith and Turner personally preside over the

implementation of the above-described overhaul of Pier 1's inventory planning and allocation functions as well as its entire distribution network, Smith repeatedly admitted prior to and throughout the Class Period, that senior Pier 1 executives were personally knowledgeable of and frequently discussed the Company's inventory levels. For example:

a. On a September 19, 2013 call with analysts, Smith stated in response to a question about inventory that senior executives "***spent a lot of time debating***" the management of clearance inventory levels.

b. On December 19, 2013, Smith participated in an earnings call where an analyst asked him about the Company's control over its inventory. In response, Smith stated that, "I think the point about our inventory, David, is ***obviously we think about it a lot***. We've been investing over the last few years a lot in systems, of course, in terms of our allocation replenishment systems, but also in investing in people and our planning and allocation functions. I think we are really getting the results of all of that investment now, which allows us to ***grow sales and not go crazy with inventory***."

c. On April 8, 2015, two months after the disclosures that led to Defendant Turner's "resignation," Smith declared his intention to return the Company's inventory to a level commensurate with sales on a conference call, stating that "***[w]e have done*** a very good job historically of keeping growth of inventory in line with sales growth. This one year ***we did*** a bad job of that, and ***we are*** going to get back to doing a good job of it."

d. On September 24, 2015, Smith again emphasized his attentiveness to inventory, stating on a conference call that, "I'll remind you of what ***I remind myself every day when I look in the mirror. Nothing good ever happens when you have too much inventory***, but good things will happen as we return to the sales and inventory relationship that we have sustained for many years."

212. Having thus emphasized their personal focus on inventory, the Executive Defendants cannot now claim that they were not aware of the extent to which excess inventory had piled up across the Company's distribution network and stores, giving rise to significant markdown risk, particularly after admitting the existence of the problem and committing to resolve it during the Class Period.

213. <u>Thirteenth</u>, the Executive Defendants themselves represented on numerous occasions either on calls with analysts or in the Company's SEC filings, that at all times prior to

and throughout the Class Period, Smith and Turner had ready access to detailed internal Company data on inventory levels, sales, and how the two metrics were or were not correlated with one another. As discussed further below, not only did one former Business Analyst responsible for creating reports on inventory and sales state that Smith and Turner received those reports directly, a fact confirmed by a former Allocations Analyst who was herself copied on the e-mails in which the Executive Defendants received daily inventory and sales reports, Company executives made statements that raise the strong inference that the Executive Defendants were aware of, or were severely reckless in disregarding the Company's excess inventory and failure to track sales at all relevant times.

214. For example, during a May 7, 2013 presentation to analysts, Defendant Smith introduced Michael Benkel, EVP of Planning and Allocations, who gave a detailed overview of the Company's deployment of a new inventory planning system, which he called "an enhanced open device system for forecasting sales and inventory at both the department and class level." This system, he explained, "has provided our planners with the ability to forecast their department sales, margin and inventory by channel and at a more granular margin component level than in the past . . ." which "allows our planners to have a more accurate view of their individual SKU plans . . . improving forecast accuracy and inventory control." Indeed, he emphasized that the new planning system was built specifically to leverage the "allocation and replenishment system sales forecast," and that "these systems allow us to identify where and how much merchandise we need in order to keep all distribution centers in optimal stock," which had purportedly improved in-stock accuracy at our distribution centers. In other words, Benkel, Pier 1's point man on planning and allocations, who had been hired and appointed to his position by the CEO and reported directly to him, and who was directly responsible for overseeing the Company's inventory levels, stated that the Company kept close track of inventory levels and sales, through proprietary internal data-

keeping and analytics systems built in-house, whose stated purpose was precisely to allow the Company to make more accurate forecasts.

215. Having touted the fact that they possessed a sophisticated system for tracking inventory that gathered information from the Company's distribution centers and reported it to senior executives, Defendants Smith and Turner cannot now claim that they were unaware of the Company's excess inventory and that it was out of sync with both sales and demand. This is especially the case, given the sheer number of former employees who have recounted scenes of excess inventory at the Company's distribution centers and stores, and the use of costly temporary solutions such as on-site outdoor storage, and the rental of railway lots to store full containers. Thus, these admissions that the Company and senior executives possessed detailed inventory and sales data and purported to review it raises a strong inference that the Executive Defendants knew or were severely reckless in disregarding that Pier 1 carried excess inventory and significant markdown risk, all while they represented the opposite was true.

216. Fourteenth, "special circumstances" exist here and support an inference of fraud based on the Defendants' roles as CEO and CFO:

- The senior executives with the knowledge of the need to take markdowns was a very small group of individuals discussed above, that included Smith, Turner, David, Benkel and Leite;
- The events at issue were critical to the Company's continued vitality. After Pier 1 announced the markdowns that it needed to take, the price of Pier 1 stock fell sharply, Pier 1 lost credibility with analysts and investors, and many questioned the continued vitality of Pier 1;
- The misrepresented and omitted information at issue was readily apparent to Smith and Turner, and Smith admitted to over-buying merchandise in March 2014; and
- The Defendants' statements were internally inconsistent with one another. For example:
    - Smith said during the March 2014 meeting that Pier 1 had become "victims of our own ambition" but later claimed that Pier 1 would be successful because it is ambitious;

- Pier 1 claimed that it reported "disappointing" sales during certain quarters of the Class Period, yet near the end of the Class Period, Smith claimed that sales had been strong;
- Pier 1 claimed that it had no immediate or significant markdown risk then disclosed massive markdowns just months later; and
- Pier 1 blamed weather problems for sales shortfalls in certain quarters, then Smith later admitted that the Company blaming "weather" for sales shortfalls was "lame."

## VIII. FALSE AND MISLEADING STATEMENTS

217. Defendants made materially false and misleading statements and/or omissions of material fact during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants repeatedly spoke about Pier 1's inventory level and expenses, the state of the Company's inventory, the factors contributing toward inventory levels, Pier 1's inventory infrastructure, and the existence or lack of immediate, significant or substantial markdown risk. While making these statements, Defendants failed to disclose that inventory was excessive and Pier 1 was incurring abnormally high and significant costs in its distribution network, and denied that there was immediate or significant markdown risk when that risk did exist.

218. The Fifth Circuit has long held that "a duty to speak the full truth arises when a defendant undertakes a duty to say anything." *Rubinstein v. Collins*, 20 F.3d 160, 170 (5th Cir. 1994). Once a defendant chooses to speak on a particular topic, it has a "duty to disclose a 'mix of information' that is not misleading." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 248-49 (5th Cir. 2009). Defendants' statements were materially false and misleading, including their failure to disclose the material adverse events discussed below that rendered their statements to investors materially misleading.

### A. False and Misleading Statements and Omissions Concerning Pier 1's Financial Metrics

219. On April 10, 2014, Defendant Turner stated during Pier 1's fiscal fourth quarter

2014 earnings call with analysts and investors that: "Turning to the balance sheet, inventory at the end of the fourth quarter totaled $378 million."

220. The dollar value of Pier 1's inventory reported on April 10, 2014 was materially false and misleading for the following reasons:

a. The reported dollar amount was overstated because Pier 1 needed to substantially mark down the value of its inventory;

b. Since Pier 1 claimed it reported the dollar value of its inventory based on the "actual landed cost of an item … using vendor invoices, ***the cost of warehousing and transporting product to the stores*** and other direct costs associated with purchasing products," the reported dollar amount of inventory omitted to disclose that there were abnormally high costs in Pier 1's distribution system to warehouse and transport product to the stores; and

c. Since Pier 1 reported the dollar value of its inventory based on the "actual landed cost of an item at the time it is received ***in the Company's distribution center***," the reported dollar amount of inventory was understated to the extent it did not include the inventory parked in shipping containers outside of Pier 1 distribution centers and not yet "received in" the centers.

221. During Pier 1's April 10, 2014 earnings call, Defendant Turner also assured investors that, "Turning to expenses, we maintained strict control over costs during the fourth quarter especially variable expenses which as a percentage of sales were relatively flat year over year … Fourth quarter SG&A expense totaled $134 million compared to $145 million a year ago … SG&A expenses for the year were $531 million compared to $513 million last year." Turner also stated that, "Turning now to capital expenditures, full-year spending totaled $80 million."

