# Exhibit A

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| TOWN OF DAVIE POLICE PENSION PLAN, individually and on behalf of all others similarly situated,<br><br>              Plaintiff,<br><br>       v.<br><br>PIER 1 IMPORTS, INC., ALEXANDER W. SMITH, and CHARLES H. TURNER.<br><br>              Defendants. | Case No. 15-cv-3415 |

## EXPERT REPORT OF MARK COHEN

I have been retained by counsel for the Plaintiffs in this action to provide my expert opinions as to the matters discussed herein.  In particular, I was asked to provide opinions on the retailing industry, Pier 1 Imports, and issues and considerations related to retail inventory and markdown risk.  This report contains my opinions on these subjects.

### PROFESSIONAL QUALIFICATIONS

I received my B.S. degree in Electrical Engineering from Columbia University's School of Engineering and Applied Science in 1969.  After my undergraduate studies, I enrolled in Columbia University's Graduate School of Business and received an M.B.A. in 1971. My Curriculum Vitae is appended to this report as **Exhibit 1**.

After graduate school, I joined Abraham & Straus's Executive Training Program and became a group buyer of men's furnishings.  Abraham & Straus was then a division of Federated Department Stores (which is now part of Macy's), and I was at Abraham and Straus from 1971 to 1977.  I then worked for Gap Stores as a General Manager from 1977 to 1979.  My next position was at Lord & Taylor as a Divisional Vice President of Menswear from 1979 to 1981. After Lord & Taylor, I worked for Mervyns Stores, then a division of Dayton Hudson Corporation, from 1981 to 1987, first as a Senior Vice President for their Men's and Boy's divisions, later as President of Mervyns South Central Territory and finally as Executive Vice President of Merchandising, Planning and Analysis.

I rejoined Federated Department Stores as President of its Goldsmith's Division from 1987 to 1988 before moving to become President, and later Chairman/CEO, of Lazarus Stores from 1988 to 1994 when Federated was acquired by Campeau Corporation (later merged with Allied Stores).  I then became Chairman/CEO of Bradlees Inc. from 1994 to 1997.

I then joined Sears Roebuck & Co. as General Merchandise Manager of the company's

women's footwear, accessories, cosmetics, bedding, bath products, floor covering, mattresses, housewares and tabletop merchandise areas.  Shortly after joining Sears Roebuck I became Chief Marketing Officer and also became President of Softlines Merchandise with additional responsibility for all overseas sourcing activities for the company and worked in these positions from 1998 to 2001.

In 2001, I became Chairman and CEO of Sears Canada Inc., an independent Canadian corporation, and served in those roles until August 2004.  At that time, Sears Canada was a $6.7 billion company doing business throughout Canada in a large network of department stores, specialty stores, quasi-franchise stores, as well as supporting an important catalog and internet-driven, direct to consumer business.  Sears Canada also was a major service provider throughout Canada in appliance delivery, installation and service, travel services, long distance telephone services, and contract logistics services.  The company also ran its own proprietary Sears Credit operation including a Sears Master Card program back-stopped by a federally-accredited national bank.

From 2006 through June 2014, I served as Professor of Retailing by contract at the Columbia University Graduate School of Business.  Since 2014, I have been Director of Retail Studies and an Adjunct Professor of Retailing at Columbia's Business School.

I maintain an independent consulting practice and have worked for retailers, manufacturers (both domestic and international) and have acted as an expert witness in various litigation actions.

I have also served on the following corporate boards:  Central Trust Corp. (a division of PNC Bank Corp.) (1988-1992), Federated/Allied Stores Corp. (1988- 1992), Bradlees Inc. (as CEO) (1994-1996), Transworld Entertainment Corp. (2002-2008), and Sears Canada Inc. (as

CEO) (2001-2004).

In addition, I have extensive experience in corporate restructuring, performance remediation, and retail turnarounds, both managed internally and in concert with outside consultants, including McKinsey, Bain, AT Kearney, Zolfo Cooper, Kurt Salmon Associates, and Deloitte, among others.  I am being compensated for my work in this action at my normal hourly rate of $1,000/hr. and the work I perform is not contingent on the outcome of this litigation.

My ability to credibly comment on this matter comes from many years of work in the retail industry, including significant experience in the business that Pier 1 represents.

