# United States District Court
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

Town of Davie Police Pension Plan,
individually and on behalf of all others
similarly situated,
Plaintiff

v.

Pier 1 Imports, Inc., Alexander W. Smith, and
Charles H. Turner,
Defendants

Case No.: 3:15-cv-03415-S

## MEMORANDUM OPINION AND ORDER

This Order addresses Defendants Pier 1 Imports, Inc. ("Pier 1" or the "Company"), Alexander W. Smith ("Smith"), and Charles H. Turner's ("Turner") Motion to Dismiss Plaintiff Municipal Employees' Retirement System of Michigan's ("MERS") Amended Class Action Complaint ("Amended Complaint") [ECF No. 93]. For the reasons stated below, the Court grants the motion.

## I. BACKGROUND OF THE CASE

### A. Procedural History

This case is a putative class action alleging claims for securities fraud, in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Securities Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder. Per Special Order 3-318, this case was transferred from the docket of Judge Sidney A. Fitzwater to the docket of this Court on March 8, 2018.

The original complaint was filed on October 21, 2015. The Court held a motion hearing on March 11, 2016, to determine the lead plaintiff and to select lead counsel. Following proceedings required by the Private Securities Litigation Reform Act ("PSLRA"), the Court appointed MERS as lead plaintiff on April 25, 2016.

MERS filed a Consolidated Class Action Complaint (the "Previous Complaint") on August 8, 2016. Defendants filed their first motion to dismiss on October 21, 2016. The Court requested oral argument from the parties, and the parties attended a motion hearing on April 28, 2017. The Court issued a lengthy memorandum opinion and order granting Defendants' first motion to dismiss on August 10, 2017, but allowing MERS the opportunity to replead (the "Fitzwater Order"). MERS filed the Amended Complaint on September 25, 2017. Defendants subsequently filed a second motion to dismiss on November 22, 2017.

The parties attended a status conference hearing ordered by this Court on March 22, 2018, and requested an oral argument on the pending motion. The Court granted the request, and the parties attended a motion hearing on April 19, 2018.

## B. Origins of the Claim

The facts set out here are taken primarily from the Amended Complaint. MERS brings this putative class action against Defendants Pier 1, Pier 1's former Chief Executive Officer, Smith, and Pier 1's former Chief Financial Officer, Turner, on behalf of itself and all other persons or entities who purchased or otherwise acquired the publicly-traded stock of Pier 1 during the period from April 10, 2014, through December 17, 2015 (the "Class Period"). MERS alleges that Defendants committed securities fraud "when, after excess inventory accumulated at Pier 1, after excess inventory imposed significant costs on the Company, and after this resulted in significant

markdown risk, Defendants, with severe recklessness, falsely and misleadingly misrepresented to investors the true state of affairs at Pier 1." Am. Compl. ¶ 1.

Pier 1 is a specialty retailer that sells decorative home furnishings at more than 1,000 stores in the United States and Canada, as well as through its website, Pier1.com. *Id.* ¶ 2. Smith became Pier 1's CEO in February 2007, following seven consecutive quarterly losses at the Company. *Id.* ¶ 31. According to the Amended Complaint, Pier 1 embarked on a series of expansion campaigns in the early 2000s, after its sales reached $1 billion. *Id.* ¶ 30. However, by 2007, sales plummeted, and the Company reported a $227 million loss for that fiscal year. *Id.* After Smith was named CEO, he adopted a cost-cutting strategy centered on aggressive inventory management. *Id.* ¶ 31. Smith announced on a conference call with analysts and investors that Pier 1 would "tighten up our supply chain," in order to "drive down costs, reduce lead times, and increase inventory turn." *Id.* ¶ 36. Turner was chosen to lead this effort and was tasked with taking over Pier 1's entire supply chain distribution system. *Id.* By 2009, Pier 1's financial condition had improved, but a shift in the industry toward online retail put new pressure on Pier 1 to enter the online market. *Id.* ¶¶ 38, 53. In response, Smith and Turner developed an "omni-channel" initiative to integrate online and in-store sales. *Id.* ¶ 53. Referred to as "1 Pier 1," the initiative allowed customers to shop online and have their purchases shipped to their homes, or to pick them up at Pier 1's U.S. stores without incurring shipping charges. *Id.* 1 Pier 1 launched in August 2012. *Id.*

The development of the 1 Pier 1 initiative required substantial investments in Pier 1's inventory management and distribution network. *Id.* ¶ 54. During a May 2013 conference call with analysts and investors, Pier 1's Executive Vice President of Planning and Allocations, Michael Benkel ("Benkel"), stated that Pier 1 had upgraded its planning and allocation systems to accurately monitor and maintain inventory in line with sales. *Id.* According to Benkel, the new

systems "resulted in more accurate projection, improved assortment planning and optimal [Distribution Center] inventories to drive sales." *Id.* During the Class Period, Defendants represented to investors on various occasions that Pier 1 was operating with a "clean"[1] inventory, that Pier 1 had the resources and infrastructure in place to scale the business, and that Pier 1's increasing inventory did not present "immediate," "significant," or "substantial markdown risk." *Id.* ¶ 3.

MERS alleges that, despite the reassurances and optimistic forecasts from Pier 1 and its top executives, Pier 1 was carrying abnormally high amounts of slow-moving inventory that represented significant markdown risk. *Id.* ¶ 6. According to MERS, Pier 1's distribution centers and logistics network "were flooded with excess merchandise." *Id.* ¶ 13. MERS claims that Pier 1 had to resort to employing outside labor and third parties to manage the inventory, and non-discretionary expenditures related to capital improvements were approximately six to seven times higher than average. *Id.* ¶ 13.