222. The foregoing statements concerning "expenses," Pier 1's purported "strict control

over costs," "variable expenses,"[5] "SG&A expense"[6] and "capital expenditures"[7] were materially false and misleading. Once Turner and Pier 1 chose to speak on these specific topics, they had a duty to disclose the following material omitted facts concerning costs and expenses, whose omission rendered Defendants' statements materially false and misleading:

> Pier 1 had incurred abnormally high costs in the Company's distribution system to warehouse and transport its products as a result of Pier 1 carrying abnormally high inventory and the existence of material inefficiencies in its distribution network. The abnormally high costs included the costs of temporary contract labor to unload inventory, temporary rental of storage facilities and equipment, fees and fines from holding abnormally high numbers of shipping containers full of inventory that were not unloaded into Pier 1's distribution centers, and shuttling of inventory between third party warehouses and Pier 1's distribution centers, all of which arose as a result of the excess inventory which Pier 1's infrastructure was not equipped to handle, as well as inefficiencies in Pier 1's distribution system. Indeed, non-discretionary capital expenditures for storing and handling excess inventory during each of calendar years 2014 and 2015 (which included parts of fiscal years 2015 and 2016) were approximately 6-7 times higher than the yearly average for the previous decade. Likewise, non-discretionary third party fees (such as shuttling costs and third party warehouse rentals) during each of calendar years 2014 and 2015 ran into the millions.

223. Furthermore, Turner and Pier 1's claim on April 10, 2014 that the Company was exercising "strict control over costs" was also independently materially false and misleading. According to the Merriam-Webster dictionary, "strict" means "***inflexibly*** maintained or adhered

[5] A "variable expense" or "variable cost" is a "corporate expense that varies with production output." http://www.investopedia.com/terms/v/variablecost.asp. "For example, a company may have variable costs associated with the packaging of one of its products. As the company moves more of this product, the costs for packaging will increase." *Id.*

[6] "Selling, General & Administrative Expense" ("SG&A") are "reported on the income statement as the sum of all direct and indirect selling expenses and all general and administrative expenses of a company." http://www.investopedia.com/terms/s/sga.asp. "SG&A are the costs that occur during the daily operations of a company and not directly related to the manufacturing of the product. These are the expenses related to the selling, promoting and delivering of a product as well as managing the company." *Id.*

[7] "Capital expenditures", or "CapEx," are "funds used by a company to acquire or upgrade physical assets such as property, industrial buildings or equipment." http://www.investopedia.com/terms/c/capitalexpenditure.asp.

to; rigorously conforming to principle ***or a norm*** or condition." Instead of "inflexibly" or "rigorously conforming" to Pier 1's prior "norm" of incurring costs, Pier 1 was incurring abnormally high costs during the Class Period based on material, undisclosed reasons – the excess inventory and Pier 1's inefficient distribution network.

224. On June 19, 2014, Defendant Turner stated during Pier 1's fiscal first quarter 2015 earnings call with analysts and investors that: "Moving to the balance sheet, inventory at the end of the first quarter was in line with our expectations and totaled $417 million."

225. The dollar value of Pier 1's inventory reported on June 19, 2014 was materially false and misleading for the following reasons:

a. The reported dollar amount was overstated because Pier 1 needed to substantially mark down the value of its inventory;

b. Since Pier 1 claimed it reported the dollar value of its inventory based on the "actual landed cost of an item … using vendor invoices, ***the cost of warehousing and transporting product to the stores*** and other direct costs associated with purchasing products," the reported dollar amount of inventory omitted to disclose that there were abnormally high costs in Pier 1's distribution system to warehouse and transport product to the stores; and

c. Since Pier 1 reported the dollar value of its inventory based on the "actual landed cost of an item at the time it is received ***in the Company's distribution center***," the reported dollar amount of inventory was understated to the extent it did not include the inventory parked in shipping containers outside of Pier 1 distribution centers and not yet "received in" the centers.

226. During the June 19, 2014 call, Defendant Turner also assured investors that, "Looking at expenses we continue to exercise prudence in managing our overall cost structure. SG&A for the first quarter leveraged 40 basis points coming in at $131 million or 31.4% of sales; that compares to $125 million or 31.8% of sales for the same period last year. Variable expenses were $90 million or 21.6% of sales compared to $86.9 million or 22% of sales last year." The foregoing statements concerning "expenses," "SG&A," "variable expenses," and "exercising prudence in managing our overall cost structure" were materially false and misleading. Once

Turner and Pier 1 chose to speak on these specific topics, they had a duty to disclose the following material omitted facts concerning costs and expenses, whose omission rendered Defendants' statements materially false and misleading:

> Pier 1 had incurred for some time, and was incurring, abnormally high costs in the Company's distribution system to warehouse and transport its products as a result of Pier 1 carrying abnormally high inventory and the existence of material inefficiencies in its distribution network. The abnormally high costs included the costs of temporary contract labor to unload inventory, temporary rental of storage facilities and equipment, fees and fines from holding abnormally high numbers of shipping containers full of inventory that were not unloaded into Pier 1's distribution centers, and shuttling of inventory between third party warehouses and Pier 1's distribution centers, all of which arose as a result of the excess inventory which Pier 1's infrastructure was not equipped to handle, as well as inefficiencies in Pier 1's distribution system.

227. In addition, Turner and Pier 1's claim on June 19, 2014 that the Company was "continu[ing] to exercise prudence in managing our overall cost structure" was materially false and misleading. According to the Merriam-Webster dictionary, "prudence" means "caution or circumspection as to danger or risk." Instead of acting with caution or circumspection with respect to the danger and risk of its costs and expenses, Pier 1 was incurring abnormally high costs during the Class Period based on material, undisclosed reasons – the excess inventory and Pier 1's inefficient distribution network. Indeed, non-discretionary capital expenditures for storing and handling excess inventory during each of calendar years 2014 and 2015 (which included parts of fiscal years 2015 and 2016) were approximately 6-7 times higher than the yearly average for the previous decade. Likewise, non-discretionary third party fees (such as shuttling costs and third party warehouse rentals) during each of calendar years 2014 and 2015 ran into the millions. Pier 1 spending the abnormally high amounts was also associated with the risk and danger that Pier 1's margins would necessarily contract significantly once Pier 1 finally sold off the excess inventory, which it did.

228. On September 17, 2014, Defendant Turner stated during Pier 1's fiscal second

quarter 2015 earnings call with analysts and investors that, "inventory at the end of the second-quarter totaled $514 million," and "***[t]his … reflects*** our expanded SKU count in support of Express Request, our new Columbus fulfillment center, and the receipt of merchandise a little bit earlier this year."

229. The dollar value of Pier 1's inventory reported on September 17, 2014 was materially false and misleading for the following reasons:

a. The reported dollar amount was overstated because Pier 1 needed to substantially mark down the value of its inventory;

b. Since Pier 1 claimed it reported the dollar value of its inventory based on the "actual landed cost of an item … using vendor invoices, ***the cost of warehousing and transporting product to the stores*** and other direct costs associated with purchasing products," the reported dollar amount of inventory omitted to disclose that there were abnormally high costs in Pier 1's distribution system to warehouse and transport product to the stores;

c. Since Pier 1 reported the dollar value of its inventory based on the "actual landed cost of an item at the time it is received ***in the Company's distribution center***," the reported dollar amount of inventory was understated to the extent it did not include the inventory parked in shipping containers outside of Pier 1 distribution centers and not yet "received in" the centers; and

230. Moreover, while affirmatively choosing to discuss what Pier 1's inventory figure "reflects," Defendant Turner falsely and misleadingly omitted to disclose the abnormally high costs in Pier 1's distribution system to warehouse and transport merchandise, or that the inventory increase resulted from over-buying.

231. During the same September 17, 2014 call, Defendant Smith discussed expenses in detail, including attributing the reported growth in SG&A spending to "marketing initiatives" and "additional headcount in our merchandising and marketing e-commerce and IT departments." Turner then gave detailed breakdowns of expenses, explaining that "SG&A for the second-quarter came in at $135 million or 32.2% of sales. … Variable expenses were $95.1 million or 22.7% of sales. … Fixed expenses during the quarter were $40 million or 9.5% of sales." These statements

were materially false and misleading. Once Smith, Turner and Pier 1 chose to speak on these specific topics, they had a duty to disclose the following material omitted facts concerning costs and expenses, whose omission rendered Defendants' statements materially false and misleading:

> Pier 1 had incurred for some time, and was incurring, abnormally high costs in the Company's distribution system to warehouse and transport its products as a result of Pier 1 carrying abnormally high inventory and the existence of material inefficiencies in its distribution network. The abnormally high costs included the costs of temporary contract labor to unload inventory, temporary rental of storage facilities and equipment, fees and fines from holding abnormally high numbers of shipping containers full of inventory that were not unloaded into Pier 1's distribution centers, and shuttling of inventory between third party warehouses and Pier 1's distribution centers, all of which arose as a result of the excess inventory which Pier 1's infrastructure was not equipped to handle, as well as inefficiencies in Pier 1's distribution system.