## MATERIALS RELIED UPON

In preparing this report, I reviewed the documents listed in **Exhibit 2** appended hereto and/or identified herein. I received these documents from counsel, and I have assumed their authenticity. The opinions set forth below are based on my review of these documents and my experience. I may review additional documents and evidence before I testify in this matter, but I am confident that the material I have reviewed is sufficient to justify the conclusions I have reached. I reserve the right to modify or supplement my testimony at trial in light of additional information that I have not considered as of the date of this report, including any subsequent reports by expert witnesses, any arguments by counsel, or any testimony by expert or fact witnesses.

I do not believe that the conclusions I express herein depend upon the resolution of any contested issue of fact. I emphasize, however, that I have not attempted to determine any factual matter that I understand is in dispute.

**OPINION**

I.     **Retail Inventory Characterizations and Salient Inventory Issues**

A retailer's inventory is best described by way of its character, its financial value relative to its quantity, age and sales performance, and the risk it poses as a consequential asset on the retailer's balance sheet.  A retailer's inventory may be characterized in a variety of ways as follows:

1.     **"Clean" Inventory**

So-called "clean" inventory represents merchandise that is compatible with what a retailer is currently offering to its customers for sale.  Compatibility suggests that any inventory in question is congruent in style, size, and color, etc. with inventory that is being presented to customers in the normal course of doing business.  It is therefore current in age, and unremarkable in quantities on hand relative to current rates of sale.  Whether basic, seasonal or fashionable in actual composition, it poses little or no unusual financial risk, either by way of markdown exposure, or, unusual logistics expenses by way of handling.  Markdown exposure here refers to the likelihood that inventory will have to be reduced in value above and beyond original expectations to be sold.  Logistics exposure refers to the cost attendant with transporting, warehousing and staging merchandise for sale to customers.  It is incorrect for a retailer to describe inventory as "Clean" if in fact it is owned in quantities far in excess of current rates of sale and is causing that retailer to shoulder unusual expenses in holding and handling that merchandise.

2.     **"Basic" or "Staple" Inventory**

"Basic" or "Staple" Inventory is inventory that a retailer carries in its stores for sale on a perpetual basis.  It is always available for sale, season in season out, in an identical style, size

and color (if applicable).  Basic inventory typically carries little or no markdown risk since the merchandise in question is not expected to change in any way over time.  But, if that basic inventory is held in excessive quantities relative to current rates of sale, it may cause unusual logistics expenses to be borne and require markdowns.

    **3.**    **"Seasonal" Inventory**

Seasonal Inventory represents merchandise that is specifically styled and committed to in quantities so as to coincide with selling seasons across the calendar.  Examples would be: spring, summer, fall and winter.  Within these seasons lie further calendar-linked seasonal characterizations such as Father's Day, Mother's Day, and Holiday/Christmas.  Seasonal inventories must be carefully selected and then further calibrated with regard to timing of receipt and quantities both at a corporate level and by selling location, as this inventory is highly time sensitive.  Seasonal inventories lose most, if not substantially all, of their value once a seasonal period has concluded.  At face value, seasonal inventory could be seen as being able to be withdrawn and then presented anew the following year.  However, that retail practice has gone the way of the horse and buggy.  This year's Christmas motif will almost never be compatible with next year's assortments and the cost of storing and restaging old merchandise is prohibitive.

Unlike basic, staple inventory, seasonal inventories are almost always committed to by a retailer irrevocably since there is literally no time to adjust manufacturing commitments at point of origin, and delivery dates at point of sale.  Seasonal merchandise can sometimes be cancelled before it is received, but when this takes place it is typically at great cost to the retailer since manufacturers have little to no time to seek out other retailers as buyers.  Seasonal merchandise, particularly but not exclusively Holiday/Christmas merchandise, carries hard and fast sell-by dates.  To facilitate adherence to those dates, retailers typically adjust their pricing, in-season, as

needed to ensure that they are not left with unworkable end of season clearance inventory balances.  Pier 1 described engaging in this behavior during the Class Period.[1]  To remain financially viable and to protect financial liquidity all retailers who present seasonal merchandise are necessarily fixated on carefully managing the performance of their seasonal inventories on a "cradle to grave" basis.