MERS alleges that Smith and Turner knew of—or were severely reckless in disregarding—Pier 1's excessive inventory and markdown risk. MERS alleges, "There were numerous red flags of excess inventory, significant markdown risk, and undisclosed costs at Pier 1." *Id.* ¶ 9. For example, during a March 2014 internal Pier 1 town hall meeting, Smith admitted that he was responsible for pushing overly high sales goals on Pier 1 employees and for underestimating what it would take to achieve them. *Id.* ¶ 10. In October 2014, Smith personally inquired of a former employee how he planned to deal with an almost 1,000-container backlog at the Baltimore distribution center. *Id.* ¶ 12.

---

[1] MERS alleges in the Amended Complaint that Defendants used "clean" to describe "inventory that did not carry a substantial or significant markdown risk because Pier 1 had just taken the necessary markdowns to reduce excess merchandise." Am. Compl. ¶¶ 251-52.

According to the Amended Complaint, Pier 1 did not disclose to its investors the existence and magnitude of its excess inventory and markdown risk until it made a series of "partial corrective disclosures" in 2015. *Id.* ¶ 16. On February 10, 2015, Pier 1 announced that it had higher costs resulting from "unplanned supply chain expenses" and announced the departure of Turner as CFO. *Id.* In response to these revelations, the price of Pier 1's stock fell 25 percent—from $16.97 per share on February 10, 2015, to $12.84 per share on February 11, 2015. *Id.*

MERS alleges that, during the months that followed, Pier 1 made a series of misrepresentations and omissions, including that Pier 1's inventory complexion was "healthy" and did "not pose a significant immediate markdown risk." *Id.* ¶ 17. On September 24, 2015, however, Pier 1 announced that its inventory had caused "issues" within its supply chain, that there were "inventory related inefficiencies within the Company's distribution center network," and that it needed to resort to increased clearance activity to sell off the excess. *Id.* ¶ 18. MERS alleges that, in response to these announcements, Pier 1's stock price fell by more than 12 percent—from $8.67 per share on September 24, 2015, to $7.61 per share on September 25, 2015. *Id.* ¶ 19.

On December 16, 2015, MERS alleges that Pier 1 confirmed for the first time that it would take at least 18 months before inventory levels would be in line with actual demand. *Id.* ¶ 20. Pier 1's interim CFO, Laura Coffey ("Coffey"), also disclosed that only four of the Company's six distribution centers were operating with "acceptable levels of efficiencies." *Id.* MERS alleges that, in response to these disclosures, Pier 1's shares again plummeted by 20 percent in one day—from $5.95 per share on December 16, 2015, to $4.75 on December 17, 2015. *Id.* In all, Pier 1's stock dropped from a Class Period high of $18.67 on April 28, 2014, to $4.75 on December 17, 2015, a reduction of more than 65 percent. *Id.* ¶ 21. Smith ultimately departed as CEO at the end of 2016. *Id.* ¶ 27.

MERS asserts two claims in the Amended Complaint. Count I alleges that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5. Count II alleges that Smith and Turner are liable as control persons under Section 20(a) of the Exchange Act.

## II. LEGAL STANDARD

### A. The Rule 12(b)(6) Standard

To defeat a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 742 (5th Cir. 2008). To meet this "facial plausibility" standard, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility does not require probability, but a plaintiff must establish "more than a sheer possibility that a defendant has acted unlawfully." *Id.* The Court must accept well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mutual Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). However, the Court does not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007). A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (internal citations omitted).

In ruling on a Rule 12(b)(6) motion, the Court limits its review to the face of the pleadings. *See Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). The pleadings include the complaint

and any documents attached to it. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). However, the Court may also consider documents outside of the pleadings if they fall within certain limited categories. First, a "court is permitted . . . to rely on 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). Second, a "court may consider documents attached to a motion to dismiss that 'are referred to in the plaintiff's complaint and are central to the plaintiff's claim.'" *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 546 (5th Cir. 2010) (quoting *Scanlan v. Tex. A & M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003)). Third, "[i]n deciding a 12(b)(6) motion to dismiss, a court may permissibly refer to matters of public record." *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994) (internal citations omitted); *see also, e.g.*, *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (stating, in upholding district court's dismissal pursuant to Rule 12(b)(6), that "the district court took appropriate judicial notice of publicly-available documents and transcripts produced by the [Food and Drug Administration], which were matters of public record directly relevant to the issue at hand." (internal citations omitted)).

The ultimate question is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff. *Great Plains Tr. Co. v. Morgan Stanley Dean Witter*, 313 F.3d 305, 312 (5th Cir. 2012). At the motion to dismiss stage, the Court does not evaluate the plaintiff's likelihood of success. It only determines whether the plaintiff has stated a claim upon which relief can be granted. *See Mann v. Adams Realty Co.*, 556 F.2d 288, 293 (5th Cir. 1977).

### B. The Rule 9(b) Standard

Because the Amended Complaint alleges fraud, MERS must plead the elements of its claims with the heightened particularity required by Rule 9(b). *See, e.g.*, *Coates v. Heartland*

*Wireless Commc'ns, Inc.*, 26 F. Supp. 2d 910, 914 (N.D. Tex. 1998). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). "At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003) (quoting *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1139 (5th Cir. 1992). Put simply, 9(b) requires the "who, what, when, where, and how" of the fraud. *United States ex rel. Williams v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 453 (5th Cir. 2005) (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)).

### C. The Pleading Standard under the PSLRA

Pleadings in federal securities fraud actions must also comply with the strictures imposed by the PSLRA. *See* 15 U.S.C. § 78u-4(b). "The PSLRA has raised the pleading bar even higher and enhances Rule 9(b)'s particularity requirement for pleading fraud in two ways." *Neiman v. Bulmahn*, 854 F.3d 741, 746 (5th Cir. 2017) (quoting *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 956 (5th Cir. 2016)). "First the plaintiff must specify each statement alleged to have been misleading." *Id.* (internal quotation marks and citation omitted); *see also* 15 U.S.C. § 78u-4(b)(1). "Second, for each act or omission alleged to be false or misleading, plaintiffs must state with particularity facts giving rise to a strong inference that the

defendant acted with the requisite state of mind." *Neiman*, 854 F.3d at 746 (internal quotation marks and citation omitted); *see also* 15 U.S.C. § 78u-4(b)(2)(A).