232. Also on Pier 1's September 17, 2014 earnings call, Turner stated that:

> After deploying more substantial levels of capital in recent years, ***the business is now positioned so that we can begin to lower our spending***.

233. Turner's statement that "the business is now positioned so that we can begin to lower our spending" was materially false and misleading. Once Turner and Pier 1 chose to speak on this specific topic of "spending," they had a duty to disclose the following material omitted facts concerning costs and expenses, whose omission rendered Defendants' statements materially false and misleading:

> Pier 1 had incurred for some time, and was incurring, abnormally high costs in the Company's distribution system to warehouse and transport its products as a result of Pier 1 carrying abnormally high inventory and the existence of material inefficiencies in its distribution network. The abnormally high costs included the costs of temporary contract labor to unload inventory, temporary rental of storage facilities and equipment, fees and fines from holding abnormally high numbers of shipping containers full of inventory that were not unloaded into Pier 1's distribution centers, and shuttling of inventory between third party warehouses and Pier 1's distribution centers, all of which arose as a result of the excess inventory which Pier 1's infrastructure was not equipped to handle, as well as inefficiencies in Pier 1's distribution system.

234. On December 18, 2014, Pier 1's Form 8-K filed with the SEC stated that "Inventory

totaled $535.5 million, an increase of 25% compared to $429.1 million in the year ago period, which reflects a combination of factors – primarily a year-over-year increase in merchandise in-transit due to earlier deliveries in advance of the Chinese New Year, merchandise related to the planned increase in online-only and Express Request assortments, and additional inventory to support higher sales." Pier 1 repeated this claim in its Form 10-Q filed with the SEC on January 7, 2015, signed by Defendants Smith and Turner. On December 18, 2014, Defendant Turner also stated during Pier 1's fiscal third quarter 2015 earnings call with analysts and investors that: "Moving to the balance sheet. Inventory at the end of the third quarter totaled $536 million, up about 25% versus a year ago. This growth reflects a combination of factors. Primarily a year-over-year increase in merchandise in transit, due to earlier deliveries in advance of the Chinese New Year. Merchandise related to the planned increase in online only and Express Request assortments, and additional inventory to support higher sales."

235. The dollar value of Pier 1's inventory reported on December 18, 2014 was materially false and misleading for the following reasons:

a. The reported dollar amount was overstated because Pier 1 needed to substantially mark down the value of its inventory;

b. Since Pier 1 reported the dollar value of its inventory based on the "actual landed cost of an item … using vendor invoices, ***the cost of warehousing and transporting product to the stores*** and other direct costs associated with purchasing products," the reported dollar amount of inventory omitted to disclose that an unusually large amount of that value was caused by the abnormally high costs in Pier 1's distribution system to warehouse and transport product to the stores; and

c. Since Pier 1 reported the dollar value of its inventory based on the "actual landed cost of an item at the time it is received ***in the Company's distribution center***," the reported dollar amount of inventory was understated to the extent it did not include the inventory parked in shipping containers outside of Pier 1 distribution centers and not yet "received in" the centers.

236. Defendants' statements attributing the 25% increase in inventory to "earlier deliveries in advance of the Chinese New Year," "merchandise related to the planned increase in

online-only" and "Express Request assortments, and additional inventory to support higher sales" were also materially false and misleading. The need to front-load shipping in order to work around the shutdown of Chinese factories during the Chinese New Year Holiday is a regular occurrence every year and cannot account for a significant amount of the increase in inventory. *See* Cohen Report at 15-16. In addition, the claim that Pier 1 acquired such a large amount of inventory "to support higher sales" is false and misleading because, at this time, Pier 1 was experiencing an abnormally high increase in the rate of inventory growth versus the rate of sales growth that did not support the amount of Pier 1's inventory or a claim that it was needed "to support higher sales." These statements were also false and misleading because Defendant Turner affirmatively spoke about what the increase in inventory "reflects," but falsely and misleadingly omitted to disclose the abnormally high costs in Pier 1's distribution system to warehouse and transport merchandise, or that the inventory increase resulted from over-buying.

237. During the same December 18, 2014 call, Defendant Turner again gave detailed breakdowns of expenses, explaining that "SG&A for the third quarter increased $12 million over the same period last year to $161 million. … Variable expenses were $115 million or 23.7% of sales. … Fixed expenses during the quarter were $46 million or 9.5% of sales." These statements were materially false and misleading. Once Turner and Pier 1 chose to speak on these specific topics, they had a duty to disclose the following material omitted facts concerning costs and expenses, whose omission rendered Defendants' statements materially false and misleading:

> Pier 1 had incurred for some time, and was incurring, abnormally high costs in the Company's distribution system to warehouse and transport its products as a result of Pier 1 carrying abnormally high inventory and the existence of material inefficiencies in its distribution network. The abnormally high costs included the costs of temporary contract labor to unload inventory, temporary rental of storage facilities and equipment, fees and fines from holding abnormally high numbers of shipping containers full of inventory that were not unloaded into Pier 1's distribution centers, and shuttling of inventory between third party warehouses and Pier 1's distribution centers, all of which arose as a result of the excess inventory

which Pier 1's infrastructure was not equipped to handle, as well as inefficiencies in Pier 1's distribution system.

238. On April 8, 2015, a Pier 1 Form 8-K stated that "Inventories at fiscal 2015 year end totaled $478.8 million."

239. The dollar value of Pier 1's inventory reported on April 8, 2015 was materially false and misleading for the following reasons:

a. The reported dollar amount was overstated because Pier 1 needed to substantially mark down the value of its inventory; and

b. Since Pier 1 reported the dollar value of its inventory based on the "actual landed cost of an item at the time it is received ***in the Company's distribution center***," the reported dollar amount of inventory was understated to the extent it did not include the inventory parked in shipping containers outside of Pier 1 distribution centers and not yet "received in" the centers.

240. Pier 1's Form 8-K filed with the SEC on June 17, 2015 stated that "[i]nventories at the end of the first quarter totaled $501.7 million."

241. The dollar value of Pier 1's inventory reported on June 17, 2015 was materially false and misleading for the following reasons:

a. The reported dollar amount was overstated because Pier 1 needed to substantially mark down the value of its inventory; and

b. Since Pier 1 reported the dollar value of its inventory based on the "actual landed cost of an item at the time it is received ***in the Company's distribution center***," the reported dollar amount of inventory was understated to the extent it did not include the inventory parked in shipping containers outside of Pier 1 distribution centers and not yet "received in" the centers.

242. In addition, the inventory figures reported in Defendants' Class Period Forms 10-K and 10-Q were materially false and misleading. These include: (i) inventory of "$377,650[,000]" at the end of fourth quarter fiscal 2014 reported in Pier 1's Form 10-K filed April 29, 2014 and Signed by Defendants Smith and Turner; (ii) inventory of "$417,643[,000]" at the end of first quarter fiscal 2015 reported in Pier 1's Form 10-Q filed July 9, 2014 and Signed

by Defendants Smith and Turner; (iii) inventory of "$513,752[,000]" at the end of second quarter fiscal 2015 reported in Pier 1's Form 10-Q filed October 8, 2014 and Signed by Defendants Smith and Turner; (iv) inventory of "$535,532[,000]" at the end of third quarter fiscal 2015 reported in Pier 1's Form 10-Q filed January 7, 2015 and Signed by Defendants Smith and Turner; (v) inventory of "$478,843[,000]" at the end of fourth quarter fiscal 2015 reported in Pier 1's Form 10-K filed April 28, 2015 and Signed by Defendant Smith; (vi) inventory of "$501,662[,000]" at the end of first quarter fiscal 2016 reported in Pier 1's Form 10-Q filed July 8, 2015 and Signed by Defendant Smith; (vii) inventory of "$533,614[,000]" at the end of second quarter fiscal 2016 reported in Pier 1's Form 10-Q filed October 7, 2015 and Signed by Defendant Smith.