### 4.   "Fashion" Inventory

Fashion inventory is inventory that is, by its very nature, time sensitive, as fashion preferences are usually short-lived.  Fashion inventory often is also seasonal in nature which further compounds the care with which this merchandise must be selected, the quantities that are committed to, and the manner in which this merchandise must be managed and sold.  Fashion inventory is a continuum of slightly-updated styles, colors and shapes and materials that may have been sold during a prior season, to radically new and different products never before seen by customers.  Pier 1 prided itself on presenting this latter category, as exemplified by statements that "The Experience" of shopping at Pier 1 was achieved by Pier 1 "Always" having "something new and different for the shopper to discover by frequently changing displays and inventory," and that Pier 1's "Audience" is "Women who are passionate about home decor and see it as a means to express themselves through color, new ideas and one-of-a-kind items."[2]

Fashion inventory, whether seasonally linked or not, carries substantial risk.  Customers may reject fashion inventory out of hand, or, in the normal course of a selling period, fail to buy quantities of fashion merchandise that have been procured for sale.  Fashion inventory, like

---

[1] Q3 FY14 Earnings Call (Dec. 19, 2013) ("[I]f you recall, our business model has been running for the last three, four years at about 50% regular price and 50% either clearance or promotional activity.")
[2] Raymond James 36th Annual Institutional Investors Conference Pier 1 Presentation Slides, dated March 2, 2015.

seasonal inventory, can rarely be cancelled, and also must be carefully monitored and controlled

from time of purchase to sale.  Whether sold in the normal course as originally planned, or

deeply discounted, fashion merchandise also carries discernable "sell-by" dates, as unsold

inventory blocks the flow of new incoming fashion merchandise that a retailer has inserted into

its inventory pipeline.  Both fashion inventory and seasonal inventory are sometimes referred to

as potentially "obsolete" inventory as they are both always subject to markdown (and therefore

gross margin) risks.  Fashion inventory risk is based upon consumer preferences, and seasonal

inventory risks are based upon the irrefutable movement of selling seasons across the calendar.

### 5.      Inventory Risk Characterization

Inventory risk represents a broad spectrum of liability which is integrally linked to

inventory by type.  Basic inventory which sells constantly and consistently over time poses

limited risk.  If basic inventory levels have, for whatever reason, become excessive relative to

current sales, then forward, inventory commitments can be adjusted to enable appropriate

inventory levels to be restored.  However, as stated above, the only caveat that I would add to

temporize this view would be with regard to massive excess basic inventory.  Massive excess

inventory that is seasonal and/or fashionable always presents extraordinary markdown risks in

addition to added logistics burdens and expenses.

### 6.      Excess Inventory Characterization

Excess inventory is universally defined in the retail industry as quantities of inventory

that do not bear a reasonable relationship to current rates of sale.  Inventory such as much of

what Pier 1 carries takes up significant physical space and carries with it significant handling

requirements.  Excess inventory must be "put" somewhere, then reintegrated into selling

inventory in the normal course.  This always results in additional space, labor and transportation

expense. While high but not abnormally excessive basic inventory can be described with some qualification as "clean," excess seasonal and/or fashion inventory can never be accurately described as "clean."  To do so would be a categorical misrepresentation of fact.

## II.    The Pier 1 Business Model

### 1.    Pier 1: The Store

Pier 1 is a specialty retailer doing business at the outset of the Class Period through a network of 1000 stores widely dispersed throughout the United States and Canada. The Company, by its own characterization, sells a wide variety of furniture, decorative home furnishings, dining and kitchen goods, candles, gifts and other specialty items for the home. Much of this merchandise is procured overseas and produced expressly for Pier 1.  Though there are some apparent "basic and staple" products in the Pier 1 mix, they are clearly not the heart of Pier 1's presentation to its customers.  The assortments that Pier 1 sells are by their very nature highly concentrated in seasonal and fashion products.  This means that Pier 1's inventory was constantly susceptible to becoming obsolete, and thus always subject to regular markdowns. Therefore, claims by Pier 1 that the Company was not subject to immediate, significant or substantial markdown risk specifically addressed the notion that there was no risk of extraordinary markdowns beyond the regular markdown cadence.

### 2.    Pier 1 on the Internet

In 2012, Pier 1 launched an omni-channel strategy through the introduction of a pier1.com web site.  The strategy was based upon the belief that Pier 1 could significantly grow its volume by making its merchandise available to customers online.  To support this strategy, Pier 1 engaged in what I would call a "Hail Mary" pass by artificially creating top-down driven, aggressive and highly inflated sales plans, which caused the organization to dramatically

increase its investment in inventory.  Pier 1 did not achieve its aggressive and highly inflated sales plans, and as a result, the crisis the Company faced, like the fabled Walt Disney Sorcerer's Apprentice cartoon, was an unending flood of excess and unwarranted inventory.