## III. ANALYSIS

### A. Violations of the Exchange Act

MERS alleges that Pier 1 and its two most senior former executives, Smith and Turner, committed securities fraud in violation of Section 10(b) of the Exchange Act and Rule 10b-5 by knowingly or recklessly making material misstatements or omissions regarding Pier 1's financial metrics; distribution network, inventory levels, and markdown risk; internal controls; and increasing costs tied to excess inventory. To state a claim under Section 10(b) and Rule 10b-5, "a plaintiff must allege, in connection with the purchase or sale of securities, '(1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused [the plaintiff's] injury.'" *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406-07 (5th Cir. 2001) (quoting *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994)); *see also Neiman*, 854 F.3d at 746.

To avoid dismissal when pleading a false or misleading statement or omission as the basis for a Section 10(b) and Rule 10b-5 claim, a plaintiff must:

> (1) specify . . . each statement alleged to have been misleading, i.e., contended to be fraudulent; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representations; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.

*Neiman*, 854 F.3d at 746 (alterations and ellipses in original) (quoting *Goldstein v. MCI WorldCom*, 340 F.3d 238, 245 (5th Cir. 2003)).

To establish scienter in a securities fraud case, a plaintiff must show that the defendant made a misrepresentation or omission with "an intent to deceive, manipulate, or defraud," or that the defendant acted with "severe recklessness." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004) (internal quotation marks omitted) (quoting *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961-62 (5th Cir. 1981) (en banc)).

> [Severe recklessness] is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Neiman*, 854 F.3d at 747 (quoting *Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 684 (5th Cir. 2014)).

In addition to its Section 10(b) and Rule 10b-5 claim, MERS alleges that Smith and Turner are liable for violations of Section 20(a) of the Exchange Act in their role as control persons of Pier 1 during the Class Period. "Under Section 20(a), a person who exerts control over a person who violates any provision of the Securities Exchange Act can be held jointly and severally liable with the primary actor of the underlying securities law violation." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 206 n.4 (5th Cir. 2009). Nonetheless, "[c]ontrol person liability is secondary only and cannot exist in the absence of a primary violation." *Southland*, 365 F.3d at 383 (citing *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1021 n.8 (5th Cir. 1996)).

### B. The Court Grants the Motion to Dismiss

Defendants move to dismiss the Amended Complaint on the following grounds: (1) the Amended Complaint does not adequately plead that Defendants made any misleading statements or omissions, and (2) the Amended Complaint does not plead the requisite strong inference of

scienter. Defendants argue, the "Amended Complaint adds nothing to overcome the deficiencies in the [Previous] Complaint." Defs.' Br. 50. According to Defendants, "MERS'[s] case remains, at best, 'fraud by hindsight,' and more correctly, 'inaccurate forecasting by hindsight.'" *Id.* at 4.

Although MERS has made substantial changes to its pleading in an attempt to cure the deficiencies identified in the Fitzwater Order, the Court finds that the Amended Complaint still fails to plead the requisite strong inference of scienter. "The PSLRA pleading standard for scienter is especially challenging for plaintiffs." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005). Pursuant to the PSLRA, failure to adequately plead scienter requires dismissal of the complaint. *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006) (citing 15 U.SC. § 78u-4 (b)(3)(A)).

### *i. Legal Framework*

The Supreme Court has outlined a framework for analyzing motions to dismiss Section 10(b) complaints based on a failure to plead a strong inference of scienter. First, as in any other motion to dismiss, the Court accepts all factual allegations in the complaint as true. *Tellabs*, 551 U.S. at 322. Second, the Court considers the entire complaint, other sources typically examined in a Rule 12(b)(6) motion, sources incorporated by reference into the complaint, and matters of which a court may take judicial notice. *Id.* Third, in determining whether the pleaded facts give rise to a strong inference of scienter, the Court must take into account plausible opposing inferences. *Id.* at 323. The Court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. *Id.* at 324. The Supreme Court noted, "The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?" *Id.* The inference of scienter need not be irrefutable, nor even the most

compelling of all competing inferences, but must be more than merely reasonable or permissible— it must be strong in light of other inferences. *Id.* A complaint will survive only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged. *Id.*

Building on this framework, the Fifth Circuit has stated that "allegations of motive and opportunity standing alone" are not enough to establish scienter, but such circumstantial evidence may "meaningfully enhance the strength of the inference of scienter." *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008). The Fifth Circuit has also rejected the group pleading approach to scienter, which would allow a plaintiff to prove a state of mind through the collective knowledge of all the corporation's officers and employees. *Id.* Instead, the Court looks only to the state of mind of the corporate officials who made or issued the alleged misleading statement to determine whether a complaint sufficiently pleads scienter. *Id.* The Fifth Circuit also discounts confidential sources, reasoning, "Such sources afford no basis for drawing the plausible competing inferences required by *Tellabs*." *Id.* at 535. Confidential sources must be described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information pleaded. *Id.*

### ii. Deficiencies Identified in the Previous Complaint

In the Fitzwater Order, the Court found that MERS failed to adequately plead that Smith or Turner had a motive to mislead the public during the Class Period. Order 18. A lack of motive is not fatal to a claim, but where a plaintiff has not alleged a clear motive for the alleged misstatements or omissions, the strength of the circumstantial evidence of scienter must be correspondingly greater. *Neiman*, 854 F.3d at 748 (quoting *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 644 (5th Cir. 2005)).