243. The dollar value of Pier 1's inventory reported on these above dates were materially false and misleading for some or all of the following reasons:

a. The reported dollar amount was overstated because Pier 1 needed to substantially mark down the value of its inventory;

b. Since Pier 1 reported the dollar value of its inventory based on the "actual landed cost of an item … using vendor invoices, ***the cost of warehousing and transporting product to the stores*** and other direct costs associated with purchasing products," the reported dollar amount of inventory omitted to disclose that an unusually large amount of that value was caused by the abnormally high costs in Pier 1's distribution system to warehouse and transport product to the stores; and

c. Since Pier 1 reported the dollar value of its inventory based on the "actual landed cost of an item at the time it is received ***in the Company's distribution center***," the reported dollar amount of inventory was understated to the extent it did not include the inventory parked in shipping containers outside of Pier 1 distribution centers and not yet "received in" the centers.

## B. False and Misleading Statements and Omissions Concerning Pier 1's Non-Scalable Distribution Network

244. On April 10, 2014, Defendant Smith stated during Pier 1's fiscal fourth quarter 2014 earnings call with analysts and investors that "[W]e ***have*** the resources and infrastructure ***in place*** to scale the business."

245. Smith's statement that Pier 1 had the "resources and infrastructure in place to scale the business" was materially false and misleading when made. "Scalability" has the following meaning:

> Scalability is a characteristic of a system, model or function that describes its capability to cope and perform under an increased or expanding workload. A system that scales well will be able to ***maintain or even increase its level of performance or efficiency when tested by larger operational demands***. . . . [I]n the corporate environment, ***a scalable company is one that can maintain or improve profit margins while sales volume increases***.[8]

246. Pier 1 did not "have the resources and infrastructure in place to scale the business." Indeed, as the operational demands on Pier 1's distribution network increased, the distribution centers were significantly less efficient and Pier 1's profit margins decreased rather than increased. Undisclosed to investors, in order to accommodate the massive increase of inventory at the Company, rather than rely on the resources and infrastructure purportedly already "in place" to "scale the business," at the time this statement was made, it was necessary for Pier 1 to:

a. Rely on costly outside, third party storage and labor to store and shuttle merchandise;

b. Engage in the costly re-racking of its distribution centers to accommodate the increased inventory;

c. Pay fines, fees and penalties to store merchandise in massive numbers of shipping containers at ports and railyards and outside Pier 1 distribution centers; and

d. Incur these and other costs that reduced Pier 1's profit margins as sales volume increased.

247. On April 8, 2015, Pier 1 held an earnings call with analysts and investors (in the wake of Pier 1's February 2015 disclosures that Pier 1 had "aggressively" addressed the Company's failure to adequately forecast its revenues and expenses by terminating Turner as CFO). During the call, interim CFO Laura Coffey stated that, during the fourth quarter of fiscal

---

[8] http://www.investopedia.com/terms/s/scalability.asp.

2015, "We incurred unplanned supply chain expenses that impacted merchandise margins by approximately $6 million in the fourth quarter" and "the majority of these expenses can be traced to incremental costs within our distribution centers, which resulted from higher than normal inventory levels." In this regard, Defendant Smith claimed that: "The issue[s] that impacted our fourth-quarter results are ***transitory*** and ***have no bearing on*** the underlying strength of the Pier 1 Imports brand, nor ***our potential to drive organic growth***," and stated that "the investments of the past few years into our ***distribution center network*** will continue to bear fruit, and ***enable us to generate further improvement in merchandise margin dollars*** going forward."

248. Smith's April 8, 2015 statements were materially false and misleading when made. The existence of high "supply chain expenses" in the Company's distribution centers having a negative impact on Pier 1's margins was not "transitory." The significant costs and widespread inefficiencies in the distribution centers also negatively impacted Pier 1's "potential to drive organic growth" and impeded any "improvement in merchandise margin dollars." The supply chain expenses, and Pier 1's markdowns to alleviate the distribution center inefficiencies caused by the excess inventory were shrinking Pier 1's margins and continued to do so for several more quarters. Indeed, the Company's problems with excess inventory were so significant that it would take Pier 1 18 months of continuing markdowns (which negatively impacts margins and organic growth) and other countermeasures to bring its inventory levels in line with sales.

249. On June 17, 2015, Defendant Smith stated during Pier 1's fiscal first quarter 2016 earnings call with analysts and investors that, although the Company's "inventories are much too high . . . the impact of that inventory is felt most intensely by the distribution centers because ***our store inventories are extraordinarily well-controlled***." Contrary to Smith's claim that, in contrast to the state of excess inventory at Pier 1's distribution centers, Pier 1's store inventories were not "extraordinarily well-controlled," the stores were in fact themselves "busting at the seams" with

excess inventory and over 40% of the Company's retail stores stored excess inventory in costly external storage "pods." As explained in Professor Cohen's report, Pier 1's store locations were neither designed for nor built to house large quantities of slow-selling merchandise, and the fact that over 40% of the Company's store locations needed to rely on outdoor storage to store excess product is a red flag indicating highly-excessive inventory. Such systematic storage of excess goods at store locations meant that the Company's store inventories were far from being "extraordinarily well-controlled." Cohen Report at 14-15.

### C. False and Misleading Statements and Omissions Concerning Pier 1's Purported "Clean" Inventory Levels and Markdown Risk

250. On April 10, 2014, Defendant Turner stated during Pier 1's fiscal fourth quarter 2014 earnings call with analysts and investors that Pier 1 was entering "fiscal 2015 in a ***clean inventory position***." This statement was materially false and misleading when made because Pier 1 was not in a "clean" inventory position and in fact needed to take significant markdowns to clear a backlog of excess inventory. In making this statement, Turner omitted to disclose that, far from being "clean," the Company's inventory was backlogged and subject to immediate, significant, and substantial markdown risk, risks which were accumulating as time went on and the backlog of inventory remained.

251. "Clean" inventory is a state of inventory where the merchandise is compatible with what a retailer is currently offering to its customers for sale and the need to take mass markdowns is unlikely. Defendants have themselves used the term "clean" inventory on numerous occasions to describe inventory that did not carry a substantial or significant markdown risk because Pier 1 had just taken the necessary markdowns to reduce excess merchandise. For example:

- On a September 20, 2007 earnings call, Defendant Turner stated: "The clearance event was very successful and we ended July with very clean inventory."
- On a December 18, 2008 earnings call, Defendant Smith informed listeners that if the Company's customers tighten spending, then "we'll end up discounting more

to clean our inventories."

- On September 19, 2013, Smith reported that Pier 1 had a "very clean inventory position. … Customers are responding well to both regular and seasonal merchandise." In response, Barclays emphasized to investors that "management entered into 3Q with a very clean inventory position." Credit Suisse also wrote that the Company had "exited Q2 with a clean inventory position . . . ***which should mitigate merchandise margin pressure***," and, on the same day, BB&T wrote that it was "encouraged to hear inventories are clean," and that Pier 1's stock presented "an attractive buying opportunity—particularly given the company's clean inventory position."

- On December 19, 2013, Pier 1 held a conference call with analysts. During the call, Defendant Smith stated that, "our inventory levels are running now at sort of historical lows. Frankly, they are not fluctuating very much because we have such great processes for taking our markdowns and ***clearing through the slow merchandise***."

- On February 28, 2014, Kevin Kingsbury, a writer for *The Wall Street Journal*, commented: "After already cutting F4Q expectations in early January following a dour December, Pier 1 (PIR) says results for the quarter ending tomorrow will actually be worse than it previously feared as the home goods retailer says weather has continued to play havoc with the business. But ***CEO Alex Smith says the new FY will begin with 'a clean inventory position,' meaning the need for mass markdowns is unlikely***."

- On December 14, 2016, during a conference call with analysts, Defendant Smith stated: "So we were clearly very thrilled with that [60% merchandise margin] number [in the third quarter]. I don't want to be redundant here, I think it's all the things we've been talking about. It's the scientific approach to our promotional activity. It's ***fewer markdowns because the inventory is clean***, [etc.]"