III.    **Pier 1's Excess Inventory and Markdown Risk**

1.      **Reckless Full-Scale Launch of pier1.com**

Management chose to adopt an arbitrary and aggressive sales plan to support the launch of pier1.com.  But, management should have taken a far more conservative view of the potential and actual build-up of excess inventory driven by those sales plans as soon as those sales plans were not achieved.

2.      **Reckless Disregard of Red Flags of Markdown Risk**

Retail executives are focused on inventory performance, inventory levels, and the amount of markdown risk facing their company at any given time.  In my experience, retail CEOs and CFOs always spend a substantial amount of their time monitoring and dissecting their company's inventory.  This is a routine aspect of their job.  During the Class Period, numerous red flags signaling excess inventory and immediate, significant and substantial markdown risk existed at Pier 1.  In my experience, every retail CEO and CFO would have immediately become aware of the presence of excessive inventory, much less an inventory excess of the extent that existed at Pier 1.   The red flags took the following forms:

- ***Abnormally High Rate of Inventory Increase***.  During the Class Period, there was an abnormally high increase in the rate of inventory growth at Pier 1, which diverged dramatically from the rate of sales growth.[3]  This was a red flag signaling immediate, significant and substantial markdown risk.

---

[3] As alleged in the Amended Class Action Complaint, the truth of which I have assumed.

- ***Abnormally High Distribution Center Costs***:  During the Class Period, the costs for Pier 1's distribution network to handle the extraordinary influx of incremental (*i.e.*, outside the normal course of business) inventory (during each of calendar years 2014 and 2015) were abnormally high, with non-discretionary capital expenditures alone of approximately 6-7 times the yearly average for the previous decade.[4]  Costs for renting third party warehouses alone topped $1 million per year.[5]  Shuttling costs between distribution centers and third party warehouses exceeded $1 million in at least two distribution center locations in 2014.[6]  In 2014, Pier 1 also had to spend over $10 million on warehouse racking equipment alone to handle incoming inventory.  These abnormally high costs were a red flag, which could not have been ignored, and a vivid indication of a buildup of excessive and unsold inventory that created significant markdown risk.

- ***"Most" of the Increase in Storage Capacity at Pier 1 Was in "Temporary" Storage***: Pier 1's need for temporary storage capacity during the Class Period was extraordinary. CFO Jeff Boyer stated on Pier 1's September 24, 2015 earnings call that, "We increased our capacity by re-racking the DCs and moving into additional storage space, most of which is temporary and a lesser amount permanent."[7]  The fact that "most" of Pier 1's increase in storage capacity was "temporary" demonstrates further that the inventory increase experienced during the Class Period was abnormal.  This was yet another red flag signaling significant incremental markdown risk.

- ***Abnormally High Number of Backlogged Shipping Containers***.  During the Class

---

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] Pier 1 Q3 FY16 Earnings Call Transcript, dated September 24, 2015.

Period, Pier 1 had an abnormally large number of backlogged containers full of merchandise that had not yet been unloaded outside of each of the Pier 1 distribution centers.  For example, as of October 2014, there were almost 1,000 shipping containers containing merchandise outside of Pier 1's Baltimore distribution center, and in late 2014, thousands of containers were sitting outside of distribution centers across the balance of Pier 1's distribution network.[8]  This abnormally large number of unopened shipping containers filled with inventory for a fashion and seasonal-based retailer like Pier 1 in particular is another red flag of immediate, significant and substantial markdown risk because merchandise in a shipping container is obviously not available for sale and its existence causes an inventory aging time bomb to tick away. Every senior retail executive knows the jeopardy of owned but unavailable for sale inventory, which lies in the manner in which it inevitably causes incremental markdowns.

- ***Reliance on Third Party Labor and Rented Equipment***.  During the Class Period, Pier 1 needed to rely on third party labor and rented equipment to store and move inventory.[9] This is another red flag that further demonstrated the inability of the Pier 1 salaried staff to handle this excessive incoming inventory.