The Court held that many of the factual allegations raised by MERS failed to support a strong inference of scienter. The Court specifically addressed MERS's second (Order 34-35), fourth and fifth (*Id.* at 23-25), sixth (*Id.* at 25), seventh (*Id.* at 28-33), ninth (*Id.* at 19-20), eleventh (*Id.* at 30), twelfth (*Id.* at 28-33), thirteenth (*Id.* at 28-33), and fourteenth (*Id.* at 30-31) factual allegations, holding that these factual allegations were insufficient to support a strong inference of scienter.[2]

In the briefing on its first motion to dismiss, MERS attempted to analogize the alleged securities fraud committed by Pier 1 to the securities fraud allegations against Ann Taylor in *Novak v. Kasaks*. 216 F.3d 300 (2d Cir. 2000). In *Novak*, the plaintiffs alleged that the defendants were knowingly holding out-of-fashion, obsolete inventory at Ann Taylor stores and purposefully lying about it to avoid a financial hit on Wall Street. *Id.* at 304. Internal company reports distributed weekly by Ann Taylor distinguished between regular inventory and "Box and Hold" inventory. *Id.* The internal reports demonstrated that (1) the "Box and Hold" inventory was several years old and thus unlikely to be sold at full price, if at all; and (2) the levels of "Box and Hold" inventory grew from about 10 percent to 34 percent of total inventory during the class period. *Id.* However, Ann Taylor's public financial statements did not distinguish between types of inventory, nor did defendants write off any of the "Box and Hold" inventory during the class period. *Id.* Instead, the defendants made a series of positive statements to the public about the status of the Ann Taylor's inventories, describing them during the class period as "under control," "in good shape," and "reasonable," and stating that "no major or unusual markdowns were anticipated." *Id.* The Second Circuit held that the plaintiffs did plead sufficient facts to give rise to a strong inference of the defendants' fraudulent intent. *Id.* at 311. "By refusing to markdown inventory they knew to be

---

[2] The Court refers to these factual allegations as numbered in the Amended Complaint.

'worthless,' 'obsolete,' and 'unsalable,' the defendants acted 'intentionally and deliberately' to artificially inflate Ann Taylor's reported financial results." *Id.*

In the Fitzwater Order, however, the Court noted that *Novak* is factually distinguishable from this case. Order 46. The Court stated,

> In *Novak* the plaintiffs alleged that the defendants "knowingly and intentionally issued financial statements that overstated Ann Taylor's financial condition by accounting for inventory they knew to be obsolete and nearly worthless at inflated values and by deliberately failing to adhere to the Company's publicly stated markdown policy." *Novak*, 216 F.3d at 3-4. In this case, there is no allegation that [D]efendants, or in fact anyone at Pier 1, knew that Pier 1's excess inventory was obsolete or that [D]efendants failed to adhere to any company policy.

*Id.* at 46 n.27. The Court ultimately held,

> MERS does not allege that the excess inventory that built up during the Class Period was seasonal or particularly susceptible to becoming obsolete (and thus subject to markdowns), much less that [D]efendants knew that Pier 1's excess inventory was of such a character. Defendants thus would have had no reason to predict a significant markdown risk since Pier 1 can manage its non-seasonal, non-obsolete inventory by adjusting future purchases. MERS has at most alleged that [D]efendants' belief that Pier 1 did not face a significant markdown risk, based on the perceived "healthy" mix of inventory (i.e., a mix of inventory that did not contain a material amount of obsolete merchandise that required clearance markdowns), ultimately turned out to be wrong. But predictions that do not come true or even that are negligent are insufficient to support a strong inference of securities fraud.

*Id.* at 33.

The Court also held that actions taken by Defendants during the Class Period seriously undercut a strong inference of scienter. First, the Court found that the fact that Defendants repeatedly disclosed throughout the Class Period Pier 1's increasing inventory, disappointing sales, and the risk of markdowns seriously weakens MERS's argument that Defendants acted with the requisite scienter. *Id.* at 21. The Court reasoned, "[I]t would have made little sense for [D]efendants to simultaneously disclose to, and attempt to mislead, the public about Pier 1's

inventory sales, and the risk of markdowns." *Id.* at 22. The Court concluded, "A much more reasonable explanation is that although [D]efendants likely realized that Pier 1's inventory was not tracking sales, they expected that Pier 1 would be able to sell down its excess inventory in future quarters without having to mark the inventory down at greater than normal levels." *Id.* Second, the Court found that the fact that Pier 1 continued to purchase inventory throughout the Class Period undercuts a strong inference of scienter. The Court reasoned, "[I]f [D]efendants had known that Pier 1's inventory was not 'clean,' or that there was a strong likelihood that its existing inventory would have to be marked down more than usual in order to sell it, they would have had no reason to exacerbate the problem by adding more inventory." *Id.* at 23. The Court concluded, "[T]he more plausible and compelling inference is that [D]efendants actually believed at the time the purchases were made that the inventory could be sold." *Id.*

In sum, the Court held that MERS alleged "fraud by hindsight." *Id.* at 33. The Fifth Circuit defines "fraud by hindsight" as a "case where a plaintiff alleges that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly" or "a case where there is no contemporaneous evidence at all that defendants knew earlier what they chose not to disclose until later." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 248-49 (5th Cir. 2009) (quoting *Miss. Pub. Emps.' Retirement Sys. V. Boston Sci. Corp.*, 523 F.3d 75, 91 (1st Cir. 2008)). The Court explained in the Fitzwater Order,

> At most, the [Previous Complaint] supports an inference that Smith and Turner were negligent in setting sales goals, managing inventory, and forecasting future sales. But 'negligence, oversight or simple mismanagement [do not] rise to the standard necessary to support a securities fraud action.' [*Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 433 (5th Cir. 2002)]. Here, there is little support for a plausible—much less strong—inference that [D]efendants knowingly or with reckless disregard misstated the character of Pier 1's inventory or the markdown risk.

Order 33.