252. Elsewhere in the industry, retailers like Gap Inc. and T.J. Maxx (Defendant Smith's former company) use the term "clean" in the same manner. For example:

- On January 11, 2009, in an article titled "Clean inventory to prove costly," *Chain Store Age* reported that: "The acceleration in sales trends [at Target Corp.] came as a result of markdown activity, which [Target's then-CEO Gregg] Steinhafel indicated would affect profits when fourth-quarter results are announced next month. 'During the month, we reduced prices to gain market share and to end the year with very clean inventories. These markdowns, combined with additions to our accounts receivable allowance, will put additional pressure on our profitability in the fourth quarter,' Steinhafel said."

- On March 15, 2011, *Reuters* quoted David Magee, an analyst from Suntrust Robinson Humphrey, as stating that "[Williams-Sonoma] ***sold more full-priced merchandise compared to last year as they had extremely clean inventory. When inventories are lean, they can do less markdowns***."

- On July 11, 2013, fashion retailer Bebe Stores, Inc announced its fiscal fourth quarter 2013 retail sales. In the press release, the Company stated that "[d]uring the quarter, the Company increased promotional activities in order to continue to clear through previously committed unproductive inventory. While this negatively impacted merchandise margin, ***the Company made progress in working through legacy merchandise to ensure a clean inventory positon*** for the fall season."

- On July 19, 2013, branded lifestyle, apparel and footwear company, VF Corporation, held a conference call with analysts to discuss its second quarter 2013 financial results. In response to an analyst's question regarding "inventories in the channel," the Company's Chairman and CEO commented that "[i]n general, with the exception of the Jeanswear business in China, the channels are clean. We have an ***inventory overhang in denim in China*** that we've – had all year, started in late last year. ***But in North America, for sure, inventories are clean throughout the channels***."

- On August 5, 2013, clothing and accessories retailer American Eagle Outfitters, Inc. issued a press release announcing downward revisions to its second quarter 2013 earnings outlook. In the press release, then-CEO Robert Hanson stated that American Eagle's "[r]esults were exacerbated by a highly promotional retail environment, which intensified over the course of July. Within this context, ***we increased the depth and breadth of markdowns; these actions have enabled us to achieve a clean inventory position*** moving into the third quarter."

- On a February 26, 2014 conference call with analysts, T.J. Maxx's CEO stated, "[w]e stuck to our off-price discipline and ***took aggressive markdowns in January***, particularly in apparel, to clear the product. Although this impacted merchandise margins, it allowed us to begin the new year with extremely clean inventories."

- On March 3, 2014, *RIS News* reported that following the announcement of a data breach at Target, "and the rapid change in the pace of sales, the Target team reacted quickly making nimble ***adjustments to minimize its excess inventory***. This quick response allowed the retailer to ***end the year with a clean inventory position***."

- On May 22, 2016, sports apparel, footwear and headwear retailer Genesco held an earnings call with analysts. On the call, Genesco's CEO, Robert Dennis, stated: "A major contributor to the improvement in first quarter profitability was the significant swing at Lids, as we began to gain traction, turning that business around following multiple initiatives we executed during fiscal 2016. This included reducing Lids' retail inventories 25% by year-end through heightened promotional activity that we ramped up throughout the year and especially intensified in the fourth quarter. This allowed us to start fiscal 2017 in a much cleaner inventory position to drive full-price selling and higher margins."

- On December 2, 2016, *The Wall Street Journal* reported that: "Holiday 2016 is supposed to be the year of clean inventory…. U.S. retailers, including Macy's Nordstrom, Gap, J.C. Penney and Kohl's, have touted lower inventory heading into the most important shopping period of the year. That has driven up stock prices for many of them, as investors hope for fewer markdowns and better margins in the

fourth quarter."

- On February 3, 2017, Dallas-based off-price retailer Tuesday Morning Corporation, held an earnings call with analysts. The Company's CFO had the following exchange with an analyst regarding inventory levels: "DAVID MANN, ANALYST, JOHNSON RICE: … I just want to clarify when you talk about your inventory levels. I think you said they were clean. Should we take that to mean that there's not any additional markdown risk into Q3? … STACIE SHIRLEY: From a mark down standpoint we don't think that there's additional exposure, you know, as it relates to our inventory position per se."

- On February 23, 2017, department store Nordstrom Inc. held a conference call with analysts. During the call, the Company's CFO Mike Koppel, stated: "As we head into 2017, we are in a clean inventory position with plans to maintain inventory growth in line with sales trends."

253. Also during the April 10, 2014 earnings call, Smith stated that "we demonstrate our ability to deliver strong growth in sales, earnings and operating cash flow," and, in that respect, "strategically I believe we are ***in the best shape we have ever been***." This statement was materially false and misleading. Pier 1 was not "in the best shape" it has ever been to deliver strong growth in sales, earnings and operating cash flow. Just weeks prior, Smith had admitted at Pier 1's internal town hall meeting that he was responsible for pushing overly high sales goals on Pier 1 employees, that he had underestimated what it would take to achieve those goals, and made a series of admissions of planning, infrastructural, and execution failures. Pier 1 was also incurring enormous unplanned and non-discretionary handling expenses for excess inventory that its infrastructure was not equipped to handle. Pier 1 was in the throes of an influx of excess and growing inventory, carrying immediate, significant, and substantial markdown risk that was highly detrimental to Pier 1's strategic position.

254. On April 29, 2014, Pier 1 filed with the SEC its Form 10-K for fiscal year 2014, signed by Defendants Smith and Turner. The Form 10-K claimed that:

> The Company reviews its inventory levels in order to identify ***slow-moving merchandise*** and uses merchandise markdowns to sell such merchandise. Markdowns are recorded to reduce the retail price of such slow-moving merchandise ***as needed***.

255. This statement was materially false and misleading when made because, during the Class Period, Defendants resisted marking down backed-up inventory and did not mark down slow-moving merchandise "as needed." This contributed to a worsening of the inventory backlog that existed as of the beginning of the Class Period, and along with it, Pier 1's significant and growing undisclosed markdown risk. Indeed, during the Class Period, much of Pier 1's inventory could not even be processed in time to reach stores and be marked down for sale.

256. On June 19, 2014, during Pier 1's fiscal first quarter 2015 earnings call with analysts and investors, a Wells Fargo analyst asked what was driving pressure on the Company's gross margin. Defendant Smith responded: "so in terms of the pressure ***it is not so much the markdown pressure***, I mean we continue to run a ***very clean inventory*** as I know you know." This statement was materially false and misleading because Pier 1 was not in a "very clean" inventory position and in fact faced significant, undisclosed markdown risk.

257. On Pier 1's September 17, 2014 second quarter fiscal 2015 earnings call with analysts and investors, Defendant Smith stated that:

> [W]hen you look at other spaces not particularly but the home space, a lot of that discounting is driven by the need to liquidate inventory. And of course, ***we don't have anything like those pressures***, because such ***a relatively small percentage of our purchases are in merchandise which has a short shelf life***. So, I just don't think frankly it [making promotional pricing cuts "across the board"] does anything for us.

258. The foregoing statement was materially false and misleading because Pier 1 does face something like "pressures" to "liquidate inventory"[9] because a significant (rather than a "small") percentage of Pier 1's products are seasonal or fashion merchandise that have a "short shelf life." At the time of this statement, Pier 1 in fact faced immediate and significant markdown risk.

---

[9] Liquidate means "to convert (assets) into cash." https://www.merriam-webster.com/dictionary/liquidate.

259. Also during Pier 1's September 17, 2014 earnings call, a UBS analyst noted that the Company stated that its inventory increase would be "15%, 20% at the end of the year," and asked, "What's changed over the last quarter?" Turner responded that it was "primary the timing of Chinese New Year that's causing about 25% of that increase." The UBS analyst responded: "So ***there's no impact there from the change in your promotional strategy on the inventory increase***?" (As Smith discussed earlier on the same call, Pier 1 had reduced the amount of its across-the-board promotional pricing.) Turner responded, "***No***." This categorical denial was materially false and misleading because Pier 1's refusal to take necessary markdowns on its inventory had caused at least some portion of the Company's increased inventory. In addition, Defendant Turner's attribution of the $106.4 million increase in inventory at the end of the year "primar[ily]" to Chinese New Year was false because it misrepresented that the timing of Chinese New Year had caused more than $26 million of increased inventory, but Chinese New Year occurs every year at approximately the same time and it is not plausible that it was uniquely responsible for the "primary" portion of that increase.