- ***Failure to Pay Bonuses***.  During calendar years 2014 and 2015, Pier 1 did not pay bonuses to its employees because of missed sales targets.  Indeed, the Defendants themselves were denied short-term incentive compensation for the Company's failure to meet EBITDA targets.[10]  Pier 1's failure to pay bonuses and incentive compensation based on missed sales is a further red flag signaling the crisis caused by using

---

[8] As alleged in the Amended Class Action Complaint, the truth of which I have assumed.
[9] *Id.*
[10] *Id.*

unwarranted sales plans to recklessly drive incremental inventory levels. Failure to meet sales plans in juxtaposition with the excessive level of inventory and the attendant markdown reckoning that this would cause could not possibly have gone unnoticed.

- ***Overriding the Demand Chain Management System***. During fiscal year 2014, Pier 1 overrode its Demand Chain Management System in order to send more products from its distribution centers to its stores than that DCM system called for. The DCM system's recommendations were based on past sales.[11] Pier 1 management's decision to override the DCM system is a further red flag signaling immediate, significant and substantial markdown risk because it clearly showed that current store sales did not support the level of inventory that Pier 1 was carrying and shipping to stores.

- ***March 2014 Town Hall Meeting***. During Pier 1's March 2014 town hall meeting, former CEO Smith admitted that Pier 1 had been overly ambitious with its sales goals and merchandise purchases.[12] This is a further red flag of immediate, significant and substantial markdown risk. Over-buying merchandise on a company wide scale, as occurred and acknowledged internally by the Company's CEO, is a red flagged recognition at the highest level of a crisis revealed but not yet solved.

- ***February 2015 Admission that Pier 1 Failed to Adequately Forecast Revenue and Expenses and Departure of CFO***. On February 10, 2015, Pier 1 announced that it was revising its financial guidance downward for the fiscal year ending February 28, 2015, and that its CFO, Defendant Turner was leaving the Company. Smith stated that, "The failure to adequately forecast the revenue and expenses in our business is a financial issue

---

[11] *Id.*
[12] *Id.*

which has been aggressively addressed."[13]   Pier 1's failure to adequately forecast its revenue and expenses and the departure of its CFO were also red flags of immediate, significant and substantial markdown risk because the Company's then-current inventory level was based on the past forecasted sales that admittedly did not occur and led to termination of the CFO.  As of February 2015, Pier 1's inventory purchases based on Turner's forecasts would still be scheduled to be delivered over the next 6-9 months, while Pier 1 already had an excessive amount of inventory.

- ***Commentary from Third Parties***.  On February 11, 2015, market analyst Wedbush reported that inventories at Pier 1 were "bloated" and that "markdown risk is high."[14]  This commentary from a third party investment commentator was a further red flag of the existence of "high" markdown risk at Pier 1.

In sum, merchandise inventory, once committed to, manufactured, shipped to company distribution centers and stores has nowhere to go in the normal course except to customers as sales.  The flood of inventory that began to arrive at Pier 1, far in excess of the Company's sales, created a catastrophic logistics crisis.  This merchandise, often large and bulky in dimension, overwhelmed the Company's storage capacity.  The Company's stores were never designed or built to house large quantities of slow-selling products.  Neither was Pier 1's distribution network, which was not scalable during the Class Period and no doubt designed and built for through put, not for sustained storage of excess inventory.  The Company's distribution network and stores were clearly overwhelmed.  The net effect was that, in addition to loading its balance sheet with unwarranted levels of inventory, the Company contracted with third party warehouses,

---

[13] Pier 1 Press Release, dated February 10, 2015.
[14]  Wedbush Analyst Report, dated February 11, 2015.

rented large numbers of outside storage trailers, and caused at least 40% of its stores to rent and fill "storage pods" to stash this torrent of merchandise. Inventory levels at a retail store are excessive and not "extraordinarily well-controlled" when the store needs to resort to using costly, external containerized storage to store merchandise. It is simply inconceivable that these red flags described could not have been noted by senior management.

### 3. Reckless Failure to Immediately Begin to Remediate the Excess Inventory

At the first sign of the myriad warnings and red flags emanating from the organization, senior Pier 1 executives should have acknowledged this crisis and begun an immediate process of remediation. They certainly should have stopped describing Pier 1's inventory as "clean" and claiming that Pier 1 had no "immediate," "significant," or "substantial" markdown risk.[15] Management's incorrect statements with regard to inventory and markdown risk in 2014 and 2105 fly in the face of the inevitable, extraordinary markdowns that the Company was forced to take in 2015 and continuing for the next 18 months.

### IV. Pier 1's Explanations for the Inventory Backlog Are Unconvincing

At various times during the Class Period, Pier 1 explained its inventory increases based on reasons that are unconvincing.