### iii. Changes in the Amended Complaint

In order to cure the pleading deficiencies regarding scienter identified by the Court in the Fitzwater Order, MERS made several significant changes in the Amended Complaint. First, MERS makes new allegations regarding Defendants' motive. Second, MERS includes new factual allegations to support its allegations of scienter. Finally, MERS alleges that Pier 1's day-to-day products are highly susceptible to obsolescence and markdown risk, and thus subject to markdowns.

### 1. New Allegations of Motive

In the Amended Complaint, MERS alleges that Defendants were motivated to commit securities fraud in order to avoid negative consequences. *See* Pl.'s Resp. 43. Specifically, MERS alleges that Smith and Turner avoided taking markdowns because of a desire not to reduce the value of the inventory held by the Company, and because they had staked their careers on the success of 1 Pier 1. Am. Compl. ¶¶ 32, 62, 64-69, 96-97, 179(g); Pl.'s Resp. 43. According to MERS, "Where strong motivations to avoid a reckoning exist, there is no requirement that plaintiff also allege immediate, monetary benefits such as insider stock sales. A motive to avoid negative consequences is sufficient." Pl.'s Resp. 43.

In support of this argument, MERS relies heavily on two district court cases. In *Texlon*, the Northern District of Ohio found that a motive to avoid negative consequences is sufficient, reasoning, "[T]he Court cannot ignore the fact that [defendants] were in a very difficult position, facing unusual pressures to perform during the class period, and stood to benefit substantially from a performance record which matched the healthy ones [the CEO] continually projected to the public." *In re Texlon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1029 (N.D. Ohio 2000). In *Hall*,

the Eastern District of Texas rejected defendants' arguments that no fraudulent motive existed because there were no insider stock sales. *Hall v. Rent-A-Ctr., Inc.,* No. Civ. A. 4:16-CV-978, 2017 WL 6398742, at \*26, \*31 (E.D. Tex Oct. 19, 2017), *adopted by Hall v. Rent-A-Ctr.,* Inc., No. Civ. A. 4:16-CV-978, 2017 WL 6379334, at \*1 (E.D. Tex. Dec. 14, 2017). The court in *Hall* found that defendants' desire to avoid write-offs of existing investments into a business initiative—on which many other strategic initiatives depended—was sufficient for alleging motive to withhold negative information. *Id.*

The Court is unpersuaded by MERS's argument. In addition to relying on non-binding precedent, MERS mischaracterizes the cases it cites by omitting crucial facts. First, MERS omits the *Texlon* court's explanation that allegations of unusual pressure to perform may be sufficient "when considered in tandem with the substantial restatement of [defendants'] financial disclosures, and the alleged accounting manipulations that caused those substantial restatements." 133 F. Supp. 2d at 1029. Second, MERS fails to explain that in *Hall,* it was alleged that defendants sought to avoid a costly write off even though they were aware that the business initiative—which had been in development for more than five years and cost the company at least $175 million—was incapable of functioning despite assurances to the public that it was "fully operational." 2017 WL 6398742, at \*1, \*26, \*31. These omissions highlight two problems that MERS cannot overcome. First, Pier 1's inventories, costs, and sales were reported quarterly and have never been restated. Second, there are no particularized allegations to suggest Defendants were aware of, but chose to hide, facts fundamentally destructive to the value of Pier 1. Thus, the facts alleged do not support a finding of motive based on a desire to avoid negative consequences.

The Court concludes that MERS has not validly alleged that Defendants had a motive to deceive the investing public and commit securities fraud. MERS does not allege that Smith or

17

Turner purchased or sold any stock during the Class Period. Generalized financial incentives such as incentive-based compensation do not sufficiently support an inference of scienter. *See Abrams*, 292 F.3d at 434. Moreover, as discussed above, MERS does not sufficiently plead facts supporting a motive to avoid negative consequences.

### 2. New Factual Allegations of Scienter

In the Amended Complaint, MERS alleges,

> Numerous facts, considered individually and collectively, demonstrate that Pier 1 and Defendants Smith and Turner knew, or were severely reckless in not knowing, that: (i) [Smith and Turner's] claims that Pier 1's inventory was "clean" and not subject to immediate significant or substantial markdown risk were materially false and misleading because the Company had an "extremely high" amount of excess inventory that it was unable to timely clear without aggressive markdowns; and (ii) Pier 1 lacked the infrastructure, warehousing, and staff to properly store and process the inventory it had accumulated, which caused the Company to incur undisclosed costs.

Am. Compl. ¶ 177.

In support of this argument, MERS points to 14 different factual allegations. *Id.* ¶¶ 178-216. In summary, MERS alleges:

(1) Smith and Turner were personally aware of Pier 1's excess inventory.

(2) Smith and Turner had access to internal reporting that showed the Company's inventory levels to be excessive, and they paid close attention to the Company's inventory and sales at internal meetings.

(3) Executives reporting directly to Smith or Turner or working alongside them were personally involved with inventory allocation and planning, and fully informed by the Company's buyers and allocators of the misalignment between inventory and sales.

(4) The sharp contrast between Defendants' statements representing a "clean" inventory and the later, admitted scale of the Company's inventory problems raises a strong inference of scienter.

(5) The close temporal proximity of Defendants' statements and omissions to later disclosures raises a strong inference of scienter.

(6) Smith and Turner's sudden resignations raise a strong inference of scienter.

(7) Pier 1's inventory level was one of the Company's most important financial metrics, a subject of intense market scrutiny and concern, and a topic on which Smith and Turner made numerous public statements during the Class Period.

(8) Defendants were on notice of the importance of the accuracy of reported inventory and disclosures of markdown risk because Pier 1's public disclosures on inventory drew the attention of the SEC, which sent a letter to Defendants on February 19, 2013, requesting clarification on a range of issues from the Company's fiscal year 2012 Form 10-K, including the Company's inventory levels.

(9) Defendants were highly motivated by their compensation programs to withhold material information concerning markdown risk and to delay necessary markdowns.