260. On Pier 1's December 18, 2014 third quarter fiscal 2015 earnings call with analysts and investors, Smith assured investors that, while total inventory had increased from the previous year, "***we do not see any significant mark down risk***." On these statements, the price of Pier 1's stock rose, from $13.90 on December 18, 2014 to $15.18 on December 19, 2014. These statements were materially false and misleading when made because, contrary to Pier 1 and Smith's claim that Pier 1 did "not see any significant mark down risk," the Company faced significant undisclosed markdown risk.

261. On January 8, 2015, the Company issued a press release which was also filed with the SEC on Form 8-K, announcing Pier 1 financial results for December 2014. In the press release, Defendant Smith stated that "***the business is well-positioned*** as we head into the early spring

selling season." This statement was materially false and misleading when made because, contrary to Smith's claim that Pier 1 was "well-positioned" heading into the spring selling season, Pier 1 carried significant undisclosed markdown risk and was incurring excess undisclosed costs in its inefficient distribution centers.

262. On March 2, 2015, Pier 1 presented at the Raymond James Institutional Investor Conference. In its presentation, Pier 1 falsely claimed that "[t]he business is healthy" and that "Current inventory composition ***does not present an immediate or significant markdown risk.***" This statement was materially false and misleading when made because, contrary to Pier 1's claim that the Company's business was "healthy" and without "immediate or significant markdown risk," Pier 1 carried significant undisclosed markdown risk and was incurring excess costs in its inefficient distribution centers.

263. On April 8, 2015, Pier 1 issued a press release announcing its financial results for fiscal year 2015 and fiscal fourth quarter 2015. In the press release, which was also filed with the SEC on Form 8-K, Defendant Smith claimed that "[a]lthough fiscal 2015 ending inventories are higher than originally planned, their ***complexion is healthy and not believed to pose a substantial markdown risk***." On an earnings call with analysts held the same day, the Company's interim-CFO Laura Coffey echoed Smith's claim, stating that, although inventory had increased, "Importantly, the complexion of our current inventories level is healthy, and ***does not pose a significant immediate markdown risk***. . . . This is a finite issue that we expect to work through quickly."

264. These statements were materially false and misleading when made because, contrary to Smith and Pier 1's claims that the complexion of the Company's inventory was "healthy" and "not believed to pose a substantial markdown risk," that the Company's inventory "does not pose a significant immediate markdown risk" and that Pier 1 would work through the

issue "quickly," Pier 1 in fact carried significant, substantial and immediate markdown risk and was still incurring excess costs in its inefficient distribution centers.

265. In addition, throughout the Class Period, each of the Company's Forms 10-K, filed with the SEC on April 29, 2014 and April 28, 2015, and signed by Defendants Smith and Turner (except for the April 28, 2015 filing, which Turner did not sign because it was filed after his departure from the Company), stated that "[t]he Company's focus remains on making ***conservative inventory purchases***." Moreover, the Company's fiscal year 2014 Form 10-K, filed with the SEC on April 29, 2014, stated that it "continues to focus on strategically managing inventory levels and closely monitoring merchandise purchases to ***keep inventory in line with demand***." These statements were materially false and misleading when made. "Conservative" means "marked by moderation or caution." The Company's inventory purchases were not "conservative" or "marked by moderation or caution" and, as the Company has admitted, Pier 1 did not "keep inventory in line with demand" during the Class Period.

### D. False and Misleading Statements and Certifications as to the Company's Inventory and Internal Controls

266. As discussed above, the Company's Forms 10-Q and 10-K contained material misstatements and omissions concerning Pier 1's inventory. Throughout the Class Period, the Company's Forms 10-K and 10-Q also included certifications pursuant to Exchange Act Rules 13a-14(a) and 15d-14(a) and the Sarbanes-Oxley Act of 2002 (i.e., the SOX Certifications). These SOX Certifications, filed with the Company's Class Period Forms 10-Q on July 9, 2014, October 8, 2014, January 7, 2015, July 8, 2015, and October 7, 2015, and in the Company's Class Period Forms 10-K, filed with the SEC on April 29, 2014 and April 28, 2015, were each signed by Defendants Smith and Turner (prior to Turner's February 2015 "resignation").

267. Pier 1's SOX Certifications falsely affirmed that Pier 1's public filings were accurate, and falsely certified that Defendants Smith and Turner had designed and implemented

internal controls over financial reporting that provided reasonable assurance that the Company's financial reporting was reliable and complied with Generally Accepted Accounting Principles ("GAAP"). Specifically, the SOX Certifications provided, in relevant part:

> 1. I have reviewed this Annual Report on Form 10-K [or Quarterly Report on Form 10-Q] of Pier 1 Imports, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

268. These statements were materially false and misleading because these SOX certifications failed to disclose the deficiencies in Pier 1's internal controls that led the Company to amass excess inventory, led to Pier 1 incurring excess undisclosed costs, and led to undisclosed markdown risk, contracted margins and reduced earnings per share. As discussed in paragraph 242 above, Defendants' Class Period SEC filings also repeatedly contained material misrepresentations and omissions concerning the value of Pier 1's inventory, which carried high markdown risk. Which further rendered the SOX certifications of the Company's financial metrics false and misleading

**E. Defendants Omitted to Disclose the Known, Material Tr ends of Significant and Growing Markdown Risk and Increasing Costs Tied to Excess Inventory**

269. Throughout the Class Period, the Company's Forms 10-K and 10-Q were materially false and misleading because they failed to disclose the information required by Item 303 of Regulation S-K. Item 303 requires the disclosure of known trends that will affect future revenue,

specifically: "known trends . . . that have had or that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues." GAAP Regulation ASC 275-10 similarly requires that a company disclose risks and uncertainties that could significantly affect the amounts reported in financial statements in the near term, and specifically raises inventory as an example of the type of disclosure it was designed to require, stating: "carrying inventories at the lower of cost or market is based on ***an assumption that there will be sufficient demand for that product in the future to be able to sell the quantity on hand without incurring losses on the sales or, if market is used, that it can be estimated***."

270. Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 require disclosure of forward-looking information." Indeed, the SEC has stated that Item 303 is "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company…with particular emphasis on the registrant's prospects for the future." *See* Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989). Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." *See* Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 8350, 2003 WL 22996757, at *11 (Dec. 19, 2003).

271. Disclosure of known trends and forward-looking information concerning the registrant's revenue are required by Item 303 "where a trend, demand, commitment, event or uncertainty is both [i] presently known to management and [ii] reasonably likely to have material effects on the registrant's financial condition or results of operations." *See* Management's

Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989).

272. As set forth in detail above, both of these conditions were satisfied here. First, the trend of Pier 1's increasing rate of inventory accumulation, the growing divergence between the rate of inventory growth and sales growth, the concomitant increasing markdown risk, Pier 1's worsening distribution center inefficiencies, and the related rising costs of transporting and storing the inventory were "known" to the Executive Defendants and other members of management. Second, the facts and allegations set forth above establish that these trends were "reasonably likely to have material effects on [Pier 1's] financial condition or results of operations." Indeed, as set forth above, as a direct result of these trends, Pier 1 incurred numerous undisclosed costs, experienced extraordinary inefficiencies, and suffered costly markdowns, all of which negatively impacted its revenues and margins.

273. Thus, pursuant to Item 303, Defendants were required to disclose during the Class Period (but did not): (i) the existence of these trends within the Company, namely that excess inventory had risen to levels that would require at least 18 months to sell-off and would negatively impact margins and earnings per share; and (ii) whether the dramatic increase in inventory that was out of line with demand had or was reasonably expected to have a "material . . . unfavorable impact on . . . revenues." Moreover, under GAAP Regulation ASC 275-10, Defendants were required to disclose the markdown risk Pier 1's excess inventories presented, or otherwise to disclose its inventory figures consistently with the markdown risk inherent in their size. Defendants failed to disclose this information during the Class Period.

## IX. LOSS CAUSATION

274. The market price of Pier 1's publicly traded common stock was artificially inflated by the material misstatements and omissions alleged herein, including the misstatements and

omissions about the Company's excess inventory.

275. The artificial inflation in Pier 1's stock price was removed when the facts, conditions, and risks misstated and omitted by Defendants were revealed to the market. The information was disseminated through partial disclosures on February 10, 2015, September 24, 2015, and December 17, 2015, which revealed on a piecemeal basis the nature and true extent of the Defendants' scheme to conceal excess inventory at the Company's retail stores and distribution centers, and their material negative impact on Pier 1. These disclosures, more particularly described below, reduced the amount of inflation in the price of Pier 1's publicly-traded stock, causing economic injury to Lead Plaintiff and other members of the Class.