For example, on December 18, 2014, Pier 1 claimed that its inventory increase of $106.4 million, leading to its highest-ever inventory level, was "primarily" the result of "merchandise

---

[15] Pier 1 Q1 FY15 Earnings Call Transcript, dated June 19, 2014 (Smith: "in terms of the pressure it is not so much the markdown pressure, I mean we continue to run a very clean inventory as I know you know."); Pier 1 Q3 FY15 Earnings Call Transcript, dated December 18, 2014 (Smith: "We do not see any significant markdown risk."); Raymond James 36th Annual Institutional Investors Conference Pier 1 Presentation Slides, dated March 2, 2015 (Pier 1: "Current inventory composition does not present an immediate or significant markdown risk."); Pier 1 Q4FY15 Earnings Call Transcript, dated April 8, 2015 (Interim CFO: "The complexion of our current inventories level ... does not pose a significant immediate markdown risk.")

in-transit due to earlier deliveries in advance of the Chinese New Year." This suggested that the Chinese New Year Holiday was somehow a unique cause of that fiscal quarter's inventory increase (versus the same prior fiscal quarter). Use of the Chinese New Year Holiday as the "primary" rationale for a uniquely large inventory increase of this scope is incomprehensible to me. The Chinese New Year Holiday occurs every year at more or less the same time. Since time immemorial, retailers who procure merchandise manufactured in China have recognized the timing and effect of this holiday on the movement of their goods. Suggesting that the Chinese New Year holiday somehow had a unique impact on that quarter's inventory is simply nonsense.

Weather is a potentially causal issue with regard to poor sales versus sales plans. However, Pier 1 has blamed the abnormally cold Northeast and mid-Atlantic winter of 2013-2014 for both that season's lower-than-expected sales as well as the poor sales the same quarter the following year (when inventory increased by $101.1 million versus an increase of $21.6 million in the original quarter affected by the bad weather). This explanation makes no sense, especially in light of the fact that comparable sales grew.

## V.    CONCLUSION

In my 35 years of active employment in retailing, well over 20 of which were in senior management roles, I have, thankfully, never caused an inventory crisis such as that the Defendants in this matter are responsible for causing. I have however, on quite a few occasions been tasked with cleaning up others' missteps.

Excessive inventory can never be ignored. Its presence can never be denied. Its remediation always results in incremental markdowns and operating expense. Sweeping the presence of excessive inventory under a rug is completely unwarranted if only because excessive inventory never goes away until remediated. I have seen this movie many times in my career and

unfortunately it always has the same ending.

Dated: September 25, 2017

_____
Mark Cohen

# **<u>Exhibit 1</u>**

# MARK A. COHEN

mac2218@gsb.columbia.edu
212 854 0630

---

| | | |
|---|---|---|
| **EXPERIENCE** | **DIRECTOR of RETAIL STUDIES**<br>**Columbia University**<br>**Graduate School of Business**<br>**Adjunct Professor** | July 2014 -<br>Present |

**PROFESSOR OF RETAILING (by contract)**
**Columbia University**
**Graduate School of Business**

May 2006 – June 2014

**CHAIRMAN AND CHIEF EXECUTIVE OFFICER**
**Sears Canada Inc.**

January 2001–
August 2004

- Independent Canadian company whose majority shareholder is Sears Roebuck & Co. (54%).
- $6.5 billion CDN volume.
- Operator of 122 conventional department stores (50/50 balance of sale, softlines to hardlines).
- Operator of 48 off mall specialty home stores (furniture, appliances and mattresses) 140, dealer stores (appliances, lawn and garden,electronics and furniture and mattresses), 48 floor covering centers and 11 outlet stores.
- Operator of Canada's largest general merchandise catalog business serviced by over 2200 catalog service locations.
- Operator of Canada's largest retail web based business (Sears.ca).
- Recently certified as a schedule 1 national bank in support of Sears Canada credit including Sears Mastercard, as well as ancillary financial products and services.
- Operator of other consumer driven businesses such as travel, home improvement products and services, long distance telephone services, etc.

**PRESIDENT SOFTLINES, CHIEF MARKETING OFFICER**
**Sears Roebuck & Co.**

August 1999 –
January 2001

- Responsible for all apparel, accessories, footwear, cosmetics, fine jewelry, home fashions and home furnishings.
- Responsible for product development and world wide sourcing.
- Continued responsibility for all corporate wide marketing.