(10)    Throughout the Class Period, Defendants engaged in a series of share repurchases and dividend increases to conceal the true state of affairs at Pier 1.

(11)    Smith and Turner were two of the longest-serving senior executives at the Company and were intimately involved in overseeing the Company's inventory level and supply chain expenses, raising a strong inference of scienter.

(12)    Not only did Smith and Turner personally preside over the implementation of the overhaul of Pier 1's inventory planning and allocation functions as well as its entire

distribution network, Smith repeatedly admitted prior to and throughout the Class Period that Pier 1 executives were personally knowledgeable of and frequently discussed the Company's inventory levels.

(13) Smith and Turner themselves represented on numerous occasions either on calls with analysts or in the Company's SEC filings, that at all times prior to and throughout the Class Period, they had ready access to detailed internal company data on inventory levels, sales, and how the two metrics were or were not correlated with one another.

(14) Special circumstances exist in this case and support an inference of fraud based on Smith and Turner's roles as CEO and CFO.

In the Fitzwater Order, the Court found 10 of the 14 allegations to be inadequate to support a strong inference of scienter. *See supra* III.B.ii. The majority of the factual allegations from the Previous Complaint are included again in the Amended Complaint with little to no modification. The first, ninth, and fourteenth factual allegations contain the most substantial changes from the Previous Complaint to the Amended Complaint.

The first allegation—that Smith and Turner were personally aware of the excessive inventory and markdown risk at Pier 1—is new to the Amended Complaint. MERS alleges that multiple facts show that the Smith and Turner were personally aware of Pier 1's excess inventory and markdown risk. Am. Compl. ¶ 178. MERS relies on claims from numerous confidential witnesses in support of this allegation. First, Pier 1's former Director of Distribution and Transportation during the Class Period alleges that Smith approached him in October 2014 to ask about ongoing efforts to process a 1,000-container backlog outside of the Baltimore distribution center. *Id.* The Director of Distribution and Transportation told Smith in reply that it would take at least six months before the inventory flow would return to normal. *Id.* Second, Pier 1's former

Supply Chain Manager during the Class Period claims that at least two dozen Capital Acquisition Requests, asking for more than $250,000 to deal with expenses arising from handling excess inventory, were delivered and returned with Smith and Turner's signatures on them during 2014 and 2015. *Id.* The Supply Chain Manager alleges that he himself wrote multiple million-dollar requests of this type, which were sent to and signed by Smith and Turner. *Id.* Third, a former Buyer for Pier 1 alleges that Pier 1 executives set ahead of time the amount of "markdown dollars" Pier 1 could take and then denied requests by employees to mark down additional products during the Class Period. *Id.*

MERS's allegations fail to support the inference that Smith and Turner were personally aware of Pier 1's excess inventory and markdown risk. Smith's inquiry regarding a 1,000-container backlog at the Baltimore distribution center does not support the inference that Smith was aware of a significant backlog of obsolete inventory across all six distribution centers and thousands of stores. Furthermore, MERS does not allege what products were in the containers or that Smith was told anything about the contents. It is a more plausible inference that Pier 1 would have made sure that products subject to obsolescence, such as holiday items or new products, were prioritized for unloading and that other products were left in the containers while the backlog was reduced. The allegations regarding the Capital Acquisition Requests also fail to support the inference that Smith and Turner were personally aware of Pier 1's excess inventory and markdown risk. During the Class Period, Pier 1 publicly disclosed that it was incurring costs and expenses associated with its growing distribution system. *See* Defs.' App. at 110, 728, 768-69. A more plausible explanation for Smith and Turner signing the Capital Acquisition Requests is that they believed it was necessary to increase storage capacity of existing warehouses and rent third party warehouses to support the increasing inventory due to higher sales and the 1 Pier 1 initiative, not

21

to stockpile obsolete inventory. The Court also finds that the allegations regarding the denials of markdown requests by Pier 1 executives constitute impermissible group pleading. The facts alleged in the Amended Complaint do not suggest that Smith and Turner were personally aware of excessive inventory and markdown risk.

The ninth allegation—that Defendants were motivated by their incentive-based compensation plan to defraud investors—was alleged in the Previous Complaint and has been recast in the Amended Complaint, but the underlying allegation remains the same. It is settled in the Fifth Circuit that "[i]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated." *Abrams*, 292 F.3d at 434. As the Fifth Circuit explains, "On a practical level, were the opposite true, the executives of virtually every corporation in the United States would be subject to fraud allegations." *Id.* Therefore, this allegation is inadequate to support the requisite scienter.

The fourteenth allegation—that special circumstances exist in this case and support an inference of fraud based on Smith's and Turner's roles as CEO and CFO—was not specifically alleged in the Previous Complaint but was addressed by the Fitzwater Order nonetheless. The Fifth Circuit has held that occasionally, special circumstances permit a plaintiff to plead scienter by pleading a defendant's position in the company. *Neiman*, 854 F.3d at 749. Special circumstances cases exhibit some combination of four considerations. *Diodes*, 810 F.3d at 959. First, the smaller the company the more likely that corporate executives would be familiar with the intricacies of day-to-day operations. *Id.* Second, the transaction at issue was critical to the company's continued vitality. *Id.* Third, the misrepresented or omitted information at issue would have been readily apparent to the speaker. *Id.* Fourth, the defendant's statements were internally consistent with one another. *Id.* In the Fitzwater Order, the Court found that special circumstances