276. On February 10, 2015, Pier 1 disclosed "unplanned" expenses, primarily related to supply chain costs associated with the 1 Pier 1 initiative, which included "incremental distribution center costs that affect our gross profit." Defendant Smith also announced that Pier 1 had failed to "adequately forecast the revenue and expenses" for the business and that inventory would remain elevated through the fiscal year. The Company also announced the immediate resignation of its CFO, Defendant Turner. In response to this news, the price of Pier 1's shares plummeted from $16.97 per share on February 10, 2015 to $12.84 per share on February 11, 2015, or approximately 25%, on heavy volume.

277. Notwithstanding this partially corrective information, Defendants' prior false statements and omissions continued to operate as a fraud on the market because the February 10 disclosure failed to disclose the full extent of the fraud, and Defendants continued to make misrepresentations to investors.

278. Then, on September 24, 2015, the Company disclosed margin pressures from increased promotional and clearance activity in addition to inventory-related inefficiencies within its distribution center network. On this news, shares of Pier 1 fell from $8.67 per share on

September 24, 2015 to $7.61 share on September 25, 2015, or 12.2%, on high trading volume.

279. On each of these occasions, Defendants either dramatically lowered prior earnings per share projections, or reported dramatically lower earnings per share than their previously issued guidance had projected. For example, in the February 10, 2015 form 8-K, Pier 1 lowered its fiscal 2015 EPS projection to $0.80 to $0.83 per share, ***14%*** below the low end of the Company's prior guidance of $0.95 to $1.05. Similarly, on September 24, 2015, Pier 1 announced that it had hit fully diluted earnings per share of only $0.04 versus a prior guidance in the range of $0.07 to $0.08. These declines in EPS guidance and results were the direct result of Defendants' severely reckless attempt to hide the existence markdown risk and a backlogged inventory, which, when finally confronted, required extensive markdowns resulting in immediate impact on margins and, by extension, the company's EPS. Notwithstanding this partially corrective information, Defendants' prior false statements and omissions continued to operate as a fraud on the market because the September 24 disclosure failed to disclose the full extent of the fraud, and Defendants continued to make misrepresentations to investors.

| **Date of Corrective Disclosure** | **Corrective Disclosure** | **Common Stock Price Change By Close Of Market Next Day** | **S&P 500 Price Change** |
|---|---|---|---|
| February 10, 2015 | Announcement of Defendant Turner's resignation and the Company's forecasting failures. | $16.97 per share on day of disclosure. Closed next day at $12.84.<br><br>**Percentage change: -25%** | $2,068.59 on day of disclosure. Closed next day at $2,068.53.<br><br>**Percentage change: -0.0029%** |
| September 24, 2015 | Announcement of margin pressures due to markdown activities, as well as supply chain inefficiencies. | $8.67 per share on day of disclosure. Closed next day at $7.61.<br><br>**Percentage change: -12.2%** | $1,932.24 on day of disclosure. Closed next day at $1,931.34.<br><br>**Percentage change: -0.046%** |

| | | | |
|---|---|---|---|
| December 16, 2015 | Announcement that it would be 18 months before inventory was in sync with sales. | $5.95 per share on the day of disclosure. Closed next day at $4.75. **Percentage change: Percentage Change: -20%** | $2,073.07 on day of disclosure. Closed next day at $2,041.89. **Percentage change: -1.5%** |

280. Next, on December 16, 2015, Pier 1 shocked the market, reporting that it had failed to keep inventory that tracked sales for the last 18 months, and that it would take another 18 months for Pier 1's inventory level to accurately track sales. On this news, shares of Pier 1 dropped 20%, falling from $5.95 per share to $4.75 per share on high trading volume. As illustrated by the chart below, each of these loss-causing disclosures occurred against a backdrop of little to no movements in the wider stock market:

Note: Each of the disclosures was made after markets had closed on the date of the disclosure and as such, each date-of-disclosure stock price is quoted as of close of market on that day. Accordingly, all market trades on the basis of the information disclosed occurred on the day after the disclosure.

281. None of these disclosures was sufficient on its own to fully remove the inflation from Pier 1's stock price because each of them only partially revealed the conditions, risks and trends that had been concealed from investors. The corrective impact of the disclosures alleged herein was tempered by Defendants' continued misstatements and omissions about Pier 1's purported success in building out its infrastructure to manage growing inventory levels due to the 1 Pier 1 initiative and its "clean" inventory levels with no immediate, significant or substantial markdown risk. These misrepresentations and omissions inflated and maintained the prices of Pier 1's publicly traded stock at levels that were artificially inflated, inducing members of the Class to continue purchasing Pier 1's common stock even after the truth began to partially enter the market.

## X. PRESUMPTION OF RELIANCE

282. At all relevant times, the market for Pier 1's common stock was efficient for the following reasons, among others:

a. Pier 1 stock met the requirements for listing, and was listed and actively traded on the NYSE, an open, developed and highly efficient and automated market;

b. As a regulated issuer, Pier 1 filed periodic public reports with the SEC and NYSE;

c. The price of Pier 1 common stock reacted promptly to the dissemination of new information regarding the Company;

d. Pier 1 common stock was actively traded throughout the Class Period, with substantial trading volume and average weekly turnover and high institutional investor participation. The average daily trading volume for Pier 1 common stock during the Class Period was 2,348,248 shares and the average weekly volume as a percentage of shares outstanding was 12%;

e. Pier 1 regularly and publicly communicated with investors via SEC filings and established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

f. Pier 1 was followed extensively by the media, and by numerous securities analysts employed by at least 22 major brokerage firms who wrote at least 279 analyst reports about Pier 1 during the Class Period which were distributed to those brokerage firms' sales forces and certain customers. Each of these reports was publicly available and entered the public market place.

283. As a result of the foregoing, the market for Pier 1 common stock promptly digested current information regarding Pier 1 from all publicly available sources and reflected such information in the price of Pier 1 stock. Under these circumstances, all purchasers of Pier 1 common stock during the Class Period suffered similar injury through their purchases of Pier 1 common stock at artificially inflated prices, and the presumption of reliance applies.

284. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's

excess inventory and its related trends, costs, and markdown risk and undisclosed impact on margins and earnings per share—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Pier 1's inventory, distribution centers, costs and markdown risk, as set forth above, that requirement is satisfied here.

## XI. CLASS ACTION ALLEGATIONS

285. Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the publicly-traded common stock of Pier 1 during the Class Period. Excluded from the Class are Defendants and their families, directors, and officers of Pier 1 and their families and affiliates.

286. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of Class members' claims in a class action will provide substantial benefits to the parties and the Court. Pier 1 has over 86 million shares of common stock outstanding, owned by thousands of investors.

287. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a. Whether Defendants violated the Exchange Act;

b. Whether Defendants misrepresented material facts;

c. Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d. Whether Defendants knew or were severely reckless in disregarding that their statements and/or omissions were false and misleading;

e. Whether the price of Pier 1 common stock was artificially inflated;

f. Whether Defendants' conduct caused the members of the Class to sustain damages; and

g. The extent of damage sustained by Class members and the appropriate measure of damages.

288. Lead Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

289. Lead Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Lead Plaintiff has no interests which conflict with those of the Class.

290. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

291. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false and misleading statements pleaded in this Complaint.

292. None of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Pier 1's reported inventories, including the Company's "clean" inventory, purported lack of markdown risk, inventory costs, internal controls over financial reporting, and the condition of the Company's distribution centers, stores and supply chain, among others.

293. To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those

in the statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Pier 1's reported inventories, including the Company's inventory costs, internal controls over financial reporting, and the condition of the Company's distribution centers, stores and supply chain, among others. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Pier 1 were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

294. To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those materially false and misleading forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false or misleading, and/or the false and misleading forward-looking statement was authorized and/or approved by an executive officer of Pier 1 who knew that the statement was false or misleading when made.

## XIII. CLAIMS FOR RELIEF

### COUNT I

**For Violation of Section 10(b) of the Exchange Act And Rule 10b-5 Promulgated Thereunder (Against All Defendants)**

295. Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

296. This Count is asserted on behalf of all members of the Class against all Defendants (Pier 1, Smith and Turner) for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

297. During the Class Period, Defendants disseminated or approved the false and misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary

in order to make the statements made, in light of the circumstances under which they were made, not misleading.

298. Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Pier 1 common stock during the Class Period. As detailed herein, the misrepresentations contained in, or the material facts omitted from, those statements included, but were not limited to Pier 1's excess inventory, its true markdown risk, undisclosed inefficiencies and costs in its distribution centers and supply chain, poor infrastructure, and inadequacy of internal controls.

299. Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above materially false and misleading statements intentionally or with reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Pier 1 common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiff and the Class, regarding, among other things, Pier 1's excess inventory, its true markdown risk, undisclosed inefficiencies and costs in its distribution centers and supply chain, poor infrastructure, and inadequacy of internal controls; (b) artificially inflate and maintain the market price of Pier 1 common stock; and (c) cause Lead

Plaintiff and other members of the Class to purchase Pier 1 common stock at artificially inflated prices and suffer losses when the true facts became known.

300. Defendant Pier 1 is liable for all materially false and misleading statements made during the Class Period, as alleged above, including the false and misleading statements in:

i. Pier 1's Form 10-K, filed with the SEC on April 29, 2014;

ii. Pier 1's Form 10-Q, filed with the SEC on July 9, 2014;

iii. Pier 1's Form 8-K, filed with the SEC on September 17, 2014;

iv. Pier 1's Form 10-Q, filed with the SEC on October 8, 2014;

v. Pier 1's Form 8-K, filed with the SEC on December 18, 2014;

vi. Pier 1's Form 10-Q, filed with the SEC on January 7, 2015;

vii. Pier 1's Form 8-K, filed with the SEC on January 8, 2015;

viii. Pier 1's Form 8-K, filed with the SEC on April 8, 2015;

ix. Pier 1's Form 10-K, filed with the SEC on April 28, 2015;

x. Pier 1's Form 10-Q, filed with the SEC on July 8, 2015; and

xi. Pier 1's Form 10-Q, filed with the SEC on October 7, 2015.

301. Defendant Pier 1 is further liable for the false and misleading statements made by Pier 1 officers in press releases and during conference calls and at conferences with investors and analysts, as alleged above, as the makers of such statements under the principle of respondeat superior. These statements are set forth in ¶¶ 175-198 above.

302. Defendants Smith and Turner, as top executive officers of the Company during their respective tenures, are liable as direct participants in the wrongs complained of herein. Defendants Smith and Turner are liable for the false and misleading statements they personally made and/or signed as follows:

<u>Defendant Smith</u>

i. Defendant Smith signed: (1) the Forms 10-Q that the Company filed with the SEC on July 9, 2014, October 8, 2014, January 7, 2015, July 8, 2015, and October 7, 2015; and (2) the Forms 10-K that the Company filed with the SEC on April 29, 2014 and April 28, 2015.

ii. Defendant Smith also made statements in press releases and participated in conference calls with securities analysts, in which Pier 1's financial condition was presented and discussed. Specifically, Defendant Smith made false and misleading statements on the Company's earnings conference calls held on April 10, 2014, June 19, 2014, September 17, 2014, December 18, 2014, April 8, 2015, and June 17, 2015, and in Pier 1 press releases disseminated on January 8, 2015, and April 8, 2015. Aside from the conference calls and presentations that occurred after his "resignation," Defendant Turner was also present during each of these conference calls.

Defendant Turner

i. Defendant Turner signed: (1) the Forms 10-Q that the Company filed with the SEC on July 9, 2014, October 8, 2014, and January 7, 2015; and (2) the Form 10-K that the Company filed with the SEC on April 29, 2014.

ii. Defendant Turner also participated in conference calls with securities analysts, during which Pier 1's financial condition was presented and discussed. Specifically, Defendant Turner made false and misleading statements on the Company's earnings conference call held on April 10, 2014, June 19, 2014, September 17, 2014, and December 18, 2014. Defendant Smith was also present during each of these conference calls.

303. As described above, Defendants Pier 1, Turner and Smith acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Pier 1 stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

304. The above allegations, as well as the allegations pertaining to the overall scope and breadth of the fraud at Pier 1, which resulted in continuous and material misstatements of the Company's excess inventory, its true markdown risk, undisclosed inefficiencies and costs in its distribution centers and supply chain, poor infrastructure, and inadequacy of internal controls, and related material omissions, establish a strong inference that Defendants Smith and Turner acted

with scienter in making the materially false and misleading statements set forth above during the Class Period.

305. Lead Plaintiff and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Pier 1 common stock, which inflation was removed from the prices of their shares when the true facts became known. Lead Plaintiff and the Class would not have purchased Pier 1 common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' materially false and misleading statements.

306. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages attributable to the fraud alleged herein in connection with their purchases of Pier 1 common stock during the Class Period.

## COUNT II

### For Violations of Section 20(a) of The Exchange Act (Against The Executive Defendants)

307. Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

308. This Count is asserted on behalf of all members of the Class against each of the Executive Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

309. During their tenures as senior officers of Pier 1, Smith and Turner were each a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers of Pier 1, the Executive Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. Each of these Defendants was able to and did control, directly and indirectly, the content of the following public statements made by Pier 1 during their tenures at the Company during the Class

Period, which include Pier 1's materially false and misleading financial statements contained therein, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein:

Defendant Smith (who was Pier 1's CEO throughout the Class Period):

a. The Forms 10-Q that the Company filed with the SEC on July 9, 2014, October 8, 2014, January 7, 2015, July 8, 2015, and October 7, 2015;

b. The Forms 10-K that the Company filed with the SEC on April 29, 2014 and April 28, 2015;

c. The Forms 8-K that the Company filed with the SEC on September 17, 2014 K; December 18, 2014; January 8, 2015; April 8, 2015;

d. The Company's earnings conference calls held on April 10, 2014, June 19, 2014, September 17, 2014, December 18, 2014, April 8, 2015, and June 17, 2015; and

e. March 2, 2015 Raymond James Conference presentation.

Defendant Turner (who was Pier 1's CFO from the beginning of the Class Period until February 10, 2015):

a. The Forms 10-Q that the Company filed with the SEC on July 9, 2014, October 8, 2014, and January 7, 2015;

b. The Form 10-K that the Company filed with the SEC on April 29, 2014;

c. The Forms 8-K that the Company filed with the SEC on September 17, 2014 K; December 18, 2014; January 8, 2015; and

d. The Company's earnings conference call held on April 10, 2014, June 19, 2014, September 17, 2014, and December 18, 2014.

310. In their capacities as senior corporate officers of the Company, and as more fully described above, the Executive Defendants had direct involvement in the day-to-day operations of the Company, in reviewing and managing its financial compliance, internal control procedures, and its accounting and reporting functions. The Executive Defendants signed materially false and misleading Pier 1 SEC filings during the Class Period, and were directly involved in certifying and/or approving the false statements disseminated by Pier 1 during the Class Period. As a result

of the foregoing, the Executive Defendants, as a group and individually, were controlling persons of Pier 1 within the meaning of Section 20(a) of the Exchange Act.

311. As set forth above, Pier 1 violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of Pier 1 and as a result of their own aforementioned conduct, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Pier 1 common stock. Moreover, as detailed above, during the respective times these Defendants served as officers and/or directors of Pier 1, each of these Defendants was culpable for the material misstatements and omissions made by Pier 1, as set forth above.

312. As a direct and proximate result of the Executive Defendants' conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases or acquisitions of Pier 1 common stock.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Lead Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XV. JURY DEMAND

Lead Plaintiff demands a trial by jury.

DATED: September 25, 2017

Respectfully submitted,

*/s/ David T. Moran*
David T. Moran
Texas Bar No. 14419400
**JACKSON WALKER LLP**
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
Telephone: (214) 953-6051
Facsimile: (214) 661-6677
dmoran@jw.com

*Liaison Counsel for Lead Plaintiff Municipal Employees' Retirement System of Michigan*

Adam Wierzbowski
Angus Ni
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
adam@blbglaw.com
angus.ni@blbglaw.com

*Counsel for Lead Plaintiff Municipal Employees' Retirement System of Michigan and Lead Counsel for the Putative Class*

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of September, 2017, the foregoing was filed electronically in compliance with L.R. 5.1 and has been served on all counsel who have consented to electronic service and all other counsel by regular mail.

*/s/ David Moran*
David Moran