**EXECUTIVE VICE PRESIDENT, MARKETING**
**Sears Roebuck & Co.**

December 1998 –
August 1999

- Reorganized all marketing activities and staff into one central organization.
- Redesigned corporate positioning program and creative presentation.
- Responsible for all image, positioning, branding, promotion, multi-cultura. marketing, event  marketing, direct mail, customer data base management, as

**MARK A. COHEN**
**Page -2-**

well as specialty catalog marketing.

| | |
|---|---|
| **SENIOR VICE PRESIDENT, MERCHANDISING**<br>**Sears Roebuck & Co.** | February 1998 –<br>December 1998 |

- Responsible for accessories, fine jewelry, cosmetics, footwear, bed, bath, window, floor coverings, housewares and luggage.

| | |
|---|---|
| **CHAIRMAN/CHIEF EXECUTIVE OFFICER**<br>**Bradlees Inc.** | 1995 – 1997 |
| **CHAIRMAN/CHIEF EXECUTIVE OFFICER**<br>**Lazarus Department Stores** | 1988 – 1995 |
| **PRESIDENT**<br>**Lazarus Department Stores** | 1988 – 1989 |
| **PRESIDENT**<br>**Goldsmith's Department Stores** | 1987 – 1988 |
| **SENIOR EXECUTIVE VICE PRESIDENT**<br>**PRESIDENT, SOUTH CENTRAL TERRITORY**<br>**SENIOR VICE PRESIDENT, MEN'S AND BOYS WEAR**<br>**Mervyn's Stores** | 1981 – 1987<br>1982 – 1986<br>1981 - 1982 |
| **DIVISIONAL VICE PRESIDENT, MEN'S WEAR**<br>**Lord & Taylor** | 1979 - 1981 |
| **GENERAL MANAGER**<br>**Gap Stores Inc.** | 1977 - 1979 |
| **BUYER, MEN'S FURNISHINGS**<br>**Abraham & Straus** | 1971 - 1977 |
| **NUCLEAR TECHNICIAN**<br>**International Atomic Energy Agency (IAEA), Universite**<br>**Lovanium, Democratic Republic of the Congo (Zaire)** | 1969 - 1970 |

---

| | | |
|---|---|---|
| **EDUCATION** | ▪ **MBA, Columbia University, New York** | 1971 |
| | ▪ **BS ELECTRICAL ENGINEERING, Columbia University, New York** | 1969 |

# **<u>Exhibit 2</u>**

## <u>List of Materials Relied Upon</u>

1. Consolidated Class Action Complaint in *Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*, Case No. 15-cv-3415, dated August 8, 2016.  ECF No. 56.

2. Defendants' Brief in Support of Motion to Dismiss the Consolidated Class Action Complaint, dated October 21, 2016.  ECF No. 69.

3. Lead Plaintiff's Opposition to Defendants' Motion to Dismiss The Consolidated Class Action Complaint, dated December 20, 2016.  ECF No. 71.

4. Defendants' Reply Brief in Support of Motion to Dismiss The Consolidated Class Action Complaint, dated January 20, 2017.  ECF No. 73.

5. Memorandum Opinion and Order Dismissing the Consolidated Class Action Complaint, dated August 10, 2017.  ECF No. 85.

6. The as-filed copy of the Amended Class Action Complaint.

7. Pier 1 Q3 FY14 Earnings Call Transcript, dated December 19, 2013.

8. Pier 1 Q4 FY14 Earnings Call Transcript, dated April 10, 2014.

9. Pier 1 Q1 FY15 Earnings Call Transcript, dated June 19, 2014.

10. Pier 1 Q2 FY15 Earnings Call Transcript, dated September 17, 2014.

11. Pier 1 Q3 FY15 Earnings Call Transcript, dated December 18, 2014.

12. Pier 1 Press Release, dated February 10, 2015.

13. Wedbush Analyst Report, dated February 11, 2015.

14. Raymond James 36th Annual Institutional Investors Conference Pier 1 Presentation Slides, dated March 2, 2015.

15. Pier 1 Q4FY15 Earnings Call Transcript, dated April 8, 2015.

16. Pier 1 Q1FY16 Earnings Call Transcript, dated June 17, 2015.

17. Pier 1 Q2FY16 Earnings Call Transcript, dated September 24, 2015.

18. Pier 1 Q3FY16 Earnings Call Transcript, dated December 16 2015.