were not present in this case because (1) Pier 1 has 24,000 employees, thousands of stores, six distribution centers, and a large online presence; (2) general allegations that the management of inventory was critical to Pier 1's success support only the inference that Smith and Turner would likely have been aware of Pier 1's inventory levels and sales figures; (3) based on the "healthy" mix of inventory, it would not have been readily apparent to Smith or Turner that there was significant markdown risk or that the existing inventory was not "clean"; and (4) MERS did not allege that Defendants' statements were internally inconsistent. Order 30-31. In the Amended Complaint, MERS now specifically alleges that special circumstances exist. MERS alleges that Defendants' statements were internally inconsistent with one another. Am. Compl. ¶ 216. For example, Smith said during the March 2014 town hall meeting that Pier 1 had become "victims of our own ambition" but later claimed that Pier 1 would be successful because it is ambitious. *Id.* MERS also alleges that "[t]he events at issue were critical to the [c]ompany's continued vitality" and "[t]he misrepresented and omitted information at issue was readily apparent to Smith and Turner." *Id.* Despite these new allegations, the Court holds that the special circumstances exception does not apply here. First, and most significantly, with 24,000 employees, Pier 1 is substantially larger than the companies in cases where the Fifth Circuit has found a special circumstance. *See, e.g., Nathenson*, 267 F.3d at 425 (32 to 35 employees); *Dorsey*, 540 F.3d at 342 (no employees). Second, the Court finds that MERS's new allegations are, for the most part, conclusory, and, without more, are insufficient to support a finding of special circumstances in this case.

### 3. Pier 1's Products Are Highly Susceptible to Obsolescence and Markdown Risk

To bolster its argument that Defendants Smith and Turner knew, or were severely reckless in not knowing, that claims that Pier 1's inventory was "clean" and not subject to immediate

significant or substantial markdown risk were false and misleading, MERS now alleges in the Amended Complaint that Pier 1 is a "trend-based fashion retailer" whose products are "highly susceptible to markdown risk." Am. Compl. ¶¶ 30-52. According to MERS, "Pier 1's business is based on fashion trends, changing consumer tastes, seasonality, and the need to constantly present new types and colors of products to consumers. These characteristics render Pier 1's products particularly susceptible to becoming obsolete." *Id.* ¶ 4. In support of this allegation, MERS points to Pier 1's 2013 and 2014 Forms 10-K filed with the SEC, in which Pier 1 stated:

> The success of the Company's specialty retail business depends largely upon its ability to predict trends in home furnishings consistently and to provide merchandise that satisfies consumer demand in a timely matter. Consumer preferences often change and may not be reasonably predicted. . . . As a result, the Company may be vulnerable to evolving home furnishing trends, changes in customer preferences and pricing shifts. . . .

*Id.* ¶ 43. MERS also points to numerous other statements by Pier 1 and Smith in SEC filings, earnings calls, its website, and presentations referencing Pier 1's "constantly changing merchandise assortment," "unique, special and trend-right products," "frequently changing displays and inventory," and new arrivals. *Id.* ¶¶ 44-49. MERS also relies on ads on Pier 1's website from the summer of 2015 announcing "everything on sale" and markdowns of "up to 50% off everything."[3]

---

[3] At MERS's request and over the objection of Defendants, the Court is taking judicial notice of the advertisements from Pier 1's website showing specific markdowns in mid-2015 because the website is a source whose accuracy cannot be (and has not been) reasonably questioned by Defendants. A court may "judicially notice a fact that is not subject to reasonable dispute," FED. R. EVID. 201(b), and "must" judicially notice such a fact "if a party requests it." FED. R. EVID. 201(c)(2). Under the Federal Rules of Evidence, "[t]he court may take judicial notice at any stage of the proceeding." FED. R. EVID. 201(d). Judicial notice of publicly available documents is appropriate for ruling on a motion to dismiss. *See Funk*, 631 F.3d at 783; *see also Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 454, 457 (5th Cir. 2005) (taking judicial notice of a website on a motion to dismiss an appeal because the website was "capable of accurate and ready determination by resort to a source whose accuracy on the matter cannot reasonably be questioned.").

24

The Court believes these new allegations recasting Pier 1 as a fashion-based retailer whose products are susceptible to significant markdown risk and obsolescence are an attempt by MERS to more closely analogize Pier 1 to Ann Taylor in response to the Court's discussion of *Novak* in the Fitzwater Order. However, the Court declines to apply *Novak* to this case. The Second Circuit has adopted a different approach to the standard for pleading scienter in a securities fraud action governed by the PSLRA. The Second Circuit has concluded that the PSLRA adopted the standard for scienter espoused by the Second Circuit prior to the passage of the PSLRA. *Novak*, 216 F.3d at 310-11. Hence, it held that "plaintiffs may continue to state a claim by pleading either motive or opportunity or strong circumstantial evidence or recklessness or conscious misbehavior." *Id.* In contrast, the Fifth Circuit has explicitly held that "allegations of motive and opportunity standing alone will not suffice." *Shaw Grp., Inc.*, 537 F.3d at 533.

Moreover, *Novak* is distinguishable. Unlike *Novak*, there is no allegation that Smith and Turner were notified of a specifically identified cache of obsolete inventory, nor is there any allegation that they acknowledged that fact but refused to disclose it because it would "kill" the Company or "damage it on Wall Street." 216 F.3d at 304. MERS claims, "Thousands of shipping containers full of unallocated product sat in distribution center parking lots for months, representing a ticking time bomb of aging inventory and markdown risk," but MERS has not made any particularized allegations of what was sitting in any of the containers and whether it was at significant immediate risk for markdown. Pl.'s Resp. 1. In addition, even if Pier 1 had backlogged inventory that it knew to be obsolete, there are no allegations that Pier 1 had not already accounted for that by reducing the value of that inventory on its books. There is no basis to conclude that Pier 1 knew it had troubled or obsolete inventory materially above normal levels or that Pier 1 did not account for it in its financial numbers.

Finally, the allegations that Pier 1 is a fashion-based retailer whose products are susceptible to significant markdown risk and obsolescence fail to demonstrate that Defendants knowingly, or with reckless disregard, misstated the character of Pier 1's inventory or the markdown risk. Labeling Pier 1 as a "trend-based fashion retailer" is a conclusory allegation and an unwarranted deduction of fact. The full context of the very statements that MERS relies on in support of its argument makes clear that Pier 1 publicly disclosed that (1) trend-based merchandise makes up a significant percentage of its inventory, (2) approximately half of its inventory is comprised of long-standing collections, and (3) it regularly takes markdowns of its products in the ordinary course of business.[4] For example, on the April 8, 2015 earnings call cited by MERS in which Smith referenced Pier 1's "unique, special, and trend-right products," Coffey also said, "Approximately half of our inventory is comprised of new and seasonal [stock keeping units], including outdoor, while the remaining 50% is comprised of long-standing collections of our products that do well for us day in and day out." Defs.' Br. 26. Isolating Pier 1's references to "trend" does not support the conclusion that most or all of Pier 1's products are trend-based and therefore inherently susceptible to markdown risk. It is undisputed that a substantial part of Pier 1's business focuses on trends. Pier 1 also consistently told the public during the Class Period that marking down products was a regular part of its business model. *See* Defs.' App. 684 [Q3 FY14 Earnings Call (Dec. 19, 2013), at 9] ("[I]f you recall, our business model has been running for the last three, four years at about 50% regular price and 50% either clearance or promotional activity."). It is far too great of a leap to infer from the facts alleged that everything Pier 1 does not sell quickly is

---

[4] In securities cases, the Court may consider "public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiff either possessed or knew about and upon which they relied in bringing the suit, without, pursuant to Rule 12(b), converting the motion into one for summary judgment." *Fin. Acquisition Partners LP*, 440 F.3d at 286 (internal citations and quotations omitted).

inherently subject to obsolescence and markdown risk, and that therefore Defendants should have known their statements regarding the inventory levels and markdown risk were false and misleading.

### C. The Amended Complaint Does Not Support a Strong Inference of Scienter

The Court finds that MERS has not alleged facts supporting a strong inference that Defendants acted with the requisite scienter in making the alleged misstatements and omissions. As an overarching problem, MERS does not plead a clear motive for Defendants' fraud. While a lack of motive is not fatal, the strength of MERS's circumstantial evidence must be correspondingly greater. *R2 Invs. LDC*, 401 F.3d at 644. In this case, the Court concludes that the circumstantial evidence is not correspondingly greater. All of the facts alleged by MERS in the Amended Complaint, taken collectively, simply fail to give rise to a strong inference of scienter. *Tellabs*, 551 U.S. at 323.

The Court finds that numerous actions taken by Defendants during the Class Period seriously undercut a strong inference of scienter. First, Pier 1 repeatedly disclosed its inventory growth, increased costs and expenses, and disappointing sales to investors and analysts. Pier 1 also disclosed the risks of markdowns if predictions of sales turned out to be wrong. Significantly, Pier 1 went to the market before its required quarterly reporting in the February 10, 2015 8-K to announce that sales fell below expectations and that the Company was experiencing cost increases in its distribution centers. *See* Defs.' App. 175 [8-K (Feb. 10, 2015), at Ex. 99.1]. The fact that Pier 1 continuously disclosed its challenging financial position belies a claim of scienter. *See Neiman*, 854 F.3d at 750. Second, throughout the Class Period, Pier 1 continued to purchase new inventory. MERS claims that Pier 1 had to continue to buy products because "[h]alting the purchase of new inventory at the time would have seriously disrupted its business and also signaled

to the market that the [c]ompany's strategies were a failure." Am. Compl. ¶ 52. The Court finds this argument to be a stretch. The more plausible inference than Defendants knowingly accumulating obsolete inventory—and exacerbating the problem by buying more—is that they believed the inventory would be sold without having to mark down the inventory down at greater than normal levels. Pier 1's continued purchases of inventory undercut a strong inference of scienter.

During the Class Period, Pier 1 suffered from growing inventory, disappointing sales, and increasing costs and expenses—ultimately resulting in its stock price plummeting from $16.97 per share to $4.75 per share and the departure of its CEO and CFO. MERS alleges that Pier 1, Smith, and Turner committed securities fraud, with severe recklessness, by falsely and misleadingly misrepresenting to investors the true state of affairs at Pier 1. The Court disagrees. A more plausible explanation is that after several years of disappointing sales and huge losses, Pier 1 was encouraged by a new CEO and an improving financial situation. As a result, Pier 1 embarked on what turned out to be an ambitious online initiative. The Company expanded its inventory and increased its spending to store, handle, and transport the growing inventory, plausibly believing at the time that Pier 1 had a healthy mix of inventory to support the anticipated increase in sales. In reality, Pier 1 apparently failed to forecast adequately revenue and expenses. Sales targets may have been too aggressive; the transition to online seemingly was not well executed; unplanned supply chain expenses added up; and inventory levels got "out of whack." Am. Compl. ¶ 140. Arguably, this may be a case of poor business judgment on the part of Pier 1, Smith, and Turner. However, the Court finds that MERS has failed to allege sufficiently that Defendants committed securities fraud when they—with severe recklessness—falsely and misleadingly misrepresented to investors the true state of affairs at Pier 1.

Accordingly, the Court grants Defendants' motion to dismiss MERS's Section 10(b) and Rule 10b-5 claims. Because MERS has failed to plausibly plead a primary violation under Section 10(b) of the Exchange Act and Rule 10b-5, the Court also dismisses MERS's Section 20(a) claim against Smith and Turner.

## IV. CONCLUSION

The Motion to Dismiss [ECF No. 93] is granted. The Amended Complaint contains more specific and detailed allegations about the alleged violations of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5; however, those allegations are insufficient to establish a cogent and compelling inference of scienter. The Amended Complaint does not meet the rigorous pleading requirements of the PSLRA. Because MERS has amended twice already, and further amendment would be futile, MERS's claims are dismissed with prejudice and without leave to amend.

**SO ORDERED.**

SIGNED June **25**, 2018.

**KAREN GREN SCHOLER**
**UNITED STATES DISTRICT JUDGE**